**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
 ------------------------------------------------------------------------------------ X

Towaki Komatsu,

                Plaintiff,                                        <u>**Complaint**</u>

      -vs-                                                 **JURY DEMAND**

Urban Pathways, Inc., Daniels Norelli Cecere & Tavel PC,
Neighborhood Association for Inter-Cultural Affairs, Inc., the City of
New York, Ronald Abad, Steven Banks, Barbara Beirne, Kristen
Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin
Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison
Heilbraun, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks,
Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea
Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann
Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg,
Eric Tavel.

- All of the defendants listed above who are people are being sued in
  their individual and official capacities,

- All of the defendants listed below are being sued in their official
  capacities,

Nancy Bannon (in her capacity as a New York State Supreme Court
Judge), Anthony Cannataro (in his capacity as the Acting Chief Judge
of the State of New York), Lyle Frank (in his capacity as a New York
State Supreme Court Judge), Shorab Ibrahim (in his capacity as a New
York City Housing Court judge assigned to the Bronx Housing Court),
Gary Jenkins (in his capacity as the Commissioner of the New York
City Department of Social Services), Lawrence Marks (in his capacity
as the Chief Administrative Judge of the Unified Court System), Maura
Noll (in her capacity as an administrative law judge who is assigned to
the New York State Office of Temporary and Disability Assistance),
Daniel Tietz (in his capacity as the Commissioner of the New York
State Office of Temporary and Disability Assistance).

                              Defendants.

 ------------------------------------------------------------------------------------ X

## Preliminary Remarks

1.      What follows serves as a table of contents for this complaint's sections:

|  | **Section** | **Page** |
|---|---|---|
| a. | Preliminary Remarks | 2 |
| b. | Jurisdiction and Venue | 10 |
| c. | Parties | 11 |
| d. | Legal Standards | 19 |
| e. | Statement of Facts | 75 |
| i. | Urban's 3 Frivolous Lawsuits Against Me as Continuing Violations and Related Fraudulent Claims by Urban's Personnel in Which They Lied by Claiming that I Have Owed Urban Rent for My Urban Apartment | 75 |
| ii. | Legal Malpractice by NAICA and Other Misconduct in Urban3 | 79 |
| iii. | Ongoing Obstruction of Justice by HRA Pertaining to Urban3 as Well as About Related Matters as Continuing Violations Through Violations of Promissory Estoppel Partly with Respect to My Right to Counsel | 88 |
| iv. | Ongoing Obstruction of Justice by HRA Pertaining to Urban3 as Well as About Related Matters as Continuing Violations Through Violations of My Rights to Receive Discovery Material | 108 |
| v. | Fraud on the Courts About My Urban Lease by Jeffrey Mosczyc and Marin Gerber of HRA in My HRA Lawsuit and My OTDA Litigation that the Judges and OTDA Personnel Tied to that Litigation Condoned | 128 |
| vi. | How the B&S Occurred, What the Repercussions from that Have Been as Snowball Effects, Other Negligence by Urban in My Building, and the Inexcusable Failure by Government Personnel to Intervene on My Behalf Against Urban | 148 |
| vii. | Why Offsetting Penalties and My Fourteenth Amendment Rights Confirm that the City of New York and People Who Have Worked for it Have No Enforceable Privacy Rights Insofar as that Relates to Me | 177 |
| viii. | Indications of sufficient entwinement between HRA and Urban that have caused Urban to be an alter-ego, proxy, and agent of HRA while being a private entity whose acts are attributable to HRA | 181 |

ix.   Miscellaneous ................................................................................. 193

f.   Causes of Action ............................................................................... 202

g.   Demand for a Jury Trial .................................................................... 217

h.   Prayer for Relief ............................................................................... 217

2.   I am a pro se litigant and am commencing this action in response to illegal acts and omissions that violated and are continuing to violate my rights as continuing violations partly with respect to the following:

a.   The First, Fifth, and Fourteenth Amendments of the U.S. Constitution as well as the Contracts Clause and Supremacy Clause of the U.S. Constitution.

b.   Civil RICO as a result of multiple instances of mail and wire fraud.

c.   The Fair Debt Collection Practices Act.

d.   Forgery in relation to an apartment lease agreement to cause an illegal bait-and-switch scheme to occur.

e.   Fraudulent reassignment without prior notice and consent of an application to receive a government rental subsidy.

f.   Violations of promissory estoppel in a variety of ways by personnel of HRA that is subjecting me to ongoing obstruction of justice and discrimination by HRA.

3.   The following applies throughout this complaint in the interests of brevity:

a.   I'm using descriptive bookmarks in the PDF file for this complaint that enable those who have access to that PDF file to be able to easily navigate between the sections that comprise this complaint and the annexed exhibits. Also, I have added markings to the lower-right corner of the annexed exhibits for cross-referencing purposes. Such markings consist of "A1", "A2", "A3"; "B1", "B2", "B3"; and "C1", "C2", and "C3", etc. Cross-references to such exhibits appear in this complaint in parentheses as "(*see* A1)", "(*see* A10)", "(*see* B4)", and "(*see* C7)".

b.      I will refer to acronyms that are shown in the next table's second column to refer

to the entities and other things to which they correspond that are shown in the third column.

| # | Abbreviation | Corresponds To |
|---|---|---|
| 1 | The 185-page PDF file | The 185-page PDF file that I received on 2/1/21 from Andrew Spears of the Law Department as discovery material in K6. |
| 2 | The 374-page PDF file | The 374-page PDF file that I filed under seal on 9/25/19 in K6 in accordance with instructions by Judge Schofield. I received that file from the Mayor's office on 2/15/19 at 4:45 pm in an e-mail message in response to a FOIL demand that I submitted to it on 7/21/17. The Mayor's office assigned the FOIL identification code of FOIL-2017-002-00687 to that FOIL demand. |
| 3 | The 4/7/17 affirmation | The affirmation that was included in the legal filing that Jeffrey Mosczyc of HRA filed in my HRA lawsuit on 4/7/17. |
| 4 | The Appellate Division | The New York State Supreme Court's Appellate Division's First Department |
| 5 | The B&S | The illegal bait-and-switch fraud and forgery that personnel of HRA and Urban subjected me to that **a)** concerns my Urban lease, **b)** proximately caused me to be coerced by Urban's personnel on or about 3/7/16 to accept assignment to my Urban apartment with a roommate instead of Urban having fully complied with my Urban lease by issuing sole possession of apartment 4C that is located in my building shortly after 2/16/16 in a fully-furnished condition and with no roommate. |
| 6 | BHC | The Bronx Housing Court |
| 7 | Bronx DA | The Bronx District Attorney's Office |
| 8 | The CAU | The Community Affairs Unit of the Mayor's Office |
| 9 | CSOs | Federal court security officers |
| 10 | City Council | New York City Council |
| 11 | City Hall | New York City Hall |
| 12 | Cubesmart | A storage unit company named Cubesmart that is located in Queens and from which I rented a storage unit while I resided in my Urban apartment. |
| 13 | Defendant City | Defendant City of New York |
| 14 | DHS | New York City Department of Homeless Services |
| 15 | DNCT | A law firm that is named Daniels Norelli Cecere & Tavel PC |
| 16 | DOI | New York City Department of Investigation |
| 17 | DSS | New York City Department of Social Services |
| 18 | FDCPA | The Fair Debt Collection Practices Act |
| 19 | FDNY | The New York City Fire Department |
| 20 | FOIL | Freedom of Information Law |
| 21 | FRAP | Federal Rule of Appellate Procedure |
| 22 | FRCP | Federal Rule of Civil Procedure |
| 23 | HPD | The New York City Department of Housing, Preservation & Development |

| 24 | HRA | New York City Human Resources Administration |
|----|-----|-----|
| 25 | HUD | The U.S. Department of Housing and Urban Development |
| 26 | Judge Bannon | New York State Supreme Court Judge Nancy Bannon |
| 27 | Judge Cannataro | Acting Chief Judge Anthony Cannataro of the State of New York |
| 28 | Judge Frank | New York State Supreme Court Judge Lyle Frank |
| 29 | Judge Gorenstein | U.S. Magistrate Judge Gabriel Gorenstein |
| 30 | Judge Ibrahim | BHC Judge Shorab Ibrahim |
| 31 | Judge Marks | Chief Administrative Judge Lawrence Marks of the UCS |
| 32 | Judge Ostrager | New York State Supreme Court Judge Barry Ostrager |
| 33 | Judge Schofield | U.S. District Judge Lorna Schofield |
| 34 | Judge Stanton | U.S. District Judge Louis Stanton |
| 35 | Judge Tisch | New York State Supreme Court Judge Alexander Tisch |
| 36 | Judge Weissman | Former BHC Judge Steven Weissman |
| 37 | Law Department | The New York City Law Department |
| 38 | MFJ | Mobilization for Justice. Inc. |
| 39 | The Mayor | New York City Mayor Eric Adams |
| 40 | Mr. Banks | Former HRA Commissioner Steven Banks |
| 41 | Mr. Sullivan | Ronald Sullivan, who was my former roommate in my Urban apartment and viciously assaulted me in it on 7/2/16. |
| 42 | My building | The building that is located at 802 Fairmount Place in the Bronx in which I reside. |
| 43 | My BS Urban lease | The forgery that personnel of Urban issued to me on or about 3/7/16 that I never signed nor otherwise agreed to and illegally contains a forged copy of my signature that is from my Urban lease. |
| 44 | My HRA contract | The binding and fully-enforceable agreement dated 8/1/17 that Defendant Scalia e-mailed to me on 8/1/17 that **a)** I received at 5:58 pm on that date and **b)** didn't include any caveat, qualifying remark, or disclaimer. |
| 45 | My Urban apartment | The apartment of 4B in my building. |
| 46 | My Urban lease | The binding and fully-enforceable apartment lease agreement that I signed in the presence of witnesses on 2/16/16 with Urban's Lisa Lombardi in HRA's offices located at 33 Beaver Street in Manhattan to be issued sole possession of apartment 4C located in the building in which I reside shortly thereafter in a fully-furnished condition with no roommate. That lease contains handwritten information on its first page. |
| 47 | NAICA | Neighborhood Association for Inter-Cultural Affairs, Inc. |
| 48 | NMIC | A legal services organization named Northern Manhattan Improvement Corporation, Inc. that HRA funds |
| 49 | NYAG | New York State Attorney General's Office |
| 50 | NYCLU | The New York Civil Liberties Union |
| 51 | NYLPI | A legal services organization named New York Lawyers for the Public Interest that HRA funds. |

| 52 | OASYS | The New York State Office of Addiction Services and Supports |
| 53 | OATH | The New York City Office of Administrative Trials and Hearings |
| 54 | OCA | The New York State Office of Court Administration |
| 55 | OSC | Order to show cause application |
| 56 | OTDA | The New York State Office of Temporary and Disability Assistance |
| 57 | SCOTUS | The U.S. Supreme Court |
| 58 | Second Circuit | The U.S. Court of Appeals for the Second Circuit |
| 59 | SUS | Services for the Underserved, Inc. |
| 60 | UCS | The New York State Unified Court System |
| 61 | Urban | Urban Pathways, Inc. |
| 62 | USMS | U.S. Marshals Service |

4.      All references that I make to HRA in this complaint interchangeably refer to DSS and

DHS in the interests of brevity.  Urban has a contract with HRA that enables Urban to be the

slumlord of my building. That contract is available at

https://drive.google.com/file/d/1tHgK2UIoUfYaf1lmW9a7m7dgrP5G9ER2/view?usp=sharing.

HRA has extended that contract and its terms enable Defendant City to replace Urban as the

slumlord of my building prior to the expiration of that contract for reasons that include violations

of applicable law and/or contractual terms by Urban. Moreover, information in that contract

suggest that HRA micromanages how Urban operates to a large degree as the slumlord of my

building that causes HRA to be sufficiently entwined with Urban in regards to how Urban

operates as the slumlord of my building to cause Urban to essentially function as an alter-ego of

HRA, agent, proxy, and marionette. This means that illegal acts and omissions that have been

and are continuing to be committed against me by Urban and its personnel are attributable to

HRA and its current and former personnel and that Urban has been and remains a private entity

while being a state actor in this regard.

5.      Information that is available on OASYS' web site at

https://oasas.ny.gov/recovery/connect-permanent-supportive-housing that corresponds to a report

that is entitled "Connect with Permanent Supportive Housing" that I accessed on 7/29/22

contains the following information that together with information in Urban's contract with HRA

for my building strongly suggests that OTDA has been and remains among the government

agencies that are responsible for providing proper oversight of how Urban operates as the

slumlord of my building because it's a publicly-funded scatter-site shelter:

> "The New York State Office of Temporary and Disability Assistance (OTDA) is the
> primary agency for overseeing homeless housing and services programs and
> providing assistance/support to eligible families and individuals."

6.      Also, I will refer to additional acronyms shown in the second column of the following

table throughout this complaint to refer to relevant litigation involving me in which I have been a

party or witness:

| # | Acronym | Litigation |
|---|---------|-----------|
| 1 | K1 | My petition for a writ of certiorari to SCOTUS about K3. |
| 2 | K2 | *Komatsu v. City of New York*, No. 20-cv-6510 (LLS)(S.D.N.Y. Oct. 22, 2020) |
| 3 | K3 | *Komatsu v. City of New York*, No. 20-3676 (2d Cir. Jan. 31, 2022) |
| 4 | K4 | *Komatsu v. City of New York*, No. 21-cv-11115 (LTS)(S.D.N.Y.) |
| 5 | K5 | *Komatsu v. City of New York*, No. 22-2025 (2d Cir.) |
| 6 | K6 | *Komatsu v. City of New York*, No. 18-cv-3698 (LGS)(GWG)(S.D.N.Y. Sep. 27, 2021) |
| 7 | K7 | The 5/11/21 decision by the Appellate Division in *Komatsu v. New York City Human Resources Administration*, 2021 N.Y. Slip Op 65928 (App. Div. 2021) |
| 8 | K8 | The 6/1/21 decision by the Appellate Division in *Komatsu v. New York City Human Resources Administration*, 195 A.D.3d 417, 144 N.Y.S.3d 574 (App. Div. 2021) |
| 9 | K9 | The 10/5/21 decision by the Appellate Division in *Komatsu v. New York City Human Resources Admin.*, 2021 N.Y. Slip Op 72645 (App. Div. 2021) |
| 10 | My HRA lawsuit | *Komatsu v. New York City Human Resources Administration*, No. 100054/2017 (Sup. Ct., NY Cty. Feb. 26, 2020) |
| 11 | My OTDA litigation | All litigation that I commenced against HRA that has been assigned to OTDA in its capacity as a New York State administrative appellate forum for claims asserted against HRA |
| 12 | Sullivan1 | *People v. Sullivan*, No. 2016BX042188 (Bronx Crim. Ct. Feb. 24, 2017) |
| 13 | Urban1 | *Urban Pathways, Inc. v. Komatsu*, No. LT-5572-19/BX (Civ. Ct., Bronx Cty., Nov. 25, 2019) |

| 14 | Urban2 | _Urban Pathways, Inc. v. Komatsu_, No. LT-8402-20/BX (Civ. Ct., Bronx Cty.) |
| 15 | Urban3 | _Urban Pathways, Inc. v. Komatsu_, No. LT-304821-22/BX (Civ. Ct., Bronx Cty.) |

7.      On 10/17/22, though SCOTUS denied a motion in K1 that I submitted to it for authorization to file my petition for a writ of certiorari about K3 out of time, that is all that it did then and the information in this complaint overwhelmingly confirms that it erred by doing so. SCOTUS certainly didn't consider the entirety of the information in this complaint when it issued that denial. Res judicata therefore doesn't apply. There is absolutely nothing whatsoever to suggest that SCOTUS fully and fairly considered that motion either. SCOTUS receives many petitions for writs of certiorari and it can't possibly grant them all. Decisions that it makes as to whether to grant such petitions are entirely discretionary. This means that there is absolutely nothing about SCOTUS' 10/17/22 denial of my motion in K1 to file my petition for a writ of certiorari about K3 to read into.

8.      I'm currently being illegally coerced to contend with Urban3 while not being accorded my First and Fourteenth Amendment right to be represented in Urban3 by a competent attorney on a pro-bono basis. In fact, I never was represented by a competent attorney in Urban3. Urban3 was commenced as an E-file case and Urban2 was converted to an E-file case. Urban1 was commenced as a paper case without being converted before that total sham was dismissed on 11/25/19. The next table contains information about legal filings that were filed in Urban2 and Urban3.

| # | Date Filed | Lawsuit | Description | Link |
|---|---|---|---|---|
| 1 | 2/18/22 | Urban2 | Case Summary | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=6tLJwAfCEJY4RHCXoCL8_PLUS_Q== |
| 2 | 2/25/22 | Urban3 | Holdover Petition | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=/S6A0K9IxIQ |

| # | Date | | Description | Link |
|---|------|---|-------------|------|
| | | | | E5Zjb1_PLUS_G5eA== |
| 3 | 2/25/22 | Urban3 | Notice of Holdover Petition | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=oPt7H8sOmqTsHgcBi2EdOg== |
| 4 | 3/13/22 | Urban3 | Affidavit of Service by Anthony Gonzalez on 3/8/22 | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=QFS_PLUS_2KxmbYgHOq3jNLSBWA== |
| 5 | 7/7/22 | Urban3 | Mr. Manjarrez's 7/7/22 OSC to withdraw as my attorney in Urban3 | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=q5oaEOyWL62TsJCAPV1i6g== |
| 6 | 7/29/22 | Urban3 | Judge Ibrahim's 7/29/22 order granting Mr. Manjarrez's 7/7/22 OSC to withdraw as my attorney in Urban3 | https://iapps.courts.state.ny.us/fbem/DocumentDisplayServlet?documentId=9OtRUPIJJIYU2j/93pHUSw==&system=prod |
| 7 | 9/30/22 | Urban3 | My 9/30/22 OSC | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=CsMqCCCpfW7EXQbHW17yvQ== |
| 8 | 9/3022 | Urban3 | Judge Ibrahim's 9/30/22 order denying my 9/30/22 OSC | https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=p8e1ZzH18m1Ha3PaG38UDg== |

9.     On 3/21/22, I exercised my First and Fourteenth Amendment right to record an audio recording at 10:42 am of most of the court hearing that was conducted in Urban3 while I was inside of a courtroom at the BHC. That audio recording is available at

https://drive.google.com/file/d/1AXGn9ATi4uqbJnp8hARMRBkZymEBRLPc/view?usp=sharing. The BHC didn't record an audio transcript of that hearing.

10.     On 10/11/22, I received audio transcripts that were recorded by BHC personnel of court hearings that were conducted in Urban3. I received those recordings in response to a request that I submitted to the BHC for them. The next table contains information about those recordings that includes links to them on the Internet.

| # | Hearing Date | Judge | Link |
|---|--------------|-------|------|
| 1 | 4/25/22 | Miriam Breier | https://drive.google.com/file/d/1jRMJzfkcAmTfr4WbkMPtTt-xMYgAp89Q/view?usp=sharing |

| 2 | 6/16/22 | Shorab Ibrahim | https://drive.google.com/file/d/1X5rF14ODwD4YoUea2b_0DXuGnyHDR4d6/view?usp=sharing |
| 3 | 7/29/22 | Shorab Ibrahim | https://drive.google.com/file/d/1PhkXoSj0qPHLBd5eynrM17nOBbPEkrGF/view?usp=sharing |
| 4 | 9/8/22 | Shorab Ibrahim | https://drive.google.com/file/d/1mj348rGMq8Mzgs_QjU1Egsp1yzbRdyLw/view?usp=sharing |

11.     On 4/11/17, OTDA recorded an audio recording of the fair hearing that it conducted between HRA and I by telephone for fair hearing number 7406570N. OTDA thereafter provided me that audio recording that is available at

https://drive.google.com/file/d/1xxKzabXgHnmp32kfYnFY90RjRLqH3BKM/view?usp=sharing

.

12.     Something major that my claims in this case have in common is that the opposing parties and their attorneys in **a)** Urban3, Urban2, and Urban1; **b)** my HRA lawsuit; and **c)** my OTDA litigation all have committed fraud on the courts and against me in much the same way by fraudulently claiming that my BS Urban lease is a lease and the one that I signed on 2/16/16 with Lisa Lombardi of Urban instead of the forgery that has always been that I never signed and never otherwise agreed to.

## Jurisdiction and Venue

1.     I incorporate my remarks in the preceding "Preliminary Remarks" section by reference as though fully set forth herein for the purpose of stating how and why this Court has jurisdiction over matters that are the subject of this action.

2.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §1331.

3.     Venue is proper pursuant to 28 U.S.C. §1391(b) because I am a resident of Bronx County in the State of New York.

4.      An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. §1988.

5.      Upon information and belief and consistent with the requirements of New York General Municipal Law §50-e, I filed timely notices of claim with the New York City Comptroller within 90 days of the accrual of my claims under New York law. In the event that I may be mistaken about this, Defendant City has had timely actual and/or constructive knowledge of the matters that this action concerns as a result of valid complaints that I reported to personnel of HRA, Urban, members of the City Council, SUS, OTDA, DOI, and others. This Court therefore has supplemental jurisdiction over my claims under New York law because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a).

6.      My claims have not been adjusted by the New York City Comptroller's Office.

### Parties

1.      I am a resident of Bronx County in the State of New York and a U.S. Navy veteran.

2.      Defendant City is a municipal corporation duly incorporated and authorized under the laws of the State of New York pursuant to §431 of its Charter.

3.      At all times relevant herein, the following defendants worked for HRA and were employees of Defendant City:

> Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Allison Gill-Lambert, Marin Gerber, Gary Jenkins, Jeffrey Mosczyc, Molly Park, Ann Marie Scalia

4.      Gary Jenkins is HRA's Commissioner.

5.      Mr. Banks is an attorney who was HRA's commissioner at all times relevant herein until 2022. Martha Calhoun has been HRA's General Counsel at all times relevant herein. Allison Gill-Lambert, Marin Gerber, Jeffrey Mosczyc, Molly Park, and Ann Marie Scalia are all attorneys as well. Between 2016 and some point thereafter, Ms. Scalia worked for HRA as a

Senior Deputy General Counsel who was in charge of its matters pertaining to OTDA fair hearings for HRA before Allison Gill-Lambert took over that role at some point. Jeffrey Mosczyc represented HRA in my HRA lawsuit for the article 78 component of that multifaceted and complex hybrid case. Marin Gerber represented HRA on 4/11/17 during the fair hearing that OTDA conducted between HRA and I for OTDA fair hearing number 7406570N that concerned a storage unit reimbursement matter. Molly Park is someone who I have talked with inside of City Hall and otherwise on its grounds on different dates who condoned the fact that HRA illegally violated its legal duty to provide me discovery material prior to OTDA fair hearings between HRA and I that I directed HRA's personnel to provide to me prior to them.

6.      Barbara Beirne worked for HRA as its Deputy Chief Agency Contracting Officer in 2016.

7.      Joni Kletter is an attorney who worked for OATH as its commissioner and an administrative law judge in 2021, according to her LinkedIn profile that is available at https://www.linkedin.com/in/joni-kletter-31b4a71b/. She also previously worked for Bill de Blasio as the treasurer for an election campaign of his before I recorded a video of her and Pinny Ringel on 11/16/21 during a public resource fair meeting in Brooklyn while both of them illegally violated my First and Fourteenth Amendment rights by interfering with my rights to have a conversation with Mr. Banks partly about my efforts to be provided pro-bono legal representation for use partly against Urban that I previously talked with Mr. Banks about during such public meetings while I was pursuing litigation against HRA.

8.      Pinny Ringel worked for the CAU on 11/16/21 during a public resource fair meeting in Brooklyn while he illegally violated my First and Fourteenth Amendment rights by interfering with my rights to have a conversation with Mr. Banks that I just discussed as a continuing

violation that related back to and amplified earlier and similar illegal acts that he and other City and State of New York personnel committed against me that dates back to April of 2017 while I attempted to lawfully attend public meetings that were public forums partly to talk with Mr. Banks and others. Mr. Ringel was a defendant in K6 and the closely-related consolidated case of _Komatsu v. City of New York_, No. 20-cv-7046 (ER)(GWG)(S.D.N.Y.) that are both now being pursued in appellate forums that include SCOTUS in the wake of my having submitted my petition for a writ of certiorari to SCOTUS about K6.

9.      Urban is a private entity, business partner of HRA, the landlord of my building, and the Petitioner in Urban3. At all relevant times herein, Urban has been an agent of the Defendant City and HRA. Urban maintains an office at the following address:

> 575 Eighth Avenue
> New York, NY  10018

10.      The following defendants at all times relevant herein worked for Urban as its employees or in some other capacity, such as contractors or consultants:

> Ronald Abad, Sharon Coates, Gary Cohen, Lisa Lombardi, Andrew Nastachowski, Kishea Paulemont, Ariana Saunders, Frederick Shack, Nancy Southwell

11.      At all times relevant herein, the following was true about those I just identified:

> a.      Mr. Abad worked for Urban as its Chief Operating Officer.
>
> b.      Ms. Coates worked for Urban as a Program Director.
>
> c.      Mr. Cohen worked as the Director of Operations for Urban in my building.
>
> d.      Lisa Lombardi worked for Urban as a Deputy Executive Director.
>
> e.      Kishea Paulemont worked for Urban as a Program Director.
>
> f.      Frederick Shack has been Urban's CEO.
>
> g.      Ms. Southwell worked for Urban as a Deputy Executive Director.

12.     Urban1, Urban2, and Urban3 have been entirely frivolous lawsuits that were filed against me by Urban through attorneys that work for DNCT that is a law firm. DNCT maintains an office at the following address:

> 272 Duffy Ave.
> Hicksville, NY 11801

13.     Harold Rosenthal, Eric Tavel, and Allison Heilbraun are attorneys who work for DNCT who have been involved in litigation work tied to Urban3, Urban2, and/or Urban1. Mr. Tavel signed the petition that was filed in Urban2. Ms. Heilbraun signed the petition that was filed in Urban1. After Judge Weissman dismissed Urban1 on 11/25/19, Mr. Rosenthal opted to discontinue Urban2 on 11/5/20 after Urban2 was commenced as a naked abuse of process and sham on 2/18/20.

14.     Anthony M. Gonzalez is a licensed process server whose services were retained by attorneys who work for DNCT to serve legal papers upon me prior to the first court hearing in Urban3 that would require my participation after those legal papers were filed in Urban3 by those attorneys to commence Urban3. Mr. Gonzalez's license number for being a process server in New York State is 2005093. He committed perjury in the sworn affidavit that he gave on 3/8/22 that was electronically filed in Urban3 on 3/13/22 by lying by claiming that he served a copy of legal filings that were filed in Urban3 upon me on 3/8/22 by leaving a copy of them at the entrance to my Urban apartment at 9:58 am on 3/8/22. Contrary to his lie, no papers were left at the entrance to my Urban apartment on 3/8/22 and video recordings that would have been recorded by video security cameras **a)** in the stairwells of my building, **b)** in the lobby of my building, and **c)** installed on the front of my building would confirm that he didn't visit my Urban apartment on 3/8/22. Urban has been legally required to preserve all of those video recordings from 3/8/22.

15.     NAICA is an organization that is heavily funded by HRA to operate shelters and provide

pro-bono legal representation in the Bronx in housing court litigation. Julio Manjarrez is an

attorney who has worked for NAICA at all times relevant herein. Until 7/29/22, Mr. Manjarrez,

prejudicially committed legal malpractice in the form of obstruction of justice while he served as

my insubordinate and incompetent attorney in Urban3. He did so after I learned on or about

4/10/22 that he was my assigned attorney for Urban3. I discovered that after I participated in a

telephone call on 3/22/22 with a woman named Annelisa Adames that was conducted for the

purpose of conducting an intake session to ascertain preliminary information about NAICA and I

to determine whether I would allow an attorney who worked for NAICA to serve as an attorney

for me in Urban3. While subjecting me to legal malpractice in Urban3 by disobeying reasonable

directives that I issued to Mr. Manjarrez about how I sought to have my interests in Urban3 to be

defended, researched and otherwise presented that includes my counterclaims in Urban3, Mr.

Manjarrez and every other employee of NAICA who I dealt with between March of 2022 and

July of 2022 concealed the material fact from me that NAICA was then on the verge of being

granted a new contract by HRA that would be worth more than $13.3 Million to facilitate

NAICA's ability to provide pro-bono legal representation in housing court cases in the Bronx

that NAICA. Information about that new contract that HRA issued to NAICA was published on

8/9/22 in an official City of New York government report named "The City Record" that is

available at https://a856-cityrecord.nyc.gov/RequestDetail/20220803108.

16.     Judge Ibrahim is a BHC judge who is assigned to Urban3. He granted an OSC on 7/29/22

without any opposition from me after Mr. Manjarrez filed that OSC in Urban3 on 7/7/22 as he

sought to have NAICA be granted authorization to withdraw as my counsel in Urban3. Had I

known that HRA was about to issue NAICA the new contract to which I just referred, I would

have insisted on having NAICA agree to immediately and continuously uphold my legal right to

competent legal representation for Urban3 for free in order for me to not oppose the 7/7/22 OSC

that Mr. Manjarrez filed in Urban3. That would have required NAICA to immediately and

continuously redirect funds from that contract and what were then its resources to completely

fund my legal expenses for Urban3. One of the expenses that would have included would have

been the costs to retain different legal counsel for Urban3.

17.     The following defendants are being sued in their individual and official capacities:

> Ronald Abad, Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun,
> Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez,
> Allison Heilbraun, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey
> Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny
> Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy
> Southwell, Samuel Spitzberg, Eric Tavel

18.     Judge Ibrahim is being sued in his official capacity as a New York City Housing Court

judge who is assigned to Urban3.

19.     Anthony Cannataro is the Acting Chief Judge of the State of New York. He is being sued

in this case for reasons that largely correspond to what I will discuss next. On 10/17/22, a news

organization named Hell Gate published a news article that was written by Max Parrott that is

entitled "Where Are the Free Housing Attorneys NYC Promised to Tenants Facing Eviction?"

That article is available at https://hellgatenyc.com/where-are-free-housing-attorneys and

discussed the fact that New York City housing court judges are illegally discriminating against

tenants in flagrant violation of their First and Fourteenth Amendment rights in relation to their

right to be represented pro-bono by competent attorneys in eviction cases in New York City.

That article also includes a link to a letter that was written to Judge Cannataro partly by Mark

Levine and Vanessa Gibson who used to work for the City Council as they urged him in that

letter to stop allowing eviction cases to proceed in New York City's housing courts against

tenants who are legally-entitled to pro-bono legal representation while such tenants are unable to be accorded that right. The following is a relevant excerpt from that article that speaks for itself about the magnitude of the discrimination that tenants in New York City are experiencing by being illegally forced to contend with eviction cases in New York City's housing courts while they're illegally not being accorded their First and Fourteenth Amendment due process and equal protection rights to be provided pro-bono legal representation for that long after the 8/9/18 filing in *Trowbridge v. DiFiore*, No. 16-cv-3455 (GBD)(GWG)(S.D.N.Y. Aug. 9, 2018) confirms that that case that was about due process violations in state courthouses in New York State and was commenced partly against former New York State Chief Judge Janet DiFiore ended with a settlement deal being reached:

> "OCA told Hell Gate that since March of this year, right to counsel providers have had to decline 7,000 eviction cases out of a total of about 28,000 that the court has calendared in 2022, an untold number of which would likely have qualified for free legal representation. Some tenant organizers believe that the number of tenants who have not received access to free legal representation is actually considerably higher. In a letter demanding that OCA take action, Manhattan Borough President Mark Levine and Bronx Borough President Vanessa Gibson noted that "only 33 percent of tenants in housing court are receiving legal representation, half of those who qualify" for free counsel."

20.      Lawrence Marks is an employee of the State of New York and is being sued in his official capacity as the Chief Administrative Judge of the UCS and a senior official within OCA. On 6/18/20, the New York Law Journal published a relevant news article that was written by Jane Webster about him that is entitled " Eviction Hearings Stayed as Chief Administrative Judge Lays Out Details for New Filings". That article is available at

https://www.law.com/newyorklawjournal/2020/06/18/eviction-hearings-stayed-as-chief-administrative-judge-lays-out-details-for-new-filings/.

21.      Both OCA and the UCS are responsible for how state courthouses in New York State

operate. Judge Cannataro is being sued in this action primarily to have him ordered by this Court to immediately **a)** stay all proceedings in Urban3, **b)** dismiss Urban2, **c)** impose a filing restriction against Urban and its personnel that will prohibit them from commencing further state-court litigation against me, **d)** authorize the removal of Urban3 to this action pursuant to CPLR §§325 and 327, **e)** end restrictions that interfere with the First and Fourteenth Amendment right that the public has to record electronic recordings inside of state courthouses in New York state that don't disrupt legal proceedings, and **f)** declare that such restrictions that have been in place in those courthouses have been unconstitutional.

22.     Judge Bannon and Judge Frank are New York State Supreme Court judges who are assigned to the New York State Supreme Court in Manhattan. Both of them were assigned to my HRA lawsuit.

23.     Both Samuel Spitzberg and Nigel Marks are attorneys who have worked for OTDA at all times relevant herein as administrators who are assigned to OTDA's Office of Administrative Hearings that oversees how matters pertaining to fair hearings that OTDA conducts.

24.     Maura Noll is an administrative law judge who is assigned to OTDA.

25.     Daniel Tietz is OTDA's Commissioner. He previously worked for HRA between 2014 and 2017 as a Chief Special Services Officer, according to his LinkedIn profile that reflects his career and is available at https://www.linkedin.com/in/danielwtietz/. His LinkedIn profile also points out that while he worked for HRA, he worked closely with Mr. Banks and was heavily involved in HRA's shelter and supportive housing programs.

26.     At all times relevant herein, the following individual defendants that are people were acting under the color of law through their acts and omissions that were inside and outside of the course and scope of their duties and functions as agents, servants, employees, and/or officers of

Defendant City. They were acting for and on behalf of Defendant City at all times relevant herein:

> Ronald Abad, Steven Banks, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg

27.     At all times relevant herein, Judge Bannon, Judge Frank, Judge Ibrahim, Nigel Marks, Maura Noll, Samuel Spitzberg, and Daniel Tietz were employees of the State of New York who acted under the color of law through their acts and omissions that were inside and outside of the course and scope of their duties and functions as they operated as agents and servants of Defendant City. They acted for and on behalf of both the State and City of New York at all times relevant herein:

28.     The individual defendants' acts hereafter complained of were carried out intentionally, recklessly, oppressively, and with malice and with egregious, callous, and wanton disregard of my rights.

29.     At all relevant times, the individual defendants were engaged in joint ventures to varying degrees as they assisted each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

### Legal Standards

1.     SCOTUS' 6/27/22 decision in _Kennedy v. Bremerton School Dist._, No. 21-148 (U.S. June 27, 2022) is controlling law and states the following:

> "Government "justification[s]" for interfering with First Amendment rights "must be genuine, not hypothesized or invented post hoc in response to litigation.""

2.     The following are related findings from SCOTUS' decision in _Gulf Oil Co. v. Bernard_, 452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981) that also are controlling law:

a.  "We conclude that the imposition of the order was an abuse of discretion. The record reveals no grounds on which the District Court could have determined that it was necessary or appropriate to impose this order.[18] Although we do not decide what standards are mandated by the First Amendment in this kind of case, we do observe that the order involved serious restraints on expression. This fact, at minimum, counsels caution on the part of a district court in drafting such an order, and attention to whether the restraint is justified by a likelihood of serious abuses."

b.  "In the present case, one looks in vain for any indication of a careful weighing of competing factors. Indeed, in this respect, the District Court failed to provide any record useful for appellate review. The court made neither factual findings nor legal arguments supporting the need for this sweeping restraint order."

c.  "The court identified nothing in this notice that it thought was improper and indeed gave no reasons for its negative ruling."

3.  In a similar vein, the following excerpts are from the decision that former U.S. District Judge William Pauley issued on 3/6/07 in _National Council of Arab Americans v. the City of New York_, No. 04-cv-6602 (WHP)(S.D.N.Y. March 6, 2007) that were about restraints imposed on First and Fourteenth Amendment rights by government personnel:

a.  "[C]ourts must . . . be cognizant of disguised attempts to refuse the fullest scope of free speech allegedly based on governmental concerns"

b.   "Discovery in this action has yielded evidence that was not before this Court at the preliminary injunction stage. Based on all the record evidence, there are disputed issues of material fact regarding whether the City's purported reasons for denying Plaintiffs' permit application are pretextual."

c.  "Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own."

d.  "The existence of reasonable grounds for limiting access to a forum "will not save a regulation that is in reality a facade for viewpoint-based discrimination.""

e.  "this Court need not accept Defendants' proposed justifications at face value. "Because the excuses offered for refusing to permit the fullest scope of free speech are often disguised, a court must carefully sort through the reasons offered to see if they are genuine.""

f.  "City's justification for denial of art exhibition permit was a pretext for content based discrimination"

g.     "City's justification for denial of a demonstration permit was a pretext for content based discrimination"

4.     The following are relevant excerpts from _Taglavore v. United States_, 291 F.2d 262 (9th Cir. 1961) about pretexts to violate constitutional and other legal rights:

a.     "The violation of a constitutional right by a subterfuge cannot be justified, and the circumstances of this case leave no other inference than that this is what was done"

b.     "The courts must be vigilant to detect and prevent such a misuse of legal processes."

5.     The following findings from _Reeves v. Sanderson Plumbing Products, Inc._, 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) address proving discriminatory intent by acknowledging mendacity and fraudulent pretexts:

a.     "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."

b.     "[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination"

c.     "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt.""

d.     "The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination."

e.     "A "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."

f.     "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."

g.    "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision."

h.    ""[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.""

6.    _Thomas v. Collins_, 323 U.S. 516, 65 S. Ct. 315, 89 L. Ed. 430 (1945) included related

findings that confirm that government personnel may not interfere with First and Fourteenth

Amendment rights without an objectively valid legal justification as they explicitly point out that

**a)** "any attempt to restrict" First Amendment "liberties must be justified by clear public interest,

threatened not doubtfully or remotely, but by clear and present danger" and **b)** that "priority

gives these liberties a sanctity and a sanction not permitting dubious intrusions." That decision

further states the following:

"whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction"

7.    _Gasparo v. City of New York_, 16 F. Supp. 2d 198 (E.D.N.Y. 1998) contains the following

relevant findings that address standardless discretion to impose illegal prior restraints on First

Amendment rights:

"The Supreme Court has established that any licensing or permitting scheme that regulates expressive activities must be constrained by articulated standards to guide the exercise of discretion by the licensor or permittor, because "a scheme that places `unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship.'" _Lakewood,_ 486 U.S. 750, 757, 108 S.Ct. 2138 (1988). Thus, "a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity

in question." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 152, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). The Court has repeatedly found "unbridled" or "unfettered" discretion to violate the First Amendment."

> `It is settled by a long line of recent decisions of this Court that an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official— as by requiring a permit or license which may be granted or withheld in the discretion of such official — is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.'"

*FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (quoting *Shuttlesworth,* 394 U.S.at 151, 89 S.Ct. 935)."

8.   *Kittay v. Giuliani*, 112 F. Supp. 2d 342 (S.D.N.Y. 2000) contains the following findings that confirm that I have a First and Fourteenth Amendment right "to communicate directly to government officials":

> "The right to petition in general guarantees only that individuals have a right to communicate directly to government officials, and that individuals have the right of access to the courts to redress constitutional violations. *See McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); *Mozzochi v. Borden,* 959 F.2d 1174, 1180 (2d Cir.1992)"

9.   *Avent v. Keybank*, No. 21-cv-01466 (CM) (S.D.N.Y. Apr. 1, 2021) contains the following findings that confirm that threatening or harassing someone in retaliation for filing a lawsuit is prohibited:

> ""[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests., Inc. v. NLRB,* 461 U.S. 731, 741 (1983); *see also California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972). As such, this right "cannot be impaired, either directly. . . or indirectly, by threatening or harassing an [individual] in retaliation for filing [a] lawsuit []. . . ." *Harrison v. Springdale Water & Sewer Comm'n,* 780 F.2d 1422, 1428 (8th Cir. 1986)"

10.   The following is a relevant excerpt from *US v. Turner*, 720 F.3d 411 (2d Cir. 2013) that confirms that the exercise of First Amendment rights is allowed to be adversarial and antagonistic while being lawful expression:

"Political speech, ugly or frightening as it may sometimes be, lies at the heart of our democratic process." *Planned Parenthood II,* 290 F.3d at 1089 (Reinhardt, *J.,* dissenting); *see also Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) ("As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.")"

11.     *Coates v. Cincinnati*, 402 U.S. 611, 91 S. Ct. 1686, 29 L. Ed. 2d 214 (1971) further

reinforces this point by stating the following:

     a.    "The First and Fourteenth Amendments do not permit a State to make criminal the exercise of the right of assembly simply because its exercise maybe "annoying" to some people. If this were not the rule, the right of the people to gather in public places for social or political purposes would be continually subject to summary suspension through the good-faith enforcement of a prohibition against annoying conduct.[5] And such a prohibition, in addition, contains an obvious invitation to discriminatory enforcement against those whose association together is "annoying" because their ideas, their lifestyle, or their physical appearance is resented by the majority of their fellow citizens.[6]

          The ordinance before us makes a crime out of what under the Constitution cannot be a crime. It is aimed directly at activity protected by the Constitution."

     b.    "The city is free to prevent people from blocking sidewalks, obstructing traffic, littering streets, committing assaults, or engaging in countless other forms of antisocial conduct. It can do so through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited. *Gregory v. Chicago*, 394 U. S. 111, 118, 124-125 (BLACK, J., concurring). It cannot constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed."

     c.    "this ordinance is unconstitutionally vague because it subjects the exercise of the right of assembly to an unascertainable standard, and unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct."

     d.    "Conduct that annoys some people does not annoy others. Thus, the ordinance is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all. As a result, "men of common intelligence must necessarily guess at its meaning.""

12.     The following excerpt from *O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed.

2d 396 (1975) that cites *Coates v. Cincinnati* further reinforces this point:

> "Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty. See, *e. g., Cohen* v. *California,* 403 U. S. 15, 24-26; *Coates* v. *City of Cincinnati,* 402 U. S. 611, 615"

13.    The following excerpts from *Concerned Jewish Youth v. McGuire*, 621 F.2d 471 (2d Cir. 1980) confirm that people have a First and Fourteenth Amendment right to assemble in a public forum near those who they seek to petition for redress and otherwise target at times that may include during demonstrations, protests, and while engaging in whistleblowing, character assassinations, and expressive association:

    a.    "since the effectiveness of any demonstration depends on its proximity to the target and the relevant audience, it is unlawful to exile demonstrators to an irrelevant milieu"

    b.    "The right to a public forum for the discussion and interplay of ideas is one of the foundations of our democracy. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."

14.    *Amidon v. Student Association of the State University of New York at Albany*, No. 05-6623-cv (L) (2d Cir. Nov. 20, 2007) states the following about access to and expression during public forums:

> "The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views. Access to a public forum, for instance, does not depend upon majoritarian consent."

15.    *Westmoreland v. CBS, Inc.*, 752 F.2d 16, 24 n. 13 (2d Cir.1984) confirms that courts are public forums "to adjudicate legal controversies".

16.    *Herrera v. Shea*, No. 20-cv-3665 (PKC)(VMS) (E.D.N.Y. Apr. 20, 2021) confirms that that Samuel Spitzberg made a decision to cancel a policy that caused the plaintiff in that case to be barred from visiting OTDA's office in Brooklyn caused that plaintiff to withdraw a related case that he had commenced as an article 78 proceeding to address that ban from OTDA's

offices.

17.     *Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004) confirms that **a)** FRCP Rule 8 doesn't

require complaints to be submitted in the form of a single pleading, **b)** judges are prohibited from

restricting how complaints may be prepared and submitted beyond the restrictions that FRCP

Rule 8 has established, and **c)** the length of a complaint by itself isn't valid grounds to reject it.

18.     *Trahan v. Lazar*, 457 F. Supp. 3d 323 (S.D.N.Y. 2020) confirms that **a)** "dismissal under

Rule 8 isn't warranted in instances in which a complaint or amended complaint doesn't

"overwhelm the defendants' ability to understand or to mount a defense" and that **b)** the judge

who was assigned to *In re Parmalat Sec. Litig.,* 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005)

refused to dismiss a 368-page complaint that included 1,249 paragraphs "even where it was "an

undue imposition on all who [were] obliged to read it".

19.     *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) is

controlling law that SCOTUS issued in which it stated the following:

> "St. Paul has no such authority to license one side of a debate to fight freestyle, while
> requiring the other to follow Marquis of Queensberry rules."

20.     Among other things, the preceding excerpt confirms that 1 group of litigants with

litigation that has been filed in the same judicial circuit are prohibited from being granted greater

consideration and leeway with respect to both page limits for complaints and deadlines for

motions for reconsideration than other litigants with litigation filed in that same judicial circuit

because that would be illegal discrimination and selective-enforcement in violation of equal

rights. The preceding excerpt also confirms that in instances in which judges throw the rulebook

out the window by doing things in litigation that applicable law prohibits, they're estopped by

that practice from denying litigants from following in their footsteps to be accorded relief in

those same cases in which the rulebook was tossed out the window. This point largely refers to

the material fact that though the following is entirely true and accurate, Judge Bannon and Judge

Frank fraudulently refused on or 9/14/21 and 8/29/22 as pretextual continuing violations to grant

me relief in my HRA lawsuit to which I certainly was legally entitled in response to order to

show cause applications that I filed in my HRA lawsuit since September of 2021:

     a.     Judge Bannon illegally dismissed and disposed of my HRA lawsuit in its entirety

on 1/31/18 while I continued to had claims that were pending to be adjudicated in that hybrid

case by a different judge. That occurred before Judge Tisch thereafter issued an order on 9/17/18

in my HRA lawsuit that reinstated that case. While issuing that order, he baselessly claimed in it

that Judge Bannon hadn't intentionally dismissed my HRA lawsuit on 1/31/18. However, he

issued that order only after he issued an order in that case on 8/17/18 in response to the OSC that

I filed in it on 8/13/18 about which he illegally ignored the entirety of the exhibits that I stored

on a USB thumb drive that I filed in support of and in conjunction with that OSC on 8/13/18.

     b.     Judge Frank also illegally dismissed and disposed of my HRA lawsuit on 4/9/19

while I continued to have claims that were pending to be adjudicated in that case. He did so after

he illegally, literally, and rapidly flipped through the pages of the OSC that I filed in that case on

4/9/19 instead of performing his legal duty to have diligently read and considered the entirety of

that OSC prior to issuing a decision about it. After issuing an amended order to supersede the

original order that he illegally issued in that case on 4/9/19 to reverse the fact that he illegally

dismissed that case then, Judge Frank fraudulently refused through that amended order to allow

me to pursue claims in my HRA lawsuit against Urban as he instead indicated that I could

possibly do so at a later juncture in that case.

21.     The following is the plain text of 18 U.S.C. §1509 that is the federal criminal statute that

corresponds to obstruction of court orders:

"Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined under this title or imprisoned not more than one year, or both.

No injunctive or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime."

22.    The following is the plain text of 18 U.S.C. §1504 that is another federal criminal statute that is about contempt of court that may be committed by judges in regards to existing court decisions and orders as well as constitutional rights:

A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—

(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;

(2) Misbehavior of any of its officers in their official transactions;

(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

23.    On 5/13/20, Judge Schofield issued an order (Dkt. 352) in K6 in which she stated the following:

"Plaintiff must file new civil actions without Court intervention."

24.    Ms. Schofield **then** clearly reinforced the preceding remarks in her 5/13/20 order in K6 by stating the following in her 7/13/20 order (Dkt. 391) in K6:

"Nothing in this Order prohibits the Plaintiff from commencing a new case to raise matters unrelated to this case, or from making filings in any other cases that may already be pending."

25.    According to the text from 18 U.S.C. §1509, in the event that a judge other than one assigned to the Second Circuit or SCOTUS would engage in behavior towards me that would willfully threaten or attempt to threaten my ability and right to benefit from the terms of Ms.

Schofield's 5/13/20 and 7/13/20 orders in K6, such a judge would find himself in a situation in which he could face both **a)** 1 year in jail and/or a $10,000 fine for violating 18 U.S.C. §1509 and **b)** other judges performing their legal duty to not countenance such illegal behavior towards me.

26.    The preceding discussion was presented primarily to give fair notice to judges who read this complaint to not make the mistake of contending that prior litigation of mine bars me from pursuing my claims in this case. Moreover, though defendants in this lawsuit are identical to those who were such in K2 and my claims in this new case are closely-related to claims that I asserted in K2 and K4, res judicata certainly doesn't apply to my claims in this case for the following reasons:

   a.    *Aghaeepour v. Northern Leasing Systems, Inc.*, 378 F. Supp. 3d 254 (S.D.N.Y. 2019) states the following:

      i.    "the crux of res judicata is that the "party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination.""

      ii.    "while "a party who has lost a case as a result of alleged fraud or false testimony cannot collaterally attack the judgment in a separate action," there is a long-standing exception to the rule which provides that "a separate lawsuit may be brought where the alleged perjury or fraud in the underlying action was `merely a means to the accomplishment of a larger fraudulent scheme' . . . `which was greater in scope that the issues determined in the prior proceeding."

   b.    On a related note, the following excerpt from *Carroll v. US Equities Corp.*, No. 1: 18-CV-667 (TJM/CFH) (N.D.N.Y. Sept. 24, 2019) confirms that the judge in that case determined that the plaintiff's claims weren't barred by res judicata because he was previously denied a full and fair hearing in his attempts to litigate them:

      "Plaintiff contends, *inter alia*, that he did not have a full and fair opportunity to litigate in the Kingston City Court. This argument is supported by the

present record."

c.      Judge Stanton prejudicially lied about, fraudulently mischaracterized, and otherwise prejudicially ignored material matters of fact, law, and evidence to my detriment in his 10/21/20 decision in K2. He did so while violating my First and Fourteenth Amendment right to file a further amended complaint in K2 in response to his 10/21/20 decision. By doing so, he arbitrarily and capriciously **a)** violated findings in _Cardoza v. Rock_, 731 F.3d 169 (2d Cir. 2013) that confirm that ignoring highly probative and material information is an abuse of discretion and defied his legal duty pursuant to _Vega v. Hempstead Union Free School Dist._, 801 F.3d 72 (2d Cir. 2015) that confirm that judges are required to draw on their judicial experience and common sense in making plausibility determinations. Also, that occurred before the Second Circuit rubber-stamped his 10/21/20 decision in its 12/20/21 order in K3. While doing so, the Second Circuit affirmed that he lied about matters in his 10/21/20 decision in K2, though it despicably and prejudicially condoned that. Hindsight confirms that while doing so, the Second Circuit both **a)** sugarcoated the fact that he lied in his 10/21/20 decision, **b)** violated FRAP Rule 34 by refusing to grant me oral arguments in K3, and **c)** abused its discretion by having upheld his refusal to allow me to file a further amended complaint in K2 in spite of how much evidence I had to prove that Judge Stanton's 10/21/20 decision in K2 and the Second Circuit's 12/20/21 decision in K3 were plain wrong about material matters.

27.     Although all of the following is entirely true and accurate, Judge Stanton arbitrarily, capriciously, and fraudulently refused to grant me reconsideration and reversal of his 10/21/20 decision in K2 as he essentially and fraudulently contended in his 6/28/22 order in K2 that my submission of that motion for reconsideration was too late after in spite of the fact that I filed it less than 2 years after he issued his 10/21/20 decision in K2:

a.    _Elgalad v. New York City Department of Education_, No. 17-cv-4849 (VSB) (S.D.N.Y. Sept. 30, 2019) and _Lichtenberg v. Besicorp Group Inc._, 204 F.3d 397 (2d Cir. 2000) confirm that judges may retroactively grant motions for reconsideration.

b.    _De Jesus v. Oyshi Table Corp._, No. 19-cv-830 (JPC) (S.D.N.Y. May 5, 2021) confirms that the plaintiffs were granted leave to file a motion for reconsideration after requesting permission to do so 44 days after the date when an order was issued about which they sought reconsideration. _United States v. Karahalias_, 205 F.2d 331 (2d Cir. 1953) and _Klapprott v. United States_, 335 U.S. 601, 69 S. Ct. 384, 93 L. Ed. 266 (1949) similarly confirm that litigants have been granted motions for reconsideration 17 years and 4 years after judgments were issued that such motions for reconsideration concerned.

c.    On 6/28/22, Judge Stanton issued an order in K2 just 1 day after SCOTUS issued its decision in _Kennedy v. Bremerton School Dist._ that I discussed earlier. While issuing his 6/28/22 order in K2, he fraudulently ignored the fact that I had a clear First and Fourteenth Amendment right to benefit from the precedents that were set in _United States v. Karahalias_, 205 F.2d 331 (2d Cir. 1953) and _Klapprott v. United States_ to be granted reconsideration and reversal of his 10/21/20 decision in K2. He instead pretextually violated _Kennedy v. Bremerton School Dist._ and _R.A.V. v. City of St. Paul_ to safeguard his reputation instead of own up to the fact that he lied and fraudulently mischaracterized matters in his 10/21/20 decision in K2. Judge Stanton stated the following in his 6/28/22 order in K2 after I submitted filings in K2 on and after 4/26/22 in which I clearly apprised him in detail of **a)** highly probative evidence that confirmed that material findings that he issued in his 10/21/20 decision in K2 were lies and fraudulent mischaracterizations and **b)** the fact that he illegally monopolized assignments to federal court litigation that was partly against Urban and filed in New York City since 2020 instead of having

proper distribution of those judicial assignments occur as a result of random assignment that is

designed to prevent steering cases to specific judges:

> "The Court will not consider any submission Plaintiff files in this action in the future
> in which he seeks relief from the Court's dismissal of this action. Accordingly, the
> Court directs the Clerk of Court to terminate any motion Plaintiff files in this action
> in the future in which he seeks relief from the Court's dismissal of this action. This
> deviates from the prescription at the end of the June 3, 2022 order, which stated,
>
>> If Plaintiff files other [than those directed to the Court of Appeals] documents that
>> are frivolous or meritless, the Court will direct Plaintiff to show cause why the
>> Court should not bar Plaintiff from filing further documents in this action.
>
> Nevertheless, it is the appropriate action. This case is closed to documents of any
> nature regarding the subjects of this case, by reason of this and the Court of Appeals'
> adjudications the time for the review of which is long past. To the extent the present
> submissions concern new matter it should be presented in a new case, to be assigned
> to a Judge randomly selected by the Court's process."

28.     The strength and nature of the evidence and matters of applicable law with which I'm

pursuing my claims in this case together with the following findings from *In re Fitch, Inc.*, 330

F.3d 104 (2d Cir. 2003) sufficiently establish that Judge Stanton abused his discretion by

dismissing K2 before the Second Circuit rubber-stamped that:

> "A district court abuses its discretion when `(1) its decision rests on an error of law ...
> or a clearly erroneous factual finding, or (2) its decision —though not necessarily the
> product of a legal error or a clearly erroneous factual finding —cannot be located
> within the range of permissible decisions.'"

29.     *Funk v. Belneftekhim*, No. 14-cv-0376 (BMC) (E.D.N.Y. July 11, 2019) states the

following about things that are warrant equitable estoppel to be applied while it confirms that the

scope of wrongdoing that warrants that is broader than some judges may think:

> "there is no reason to believe the Court of Appeals viewed fraud, misrepresentation,
> and deception as an exhaustive list of all wrongdoing that gives rise to equitable
> estoppel. To the contrary, in Zumpano, the Court of Appeals confirmed the broad
> scope of equitable estoppel when it explained that "courts will not bar the assertion of
> equitable estoppel when plaintiff is unable to file a lawsuit because of defendant's
> affirmative wrongdoing" in light of courts' power "to bar the assertion of the
> affirmative defense of the Statute of Limitations where it is the defendant's

affirmative wrongdoing ... which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding.'"

30.     The following excerpt from *Mazzola v. Lipkin*, 2021 N.Y. Slip Op 50046 (App. Term 2021) is pretty clear about the fact that this Court needs to allow me to pursue the entirety of my claims in this case largely due to Judge Stanton having opted to wash his hands of my claims in K2 as he pretextually and prejudicially subjected me to obstruction of justice in that regards in flagrant violation of my First and Fourteenth Amendment rights:

> "There are many cases where a new trial should be granted because of complexity, confusion, the possibility of other proof, error, misconception on the part of the Trial Judge as to the burden of proof or for other appropriate reasons ... Also certain cases peculiarly lend themselves to a reconsideration of the facts by a trial court."

31.     On 6/15/21, the New York Times published an obituary about the passing of former Brooklyn federal judge Jack Weinstein that is entitled "Jack B. Weinstein, U.S. Judge With an Activist Streak, Is Dead at 99". That obituary is available at

https://www.nytimes.com/2021/06/15/nyregion/jack-b-weinstein-dead.html. The following is a relevant excerpt from that obituary:

> "As a scholar and law professor of expansive intellect before his appointment to the bench, Judge Weinstein wrote the book — several books, actually — on New York civil procedure and the federal rules of evidence. His multivolume treatises "New York Civil Practice" and "Weinstein's Federal Evidence" are law library standards."

32.     Judge Weinstein also issued the decision in *DaCosta v. City of New York*, 296 F. Supp. 3d 569 (E.D.N.Y. 2017) in which he stated the following about discovery matters:

> "Decisions of the Court of Appeals for the Second Circuit reflect the broad principle that courts should not be quick to dismiss plaintiffs for lack of information that is in the possession of the defendants. Elimination of the information asymmetry that exists at the outset of every case is a bedrock principle of our legal system; after all, "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor,* 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947). The Court of Appeals for the Second Circuit has consistently emphasized that courts should be more lenient with civil rights pleadings and permit discovery when plaintiffs would otherwise not be able to state a claim for relief due to a lack of

information about defendants and their practices."

33.     _Cramer v. Devon Group, Inc._, 774 F. Supp. 176 (S.D.N.Y. 1991) similarly states the

following:

   a.   "It is clear that summary judgment should "be refused where the nonmoving party
        has not had the opportunity to discover information that is essential to his
        opposition."

   b.   "A party should not be "`railroaded' by a premature motion for summary
        judgment.""

   c.   "If inadequate discovery prevents presentation of facts necessary to oppose a
        summary judgment motion, Fed. R.Civ.P. 56(f) allows a court to deny summary
        judgment or order a continuance until discovery is complete. To obtain Rule 56(f)
        relief the party seeking additional discovery must file an affidavit explaining what
        facts are sought, how they will create a factual issue precluding summary
        judgment, what efforts have been made to obtain these facts and why these efforts
        have failed.""

34.     _Dornberger v. Metropolitan Life Ins. Co._, 961 F. Supp. 506 (S.D.N.Y. 1997) confirms

that I'm entitled to plead matters upon information and belief, especially when the defendants

possess the facts and evidence that cause me to need to do so until discovery occurs.

35.     _Mitschele v. Schultz_, 36 A.D.3d 249, 826 N.Y.S.2d 14 (App. Div. 2006) states the

following about the legal standard that applies to fraudulent concealment while these findings

pertained to a malpractice claim:

        "The elements of a fraudulent concealment claim—concealment of a material fact
        which defendant was duty-bound to disclose, scienter, justifiable reliance, and injury
        (_see Kaufman v Cohen,_ 307 AD2d 113, 119 [2003]; _and see Ozelkan v Tyree Bros.
        Envtl. Servs., Inc.,_ 29 AD3d 877 [2006])—are all sufficiently pleaded by the claims
        which may be properly gleaned from the complaint: that defendants failed to inform
        plaintiff of their conflicted interests, despite their professional obligation to make
        such disclosure, inducing plaintiff to retain them and rely on their advice in the belief
        that defendants had undertaken to provide professional advice in her best interests."

36.     _Hack v. President and Fellows of Yale College_, 237 F.3d 81 (2d Cir. 2000) is controlling

law that states the following:

   a.   "The district court has a duty to consider whether a plaintiff's allegations could

provide relief under any available legal theory."

b.    "federal pleading is by statement of claim, not by legal theory."

c.    "complaint does not have to state a legal theory and specification of an incorrect theory is not fatal"

37.    The material fact that Judge Stanton biasedly and prejudicially didn't let me engage in discovery in K2 and the findings in the 7/15/11 decision in *Vasquez v. City of New York*, 2011 N.Y. Slip Op 32010 (Sup. Ct. 2011) that appear in this complaint's "Legal Standards" section confirm that plaintiffs need to be able to engage in meaningful discovery to determine whether and to what degree HRA has control over the operations of its partners that it funds to operate shelters in order to determine whether such partners may be state actors in regards to committing illegal acts and omissions that are attributable to HRA for liability confirms that Judge Stanton massively screwed up in K2 by ignoring a clearly applicable legal standard and precedent before he thereafter fraudulently refused to correct his mistakes. By not allowing me to engage in such discovery in K2, Judge Stanton prejudicially deprived me of my right to a full and fair hearing and that causes res judicata to be inapplicable to K2. *Carroll v. US Equities Corp.*, No. 1:18-CV-667 (TJM/CFH) (N.D.N.Y. Sept. 24, 2019) was about an instance in a court determined that a litigant was denied a full and fair opportunity to litigate matters that caused res judicata not to apply. The 6/1/22 decision in *Santiago v. City of New York*, 2022 N.Y. Slip Op 3538 (App. Div. 2022) has findings that are similar to those in *Vasquez*. Also, *Diaz-Pascall v. Pereira*, 2019 N.Y. Slip Op 33095 (Sup. Ct. 2019) addresses alter ego liability and piercing the corporate veil and is relevant because Urban has acted as an agent, proxy, and alter-ego of HRA in how it has operated my building. In addition, findings in *Tolentino v. City of Yonkers*, No. 15-cv-5894 (VB) (S.D.N.Y. Oct. 2, 2017) that is about liability for a snowball effect affirms that HRA as well as current and former personnel of it share liability with Urban, its current and former personnel for

claims that I'm asserting in this case largely due to an illegal cover-up that has been and continues to be a continuing violation. That causes the continuing violation doctrine to apply to toll the statutory deadlines for the entirety of my claims were triggered by the B&S and its repercussions.

38.     U.S. Chief District Judge Laura Taylor Swain illegally and flagrantly violated my First and Fourteenth Amendment rights in K4 as she ignored relevant facts, matters of law, and evidence that I clearly presented in my complaint in that case as she did so partly about information on pages 6 and 10 that I previously apprised her about. She thereafter fraudulently misled me in K4 through remarks that she made in her 5/2/22 order by claiming then that she would address requests that I made prior to then in K4 once the Second Circuit issued a decision about an interlocutory appeal that I had commenced in K4. The requests of mine that she was then referring to included a request that I made on 3/17/22 in K4 to have Urban3 promptly stayed and removed to K4 due to overlapping claims, judicial economy, and the fact that the BHC is a court of limited jurisdiction that that can't possibly consider the entirety of my counterclaims an defenses in Urban3 nor otherwise grant me the entirety of the relief that I seek in Urban3. After the Second Circuit issued a mandate on 8/10/22 about the interlocutory appeal that I just discussed, Judge Swain fraudulently reneged on her 5/2/22 commitment as I waited more than one month for her to honor it after 8/10/22. On 9/12/22, instead of letting Judge Swain continue to violate my First and Fourteenth Amendment rights in K4, I exercised an option to give the Second Circuit full jurisdiction to hear an appeal about K4 by disclaiming my right to file a further amended complaint in K4. As a result, K5 now corresponds to that appeal to the Second Circuit about K4.

13.     The preceding discussion sufficiently identified how Judge Stanton, Judge Swain, and the

Second Circuit prejudicially behaved as deviants to my detriment in K2, K3, and K4. Judge

Ibrahim has also behaved as a deviant in Urban3 to my detriment that I will discuss later in this

complaint. These facts and circumstances largely explain why I am commencing this new

lawsuit partly to be granted immediate injunctive, declaratory, and equitable relief. On a related

note, Bronx Criminal Court Judge Jeffrey Zimmerman stated the following in the first paragraph

of page 1 in the decision that he issued on 5/16/22 in _People v. Beshiri_, No. 2019BX019319

(Bronx Crim. Ct., May. 16, 2022):

> "To slightly re-order the words of Daniel Patrick Moynihan, deviancy can be defined
> downward only so far before there are consequences."

14.     The preceding remarks by him are reinforced by the following excerpt from _Whitney v._

_California_, 274 U.S. 357, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) that addresses recidivism and are

equally applicable to the fact that deviancy and scapegoating against me partly by Judge Stanton,

Judge Swain, the Second Circuit, and Judge Ibrahim in K2, K3, K4, and Urban3 proximately

spurred this lawsuit to remedy such misconduct and the repercussions from that I'm

experiencing:

> "Every denunciation of existing law tends in some measure to increase the probability
> that there will be violation of it.[3] Condonation of a breach enhances the probability.
> Expressions of approval add to the probability."

15.     To reiterate, the penalties for violations of 18 U.S.C. §1509 establish that no judge who

was of coordinate jurisdiction with respect to Ms. Schofield was authorized to usurp her

authority and interfere with my ability and right to benefit from her remarks in her 5/13/20 and

7/13/20 orders that I discussed earlier because such judges aren't appellate judges. Despite this

fact and the fact that K2 wasn't dismissed with prejudice, Judge Stanton flagrantly violated this

clear legal standard that was driven by his desire to divert attention away from his deficiencies as

a judge.

16.   *Craig v. Harney*, 331 U.S. 367, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947) is controlling law

that contains the following findings that affirm that the public has a First and Fourteenth

Amendment right to record what transpires in courtrooms:

> "We start with the news articles. A trial is a public event. **What transpires in the court room is public property**. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

> (boldface formatting added for emphasis)

17.   The following findings from *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S. Ct.

2791, 49 L. Ed. 2d 683 (1976) reinforce this point:

> "Secrecy of judicial action can only breed ignorance and distrust of courts and suspicion concerning the competence and impartiality of judges; free and robust reporting, criticism, and debate can contribute to public understanding of the rule of law and to comprehension of the functioning of the entire criminal justice system, as well as improve the quality of that system by subjecting it to the cleansing effects of exposure and public accountability. See, *e. g., In re Oliver, supra,* at 270-271; L. Brandeis, Other People's Money 62 (1933) ("Sunlight is said to be the best of disinfectants; electric light the most efficient policeman")"

18.   *Yang Zhao v. Keuka College*, 264 F. Supp. 3d 482 (W.D.N.Y. 2017) confirms that

equitable tolling may be warranted in instances in which **a)** a judge has misled a plaintiff; **b)** the

plaintiff who seeks such tolling has actively pursued judicial remedies, but filed a defective filing

within the statutory time period; **c)** an adversary that may include a judge "induced or tricked"

the plaintiff into filing after a deadline passed; **d)** affirmative misconduct by a defendant "lulled

[the] plaintiff" into inaction. *Yang Zhao v. Keuka College* further states the following:

> a.   "A district court must determine whether the plaintiff acted with reasonable diligence during the tolling period, and whether the plaintiff "has proved that the circumstances are so extraordinary that the doctrine should apply.""

b.      "equitable tolling [of the 300-day statutory deadline] is only appropriate `in rare and exceptional circumstances' ... in which a party is `prevented in some extraordinary way from exercising [her] rights.'"

19.     The following facts confirm that Judge Swain prejudicially misled me in K4 after I timely and diligently submitted a request in K4 on 3/17/22 to urge her to immediately stay and remove Urban3 to K4 for consolidation with K4:

a.      She claimed in her 5/2/22 order in K4 by that she would respond to 5 letters that I had filed in K4 after the Second Circuit issued what turned out to be its 8/10/22 mandate in response to my 2/25/22 interlocutory appeal in K4. One of those 5 letters was the letter that I filed in K4 on 3/17/22 to which I just referred.

b.      She prejudicially continued to demonstrate contempt for my First and Fourteenth Amendment rights between 8/10/22 and 9/12/22 by reneging on her remarks in her 5/2/22 order in K4 by not issuing an order, memo endorsement, or decision in K4 during that period to respond to my 3/17/22 letter. While doing so, her contempt for my constitutional rights proved that stupid people wearing white sheets and stupid hats don't have a monopoly on such despicable behavior because that is shared by Black people too. That prompted me to immediately exercise an option in K4 in which I disclaimed my right to file a further amended complaint in K4 in order to give the Second Circuit full jurisdiction to review an appeal of mine about her 3/2/22 order in K4.

20.     On page 6 in her 3/2/22 order in K4, Judge Swain stated the following as she acknowledged the material fact that I had firmly established in my complaint in K4 that I can't rely on article 78 proceedings because I had already commence one in my HRA lawsuit in January of 2017 before Judge Bannon repeatedly engaged in unduly prejudicial and substantial acts of judicial misconduct and fraud in that case while she was the article 78 judge in that

complex hybrid case:

> "Plaintiff also provides six examples of "Constitutional Deficiencies with Article 78 Proceedings." (Id. at 73.) The alleged deficiencies occurring during the Article 78 proceedings took place in 2017, except for one in 2018"

21.    My HRA contract (*see* A3) is governed by **a)** *Forcelli v. Gelco Corp.*, 109 A.D.3d 244, 972 N.Y.S.2d 570 (App. Div. 2013) and **b)** *Kaye v. Grossman*, 202 F.3d 611 (2d Cir. 2000).

*Forcelli* confirms that agreements that are transmitted via e-mail are binding and fully-enforceable. *Kaye v. Grossman* states the following about promissory estoppel:

> "A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."

22.    My Urban lease was governed by **a)** *Rex Medical LP v. Angiotech Pharmaceuticals (US)*, 754 F. Supp. 2d 616 (S.D.N.Y. 2010) and **b)** *The Carlton Group, LTD. v. Mirabella SG SpA*, No. 16-cv-6649 (LGS) (S.D.N.Y. July 19, 2018) and that also governed my HRA contract. *Rex Medical LP v. Angiotech Pharmaceuticals (US)* contains the following relevant findings:

   a.    "The public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense."

   b.    "public policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements."

   c.    "[T]he usual and most important function of courts of justice is rather to maintain and enforce contracts, than to enable parties thereto to escape from their obligation on the pretext of public policy."). Thus, this factor also favors the issuance of an injunction to enforce the parties' Agreement"

23.    *The Carlton Group, LTD. v. Mirabella SG SpA* contains the following relevant findings:

   a.    "[U]nder New York law a contract entered into under duress is generally considered not void, but merely voidable, . . . and one who would repudiate a contract procured by duress must act promptly or will be deemed to have elected to affirm it."

   b.    "[U]nder new York law, an unconscionable agreement is voidable, not void. . . .Because he failed to promptly repudiate [it,] . . . Defendant cannot now avoid its

terms."

    c.    "Under New York law, a party who signs a contract is bound by its provisions unless he can show `special circumstances,' such as fraud, duress, coercion, or misrepresentation, that `relieve him of such an obligation."

24.    Counterfeit bags that are sold in Chinatown in Manhattan are counterfeit bags and my BS Urban lease has always similarly been a forgery and counterfeit document due to the B&S instead of a lease agreement of any type. This point is buttressed by the following excerpt from *Doctor's Associates, Inc. v. Alemayehu*, 934 F.3d 245 (2d Cir. 2019):

    An agreement that has not been properly formed is not merely an unenforceable contract; it is not a contract at all.

25.    The decision that was issued in *In Matter of Truong*, 22 A.D.3d 62, 800 N.Y.S.2d 12 (App. Div. 2005) confirms that the fraudulent use of my BS Urban lease as a false instrument by **a)** Urban, its personnel, and its attorneys in Urban1, Urban2, and Urban3 and **b)** Jeffrey Mosczyc and Marin Gerber of HRA in my HRA lawsuit and my OTDA litigation while all of them committed fraud on the courts and against me by fraudulently misrepresenting that forgery as being a copy of the apartment lease that I signed on 2/16/16 with Lisa Lombardi of Urban wasn't some new, deceitful, and illegal litigation practice. The following findings from *In Matter of Truong* both confirm this point and the fact that all of the attorneys who fraudulently misrepresented my BS Urban lease in that way in such litigation, their accomplices, and co-conspirators need to immediately be punished as severely and permanently as the attorney whose misconduct *In Matter of Truong* was about:

    "By order entered December 2, 2003 (2 AD3d 27), this Court, pursuant to 22 NYCRR 603.4 (d), Judiciary Law § 90 (2), and the doctrine of collateral estoppel, found respondent guilty of professional misconduct in violation of Code of Professional Responsibility DR 1-102 (a) (4) and (5), and DR 7-102 (a) (1), (2) and (4) (22 NYCRR 1200.3, 1200.33), and temporarily suspended him from the practice of law, pursuant to 22 NYCRR 603.4 (e) (1) (iii), based upon uncontested evidence of professional misconduct immediately threatening the public interest. This evidence was the finding of the trial court in a Supreme Court landlord-tenant action that

respondent offered a forged lease into evidence and gave false testimony in support thereof. On appeal from the judgment entered against respondent and his wife in that action, this Court affirmed the trial court's determination that the proffered lease was forged, and sustained the court's imposition of sanctions against the defendants for their "unremitting course of obstructionist, frivolous and otherwise contemptuous conduct during this litigation, including disobedience of court orders" (*Broadwhite Assoc. v Truong,* 294 AD2d 140, 141 [2002])."

26.     *Aponte v. Diego Beekman MHA HDFC*, No. 16-cv-8479 (JPO) (S.D.N.Y. Jan. 24, 2019) contains findings that confirm that a private entity such as Urban can function as a state actor to violate civil rights. Also, findings that were issued in **a)** *Help Social Serv. Corp. v. Harris*, 2020 N.Y. Slip Op 50818 (Civ. Ct. 2020), **b)** *Matter Of Volunteers of America-Greater New York, Inc. v. Almonte*, 65 A.D.3d 1155, 886 N.Y.S.2d 46 (App. Div. 2009), and **c)** *512 E. 11TH ST. HDFC v. Grimmet*, 181 A.D.2d 488, 581 N.Y.S.2d 24 (App. Div. 1992) have established that sufficiently close entwinement has previously been determined to exist between HRA and its business partners that provide shelter services through contracts with HRA. Similarly close entwinement has existed between HRA and Urban.

27.     The 7/15/11 decision in *Vasquez v. City of New York*, 2011 N.Y. Slip Op 32010 (Sup. Ct. 2011) was about how a shelter was operated in the Bronx by a business partner of HRA and that decision was issued before that case ended with a settlement being reached. That 7/15/11 decision confirms that HRA lost its attempt to dismiss that case then. That decision also contains the relevant findings shown next that are about the need to engage in meaningful discovery to determine the extent to which HRA controls how its business partners that operate shelters operate while not putting the cart before the horse instead by stupidly prejudging matters and making baseless and assumptions that discovery could contradict. Such discovery is necessary to determine whether sufficient entwinement exists between HRA and such partners to cause such partners to function as state actors, agents, and proxies for HRA and Defendant City in relation

to claims linked to 42 U.S.C. §1983 that are attributable to HRA, Defendant City, and their

personnel.

### Excerpts from *Vasquez v. City of New York*:

a.  "A summary judgment motion may be denied as premature when "facts essential to justify opposition may exist but cannot then be stated." (CPLR 3212[f]). "This is especially so when the opposing party has not had a reasonable opportunity for disclosure prior to the making of the motion.""

b.  "the motion is premature, as depositions of Stadium Family Center and plaintiffs have yet to be conducted, and Deegan, recently named as defendant, has not had a reasonable opportunity to obtain disclosure from City or Stadium Family Center regarding their respective roles in the operation of the homeless shelter and control of the building. (*See Gardner,* 82 AD3d at 930 [summary judgment motion premature where no depositions had been taken and party opposing motion did not have an opportunity to seek disclosure]; *James,* 2011 NY Slip Op 4206 [summary judgment motion filed prior to exchange of discovery denied as premature]; *George v New York City Tr. Auth.,* 306 AD2d 160, 161 [1st Dept 2003][defendant's summary judgment motion premature where plaintiff has yet to depose it and it had yet to respond to plaintiffs discovery requests]; *Senken v Eklund,* 150 AD2d 671 [2d Dept 1989] [summary judgment premature where depositions of key witnesses had not been conducted])."

c.  "Here, although City provides admissible and probative evidence demonstrating that it did not own the subject premises at the time of the accident, it offers no evidence as to the control of the premises and the homeless shelter operating thereon and has thus failed to negate, *prima facie,* an essential element of plaintiffs' negligence claims. (*See Abdellatif v Khoukaz,*21 AD3d 1278 [4th Dept 2005] [defendant's motion for summary judgment denied although she provided proof that she did not own premises, as she provided no proof that she did not control them]; *Arce v 1681 Realty Holding Corp.,* 276 AD2d 328[1st Dept 2000] [same])."

d.  "To establish a *prima facie* case of negligence, a plaintiff must show duty, breach, and proximate cause. (*Kenney v City of New York,* 30 AD3d 261, 262 [1st Dept 2006]). Liability for a dangerous condition on property is "predicated upon occupancy, ownership, control, or special use of such premises. The existence of one of more of these elements is sufficient to give rise to a duty of care.""

28.  That 7/15/11 decision in *Vasquez* is reinforced by the findings in the 4/29/13 decision in

*Vasquez* that is available at

https://decisions.courts.state.ny.us/fcas/fcas_docs/2013may/3001042812009006sciv.pdf. These

facts confirms that both Judge Stanton and the Second Circuit violated my First and Fourteenth

Amendment rights in K2 and K3 by dismissing K2 and affirming that dismissal in spite of the

fact that I prejudicially was denied the opportunity to engage in such discovery. HRA has the

power through its contract with Urban for my building to replace Urban as the landlord of that

building and to have Urban reimburse Defendant City for costs that that are incurred in the event

that Urban is replaced as the landlord of the building in which I reside.

29.   _Diaz-Pascall v. Pereira_, 2019 N.Y. Slip Op 33095 (Sup. Ct. 2019) contains the following

relevant findings about alter-ego liability that relates to determining where liability rests for

illegal acts and omissions by methodically piercing the corporate veil to ascertain the degree to

which one entity is controlled by another that may reveal that one entity is essentially a

marionette and tool of another:

    a.    "Alter ego liability is "[a]kin to piercing the corporate veil to `prevent fraud or achieve equity'"

    b.    "The plaintiff must demonstrate that the defendant took steps to render the corporation judgment proof or insolvent so as "`to perpetrate a wrong or injustice against'" it (James v Loran Realty v Corp., 20 NY3d 918, 919 [2012], quoting Matter of Morris, 82 NY2d at 142), or that the defendant treated the business as "a `dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends""

    c.    A plaintiff pursuing this theory must allege "`complete domination of the corporation ... in respect to the transaction attacked' and `that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury'"

    d.    "The issue of control may be determined by the following factors:

        "[D]isregard of corporate formalities; inadequate capitalization; intermingling of funds; overlap in ownership, officers, directors and personnel; common office space or telephone numbers; the degree of discretion demonstrated by the alleged dominated corporation; whether the corporations are treated as independent profit centers; and the payment or guarantee of the corporation's debts by the dominating entity""

e.      "Evidence of domination alone, though, is insufficient "without an additional
showing that it led to inequity, fraud, malfeasance""

30.    _Mizrahi v. City of New York_, No. 15-cv-6084 (ARR)(LB) (E.D.N.Y. Aug. 13, 2018)

contains the following findings about shared liability that people and organizations may have for

illegal acts and omissions that are committed by others:

"("[W]here a defendant has `knowledge of the facts that rendered the conduct illegal,'
he may be liable even where his participation in the illegality is only `"indirect"—
such as . . . helping others to do the unlawful acts.'") (quoting _Provost v. City of
Newburgh_, 262 F.3d 146, 155 (2d Cir. 2001))."

31.    _US v. Basey_, 816 F.2d 980 (5th Cir. 1987) contains the following similar findings:

"Well settled is the principle that a party to a continuing conspiracy may be
responsible for a substantive offense committed by a co-conspirator, even though that
party does not participate in the substantive offense or have any knowledge of
it. _Pinkerton v. United States_, 328 U.S. 640, 647, 66 S.Ct. 1180 [1184] 90 L.Ed. 1489
(1946). Once the conspiracy and a particular defendant's knowing participation in it
has been established beyond a reasonable doubt, the defendant is deemed guilty of
substantive acts committed in furtherance of the conspiracy by any of his criminal
partners."

32.    The following excerpt from _Henry v. Wyeth Pharmaceuticals, Inc._, 616 F.3d 134 (2d Cir.

2010) is largely about the use of agents and proxies by a principal to commit illegal acts and

omissions:

"_Gordon_ directly addressed the situation in which a corporate agent _carries out_ an
adverse employment action on the _orders,_ explicit or implicit, of a superior with
knowledge that the plaintiff has engaged in a protected activity. However, in order to
show causation in the sense required by _McDonnell Douglas_ — that is, a causal
connection between the protected activity and the adverse employment action — it is
not necessary that the supervisor who has knowledge of the plaintiff's protected
activities have _ordered_ the agent to impose the adverse action. A causal connection is
sufficiently demonstrated if the agent who decides to impose the adverse action but is
ignorant of the plaintiff's protected activity acts pursuant to _encouragement_ by a
superior (who has knowledge) to disfavor the plaintiff."

33.    _Santiago v. City of New York_, 2022 N.Y. Slip Op 3538 (App. Div. 2022) was about a

lawsuit that was filed against Defendant City due to negligence by HRA in which discovery

occurred in that case. That decision contains the following findings that are partly about the

material fact that judges are to diligently analyze both **a)** how HRA's personnel behave in

relation to partnerships that HRA has with some of its partners to operate shelters in relation to

determining the degree to which HRA may control how those partners operate for that purpose

and **b)** the terms of agreements that exist between HRA and such partners to have those partners

operate shelters:

     a.    "the City, as the landowner, and HRA as the agent of the City, "remain[ ] in presumptive control over [the] property and subject to the attendant obligations of ownership until it is found that control was relinquished, either as a matter of law or by a factfinder after presentation of all of the evidence" (_Gronski v County of Monroe,_ 18 NY3d at 382). In assessing an out-of-possession landowner's duty in tort, the court should look not only to the terms of the agreement but also to the parties' course of conduct"

     b.    "Generally, a landowner owes a duty of care to maintain his or her property in a reasonably safe condition (_see Gronski v County of Monroe,_ 18 NY3d 374, 379; _Basso v Miller,_ 40 NY2d 233, 241). "That duty is premised on the landowner's exercise of control over the property, as the person in possession and control of [the] property is best able to identify and prevent any harm to others" (_Gronski v County of Monroe,_ 18 NY3d at 379"

     c.    "Indeed, "[i]t has been held uniformly that control is the test which measures generally the responsibility in tort of the owner of real property" (_Ritto v Goldberg,_ 27 NY2d 887, 889)."

     d.    "Here, the Sponsorship Agreement, which expressly states that "[t]his is an agreement for services and does not convey any interest in real property to" CAMBA, does not convey a leasehold interest to CAMBA."

34.   _Gronski v. County of Monroe_, 963 N.E.2d 1219, 18 N.Y.3d 374, 940 N.Y.S.2d 518

(2011) that is cited in the preceding excerpts contains the following related findings:

     a.    "Viewing all of the evidence in the light most favorable to the plaintiff, as we must on this motion for summary judgment (see _Branham v Loews Orpheum Cinemas, Inc._, 8 NY3d 931, 932 [2007]), we cannot say, as did the lower courts, that, as a matter of law, the County relinquished complete control of the recycling center to Metro Waste. In focusing exclusively on the terms of the agreement to designate the County free from any duty owed to plaintiff, the courts below erred in failing to give due weight to the County's course of conduct."

b.     "the issue that remains to be resolved by a trier of fact is whether the County, through its course of conduct, exercised sufficient control over the facility such that it owed plaintiff a duty to prevent and remedy the kind of condition that resulted in his injury."

c.     "when a landowner and one in actual possession have committed their rights and obligations with regard to the property to a writing, we look not only to the terms of the agreement but to the parties' course of conduct — including, but not limited to, the landowner's ability to access the premises — to determine whether the landowner in fact surrendered control over the property such that the landowner's duty is extinguished as a matter of law"

d.     In this case, the agreement between the County and Metro Waste unambiguously assigned the responsibility to implement safe practices and to remedy unsafe conditions at the recycling center to Metro Waste. Significantly, however, the agreement vested the County with ultimate approval authority over Metro Waste's operating procedures. Morever, an examination of the County's conduct indicates that it maintained both a visible and vocal presence at the recycling center. Unlike the defendant in *Butler,* who was entirely excluded from his cotenant's portion of the property (*see id.*), here, the agreement granted the County supervisory rights and unfettered access to the facility. In fact, the County availed itself of those provisions through Collins' regular public tours and Rutkowski's routine, unannounced inspections. Though Rutkowski equivocated on the specific issue of his authority to monitor and remedy unsafe conditions — answering both yes and no to the question of whether he oversaw safety and maintenance issues — he offered specific examples of circumstances in which he would take action"

e.     "In *Ritto,* we applied this standard and concluded that, despite a lease that transferred possession and control to commercial tenants, the issue of whether the landlord actually exercised control over the premises was one for the jury"

f.     "There, the defendant landlord leased a room to operators of an automatic washing machine business, granting the tenants "exclusive use of the aforementioned room" (*id.* at 888). The plaintiff, a residential tenant injured by a defective washing machine, sued both the landlord and the commercial tenants (*see id.* at 887-888). While we found that, pursuant to the lease, the "landlord surrendered the right of occupancy ... and reserved no control over the instruments used by those tenants in their business" (*id.* at 888), we concluded that:

         "[t]here is proof ... from which a jury might determine that the landlord, by a long course of conduct of his employees in reporting malfunctions of the machines to the repair service and the owner, so intervened in the operation of the business as to give rise to a reliance by residential tenants in the building on reports of malfunction being made by the landlord. Hence a liability might

result if reports were not made and this played an effective part in the occurrence of the accident"""

35.  _Vann v. City of New York_, 72 F.3d 1040 (2d Cir. 1995) includes the following findings about municipal liability and deliberate indifference:

    c.    "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious."

    d.    "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents."

36.  The following findings from _In re Cohn_, 54 F.3d 1108 (3d Cir. 1995) address how objectively reasonable inferences about an intent to deceive may be drawn and certainly are applicable to the involvement by personnel of HRA and Urban in committing the B&S as well as HRA's efforts to avoid having to deal with the repercussions from that while such repercussions include **a)** HRA's legal duty to pay for and otherwise reimburse me for storage unit rental expenses while I resided in my Urban apartment and **b)** HRA's shared liability for my having been viciously assaulted on 7/2/16 in the living room of my Urban apartment:

    a.    "We acknowledge that because a debtor will rarely, if ever, admit that deception was his purpose"

    b.    the intent to deceive can be inferred from the totality of the circumstances, including the debtor's reckless disregard for the truth. _See, e.g., Equitable Bank v. Miller (In re Miller),_ 39 F.3d 301, 305 (11th Cir.1994) ("A bankruptcy court may look to the totality of the circumstances, including the recklessness of a debtor's behavior, to infer whether a debtor submitted a statement with intent to deceive."

    c.    "The creditor must establish that a materially false writing was made knowingly with the intent to deceive.... However, the requisite intent may be inferred from a sufficiently reckless disregard of the accuracy of the facts."

    d.    "The standard ... is that if the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied."). We hold that a creditor can establish intent to deceive by proving reckless indifference to, or reckless

disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an inference."

37.   _United States v. Campbell_, No. 19-3081-cr (L) (2d Cir. Apr. 8, 2021) states that a "defendant's knowing and willing participation in a conspiracy may be inferred from . . . evidence that [he] . . . possessed items important to the conspiracy". Such items and evidence certainly can include possession and use of an illegally forged apartment lease agreement that corresponds to my BS Urban lease that personnel of HRA, Urban, and Urban's attorneys then used as false instruments in litigation involving me as they did so without any immunity for that. While doing so, they committed numerous acts of mail and wire fraud as well as defamation and an abuse of process against me.

38.   _US v. Ulbricht_, 14-cr-68 (KBF)(S.D.N.Y. July 9, 2014) confirms that the "money laundering statute that corresponds to 18 U.S.C. § 1956(c)(4) defines a "financial transaction" as involving **a)** "the movement of funds by wire or other means and/or b) "the transfer of title to any real property". This means that the illegal reassignment of my 2/16/16 application to HRA for its SEPS rental assistance subsidy and the B&S were acts of money laundering by both personnel of HRA and Urban without immunity.

39.   Findings in _Bridge v. Phoenix Bond & Indem. Co._, 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008) were about fraud against competitors in regards to a bidding process and confirm that no reliance is needed for mail and wire fraud acts that are used for civil RICO claims. In _Doe v. Trump_, No. 18-cv-9936 (LGS)(S.D.N.Y. July 24, 2019), Schofield addressed civil RICO claims partly by stating that "a complaint must allege a causal connection between the substantive RICO violation and the plaintiff's injury that is not "too remote".

40.   The BHC is a court of limited jurisdiction and can't possibly consider the entirety of my counterclaims and defenses in Urban3 for that reason. For example, it can't consider my

counterclaims about violations of the FDCPA and RICO by Urban.

41.    _McNeill v. New York City Housing Authority_, 719 F. Supp. 233 (S.D.N.Y. 1989) states

that the "threat of eviction and the realistic prospect of homelessness constitute a threat of

irreparable injury, and satisfies the first prong of the test for preliminary injunctive relief." It also

points out that the Younger Abstention "doctrine and the related Anti-Injunction Act do not"

preclude preliminary injunctive relief in instances in which a plaintiff is unable to present his

federal claims in pending state court proceedings. This includes New York City Housing Court

cases because those courts are courts of limited jurisdiction.

42.    _Sinisgallo v. Town of Islip Housing Authority_, 865 F. Supp. 2d 307 (E.D.N.Y. 2012) is

cited partly by the decision that U.S. District Judge Colleen McMahon issued in _Ochei v. Lapes_,

_No. 19-cv-3700 (CM) (S.D.N.Y. Jan. 31, 2020)_ in which she stated the following about the

findings in _Sinisgallo_:

> "because the plaintiffs' "ability to litigate their federal disability claims in the state
> court eviction proceeding [was] `more theoretical than real,' and. . . the state court
> [was] unlikely to hear their federal disability claims," the Anti-Injunction Act and
> the _Younger_ abstention doctrine did not prevent a federal district court from enjoining
> a state-court eviction proceeding"

43.    The following remarks by Judge Stanton in _Rosenberg v. City of New York_, 20-cv-4012

(LLS) (S.D.N.Y. July 13, 2020) confirm that all of the litigation between Urban and I belong in

one case due to overlapping claims to befit the interests of judicial economy and one that won't

be assigned to any New York City housing court because those courts are courts of limited

jurisdiction:

> "By order dated May 28, 2020, Chief Judge McMahon dismissed this action without
> prejudice as duplicative of the substantially similar suit that remains pending under
> docket number 20-CV-3911.[1] Chief Judge McMahon noted that claims arising out of
> the same events should be included in a single suit: Rather than prosecuting two
> lawsuits with overlapping claims against many of the same parties, Plaintiff could
> amend the complaint in 20-CV-3911, consistent with Rule 15 of the Federal Rules of

Civil Procedure, to include all of his claims arising from those events in one action under docket number 20-CV-3911."

44.    The exceptions to the Younger Abstention doctrine are about instances of harassment, bad-faith, and substantial and irreparable injury. All of that has occurred and is continuing to occur in Urban3 with respect to how it has been conducted. That fact and circumstance demands the immediate issuance of an order that stays Urban3 and removes and consolidates Urban3 with this case.

45.    On 6/15/22, Judge Ibrahim issued the decision in _Powell v. Jones_, 2022 N.Y. Slip Op 50537 (Civ. Ct. 2022) as he stated the following in it:

      a.    "Harassment "shall mean any act or omission by or on behalf of an owner that (i)*causes* or is intended to cause any person lawfully entitled to occupancy of a dwelling unit" [emphasis added] (*see* NYC Admin Code § 27-2004(a)(48)). In other words, the harassment statute contemplates that an occupant who has been harassed may well surrender possession."

      b.    "CPLR § 2201 states, "except where otherwise prescribed by law, the court in which an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be just." Granting such a stay is within the sound discretion of the court. (*see Concord Associates, L.P. v EPT Concord, LLC,* 101 AD3d 1574, 1575, 957 NYS2d 509 [3rd Dept 2012])."

46.    The following findings about instances in which judges must recuse themselves were issued in _Concord Associates, LP v. EPT Concord, LLC_, 130 A.D.3d 1404, 15 N.Y.S.3d 270 (App. Div. 2015) after an earlier decision from that case appears to have been cited in the preceding excerpt:

      "Under the circumstances, it seems to us that Acting Justice LaBuda should have recognized that this was a situation in which his "impartiality might reasonably be questioned" (22 NYCRR 100.3 [E] [1]), and, therefore, we must conclude that his failure to recuse himself constituted a clear abuse of discretion"

47.    The preceding findings apply to the fact that bias, prejudice, and discrimination that Judge Ibrahim has demonstrated against me in Urban3 in different ways requires the immediate termination of his assignment to Urban3 and a reversal of rulings that he has issued against me in

Urban3. Also, *Abkco Music v. Stellar Records*, 96 F.3d 60 (2d Cir. 1996) confirms that an abuse

of discretion by judges "usually involves either the application of an incorrect legal standard or

reliance on clearly erroneous findings of fact." *Monroe v. Houston Independent School District*,

No. 19-20514 (5th Cir. Nov. 25, 2019) similarly states that application "of an incorrect legal

standard is, by definition, an abuse of discretion".

48.     *United States v. Robin*, 553 F.2d 8 (2d Cir. 1977) states the following about instances

when it's futile for a litigant to keep dealing with a judge who is clearly both wrong about

matters and too insolent and pigheaded and/or biased to make proper amends to correct his or her

errors:

> "In the rare case where a judge has repeatedly adhered to an erroneous view after the
> error is called to his attention, see, e. g., *United States v. Brown*, 470 F.2d 285, 288
> (2d Cir. 1972) (court twice used improper sentencing procedure), reassignment to
> another judge may be advisable in order to avoid "an exercise in futility [in which]
> the Court is merely marching up the hill only to march right down again"

49.     On 9/30/22, Judge Ibrahim indisputably demonstrated bad-faith as he harassed me in

Urban3 through the order that he issued then in response to the OSC that I filed in Urban3 on

that date. This characterization of harassment is consistent with how he defined harassment in

*Powell v. Jones* because of what the effect of his harassment against me in Urban3 would

naturally lead to. One of the ways that he harassed me in Urban3 on 9/30/22 as he caused me

substantial and irreparable harm by doing so was by ignoring the overwhelming major of the

relief that I requested in that OSC as his 9/30/22 order only addressed the request for a stay to be

issued in Urban3 instead of any of the other relief that I requested in that OSC.  By doing so, he

flagrantly violated my First and Fourteenth Amendment rights and findings in *Vargas v. Sotelo*,

2017 N.Y. Slip Op 50417 (Civ. Ct. 2017) that confirm that the "court must consider the entire

pleading" and "the court must interpret the submissions of an unrepresented litigant so as to raise

the strongest arguments they suggest." In fact, while issuing that 9/30/22 order, he ignored the

detailed and relevant information that I clearly presented in my 9/30/22 OSC in Urban3 that was

about the material fact that Bronx Housing Court Judge Diane Lutwak issued the decision in

*1163 WASH. LLC v. Cruz*, 2022 N.Y. Slip Op 50751 (Civ. Ct. 2022) on 8/15/22 that firmly

established the fact that Judge Ibrahim discriminated against me in Urban3 by refusing to grant

me a subpoena against Urban partly for video recordings that were recorded by video security

cameras that are installed in my building and on its exterior on 3/8/22. He needed to have agreed

to grant a subpoena for that after his remarks that were recorded by the 6/16/22 audio transcript

of the court hearing that was conducted in Urban3 confirmed that he was aware then that Julio

Manjarrez of NAICA had been prejudicially demonstrating incompetency as my attorney in

Urban3. That impermissible prejudice needed to be remedied by Judge Ibrahim in Urban3 by

granting my request for the subpoena on account of the material fact that Mr. Manjarrez

incompetence as an attorney needed to be entirely his problem instead of mine and Mr.

Manjarrez prejudicially hadn't properly investigated whether video recordings existed that would

prove that the process server that Urban used for Urban3 to serve legal papers upon me prior to

the first court hearing in Urban3 committed perjury in a sworn affidavit that was filed in Urban3

by lying by claiming that he served legal papers for Urban3 upon me on 3/8/22 in my building by

affixing them to the front door to my Urban apartment. The video recordings that would have

been recorded on 3/8/22 by video security cameras that are installed in public areas of my

building and on its exterior in front of my building certainly would prove whether that process

server visited the fourth floor in my building on 3/8/22.

50.     The Appellate Division's 6/9/22 decision in *Family Health Mgt., LLC v. Rohan Devs.,*

*LLC*, 2022 N.Y. Slip Op 3796 (App. Div. 2022) contains the following relevant findings about

lease agreements that support my claims in this case:

a.     "in the absence of a valid lease, there can be no claim for unpaid rent."

b.     A lease agreement that wasn't signed by both the landlord and tenant was invalid and never was binding nor took effect because it wasn't signed by both of them.

c.     Although the tenant signed various exhibits that were related to that lease, that didn't change the fact that the tenant didn't signed that lease.

d.     Communications that occurred that suggested that the tenant had signed or would sign that lease were irrelevant and didn't change the fact that the tenant didn't sign it.

e.     Since that lease agreement was never signed by both the landlord and tenant, the landlord was never entitled to a rent payment for that lease.

f.     It was clear as a matter of law that the signing and delivery requirement for that lease wasn't waived or otherwise ineffective because that requirement was a condition precedent to the formation of a binding lease agreement.

g.     When parties don't intend to be bound by a lease's terms until it's written and signed, not contract exists in the interim between them in regards to that lease even if the parties have orally agreed upon all the terms and the doctrines of promissory estoppel, equitable estoppel, and part performance aren't effective.

h.     Even an executed oral modification to a lease couldn't have been effective because no underlying written lease existed between a landlord and tenant to be modified.

i.     Conversion occurs "when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession"

51.    _Smith v. County of Nassau_, No. 10-cv-4874 (MKB) (E.D.N.Y. Mar. 31, 2015) contains

the additional relevant findings about lease agreements that confirm that the nature of my

residency in my Urban apartment without a valid lease agreement and while personnel of Urban

have periodically engaged in trespassing in my Urban apartment without prior notice to me has

been that of a licensee in temporary month-to-month shelter instead of permanent housing:

a. Although there is evidence suggesting that Plaintiff had a lease for the Property, the undisputed facts demonstrate that Plaintiff's lease was not valid. Indeed, Plaintiff reported to the Nassau County Police Department on October 12, 2009 that he was the "victim of a scam" and that Terezakis was the "true owner" of the Property. (*See* Pl. Supp. Dep. 2.) Plaintiff's invalid lease cannot support his tenancy claim in the Property.

b. "In addition, the fact that Terezakis gave Plaintiff permission to stay at the Property did not make Plaintiff a tenant. There is no indication that this permission was formalized as a lease or rental agreement giving Plaintiff exclusive control or possession of the Property, and accordingly, rights as a tenant. *See Feder v. Caliguira,* 208 N.Y.2d 400, 404 (1960) ("It is the transfer of absolute control and possession of property at an agreed rental which differentiates a lease from other arrangements dealing with property rights."); *City of New York v. New York & Hong Kong Reciprocation Exch. Corp.,* 749 N.Y.S.2d 405, 407 (Sup. Ct. 2002) (noting that "the term `tenant' would not include a licensee"); *Am. Jewish Theatre, Inc.,* 610 N.Y.S.2d at 257 (acknowledging the distinction between licensee and tenant and stating that where as a license "connotes use or occupancy" of a property, "a lease grants exclusive possession")."

52.   The decision that was issued on 5/15/19 in *Ryer 26 LLC v Acosta*, Index No. 46843/18

(Civ. Ct., Bronx Cty., May 15, 2019) was issued by a judge assigned to the BHC confirms that a

landlord is prohibited from maintaining a nonpayment proceeding against a tenant in instances in

which no valid lease agreement exists between them.  The decision that was issued in *Board of*

*Mgrs. of 2 Dag Haarskjold Plaza Condominium v. Ali Baba's Terrace, Inc.*, 2020 N.Y. Slip Op

50082 (Civ. Ct. 2020) was even clearer about this point by stating the following:

a. "It is well settled that absent a lease, petitioner may not maintain a nonpayment proceeding."

b. "In a month to month tenancy there is no agreed upon rental, and no basis for holding respondent liable for rent reserved in the terminated lease"

c.    "a court must search the record on a motion for summary judgment and grant relief where appropriate (*99 Realty Co. v. Eikenberry,* 242 AD2d 215, 217), particularly within the context of a summary proceeding (CPLR § 409(b))."

d.    "respondent's motion for summary judgment is granted and the proceeding is dismissed without prejudice."

53.    *Putnam Realty Assoc. LLC v. Piggott*, 2012 N.Y. Slip Op 50281 (Civ. Ct. 2012) contains the following findings that confirm that Urban and its attorneys fraudulently commenced Urban1 and Urban2 in spite of the fact that nonpayment proceedings require the existence of a valid lease agreement:

a.    "the underlying non payment proceeding cannot be maintained."

b.    "there is no lease in effect between the parties, and as such no contract between them for payment of rent."

c.    "It is undisputed that to date neither the respondent nor his attorney have received a copy of the lease he signed that was to commence on August 1, 2011 back from the petitioner with the petitioner's signature."

d.    "Based on the foregoing, and in light of the particular circumstances presented herein, the remaining branch of the respondent's motion seeking dismissal of the underlying nonpayment proceeding is granted."

54.    The New York State Court of Appeals' decision in *Riggs v. Palmer*, 115 N.Y. 506, 22 N.E. 118, 22 N.E.2d 188 (1889) is available at

https://www.nycourts.gov/reporter/archives/riggs_palmer.htm and includes the following relevant excerpt:

> **"No one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime. These maxims are dictated by public policy, have their foundation in universal law administered [\*512] in all civilized countries, and have nowhere been superseded by statutes.** They were applied in the decision of the case of the *New York Mutual Life Insurance Company v. Armstrong* (117 U. S. 591). There it was held that the person who procured a policy upon the life of another, payable at his death, and then murdered the assured to make the policy payable, could not recover thereon. Mr. Justice FIELD, writing the opinion, said: "Independently of any proof of the motives of Hunter in obtaining the policy, and even assuming that they were just and proper, he forfeited all rights under it when, to secure its

immediate payment, he murdered the assured. It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of a party whose life he had feloniously taken. As well might he recover insurance money upon a building that he had willfully fired.""

(boldface formatting added for emphasis)

55.    The preceding excerpt confirms that Urban has always been equitably estopped and barred from commencing litigation against me to seek payments from me as a result of the B&S that Urban and HRA jointly and criminally perpetrated against me. This point is buttressed by the following findings that are about estoppel that are from _Glus v. Brooklyn Eastern Dist. Terminal_, 359 U.S. 231, 79 S. Ct. 760, 3 L. Ed. 2d 770 (1959):

"To decide the case we need look no further than the maxim that no man may take advantage of his own wrong."

56.    What is shown next are relevant findings from _Lee v. Kucker & Bruh, LLP_, 958 F. Supp. 2d 524 (S.D.N.Y. 2013) that was about a case in which attorneys for a landlord fraudulently sued a tenant in New York City's housing courts for nonpayment of rent that the tenant actually didn't owe and caused those attorneys to have violated the FDCPA by suing that tenant on that basis. Urban and its attorneys are also guilty of violating the FDCPA by having similarly and fraudulently claimed in Urban1, Urban2, and Urban3 that I have owed Urban rent payments for my Urban apartment.

- **Excerpts from _Lee v. Kucker & Bruh, LLP_:**

  a.    "It is well established that the FDCPA imposes strict liability on debt collectors. Plaintiff need not prove that the prohibited conduct was intentional."

  b.    "Plaintiff Rafael Lee brings this action against debt collectors, Kucker & Bruh, LLP ("K & B") and Alan D. Kucker (together "Defendants"), alleging that they violated the Federal Debt Collection Practices Act, 15 U.S.C. § 1692 _et seq._ ("FDCPA"), by misrepresenting that Mr. Lee was delinquent in his rent obligations. Defendants move for summary judgment, arguing that they have not violated the FDCPA and, _arguendo_, asserting the bona fide error affirmative defense. Plaintiff cross-moves for partial summary judgment on liability, but not

damages. Having considered the parties' written submissions and oral arguments, and for the reasons stated below, Defendants' motion is denied, and Plaintiff's motion is granted."

57. _Croslan v. Housing Author. for City of New Britain_, 974 F. Supp. 161 (D. Conn. 1997) states the following about my claims in this case that pertain to violations of tortious interference by personnel of Urban and HRA in regards to both **a)** my Urban lease and **b)** the storage unit that I rented from Cubesmart while I resided in my Urban apartment that I wouldn't have needed to keep renting past March of 2016 but-for the B&S:

    a.    "The elements of a tortious interference claim include a contractual or beneficial relationship, or a prospective contractual relationship or business expectancy, knowledge by defendant of that relationship, intentional interference with the relationship and actual loss suffered by plaintiff."

    b.    "Plaintiff must show that defendant's conduct was in fact tortious, which may be satisfied by proof of fraud, misrepresentation, intimidation, molestation or maliciousness."

58. _Sanko v. Roth_, 2016 N.Y. Slip Op 30930 (Sup. Ct. 2016) also addressed tortious interference by stating the following:

    "To succeed on a cause of action to recover damages for tortious interference with a contractual relationship, plaintiff must establish that (1) plaintiff and a third party have a contract; (2) defendant knew about the contract; (3) defendant intentionally induced the third party to breach or otherwise render performance impossible without justification; and (4) plaintiff sustained damages. (_Burrowes v Combs,_ 25AD3d 370, 373 [1st Dept 2006].) A plaintiff must specifically allege that "the contract would not have been breached `but for 'the defendant's conduct.'""

59. Bad business deals and decisions are made all of the time, such as when people short stocks at the wrong times and with the wrong stocks. However, that doesn't allow anyone to commit acts of fraud to try to undo a bad business deal to avoid losses from them. The only options that exist to undo a bad business deal are to **a)** get the consent of the counterparties that are involved in those deals to modify or void them or **b)** commence litigation to have a court modify or void them. Despite this fact, Urban and HRA subjected me to the B&S most likely to

try to avoid a loss that may have resulted from the fact that my Urban lease was for the entirety of apartment 4C in my building instead of having been for just a room in that apartment. This point relates to the following excerpt from SCOTUS' decision in *Alabama Association of Realtors v. Department of Health and Human Services*, 594 S. Ct. (U.S., August 26, 2021) that refers to a 1952 SCOTUS decision in support of it:

"our system does not permit agencies to act unlawfully even in pursuit of desirable ends"

60. *Alabama Assn. v. Department of Health and Human Services* also states the following about one of the primary rights that people have about property ownership that includes renting apartments:

"one of the most fundamental elements of property ownership—the right to exclude."

61. *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972) confirms that Fourteenth Amendment liberty rights include all of the following:

    a.    The "right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men".

    b.    Freedom from bodily restraint

62. The preceding findings in *Board of Regents of State Colleges v. Roth* partly addressed the First Amendment and Contracts Clause of the U.S. Constitution and the Castle doctrine. According to the Contracts Clause, no state may pass a law impairing the obligation of contracts. In this context, a law may be a statute, constitutional provision, municipal ordinance, or administrative regulation having the force and operation of a statute. The Castle doctrine is about

how a man's home is his castle and is addressed in _United States v. James Daniel Good Real Property_, 510 U.S. 43, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993) by stating that "Good's right to maintain control over his home, and to be free from governmental interference, is a private interest of historic and continuing importance."

63.     _Amato v. Wilentz_, 952 F.2d 742 (3d Cir. 1991) contains the following findings that are about third-party standing to file a lawsuit and are applicable to my interests in suing Urban largely to have all of its contracts with the City and State of New York terminated immediately largely due to fraudulent misrepresentations of fact and fraudulent concealment of fact by Urban that include its commitment to complying with all applicable laws and the terms of those contracts:

> "Where a plaintiff asserting third party standing has suffered concrete, redressable injury (that is, the plaintiff has Article III standing), federal courts are to examine at least three additional factual elements before allowing the suit to proceed. _Caplin & Drysdale,_ 491 U.S. at 623 n. 3, 109 S.Ct. at 2651 n. 3. First, the court must examine the relationship between the plaintiff and the third party whose rights are asserted; second, the court must consider the ability of the third party to advance its own rights — whether some obstacle impedes the rightholder's own suit; and third, the court must inquire into the impact on third party interests — whether the plaintiff and the third party have consistent interests."

64.     _Amnesty America v. Town of West Hartford_, 361 F.3d 113 (2d Cir. 2004) includes the relevant findings shown next that are about municipal liability for and deliberate indifference about illegal acts and omissions. These findings are relevant partly because they underscore the material fact that municipal liability and deliberate indifference certainly exists in regards to my claims in this case primarily because senior current and former City and State of New York personnel that include New York City Mayor Eric Adams and Mr. Banks directed, condoned, and/or ratified illegal acts and omissions pertaining to my claims in this case and/or otherwise participated in an illegal cover-up about that.

**Excerpts from *Amnesty America v. Town of West Hartford*:**

a.   "when a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority. One means of doing so, of course, is to establish that a policymaker ordered or ratified the subordinates' actions."

b.   "Another method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions."

c.   "municipal liability lies where the subordinate's misconduct is "so manifest, as to imply the constructive acquiescence of senior policymaking officials"

d.   "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a "deliberate choice," that acquiescence may "be properly thought of as a city `policy or custom' that is actionable under § 1983.""

e.   "see also *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), *Jeffes v. Barnes*, 208 F.3d 49, 63 (2d Cir.2000) (holding that sheriff's acquiescence in unconstitutional retaliation could be inferred from his tolerance and encouragement of harassment of plaintiffs)."

f.   "Moreover, because a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability."

g.   "§ 1983 plaintiffs may establish that the city is liable for their injuries by proving that "the authorized policymakers approve[d] a subordinate's decision and the basis for it." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion)"

65.   On a related note, the following findings from *City of St. Louis v. Prapotnik* are about the fact that municipal liability may be implicated by illegal acts and omissions by personnel of the City of New York that essentially demonstrate that stated policies of the City of New York aren't worth the paper that they're printed on because of how disingenuous and fraudulent they may be:

a.   "We nowhere say or imply, for example, that "a municipal charter's precatory admonition against discrimination or any other employment practice not based on merit and fitness effectively insulates the municipality from any liability based on acts inconsistent with that policy."

      b.      *"Refusals to carry out stated policies could obviously help to show that a municipality's actual policies were different from the ones that had been announced."*

66.      The following is a pertinent excerpt from *Bleiwas v. City of New York*, No. 15-cv-10046 (ER) (S.D.N.Y. Aug. 14, 2017) that lists the elements for a claim based upon negligence:

"To demonstrate that a defendant acted with negligence under New York law, a plaintiff must show `1) the existence of a duty flowing from defendant to plaintiff; 2) a breach of this duty; 3) a reasonably close causal connection between the contact and the resulting injury; and 4) actual loss, harm or damage."

67.      *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009) is controlling law and includes the following relevant findings:

      a.      "an agency must act consistently. The agency must follow its own rules."

      b.      "Unexplained inconsistency is" a "reason for holding an interpretation to be an arbitrary and capricious change from agency practice"

      c.      "in determining whether an agency's policy choice was "arbitrary," a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

      d.      "when an agency seeks to change those rules, it must focus on the fact of change and explain the basis for that change."

      e.      "To explain a change requires more than setting forth reasons why the new policy is a good one. It also requires the agency to answer the question, "Why did you change?""

68.      *Mary Jo C. v. NY State and Local Retirement Sys.*, 707 F.3d 144 (2d Cir. 2013) is controlling law and states that "under New York law, "[a] duly promulgated regulation ... has the force of law."" This necessarily means that OTDA and HRA personnel as well as Judge Bannon were and remain prohibited from contravening federal and New York State laws and regulations. Such regulations partly include **a)** 18 NYCRR §358-3.7(b)(2) that governs discovery rights for

OTDA fair hearings, **b)** 18 NYCRR §352.6(f) that confirms that HRA is legally required to pay for storage unit rental expenses when people reside in temporary shelter, and **c)** 18 NYCRR §352.31(f)(1) that confirms that HRA is required to fully rectify underpayments by it for government benefits within 30 days.

69. _Singh v. US Dept. of Justice_, 461 F.3d 290 (2d Cir. 2006) similarly states the following:

    a.    "agencies are bound to follow regulations on which individuals justifiably rely"

    b.    "the Supreme Court has held that an administrative agency must adhere to its own regulations."

    c.    "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."

70. The preceding excerpts from **a)** _Alabama Association of Realtors v. Department of Health and Human Services_, **b)** _FCC v. Fox Television Stations, Inc._, and **c)** _Singh v. US Dept. of Justice_ confirms all of the following is entirely true:

    a.    HRA and its personnel were prohibited from being involved in committing, condoning, and covering-up the B&S.

    b.    HRA and its personnel were prohibited from being involved in efforts to prevent me from lawfully attending public meetings that include town hall meetings, resource fair meetings, and public hearings in the rooms in which they were conducted by government personnel with members of the public during which I could and would have attended those public forums in accordance with my First and Fourteenth Amendment rights to try to engage in networking with people who I would happen to meet there partly to improve my chances of being provided pro-bono legal representation partly for use against Urban and HRA.

    c.    HRA and its personnel needed to fully comply with the terms of my HRA contract and verbal agreements that Mr. Banks made to me that I recorded on audio as he told me

that HRA would continue to try to cause me to be provided pro-bono legal representation partly for use against Urban.

      d.    State court personnel assigned to the state courts in New York City have needed to behave consistently instead of in the discriminatory and unduly prejudicial manner that they have in bad faith toward me. That abuse has harassed me and has me facing substantial and irreparable harm in Urban3. That abuse explains why I have commenced this case pursuant to the exceptions to the Younger Abstention doctrine.

71.    This point is further buttressed by the fact that the New York State Supreme Court Appellate Division's First Department's 6/10/22 decision in _Matter of Nichols v. Hochul_, 2022 N.Y. Slip Op 3809 (App. Div. 2022) confirms that "procedural infirmities" occurred that were committed by government personnel that warranted having that court grant the appellants the relief that they sought. In a similar vein, _Morse v. Frederick_, 551 U.S. 393, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007) states the following about the fact that people often are creatures of habit and continue to commit illegal acts and omissions as a result of a _laissez-faire_ attitude about that by others:

> "Every denunciation of existing law tends in some measure to increase the probability that there will be violation of it. Condonation of a breach enhances the probability. Expressions of approval add to the probability.... Advocacy of law-breaking heightens it still further."

72.    The following findings from _Securities & Exch. Com'n v. Management Dyn., Inc._, 515 F.2d 801 (2d Cir. 1975) are about such lawless behavior and the propensity and proclivity that applies to it:

      a.    "the commission of past illegal conduct is highly suggestive of the likelihood of future violations."

      b.    "the "critical question" in issuing an injunction is whether "there is a reasonable likelihood that the wrong will be repeated.""

c.    "Whether the inference that the defendant is likely to repeat the wrong is properly drawn, however, depends on the totality of circumstances, and factors suggesting that the infraction might not have been an isolated occurrence are always relevant."

73.    The syllabus that was issued in SCOTUS' decision in *Uzuegbunam v. Preczewski*, No. 19–968 (U.S. Mar. 8, 2021) answered the question about whether a policy change by government personnel about a past wrong by them that remedies that wrong leaves a litigant who pursues a claim about having experienced that wrong without a controversy and case to pursue by expressing that such a policy change is inconsequential in the event that such a litigant seeks relief that exceeds a correction of that past wrong in relation to it that included nominal damages as a result of that past wrong. One of the things that confirms is that when I pursued claims against HRA about illegal acts and omissions by its personnel against me and those claims have been assigned to OTDA, it has been irrelevant about whether HRA has remedied those wrongs prior to fair hearings that OTDA has scheduled to address those matters. This is because that doesn't change the fact that I'm legally entitled to be provided discovery material from HRA prior to those hearings about those illegal acts and omissions. Following my receipt of such discovery material, I can thereafter freely use that material to try to hold HRA's personnel fully accountable for their illegal acts and omissions in numerous ways. Such ways include sharing that discovery material with prosecutors and using it in other litigation and in conjunction with testimony that I may present during public hearings. While doing so, such efforts would be partly to try to prevent recidivism by HRA's personnel.

74.    *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977) is controlling law that includes the following relevant findings about the fact that federal judges are authorized to restructure how state and local governments operate in response to violations of

constitutional rights:

   a.   "The power of the federal courts to restructure the operation of local and state
        governmental entities "is not plenary. It `may be exercised "only on the basis of a
        constitutional violation.""

   b.   ""Once a constitutional violation is found, a federal court is required to tailor `the
        scope of the remedy' to fit `the nature and extent of the constitutional violation.""

75.   *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899 (8th Cir. 2012) includes the

following related findings about the fact that courts have the ability to issue injunctions in

response to a proclivity to commit illegal acts:

          "a district court has authority to issue a broad injunction in cases where "a proclivity
          for unlawful conduct has been shown." See *McComb v. Jacksonville Paper Co.*, 336
          U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949). The district court is even permitted
          to "enjoin certain otherwise lawful conduct" where "the defendant's conduct has
          demonstrated that prohibiting only unlawful conduct would not effectively protect the
          plaintiff's rights against future encroachment." *Russian Media Grp., LLC v. Cable
          America, Inc.*, 598 F.3d 302, 307 (7th Cir.2010) (citing authorities). If a party has
          violated the governing statute, then a court may in appropriate circumstances enjoin
          conduct that allowed the prohibited actions to occur, even if that conduct "standing
          alone, would have been unassailable." *EEOC v. Wilson Metal Casket Co.*, 24 F.3d
          836, 842 (6th Cir.1994)"

76.   *Toy Manufacturers v. Helmsley-Spear*, 960 F. Supp. 673, 42 U.S.P.Q.2d 1203 (S.D.N.Y.

1997) similarly states the following:

   a.   "It is well-established that "[i]n fashioning relief against a party who has
        transgressed the governing legal standards, a court of equity is free to proscribe
        activities that, standing alone, would have been unassailable."

   b.   "courts have power to enjoin "an act, which if done alone could be legal, but
        when performed in the context of a totality of acts does constitute unfair
        competition"

77.   *Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991) contains findings

that confirm that I'm permitted to sue individual defendants that have been employees of the

State of New York in their individual capacities for monetary damages. In a similar vein, the

decision that Judge Swain issued on 2/22/22 in *Abdul-Matiyn v. District Attorney's Office Bronx*

*County*, No. 21-cv-11074 (LTS) (S.D.N.Y. Feb. 22, 2022) confirms that I'm authorized to sue judges in this case for declaratory and prospective injunctive relief due to violations of federal law that apply to how Urban3 has been conducted in violation of my First and Fourteenth Amendment rights:

    a.    "[J]udicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity."

    b.    "[A] plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective injunctive relief from violations of federal law."

78.    *Max v. Kaplan*, No. 22-cv-6156 (DLC)(S.D.N.Y.) is an ongoing lawsuit against New York State Supreme Court Administrative Judge Deborah Kaplan in response to illegal *ex-parte* communications that have allegedly occurred in state-court litigation in New York City partly because of a lack of proper oversight by Judge Kaplan. That case is relevant because the complaint that was filed in it confirms that plaintiffs can sue state-court judges in New York State in federal court for relief that includes monetary relief in addition to declaratory and prospective injunctive relief. Meanwhile, Judge Frank issued a decision on 10/19/22 in the case of *New York Civil Liberties Union v. New York State Office Of Court Administration*, No. 154792/2022 (Sup. Ct., NY. Cty.) that NYCLU commenced against OCA and Judge Marks in which Judge Frank granted a request by NYCLU to have OCA provide it copies of secret communications between OCA personnel and judges in relation to claims that OCA personnel have allegedly have been interfering with the independence of such judges by urging them to rule about matters in specific ways that is comparable to witness tampering. According to that decision, OCA has 6 months to provide those records to NYCLU. This point is buttressed by the following excerpt from *360 Mortgage Group, LLC v. Fortress Investment Group LLC*, No. 19-cv-8760 (LGS) (S.D.N.Y. Mar. 30, 2022):

"Attempts to influence governmental action through overtly corrupt conduct, such as bribes (in any context) and misrepresentation (in the adjudicatory process), are not normal and legitimate exercises of the right to petition, and activities of this sort have been held beyond the protection of Noerr.")"

79.   _Matter of Scirica v. Bane_, 216 A.D.2d 304, 627 N.Y.S.2d 742 (App. Div. 1995) contains

the following findings:

     a.     "The City DSS was required to provide a timely response to the petitioner's document request prior to the fair hearing (_see_, 18 NYCRR 358-3.7 [b] [2]; 358-4.2 [c])"

     b.     "The City DSS failed to respond to the petitioner's document request"

80.   The following is a lengthy excerpt from _Pantheon Properties, Inc. v. Houston_, No. 20-cv-

3241 (ALC)(SN)(S.D.N.Y. March 28, 2022):

"The Court, however, "is not powerless to address abuses of the discovery process," and may "rely on its broad inherent powers to sanction parties `acting in bad faith, vexatiously, wantonly, or for oppressive reasons.'" Church of Scientology,1994 WL 38677, at *2 (quoting Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992)). Houston prevented defendants from obtaining information to which they were entitled, and he did so in bad faith. He refused to answer basic questions and lied in response to others. See e.g., Houston Dep. 204:15-205:1; ECF No. 89, Ex. 10 at 3 (denying he had other personal bank accounts even though he had just opened a personal checking account with BBVA); see also In re an Arb. Between Karaha Bodas Co., LLC v. Minyak, No. 21-mc-98 (TPG), 2007 WL 1284903, at *6 (S.D.N.Y. Apr. 30, 2007) (awarding sanctions pursuant to the court's inherent power where deponent made intentional false statements); Banjo v. United States, No. 95-cv-633 (DLC), 1996 WL 426364, at *7 (S.D.N.Y. July 30, 1996) (same). He refused to give direct answers to basic questions such as the location of JHC's alleged clients, the approved uses of Paycheck Protection Funds, and whether he ever had anAmazon.com account. See Winn v. Associated Press, 903 F. Supp. 575, 582 (S.D.N.Y. 1995) (awarding monetary sanctions where plaintiff obstructed discovery by, among other misconduct, giving uninformative responses at her deposition and claiming that she "did not recall numerous maters which she surely should be expected to know" despite Court warnings).Houston's disdain for the integrity of the process is exemplified by an exchange with counsel in his second deposition. When counsel asked Houston if he understood that she was entitled to ask additional questions in response to his answers, he responded, "I do, and I'm going to answer the way that I want to answer it." Houston Dep. at 372:3-8. This "willful non-compliance with the discovery process" justifies an award of sanctions against Houston in accordance with the Court's "broad inherent power to impose sanctions in response to abusive litigation practices, thereby ensuring the proper administration of justice." Winn, 903 F. Supp. at 581, 582."

81.     The following are relevant findings from *CDR Créances SAS v. Cohen*, 23 N.Y.3d 307,

15 N.E.3d 274, 991 N.Y.S.2d 519 (2014) that are about fraud on the court and obstruction of

justice:

      a.      "Fraud on the court involves wilful conduct that is deceitful and obstructionistic, which injects misrepresentations and false information into the judicial process "so serious that it undermines ... the integrity of the proceeding""

      b.      It strikes a discordant chord and threatens the integrity of the legal system as a whole, constituting "a wrong against the institutions set up to protect and safeguard the public"

      c.      ""The paramount concern of this Court is the preservation of the integrity of the judicial process"]). The federal courts have applied the clear and convincing standard in determining whether the offending party's actions constitute fraud on the court"

      d.      "Characteristic of federal cases finding such fraud is a systematic and pervasive scheme, designed to undermine the judicial process and thwart the non-offending party's efforts to assert a claim or defense by the offending party's repeated perjury or falsification of evidence (*id.* at 1118). Fraud on the court warrants heavy sanctions, including the striking of an offending party's pleadings and dismissal of the action.""

82.     *Ortega v. City of New York*, 876 N.E.2d 1189, 9 N.Y.3d 69, 845 N.Y.S.2d 773 (2007)

contains the following findings about illegal cover-ups, other failures to preserve evidence, and

how state-court judges in New York State can deal with that:

      a.      "Where appropriate, a court can impose the ultimate sanction of dismissing the action or striking responsive pleadings, thereby rendering a judgment by default against the offending party"

      b.      "New York courts therefore possess broad discretion to provide proportionate relief to the party deprived of the lost evidence, such as precluding proof favorable to the spoliator to restore balance to the litigation, requiring the spoliator to pay costs to the injured party associated with the development of replacement evidence, or employing an adverse inference instruction at the trial of the action"

83.     RPL §853 states the following and covers illegal evictions that includes preemptive

evictions that block people from being granted possession of an apartment to which they're

legally entitled to possess in the first place that confirm that this applies to the B&S:

> "If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrong-doer."

84.    The findings in _Zinna v. Congrove_, 680 F.3d 1236 (10th Cir. 2012) confirm that a jury awarded the plaintiff $1,791 in damages in response to "unlawful conduct by a government employee towards the plaintiff to retaliate or interfere with his freedom of speech. That jury issued that verdict after it was instructed that it **a)** could award the plaintiff damages for emotional distress that the plaintiff experienced in connection with violations of his First Amendment rights and **b)** would need to award that plaintiff nominal damages in the amount of $1.00 in the event that it determined that the plaintiff hadn't met his burden of proving that he suffered damages by the defendant.

85.    _Kenney v. Clay_, 172 F. Supp. 3d 628 (N.D.N.Y. 2016) states the following about punitive damages:

> "Punitive damages are available in a §1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Lee v. Edwards, 101 F.3d 805, 808 (2d. Cir. 1996) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)). "The fact that the constitutional violation does not warrant an award of compensatory damages is not a basis for denying an award of punitive damages." New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 121 (2d. Cir. 2001)"

86.    The following findings from the Second Circuit's decision in _Wright v. Musanti_, 887 F.3d 577 (2d Cir. 2018) confirm that total household income may be used to calculate punitive damages:

> "New York law permits the fact finder to consider evidence of a defendant's wealth when setting the amount of punitive damages, in order to determine what amount would be sufficient to punish that particular defendant and deter "others of similar mind." _Rupert v. Sellers_, 48 A.D.2d 265, 368 N.Y.S.2d 904, 910 (4th Dep't 1975). Musanti presents no authority to support her assertion that consideration of her entire

household's income and assets was improper."

87.      New York State Public Officer Law §30 is used to create job openings for jobs that government personnel hold in New York State and is applicable for government jobs that City and State of New York personnel hold. New York State Public Officer Law §30 previously was used to strip Chaim Deutsch of the job that he had as a member of the City Council after he pled guilty to tax evasion. That occurred after I wasted time by **a)** testifying to him during public hearings that the City Council held and **b)** otherwise talked with him outdoors.

88.      This Court has the power to invoke New York State Public Officer Law §30(1)(f) and (1)(g) to effectively fire people who hold government jobs throughout New York State that are subject to New York State Public Officer Law §30. This partly includes state court judges, OTDA personnel, and HRA personnel. New York State Public Officer Law §30(1)(f) confirms that the "entry of a judgment or order of a court of competent jurisdiction declaring him to be incompetent" is sufficient to create a vacancy for the government job that someone has that is subject to New York State Public Officer Law §30. New York State Public Officer Law §30(1)(g) confirms that the "judgment of a court, declaring void his election or appointment, or that his office is forfeited or vacant" also is sufficient to create a vacancy for the government job that someone has that is subject to New York State Public Officer Law §30. As I just suggested above, administrative law judges, hearing officers, and other personnel who work for OTDA who have their jobs as a result of appointments or elections are among government personnel in New York State whose government jobs as such appear to be subject to New York State Public Officer Law §30. It appears that I don't need to sue them to cause them to be fired from their government jobs because I can instead use New York State Public Officer Law §30 in conjunction with *ex Parte Young* while suing OTDA's Commissioner to cause them to be fired

immediately.

89.     On 5/24/18, CBS News published a news article that is entitled, "Georgia Jurors Award $1 Billion to Rape Victim, Leave Jury Box to Hug Her" that is available at . That article was about https://www.cbsnews.com/news/hope-cheston-rape-victim-wins-1-billion-verdict-against-security-company/ a woman named Hope Cheston to whom a jury awarded $1 Billion in damages in response to an assault that she suffered at the building where she resided by a security guard that was avoidable because that guard wasn't qualified to be one in the first place because he wasn't licensed to be one. The more than 15 punches that I was struck by in the immediate area of my left temple on my head on 7/2/16 by Mr. Sullivan that caused me to be diagnosed on 7/30/16 with a concussion coupled with the fact that I was thereafter severely traumatized by the fact that I had to continue to have him as my roommate following the NYPD's release of him on 7/11/16 when it arrested him for that assault that caused him to resume being my roommate arguably was more severe than the harm that Ms. Cheston suffered from her assault. This isn't meant to downplay, diminish, and gloss over the magnitude of the harm that Ms. Cheston suffered. While there is no question that Ms. Cheston will never receive the $1 Billion jury award partly because of a reduction of that award that is certain to occur, that doesn't change the fact that those who suffer tremendous harm from violent assaults are entitled to be awarded very substantial damage awards.

90.     In a similar vein, "City to Pay Protester Shoved by Cop $387K, Officer Contributes $3,000" is the title of a new article that a news organization named The City published on 2/122 that is available at https://www.thecity.nyc/2022/1/31/22911692/city-to-pay-protester-shoved-by-cop-387k-officer-contributes-3000. That article reported that a legal settlement was reached in a lawsuit that a woman named Dounya Zayer filed against the City of New York and a

criminal in the NYPD who assaulted her by shoving her to the ground in Brooklyn that caused

her to suffer a concussion and other injuries. According to that article, she will receive a payment

of $387,000 as a result of that settlement. This is relevant because though she and I experienced

concussions by being assaulted, it wasn't punches to her head that caused her concussion in

contrast to me and that suggests that monetary damages that I'm owed from the 7/2/16 assault

that I sustained call for far greater damages than what she received from her settlement.

91.    On 12/13/19, the New York Daily News published a news article that is entitled

"Brooklyn Woman Whose Baby Was Ripped From Her Arms in NYC Human Resources Offices

Receives $625,000 Settlement" that is available at https://www.nydailynews.com/new-york/ny-

jazmine-headley-settlement-20191213-6jxorfmzeberhdyecpz5ao3ery-story.html. That article was

about the fact that the City of New York reached a settlement deal with a woman named Jazmine

Headley after security personnel physically and otherwise harassed her and her son in an HRA

office that left them traumatized. The amount of that settlement deal was likely due to emotional

distress that Ms. Headley and her son suffered from that incident that certainly was far less

severe than the assault that I suffered on 7/2/16 by Mr. Sullivan and the fact that I thereafter had

to continue to have him as my roommate.

92.    _Carney v. Boston Market_, No. 18-cv-713 (LGS) (S.D.N.Y. Dec. 20, 2018) contains the

following findings partly about emotional distress:

   a.    "a claim for intentional infliction of emotional distress has four elements: "(i)
         extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial
         probability of causing, severe emotional distress; (iii) a causal connection
         between the conduct and injury; and (iv) severe emotional distress."

   b.    With regard to the "extreme and outrageous conduct" element, courts have found
         liability "only where the conduct has been so outrageous in character, and so
         extreme in degree, as to go beyond all possible bounds of decency, and to be
         regarded as atrocious, and utterly intolerable in a civilized community."

    c.      "New York recognizes two settled theories of negligent infliction of emotional distress: (1) the bystander theory and (2) the direct duty theory."

    d.      "Under the `direct duty' theory, a plaintiff suffers emotional distress caused by `defendant's breach of a duty which unreasonably endangered [plaintiff's] own physical safety.'"

    e.      "A cause of action to recover damages for negligent infliction of emotional distress generally requires a plaintiff to show a breach of a duty owed to him [or her] which unreasonably endangered his [or her] physical safety, or caused him [or her] to fear for his [or her] own safety."

    f.      "[T]he unreasonable endangerment element of a cause of action for negligent infliction of emotional distress involves an objective inquiry turning on whether a plaintiff's physical safety actually was endangered, not a subjective evaluation dependent on the plaintiff's state of mind."

93.     *Padilla v. Metro-North Commuter RR*, 92 F.3d 117 (2d Cir. 1996) contains findings about the fact that the Second Circuit upheld a decision to award someone backpay, liquidated damages, and front pay until he is became 67 years of age.

94.     *Aristotle Psychological and BioFeedback Services, PLLC v. Tenenbaum*, 2019 N.Y. Slip Op 32159 (Sup. Ct. 2019) contains the following findings about irreparable harm that are in relation to the right that people have to pursue a livelihood for others through employment and other lawful means:

    a.      "Powerful considerations of public policy militate against sanctioning the loss of a person's livelihood"

    b.      "This policy is so potent that covenants tending to restrain anyone from engaging in any lawful vocation are almost uniformly disfavored, and are sustained only to the extent that they are reasonably necessary to protect the legitimate interests of the employer, and are not unduly harsh or burdensome to the one restrained"

95.     *Petty v. City of New York*, No. 10-cv-8581 (KPF) (S.D.N.Y. Nov. 25, 2014) states that "there is a deprivation entitled to protection" "when the challenged action effectively prohibits one from engaging in a profession, or pursuing any job in a given field".  In a similar vein, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)

confirms that Fourteenth Amendment liberty right include the right to "engage in any of the

common occupations of life". _Cityspec, Inc. v. Smith_, 617 F. Supp. 2d 161 (E.D.N.Y. 2009)

further addresses this point by stating the following:

> "The Second Circuit has also referred to the "liberty interest in earning a livelihood"
> in connection with obtaining a state license to pursue a particular occupation. In cases
> challenging licensing requirements, a plaintiff alleging deprivation is not required to
> show an entitlement to the license. _RRI Realty Corp. v. Incorporated Village of
> Southampton_, 870 F.2d 911, 918 n. 4 (2d Cir.1989). The liberty interest is "impaired
> if the license is arbitrarily denied." Id. Whether this case is viewed as alleging
> deprivation of a liberty or property interest, it is clear that the interest alleged to have
> been interfered with is the interest in pursuing a chosen occupation. As the foregoing
> cases make clear, that right is not absolute, and an unconstitutional deprivation does
> not occur any time the State regulates a profession. Instead, it is only when the
> challenged action effectively prohibits one from engaging in a profession, or pursuing
> any job in a given field that there is a deprivation entitled to protection."

96.     _Wanamaker v. Columbian Rope Co._, 108 F.3d 462 (2d Cir. 1997) addresses illegal

employment blacklisting practices by stating the following:

> "The terminated employee, however, may have tangible _future_ employment
> objectives, for which he must maintain a wholesome reputation. Thus, plaintiffs may
> be able to state a claim for retaliation, even though they are no longer employed by the
> defendant company, if, for example, the company "blacklists" the former
> employee, _see Silver v. Mohasco Corp.,_ 602 F.2d 1083, 1090 (2d Cir.1979), _rev'd on
> other grounds,_ 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), wrongfully
> refuses to write a recommendation to prospective employers, _see Pantchenko v. C.B.
> Dolge Co., Inc.,_ 581 F.2d 1052, 1054-55 (2d Cir.1978), or sullies the plaintiff's
> reputation, _see id._ at 1054."

## Statement of Facts

**A.      Urban's 3 Frivolous Lawsuits Against Me as Continuing Violations and Related
Fraudulent Claims by Urban's Personnel in Which They Lied by Claiming that I
Have Owed Urban Rent for My Urban Apartment**

1.      Despite the fact that Urban and HRA subjected me to the B&S that necessarily meant that

I have never owed Urban any rent payments because it defaulted on its legal duty to issue me

sole possession of the entirety of apartment 4C that is located in my building in a fully-furnished

condition and with no roommate shortly after 2/16/16, Sharon Coates of Urban issued a notice

dated 8/16/19 in which she lied by fraudulently claiming that I owed Urban more than $30,000 in rent for my Urban apartment.

2.      Also, despite the findings in _Ryer 26 LLC v Acosta_, Index No. 46843/18 (Civ. Ct., Bronx Cty., May 15, 2019) that are shown in the "Legal Standards" section in this complaint and the fact that my BS Urban lease has always been a forgery due to the B&S instead of a valid lease agreement, Urban used attorneys for DNCT to illegally commence both Urban1 and Urban2 as nonpayment proceedings against me. Due to mootness, Urban1 and Urban2 must be dismissed with prejudice. Also, the fact that I told a representative of the BHC on 3/22/22 during the first court hearing in Urban3 that I wasn't provided any legal papers for Urban3 by Urban, its attorneys, or a process server used by them prior to that hearing required both **a)** the immediate dismissal then of Urban3 due to noncompliance with the binding legal prerequisite that required them to have served me those legal papers prior to that court hearing and **b)** a request that I thereafter made in Urban3 to Judge Ibrahim for a subpoena that would order Urban to provide me the video recordings that were recorded on 3/8/22 both in the lobby and stairwells in my building as well as those that were recorded in front of my building by video security cameras that Urban controls to enable me to prove that I wasn't served legal papers for Urban3 then by Defendant Anthony Gonzalez who claimed that he served me legal papers then by leaving a copy of them outside of the entrance to my Urban apartment. Judge Ibrahim has instead illegally, biasedly, and prejudicially allowed Urban3 to proceed and refused to issue an order that would cause me to be provided those video recordings.

3.      Upon information and belief, DNCT mailed copies of the legal papers on Urban's behalf to me that were filed in Urban1, Urban2, and Urban3 as it did so for Urban3 only after the first court hearing occurred in Urban3. By committing those acts and commencing Urban1, Urban2,

and Urban3, Urban, DNCT, and their personnel committed continuing violations against me as they committed mail fraud (18 U.S.C. §1341) and otherwise violated RICO 18 U.S.C. §1964), the FDCPA (15 U.S.C. §1692), New York State Judiciary Law §487, New York State General Business ("GBS") Law §349, RPAPL §741, 22 NYCRR §130-1.1, and New York State Civil Rights Law §50. The fact that Urban3 was commenced as an e-File case in contrast to Urban1 and Urban2 also means that Urban, DNCT, and their personnel committed multiple acts of wire fraud against me through legal filings that were filed by attorneys for Urban in Urban3.

4.      FRCP Rule 9 requires claims about fraud to be pled with sufficient particularity. As a result, I will do so here about what I just stated. The next table identifies legal filings that were filed in Urban1, Urban2, and Urban3 in which personnel of Urban, DNCT, and a process server that DNCT retained the services of committed fraud against me by lying in them:

| # | Case | Filing Date | Filing | Details |
|---|------|-------------|--------|---------|
| 1 | Urban1 | 1/28/19 | Notice of Petition (*see* A4) | Allison Heilbraun of DNCT signed that on 1/28/19 and lied in this by fraudulently claiming that **a)** my BS Urban lease has been a valid lease agreement, **b)** I have resided in my Urban apartment as a result of a valid lease agreement, and **c)** I have owed Urban rent for my Urban apartment that I actually haven't due to the B&S. |
| 2 | Urban2 | 2/4/20 | Nonpayment Petition (*see* A5) | Eric Tavel of DNCT signed that on 2/4/20 and lied in this by fraudulently claiming that **a)** my BS Urban lease has been a valid lease agreement, **b)** I have resided in my Urban apartment as a result of a valid lease agreement, and **c)** I have owed Urban rent for my Urban apartment that I actually haven't due to the B&S. He also claimed that my building is "subject to a regulatory agreement" with HRA "to provide supportive housing to homeless veterans" in spite of the material fact Mr. Banks told me on 8/22/18 that my building isn't supportive-housing as he described it as being "supportive-housing-like" while I recorded that |

| | | | | face-to-face conversation on audio. |
|---|---|---|---|---|
| 3 | Urban2 | 2/4/20 | Notice to Tenant<br><br>(see A3) | Nancy Southwell signed that on 1/13/20 and lied in this by fraudulently claiming that I was indebted to Urban as she fraudulently claimed that I owed Urban rent payments. |
| 4 | Urban3 | 2/25/22 | Holdover Petition | Eric Tavel of DNCT fraudulently claimed all of the following on Urban's behalf on 2/23/22 in that before that was filed on 2/25/22:<br><br>**a)** my BS Urban lease has been a valid lease agreement;<br><br>**b)** I have resided in my Urban apartment as a result of a valid lease agreement;<br><br>**c)** I have owed Urban rent for my Urban apartment that I actually haven't due to the B&S;<br><br>**d)** The term of a rental by me from Urban for my Urban apartment expired on 5/31/13 in spite of the fact that that wasn't possible due to the B&S that meant that such a rental couldn't have possibly begun in the first place because my Urban lease was for apartment 4C in my building instead. |
| 5 | Urban3 | | Holdover Petition | Nancy Southwell of Urban fraudulently claimed all of the following on Urban's behalf on 2/16/21 in a Notice of Termination that was included in that 2/25/22 Holdover Petition:<br><br>**a)** I exhibited unreasonable behavior that infringed on the use and enjoyment of other tenants or occupants in my building or caused a safety hazard to others.<br><br>**b)** I was involved in a physical altercation with Ronald Sullivan on 7/5/22 and that I pushed him then in spite of the fact that we weren't near one another then and he criminally assaulted me on 7/2/16 instead in my Urban apartment prior to having been arrested on 7/11/16 about that and prosecuted for that by the Bronx DA in Sullivan1.<br><br>**c)** I harassed Mr. Sullivan on 7/9/16 about |

| | | | | furniture in my Urban apartment. She fraudulently omitted the fact that the furniture in question was furniture to be shared equally in my Urban apartment and that Mr. Sullivan instead harassed me partly by monopolizing its use by keeping that in his bedroom.<br><br>**d)** I owed Urban rent payments that I actually didn't owe due to the B&S.<br><br>**e)** Actions by me had endangered other occupants in my building. |
|---|---|---|---|---|

**B.**   <u>**Legal Malpractice by NAICA and Other Misconduct in Urban3**</u>

1.      While Julio Manjarrez of NAICA served as my attorney in Urban3, I was legally-entitled to be provided zealous representation by him in Urban3. Hindsight instead confirms that he and NAICA engaged in legal malpractice against me in Urban3 by defying reasonable directives that I issued to him about things I sought for him to do as my attorney in Urban3. The following are examples of the malpractice that he and NAICA committed against me in Urban3:

        a.      He didn't attempt to prove that Anthony Gonzalez lied by claiming that he served legal papers upon me for Urban3 in my building by not bothering to try to obtain the video recording that were recorded on 3/8/22 by video security cameras that are installed in my building and on its exterior that are controlled by Urban. This is in spite of the fact that **a)** a representative of NAICA participated in the 3/21/22 court hearing in Urban3 while I clearly stated that I hadn't received any legal papers for Urban3 yet as a result of actions taken by Urban and its attorneys and **b)** I told Annelisa Adams of NAICA that same information on 3/22/22 while she conducted an intake session with me by telephone to gather relevant facts about Urban3 while I recorded that phone call on audio. That audio recording is available at

https://drive.google.com/file/d/1koLb5cUtEqCNcTOuOA8SvZL9q5I8SCr7/view?usp=sharing.

On 6/23/22, Mr. Manjarrez sent an e-mail message at 5:13 pm to me and an attorney named Paul

Finkelstein of NAICA in which Mr. Manjarrez confirmed that he was defying a directive that I had issued to him to obtain the video recordings that were recorded on 3/8/22 by video security cameras that are installed in public areas in my building and on its exterior for the reasons that I discussed earlier as Mr. Mr. Manjarrez stated the following about that in that e-mail message:

> I spoke with Mr. Finkelstein. After a lengthy discussion, we think it is best to **not** subpoena the video recordings, for the following reasons:
>
> 1. We do not know what is on the video. While it is possible the process server did not attempt to serve someone personally, it is possible that the footage shows that they did. Further, we do not know what else may appear on the video, which can hamper your case. We believe it is best to *only* subpoena when we are 100% certain we know what the footage would reveal;
>
> 2. Even without subpoenaing the footage, we can challenge the service in our answer, which could potentially raise a traverse issue. If we prevail in the traverse hearing, the case may be able to get dismissed. As you may or may not be aware, a traverse issue will be decided along with the trail; and
>
> 3. Even if a case is dismissed because of service, the landlord can bring the exact case again, so long as they comply with the service requirement. Being dismissed because of service won't dismiss the case with prejudice as it won't be dismissed on the merits.

2.      The fact that Mr. Manjarrez fraudulently suggested in that e-mail message that I had a roommate for my Urban apartment other than Ronald Sullivan indicated that Mr. Manjarrez prejudicially wasn't paying proper attention to details in Urban3. Mr. Sullivan was the only roommate who I had in my Urban apartment. Mr. Manjarrez also fraudulently mischaracterized information in that e-mail message that I previously told him as he claimed in it that I told him that Mr. Sullivan pushed me on 7/5/16. I didn't tell him that. I instead told him that Mr. Sullivan and I weren't near each other on 7/5/16 and that Mr. Sullivan had instead viciously assaulted me on 7/2/16 in my Urban apartment.

3.      Also, the material fact that Urban and its attorneys premised their claims in Urban3 on their allegations that a valid lease existed between Urban and I for my Urban apartment confirms

that Mr. Manjarrez also lied in that e-mail message by fraudulently stating the following because

the fact that Urban and its attorneys lied about that in Urban3 legally required the immediate

dismissal of Urban3 and sanctions:

> "this case, as I mentioned to you before, does not depend on whether the lease was
> altered or not."

4.      Mr. Manjarrez impermissibly and prejudicially didn't comply with a demand that I

submitted to him on 7/6/22 at 8:27 pm via e-mail while he was my attorney in Urban3 to have

written transcripts to be prepared from the court hearings that were conducted in Urban3. He

similarly, refused to comply with earlier directives that I issued to him to cause me to be

provided the audio transcripts that were recorded from court hearings in Urban3. Additionally,

neither he nor anyone else who works for NAICA has reimbursed me for legal expenses that I

paid as a result of Urban3 while Mr. Manjarrez was my attorney in Urban3. Such expenses

includes printing and notary services as well as transportation to the BHC.

5.      BHC personnel violated my First and Fourteenth Amendment rights in Urban3 in the

ways discussed next. Judge Ibrahim and others have illegally discriminated against me in Urban3

in the following ways:

a.      They have required my ongoing participation in Urban3 in spite of the material

fact the fact that I wasn't served legal papers for Urban3 prior to the first court hearing in it

required the dismissal of Urban3.

b.      They discriminated against me by causing me to be the only participant in the

3/21/22 court hearing in Urban3 who was required to participate in that hearing from inside of a

courtroom inside of the BHC as the other participants in it were able to participate in that hearing

remotely from other locations. Among other things, that enabled them to both **a)** save time and

money by not having to travel to the BHC for that court hearing and **b)** minimize their risks of

being infected by Covid-19 and other contagious illnesses too by doing so. I had a clear First and

Fourteenth Amendment right to have had all of those other participants in the same courtroom

with me on 3/21/22 for that court hearing in Urban3.

      c.      The BHC's personnel didn't record an audio transcript of the 3/21/22 court

hearing in contrast to the fact that its personnel recorded audio transcripts of other court hearings

in Urban3. That circumstance has prejudicially has prevented people from ordering a copy of the

audio transcript from the 3/21/22 from the BHC partly to use for legal research, news reporting,

and competing against Urban for government contracts.

      d.      Judge Ibrahim told me during the 9/8/22 court hearing in Urban3 that he won't let

me participate in the 10/18/22 court hearing in Urban3 remotely unless I have a medical reason

for that. The fact that the other participants in the 3/21/22 court hearing in Urban3 participated in

that hearing remotely cements the fact that he discriminated against me by telling me that. The

fact that those other participants participated in that 3/21/22 court hearing remotely confirms that

I have a clear First and Fourteenth Amendment right to level the playing field by participating in

the 10/18/22 court hearing remotely while they would instead be required to then be in a

courtroom inside of the BHC. Also, the audio transcript of the 6/16/22 court hearing in Urban3

confirms that though Judge Ibrahim made remarks during it that confirmed that people had been

required to be in a courtroom in the BHC on that date with him for some other case, he told them

during a telephone call that they could instead participate in that court hearing remotely in the

event that they wouldn't be able to get to that courthouse on that date for that purpose. He played

that phone call on speakerphone and didn't require those other people to have to have a medical

reason to not have to appear on that date in that courthouse. This further confirms that I have a

First and Fourteenth Amendment right to participate in court hearings remotely in Urban3 that

are assigned to Judge Ibrahim and don't need a medical reason to do so.

6.      The following is entirely true, accurate, and relevant about what is heard in the audio transcript of the 6/16/22 court hearing in Urban3:

a.      At the elapsed time of 34 seconds, Defendant Harold Rosenthal is heard as he told Judge Ibrahim that my building is a scatter-site shelter as he also lied by claiming that it was supportive-housing too.

b.      At the elapsed time of 3 minutes and 53 seconds, Julio Manjarrez is heard as he told Judge Ibrahim that I informed him that there are video security cameras installed in my building that could be used to determine whether a process server whose services Urban's attorneys in Urban3 allegedly retained to effectuate service of process upon me for Urban3 had actually visited my building on the dates that process server claimed he had to serve legal papers upon me for Urban3.

c.      At the elapsed time of 4 minutes and 21 seconds, Mr. Rosenthal fraudulently claimed to Judge Ibrahim that I hadn't submitted an Answer in Urban3 in which I expressed that I hadn't received the legal papers that Urban's attorneys filed in Urban3 to commence Urban3. Contrary to his deceit, I explicitly told Mr. Rosenthal, a female court attorney for the BHC whose last name is Smith, and a representative of NAICA on 3/21/22 during the court hearing in Urban3 that I hadn't received any legal papers for Urban3 yet. I then told Annielisa Adames of NAICA that same information on 3/22/22 while I taped my remarks on both 3/21/22 and 3/22/22 on audio.

d.      At the elapsed time of 4 minutes and 35 seconds and right after Mr. Rosenthal lied by fraudulently claiming to Judge Ibrahim that I hadn't submitted an Answer in Urban3 in which I expressed that I hadn't received the legal papers that Urban's attorneys filed in Urban3 to

commence Urban3, Judge Ibrahim demonstrated clear disrespect to me as he told me that I shouldn't raise my hand to try to interject in that discussion in defiance of my First and Fourteenth Amendment right to speak up then on my behalf to immediately rebut what Mr. Rosenthal just lied about. Judge Ibrahim erroneously claimed that I then had an attorney (Mr. Manjarrez) to do that instead in spite of the fact that he had been chastising Mr. Manjarrez during that hearing up to that point because of his incompetence. It was only after I made it perfectly clear that I wouldn't be bullied into foregoing my First Amendment to speak during that court hearing that Judge Ibrahim relented.

e.      At the elapsed time of 5 minutes and 43 seconds, Judge Ibrahim resumed chastising Mr. Manjarrez largely about the fact that he had neither filed an Answer in Urban3 nor expressed that he reserved the right to do so.

f.      At the elapsed time of 7 minutes and 10 seconds, Judge Ibrahim demonstrated impermissible bias and prejudice as he made a remark in which he claimed that a lot of people contend that they don't receive legal papers after they have allegedly been served. Judge Ibrahim ignored the material fact that I'm not those other people and that I don't have any idea who he was referring to specifically by that stereotypical and irrelevant remark.

g.      At the elapsed time of 8 minutes and 10 seconds, I explicitly and clearly told Judge Ibrahim that I stated during the 3/21/22 court hearing in Urban3 that I hadn't received any legal papers that were filed in Urban3 to commence Urban3.

h.      At the elapsed time of 8 minutes and 18 seconds, I explicitly told Judge Ibrahim that though Defendant Anthony Gonzalez claimed in an affidavit of service that was filed in Urban3 that he served a copy of the legal papers that were filed in Urban3 to commence Urban3 upon me by affixing a copy of those papers to the front door to my Urban apartment on 3/8/22,

no such legal papers were affixed to that door on 3/8/22 and that I knew that to be entirely true and accurate because I entered and exited my Urban apartment on 3/8/22 without seeing any such legal papers there then.

i.     At the elapsed time of 8 minutes and 28 seconds, I explicitly told Judge Ibrahim that video security cameras are installed in my building that would show in the video recordings that they record those who enter and exit my building. I told him that to point that those recordings would be able to determine whether Defendant Anthony Gonzalez was inside of my building on 3/8/22 when he claimed he visited it to effectuate service of legal papers upon me for Urban3.

j.     At the elapsed time of 9 minutes and 19 seconds, Judge Ibrahim told others I a telephone call that he played on speakerphone that they were supposed to be in his courtroom on that date for a different case. Judge Ibrahim is heard at the elapsed time of 9 minutes and 35 seconds as he told the other people to whom he was talking in that phone call that they could instead participate in that court hearing in that other case remotely in spite of the fact that that court hearing was to have been conducted in-person.

k.     At the elapsed time of 13 minutes and 29 seconds, after Judge Ibrahim baselessly and frivolously claimed that there had been 2 attempts by Defendant Anthony Gonzalez to effectuate service upon me of the legal papers that were filed in Urban3, I immediately countered his claim that relied strictly on the lies by Mr. Gonzalez in an affidavit of service in Urban3 by pointing out that video recordings that were recorded by video security cameras in my building would likely be able to confirm that there had actually been no attempts by Mr. Gonzalez to serve those legal papers upon me in my building.

l.     At the elapsed time of 13 minutes and 38 seconds, I told Judge Ibrahim that he

could issue a subpoena that would cause me to be provided video recordings that would prove that Defendant Anthony Gonzalez actually didn't visit my building on the dates that he claimed in an affidavit of service to effectuate service of legal papers upon me for Urban3. I was then referring to the fact that Judge Ibrahim could issue such a subpoena that would order Urban to cause me to be provided the video recordings that were recorded by the video security cameras that are installed in public areas of my building as well as those that are recorded by video security cameras that are installed on the exterior of my building for the dates that Mr. Gonzalez claimed that he visited my building to try to effectuate service of legal papers upon me for Urban3.

m.      At the elapsed time of 13 minutes and 40 seconds, Judge Ibrahim is heard making remarks to me in which he acknowledged that he could issue such a subpoena, but he needed a reason to do so. While making that remark, he prejudicially ignored the material fact that I had already given him sufficient grounds to issue that subpoena.

n.      At the elapsed time of 13 minutes and 49 seconds, Judge Ibrahim insolently refused to let me interject then in response to the fact the he was prejudicially ignoring the fact that he clearly already had sufficient legal grounds to immediately issue the subpoena that I discussed. While doing so, he clearly demonstrated prohibited intemperance and insubordination to me that demanded his immediate recusal from Urban3 to allow for the appearance of justice to exist in Urban3.

o.      At the elapsed time of 14 minutes and 19 seconds, Judge Ibrahim confirmed that Mr. Manjarrez had filed a motion to dismiss Urban3.

p.      At the elapsed time of 16 minutes and 21 seconds, Judge Ibrahim made a remark in which he expressed that it was possible that judges who are assigned to the BHC aren't

authorized to determine whether a document is an authentic lease agreement.

q.    At the elapsed time of 16 minutes and 43 seconds, I told Judge Ibrahim that when I signed my Urban lease on 2/16/16, I did so in conjunction with a government rental subsidy application. I further told him then that a clear handwriting match exists in that subsidy application and my Urban lease that is among other factors that establish that my BS Urban lease has always been a forgery.

r.    At the elapsed time of 18 minutes and 1 second, Judge Ibrahim fraudulently and intemperately claimed that information that I just told him about remarks that Judge Weissman made to me in Urban1 as he expressed that he possibly would be willing to issue a subpoena to cause me to be provided records from HRA that were related to my Urban lease to prove that my BS Urban lease has always been a forgery constituted the "Law of the Case". Since Urban and its attorneys commenced Urban3 while seeking much of the same relief that they sought in Urban1, the law of the case doctrine from Urban1 is equally applicable to Urban3. Urban is trying to get many of the same rent payments for the same period of time that it sought those payments in Urban1.

s.    At the elapsed time of 19 minutes and 58 seconds, Judge Ibrahim made remarks in which he confirmed that nonpayment proceedings may not be commenced in instances in which no valid lease agreement exists as he ignored the material fact that Urban and its attorneys had illegally done so anyway by commencing Urban1 and Urban2 as nonpayment proceedings.

7.    The following is entirely true, accurate, and relevant about what is heard in the audio transcript of the 9/8/22 court hearing in Urban3:

a.    Judge Ibrahim condoned the fact the BHC's personnel didn't record an audio transcript of the 3/21/22 court hearing in Urban3.

b.      At the elapsed time of 34 seconds, Judge Ibrahim claimed that it was his policy for people to have to appear in court for court hearings in cases while those court hearings are assigned to him unless they have a medical reason. He made that remark after he made earlier remarks during the 6/16/22 court hearing in Urban3 that I identified earlier in this complaint that directly contradicted his 9/8/22 remarks to me about that.

## C.      Ongoing Obstruction of Justice by HRA Pertaining to Urban3 as Well as About Related Matters as Continuing Violations Through Violations of Promissory Estoppel Partly with Respect to My Right to Counsel

1.      Before Mr. Banks resigned from HRA near the start of 2022 or towards the end of 2021, he repeatedly told me that he and HRA would continue to try to cause me to be provided pro-bono legal representation by business partners of HRA that HRA funds to provide those services. Also, Ms. Scalia issued me my HRA contract on 8/1/17 in which she provided me a referral to a an attorney named John Bart while he then worked for MFJ that is a legal services organization. Inc. MFJ used to be known as "MFY" and that referral was to enable me to learn whether MFY would provide me pro-bono legal representation for various legal matters that included housing and wage-theft matters. However, Mr. Bart and MFJ chose not to provide me legal representation for reasons that weren't due to a lack of merit and were instead due to resource limitations and how challenging the legal matters for which I sought pro-bono legal representation were. Also, actions speak louder than words and the actions by Mr. Banks and other HRA personnel as well as other City of New York personnel sabotaged my ability to be provided pro-bono legal representation. They have done so partly by engaging in illegal acts against me pertaining to public meetings that have been public forums that include town hall meetings, resource fair meetings, and public hearings by illegally preventing from lawfully attending them in the rooms in which members of the public conducted them with Mr. Banks and other government personnel while they were conducted that illegally blocked me from

following-up with Mr. Banks in-person partly about the fact that I still hadn't been provided pro-bono legal representation partly to facilitate my efforts to sue Urban and everyone else who was also responsible for the B&S and otherwise prevent Urban from continuing to file frivolous lawsuits against me.

2.      The last time that I tried to talk with Mr. Banks face-to-face during a public meeting was on 11/16/21 in Brooklyn during a public resource fair meeting that members of the public conducted partly with him; New York City Mayor Eric Adams while he then was the Brooklyn Borough President; Bill de Blasio while he was then New York City's Mayor; Pinny Ringel while he then worked for the CAU as its Assistant Commissioner; Joni Kletter while she then was an attorney and OATH's commissioner. In short, I recorded a video during that meeting at 5:19 pm that is available at

https://drive.google.com/file/d/11wYrY8we5z5iTuSNzRjH5S6bi0f59f_4/view?usp=sharing that confirms that Mr. Ringel and Ms. Kletter illegally prevented me from having a conversation with Mr. Banks during that meeting right after I talked with Mr. de Blasio during it while he stood next to Mr. Adams. I certainly intended to talk with Mr. Banks then partly about Urban and being provided pro-bono legal representation for use against it after it had previously commenced Urban1 and Urban2 as frivolous litigation against me. The video that I recorded confirms that **a)** Mr. Ringel told me that I needed to walk away from Mr. Banks instead of being able to talk with him then and **b)** Ms. Kletter lied to me by telling me that she would have me talk with Mr. Banks during that meeting before she promptly thereafter and illegally interfered with my ability to do so as she told me that her actions against me then were due to litigation of mine. Prior to that meeting, I had never talked with her. That means that she and other City of New York personnel illegally conspired against me in regards to that meeting to prevent me from

having a conversation with Mr. Banks because that is the only way that she would have known about litigation of mine. I intended to try to have sufficient public pressure exerted on Mr. Banks during that meeting and earlier public meetings to have him finally cause me to be provided pro-bono legal representation for use partly against Urban.

3.      Prior to that 11/16/21 public resource fair meeting, Mr. Banks intentionally harassed me on 9/23/21 during a public resource fair meeting in Kew Gardens in Queens while I recorded a video of him at 1:46 pm as he did so that is available at

https://drive.google.com/file/d/1yuaEKbRsaYZ-80K1gHngjK3r8rvdUjwe/view?usp=sharing.

That video confirms that Mr. Banks fraudulently claimed that I sent him threatening e-mails and commenced threatening litigation to try to excuse his illegal harassment of me then as he refused to comply with my First and Fourteenth Amendment rights to seek redress from him then partly by yet again following-up with him about why I still hadn't been provided pro-bono legal representation partly for use against Urban that doesn't include the pro-bono legal representation that I had for Urban1 that was of a very limited scope. That video also confirms that I apprised him then that had received discovery material that confirmed that he was among City of New York personnel who had actually been illegally involved in causing me to be prevented from attending such public meetings that were public forums in 2017.

4.      The e-mail message shown next was sent on 4/13/17 at 9:40 am and appears on page 5 in the 185-page PDF file. That e-mail message was sent by Raquel Lucas while she then worked for Mr. Banks as an assistant. Those to whom she sent it then were senior personnel of HRA and the Mayor's Office. That e-mail message confirms that Mr. Banks, Jacqueline ("Jackie") Bray, and other senior City of New York personnel were part of a criminal conspiracy as they orchestrated a fraudulent scheme to cause me to be preemptively barred from attending public meetings in

violation of the Voting Rights Act and other applicable laws as an act of pretextual First

Amendment retaliation and viewpoint discrimination. They did so primarily in response to

criticism and whistleblowing that I lawfully engaged in against Mr. Banks, HRA's business

partners, and others while Mr. de Blasio was running for re-election as New York City's Mayor

while Mr. Banks and others sought to ride his coattails for job security and access to promotions

in their careers.

> **From:** Lucas, Raquel [mailto:quezadar@hra.nyc.gov]
> **Sent:** Thursday, April 13, 2017 9:40 AM
> **To:** Lauter, Rachel; Arslanian, Kayla; Gillroy, Elizabeth
> **Cc:** Bray, Jackie
> **Subject:** Townhall Tonight Re: Towaki Komatsu
>
> +Elizabeth and Jackie
>
> Good Morning,
>
> Jackie Bray had spoken to the Commissioner this morning about this client Towaki
> Komatsu who has been extremely disruptive at events with the Mayor and
> Commissioner Banks. His case history is below. His behavior has been borderline
> harassment to the Commissioner, and he is increasingly belligerent despite our best
> efforts to assist him. Is there any way without making a scene to not allow him in the
> town hall tonight from a safety perspective? Jackie Bray and I are both around if you
> want to talk further. Thanks.

5.      Ms. Lucas committed defamation against me in her remarks in the preceding e-mail

message by virtue of the fact that contrary to her claims, I never was disruptive when she

claimed that I was so and that the behavior by Mr. Banks and other City of New York personnel

towards me was instead harassment. For example, the simple fact that she was and others were

clearly then trying to illegally and pretextually block me from being able to attend a public

meeting that was a public forum while according me absolutely no due process about that

certainly was belligerent, harassing, disruptive, and criminal behavior. Ms. Lucas sent the

preceding e-mail message less than 2 days after the following occurred on 4/11/17:

a.       Harold Miller and members of the NYPD security detail for Bill de Blasio illegally prevented me from lawfully attending the public resource fair meeting that members of the public conducted on 4/11/17 in Staten Island in Borough Hall shortly after Mr. Banks yet again lied to my face a short time earlier nearby shortly after 12:30 pm on a public sidewalk as he lied to my face about why I hadn't been provided pro-bono legal representation by legal services providers that HRA funds. He lied to my face then by claiming that that was due to determinations that NMIC and NYLPI made in which they contended that there was a lack of merit to provide me such pro-bono legal representation. Contrary to his lies, I have audio recordings of my conversations with their personnel and e-mail messages from them too that confirm that he lied about that. NMIC's rationale was instead due to a lack of jurisdiction for matters in Queens while it didn't comment about why it wouldn't provide me legal representation for use against Urban. NYLPI's rationale was due to its contention that the legal matters about which I sought pro-bono legal representation were outside of its areas of practice. If I had been permitted to attend that 4/11/17 public resource fair meeting, I certainly would have engaged in whistleblowing against Mr. Banks then partly to try to improve my chances of being provided pro-bono legal representation partly for use against Urban.

b.       I received a voicemail at 9:56 am on 4/11/17 that I still have that was from Jerome Noriega in his capacity as the court clerk for Judge Bannon. He informed me in that voicemail that Judge Bannon granted an adjournment request that Jeffrey Moszcyc of HRA submitted in that case to adjourn what had been the scheduled 4/12/17 oral arguments hearing in my HRA lawsuit. Mr. Noriega didn't mention the material fact that that Judge Bannon and Mr. Moszcyc criminally stole that 4/12/17 oral arguments hearing from me while I was Jewish since birth after Mr. Moszcy claimed to Judge Bannon that he sought that adjournment due to Passover. The fact

that I'm Jewish and Mr. Mosczyc was prohibited from engaging in illegal ex-parte communications with Judge Bannon confirm that Judge Bannon was legally required to not grant that adjournment application. She criminally did so anyway by adjourning that 4/12/17 oral arguments hearing to 6/7/17 while she was then running for re-election as a corrupt judge. If my 4/12/17 oral arguments hearing in my HRA lawsuit hadn't criminally been rescheduled, then that hearing would have been a limited public forum that spectators could have attended while I could then have talked partly about one of my claims in my HRA lawsuit that was about the fact that HRA was shirking its legal duty to cause me to be provided pro-bono legal representation partly for housing matters.

c.      Personnel of OTDA clearly appear to have engaged in illegal *ex-parte* communications with personnel of HRA as well as fraud and collusion that caused the agenda for my 4/11/17 OTDA fair hearing for OTDA fair hearing number 7406570N that OTDA conducted by telephone on 4/11/17 between HRA and I to have been materially reduced in scope from the matters that it had originally been scheduled to address with respect to claims that I asserted against HRA and apprised OTDA about in a 62-page fax that I transmitted to OTDA on or about 2/9/17. Instead of addressing all of those claims as that 4/11/17 OTDA fair hearing was originally scheduled by Jackie Donovan to do, someone thereafter changed that fair hearing's agenda in a way that caused it to only address a single matter for HRA's benefit that that was about storage unit rental expenses and barred by res judicata from being considered. I was legally required to have been apprised about all proposed changes to that fair hearing's agenda before those changes were implemented in order to comply with my rights to both **a)** submit opposition in response and be fully and fairly heard about that by OTDA and **b)** be able to prepare properly for that 4/11/17 OTDA fair hearing partly by not spending time on preparations for discussing

matters that hearing wouldn't address.

6.      On 12/10/17 at 4 pm, John Bart who I discussed earlier sent me the e-mail message

shown next while I then had a different cell phone number as he implicitly confirmed then that

Mr. Banks previously lied to my face by fraudulently claiming that I hadn't followed-up with

MFJ. Mr. Bart's e-mail message to me then included a copy of the audio recording for the

voicemail message that I left for him on 12/7/17 at 2:46 pm in which I'm heard pointing out that

Mr. Banks lied to me in the way that I just pointed out. That audio recording is available at

https://drive.google.com/file/d/1xsW8vhQWTEGPbWFuZhFco6nlaaNo-4Ty/view?usp=sharing.

> **From:** John Bart <jbart@mfjlegal.org>
> **Subject:** Fw: New Voicemail from 7184506951 - 7184506951
> **Date:** December 10, 2017 at 4:00:25 PM EST
> **To:** "towaki_komatsu@yahoo.com" <towaki_komatsu@yahoo.com>
>
> Good afternoon,
>
> I am in receipt of your voice-mail.
>
> As to anyone who has a question about whether you have been in contact with my office
> or the timing of your contacts with my office, you have an electronic record of our
> contacts to protect you.
>
> Regarding Steve Banks specifically, I decline to call him and don't see the legal
> significance of his opinion on your attempts to consult with or retain legal counsel.
>
> If there is anything else that you would like to discuss, please write me.
>
>
> John Bart, Esq.
> Supervising Attorney
> Mobilization for Justice, Inc.
> 100 William Street, 6th Floor
> New York, NY  10038
> Tel. (212) 417-3766
> Fax (212) 417-3890
> jbart@mfjlegal.org

7.      The following shows two relevant parts from the e-mail message that Mr. Bart sent to me

on 12/17/17 at 2:47 pm that further confirms that Mr. Banks lied to my face on 12/5/17 during a

town hall meeting in Queens as he fraudulently claimed that I hadn't followed-up with MFJ after

having received a referral to it and Mr. Bart on 8/1/17 from Ms. Scalia:

| a) | **From:** John Bart <jbart@mfjlegal.org><br>**Subject:** Re: Update<br>**Date:** December 17, 2017 at 2:47:07 PM EST<br>**To:** Towaki Komatsu <towaki_komatsu@yahoo.com><br><br>Mr. Komatsu,<br><br>Allow me to re-phrase and clarify. |
|----|----|
| b) | Please note that I have never said that you have not followed up with me and have taken pains to try to clear the record on that point including a December 14th email to Commissioner Banks and you. |

8.      On 12/5/17, I recorded an audio recording at 10:03 pm as I had a face-to-face

conversation with Mr. Banks at the end of the town hall meeting that was held at 400 Beach

135th Street in Belle Harbor in Queens. That audio recording is available at

https://drive.google.com/open?id=1tYcwzIXt9tdX0iFLotmvVFOPkavABExX. That recording

confirms that Mr. Banks is heard in it at the elapsed time of 3 minutes and 57 seconds as he told

me that HRA had received information from MFJ about a claim that he previously made to me

on 11/30/17 during an earlier town hall meeting as he told me on 11/30/17 that HRA had

received such information that indicated that I hadn't followed-up with MFJ. The specific

remarks that he made to me then on 12/5/17 were the following additional lies by him:

**"The law firm of Mobilization for Justice that has been waiting for you to follow-up.
You have not followed-up."**

9.      Mr. Banks is also heard saying the following at the elapsed time of 4 minutes and 4

seconds in that same audio recording:

"Then you can follow-up with another agency and we'll be happy to reconnect you."

10.      He made that remark in response to one that I had just made as I told him that I had e-

mail messages that confirm that I had followed-up with MFJ.

11.     On 12/14/17, I recorded an audio recording at 10:35 pm as I had a face-to-face

conversation with Mr. Banks at the end of the town hall meeting that was held at 544 7th Avenue

in Brooklyn. That audio recording is available at

https://drive.google.com/open?id=1ReYEiEDkUue5EaRZfkSmNxEF_xr_3Lyj. That recording

confirms that Mr. Banks and I had the following exchange between the elapsed times of **a)** 2

minutes and 47 seconds and **b)** 4 minutes and 12 seconds:

    a.     <u>**Me**</u>:

           "I have a legal case tomorrow. I've asked for legal counsel…for legal assistance. I
           have to walk into a courtroom tomorrow for a wage-theft case. I've repeatedly
           asked you for legal assistance. Mr. Bart from Mobilization for Justice…he sent
           me an e-mail confirming…yeah, I have been in contact with his office. Your
           statement to me was I didn't follow-up with his organization."

    b.     <u>**Mr. Banks**</u>:

           "So, Mr. Komatsu. We contacted MFY after you sent us that and they advised us
           that you did not follow-up."

    c.     <u>**Me**</u>:

           "I have an e-mail from Mr. Bart."

    d.     <u>**Mr. Banks**</u>:

           "I'm telling you…we followed-up after you were in touch with Mr. Bart and we
           were advised that you were given the ability to follow-up with them and you did
           not."

    e.     <u>**Me**</u>:

           "That's not true."

    f.     <u>**Mr. Banks**</u>:

           "Mr. Komatsu, I can't every week have you tell me something's not true. You
           come, you tell us something…we check with them. They said you never
           followed-up with them."

g.      **<u>Me</u>**:

        "Didn't I send you that e-mail? Did you read it?"

h.      **<u>Mr. Banks</u>**:

        "Yes, after you sent the e-mail, we followed-up with MFY and they advised us
        that you did not follow-up with them. When you told us that you contacted
        them…you said, 'Oh, what happened?'…So, we called them up and they said you
        then never followed-up..."

i.      **<u>Me</u>**:

        "Where did you get that information specifically?"

j.      **<u>Mr. Banks</u>**:

        "I'm not going to go back and forth with you."

k.      **<u>Me</u>**:

        "I understand that. The only reason I'm asking you that question is the
        Supervising Attorney of that organization is telling me…"

l.      **<u>Mr. Banks</u>**:

        "Mr. Komatsu, I'm not going to every week go back and forth with you…"

m.      **<u>Me</u>**:

        "Then let's approach it in a different way. Can you…can you refer me to a
        different organization that can provide…?"

n.      **<u>Mr. Banks</u>**:

        "This is the fourth organization that we've referred you to that you have not
        followed-up with."

o.      **<u>Me</u>**:

        "I have."

p.      **<u>Mr. Banks</u>**:

        "I'm not going to keep going back and forth."

12.     On 12/16/16, Mr. Banks was the primary speaker during a public meeting that the New

York Law School conducted that it arranged to be recorded on video that is available at

https://www.youtube.com/watch?v=czkZh6cAVWY.  That video confirms that Mr. Banks and I

had a conversation during that meeting engaged that begins at the elapsed time of 48 minutes and

40 seconds. The following reflects the exchange that we had then as he lied to my face during

that conversation by claiming that legal services providers that are business partners of HRA that

HRA refers people to in order to let those people learn whether those organizations will provide

them legal representation or legal assistance need to make decisions on the merits as to whether

to provide those people such services:

    a.     **Me**:

        "Hi Mr. Banks. We met previously. The first time I met you was on March 1st at
        the Yale Club where Chief Judge DiFiore was present and so was Judge Lippman.
        At that event, I gave you about 5 court transcripts and you told me that you would
        try to get me some legal help. That never happened. Um, what is your
        response…what can HRA do for past cases? We've talked about that previously
        and it seems like I haven't gotten an answer."

    b.     **Mr. Banks**:

        "So, we've increased funding for legal services tenfold from $6.5 Million to $62
        Million and increased representation in Housing Court. We refer clients who are
        being evicted or being harassed to those providers. Someone like yourself that
        may have a past case is a case in which we can certainly refer anybody to
        providers…there are a lot of providers that are represented in this room. But
        ultimately, they have to make the judgment about whether there is merit to bring a
        case. When I ran the Legal Aid Society and someone in a situation like you would
        come to us, a lawyer would evaluate your case and see if there was anything that
        could be done. In terms of a government funder, the change that we've made…the
        reform that we've made is we've increased representation in Housing Court from
        where it was at 1 percent to 27 percent and we're continuing to do that. But,
        ultimately, whether a particular tenant has a case or not is a matter between a
        lawyer's evaluation of a case to be brought or not."

13.     According mostly to his LinkedIn profile that reflects his career and is available at

https://www.linkedin.com/in/jordanmdressler/, Jordan Dressler currently works for OCA as a Special Counsel after he previously worked for HRA and was the head of its Office of Civil Justice division that is tasked with managing HRA's efforts to cause people to be provided pro-bono legal representation partly about housing matters by issuing them referrals to legal services organizations that HRA funds to provide those services. Both Mr. Dressler and Jean Schneider have major conflicts of interest that naturally cause it to be in their interests for me to not be represented by a competent attorney in Urban3 to avoid major problems in their careers and/or marriages. Prior to joining OCA in November of 2021, Mr. Dressler was among HRA's personnel who illegally sabotaged my efforts to be provided pro-bono legal representation in 2017 and thereafter partly for use against Urban. I have e-mail and video recording evidence that confirms this. Jean Schneider is both Mr. Banks' wife and the Supervising Judge Citywide for New York City's housing courts. On 10/24/17, I talked with Mr. Dressler at the end of a public meeting that was conducted in Harlem by Mark Levine while Mr. Levin then was a member for the City Council. While attending that meeting, I recorded a video of Mr. Dressler, Mr. Levine, and Rodrigo Camus-Sanchez while they were among the panelists for that meeting that was about the rights of tenants and Mr. Camus-Sanchez also worked for NMIC as its Legal Director who I had previously talked with by telephone in April of 2017 while I visiting NMIC's office in the Bronx. That video recording is available at

https://drive.google.com/file/d/1t9UQc24Z1aPUFUexFn75qoj-h8JmW8VW/view?usp=sharing.

14.     On 2/1/21, I received the 185-page PDF file as significant discovery material in K6. That occurred after personnel of HRA and other personnel of Defendant City flagrantly, repeatedly, and illegally violated my privacy rights partly by violating the sealing order that Judge Ostrager issued on 1/17/17 in my HRA lawsuit at my request. That fact and circumstance together with

estoppel about it, offsetting penalties, and my Fourteenth and First Amendment rights confirm

that Defendant City and its personnel couldn't possibly have any privacy rights that could legally

be enforced against me. Page 157 in the 185-page PDF file includes the following e-mail

message:

> **From:** "French, Scott" <frenchs@hra.nyc.gov>
> **Date:** October 25, 2017 at 8:54:48 AM EDT
> **To:** "Haley, Molly (MHaley@cityhall.nyc.gov)" <MHalev@cityhall.nyc.gov>, "Lauter,
> Rachel" <rlauter@cityhall.nyc.gov>, "mcarrion@cityhall.nyc.gov"
> <mcarrion@cityhall.nyc.gov>
> **Cc:** "Banks, Steven" <banksst@hra.nyc.gov>
> **Subject:** Resource FAiur
>
> Hi Rachel, Molly and Commissioner Carrion -
>
> I just wanted to make you aware that Mr. Komatsu, who has attended several events
> where the Mayor and Commissioner Banks are in attendance, indicated at a Access to
> Counsel Town Hall last night that CM Levine and CM Perkins held that he was planning
> on attending today's Resource Fair and expected that he wouldn't be allowed in to the
> Fair.
>
> Wanted to flag for you so you could let Redmond know (who is very familiar with Mr.
> Komatsu). He may ultimately not show up but wanted to flag as a possibility.
>
> Thanks
> Scott
>
> **Scott French** | *Chief of Staff*
> Office of the Commissioner
> 150 Greenwich St. Floor 42, New York, NY 10007
> T: 929-221-7371
> *frenchs@hra.nyc.gov* | **NYC.gov/dss**

15.     Mr. French sent the preceding e-mail message on 10/25/17 while acting as a criminal

accomplice of other senior City of New York personnel that included Mr. Banks, people who

worked for the CAU, and others who worked for the NYPD security detail for Bill de Blasio.

That occurred while they and their colleagues **a)** were hell-bent on rigging the 2017 New York

City government elections for the sake of their job security and access to promotions and **b)**

routinely and flagrantly violated core First and Fourteenth Amendment rights and the Voting

Rights Act in relation to public meetings that I sought to lawfully attend while I was both a

whistleblower and the plaintiff in litigation against some of them in my HRA lawsuit. Mr.

French referred to Mr. Dressler in the preceding e-mail message with respect to the fact that I

told Mr. Dressler on 10/24/17 that I expected that City of New York personnel would again

illegally prevent me from attending a public resource fair meeting on the following day in

Brooklyn at Brooklyn College that I sought to and was legally entitled to lawfully attend after

they had been illegally preventing me from lawfully attending such meetings since April of 2017

while all of those meetings were public forums. That illegal scheme and conspiracy began after

Mr. Mosczyc and Judge Bannon jointly and criminally stole my scheduled 4/12/17 oral

arguments hearing in my HRA lawsuit by engaging in illegal *ex-parte* communications between

4/5/17 and 4/11/17. That 4/12/17 oral arguments hearing would have been a limited public forum

that others could have freely attended as spectators while I would have had the option of talking

partly about **a)** parallel litigation that OTDA conducted on 4/11/17 between HRA and I in my

OTDA litigation **b)** what are my counterclaims and defenses in Urban3, and **c)** the fact that HRA

was shirking its legal duty to cause me to be provided pro-bono legal representation partly for

use against Urban that was among my claims in my HRA lawsuit.

16.     The material fact that senior HRA personnel orchestrated a criminal scheme and

conspiracy in April of 2017 to preemptively and pretextually violate my First and Fourteenth

Amendment rights to pursue my claims in my HRA lawsuit by stealing my 4/12/17 oral

arguments hearing that illegally caused that to be adjourned to 6/7/17 and attend public meetings

that were public forums that were comprised of town hall meetings, public resource fair

meetings, and public hearings during which I could and would have lawfully **a)** engaged in

whistleblowing partly about the theft partly by HRA of my 4/12/17 oral arguments hearing and

**b)** tried to improve my chances of being represented by counsel for use partly against HRA and

Urban counters pretextual remarks that City of New York personnel made about that behind the

scenes and directly to me. For example, page 107 in the 185-page PDF file contains the

following excerpts about me from an e-mail message that Jaclyn Rothenberg sent on 6/29/17 at

9:43 am to others who then were also senior City of New York personnel:

    e.    "Here is an updated timeline from HRA:

        He went to the Corey Johnson Town Hall in Chelsea in March (JP, Marco and Kayla could provide more detail) – he asked the Mayor an incoherent question about having a lawsuit against the courts, judges"

    f.    "Banks is a liar to testify at the Council that legal services are available - the Mayor cut him off - and we offered him referrals to two additional legal providers, which turned him down - and one described him as disruptive (Jordan has details)

        Before that town hall, he came to at least three events that Banks and he spoke at and took questions (City Bar, Yale Club and NY Law School) - each time he asked for legal assistance to bring a case against the court system to challenge a 2015 eviction - he was referred to providers who did not accept the case because of lack of merit. Before the Johnson Town Hall, he started complaining to Ann Marie about the denial a storage allowance (which we denied because he was living in housing and state regulations do not authorize a storage allowance unless the person is without housing) – he went on her husband's twitter account to complain about her (Ann Marie has more details)."

    g.    "He then signed up to come to the SI resource center during CH in Staten Island to see the mayor and was not allowed in because he had already spoken to the mayor in the prior town hall"

17.    The e-mail message that I just discussed was sent by Ms. Rothenberg to the following

people while they then were senior members of Mr. de Blasio's administration while he then was

New York City's Mayor:

    a.    Emma Wolfe while she was then Mr. de Blasio's Chief of Staff.

    b.    Howard Redmond while she was then the head of Mr. de Blasio's NYPD security

detail.

    c.      Marco Carrion while he then was the CAU's commissioner.

    d.      Eric Phillips while he then was Mr. de Blasio's mouthpiece as his spokesperson.

    e.      New York State Senator Jessica Ramos.

    f.      Kayla Arslanian, Michael Casca, Ricky Da Costa, Andrew Hagelgans, Jeff Lynch, and Shauna Stribula.

18.    In addition, the following facts apply to the e-mail about me that Ms. Rothenberg sent on 6/29/17 at 9:43 am in which she employed patently clear and vile smear tactics:

    a.      The next table elaborates about abbreviations that Ms. Rothenberg used in that e-mail.

| # | Abbreviation | Refers to |
|---|---|---|
| 1 | Ann Marie | Ann Marie Scalia of HRA |
| 2 | Banks | Mr. Banks |
| 3 | CH | City Hall |
| 4 | City Bar | The New York City Bar Association that is located on West 44th Street in Manhattan |
| 5 | Council | The City Council |
| 6 | Jordan | Jordan Dressler |
| 7 | JP | Jon Paul Lupo |
| 8 | Kayla | Kayla Arslanian |
| 9 | Marco | Marco Carrion |
| 10 | NY Law School | The New York Law School |
| 11 | SI | Staten Island |
| 12 | SI resource center during CH in Staten Island | The public resource fair meeting that members of the public conducted on 4/11/17 in Staten Island that I registered with the Mayor's Office in advance to lawfully attend before members of the NYPD security detail and Harold Miller of the CAU illegally didn't let me attend that public forum while that resource fair meeting was part of an initiative by the Mayor's Office that was known as "City Hall in Your Borough" in which the Mayor's Office temporarily took its show on the road by shifting its base of operations to different parts of New York City. |
| 13 | Yale Club | The Yale Club in Manhattan that is located near Grand Central Terminal. |

    b.      The "Corey Johnson Town Hall in Chelsea" that she referred to was held on

3/15/17 and was recorded on video as a result of arrangements that were made by people who then worked for the Mayor's Office. That video directly contradicts Ms. Rothenberg's self-serving and fraudulent mischaracterization about me in her e-mail because that video confirms that my remarks to Mr. de Blasio during that 3/15/17 town hall were clear and were welcomed by that meeting's audience.

        c.      The 2 legal services providers to which HRA referred me that Ms. Rothenberg referred to were NMIC and NYLPI. Contrary to Ms. Rothenberg's deceit, I wasn't disruptive whatsoever during my interactions with them. The opposite was true during a legal intake meeting with NMIC that I participated in at its office in the Bronx in April of 2017. Since I can't trust attorneys, I periodically record electronic recordings of my communications with them partly for possible later use as material to use in conjunction with testimony that I present in public hearings. During one of the legal intake meeting that I participated in at NMIC's offices, Leydy Pimentel fraudulently coerced me to delete the audio recording that I had been recording of that meeting while she then worked for NMIC and had been making remarks to me as she indicated that her organization wouldn't provide me services in good-faith for use in litigation against both HRA and Urban about the B&S in spite of the fact that NMIC is funded partly by HRA to do so without regard to conflicts of interest. Also, I received an e-mail message on 4/11/17 from a woman named Adlin Adon while she then worked for NMIC as a paralegal. The information in the PDF file that she included in that e-mail confirms that NMIC decided not to provide me pro-bono legal representation due to a lack of jurisdiction over matters that occurred in Queens while not mentioning anything about why it refused to assist me with litigation against Urban about which it certainly would have jurisdiction. Also, an audio recording of a telephone call that I had with an attorney named Anthony Gemmell on 4/3/17 while he then worked for

NYLPI confirms that he prejudicially neglected to pay proper attention to details while he and I had discussions for the purpose of determining whether NYLPI would provide me pro-bono legal representation for matters that included those that pertain to the B&S. He also told me that the focus of NYLPI's practice was mainly for people with disabilities. The preceding information is relevant because it showcases the fact that Ms. Rothenberg fraudulently insinuated in her 6/29/17 9:43 am e-mail about me that NMIC and NYLPI made decisions on the merits to not provide me pro-bono legal representation after those decisions weren't due to that.

       d.      Ms. Rothenberg lied by fraudulently claiming that applications for HRA to pay for storage unit rental expenses on behalf on an applicant may legally be denied in instances in which the applicant resides in temporary shelter instead of permanent housing otherwise meets the other eligibility criteria to have HRA to pay for such storage unit rental expenses. Also, the material fact that HRA actually paid for those expenses while I resided in my Urban apartment for the entire storage unit rental period between September of 2016 and September of 2018 directs the claims by Ms. Rothenberg and HRA in which they fraudulently contended that those payments couldn't be made by HRA and that I was ineligible to have HRA make those payments. Also, contrary to her fraudulent suggestion that my Urban apartment has been housing for me, **a)** Harold Rosenthal of DNCT has told judges who presided over Urban1 and Urban3 during court hearings that my building is a scatter-site shelter and **b)** 24 CFR §578.3 confirms that my Urban apartment has never been "permanent housing" for me because of the B&S. 24 CFR §578.3 requires someone who resides in an apartment to have a valid apartment lease agreement for it in order to be considered to be someone who resides in "permanent housing". Since 24 CFR §578.3 is a federal regulation, HRA, OTDA, and others were and remain prohibited by the Constitution's Supremacy Clause from defining "permanent housing" to mean

something that contradicts how 24 CFR §578.3 defines that.

      e.     Ms. Rothenberg fraudulently suggested that the fact that I talked with Mr. de Blasio on 3/15/17 during a town hall meeting could legally be used as grounds to prevent me from attending the public resource fair meeting that members of the public conducted on 4/11/17 in Staten Island after I registered with the Mayor's Office in advance to lawfully attend that 4/11/17 public forum. Contrary to her innuendo about that, absolutely nothing about prior interactions that I had with City of New York personnel could be used to legally bar me from attending public meetings that were public forums without according me proper due process beforehand in regards to plans to impose a prior restraint against me. In fact, right before I attempted to attend the 4/11/17 public resource fair, I talked with Mr. Banks near the building that hosted that public forum as he yet again lied to my face yet again about why I hadn't been provided pro-bono legal representation as a result of referrals that I had received from HRA too legal services providers that HRA funds to provide pro-bono legal representation. He told me then that the reason for that was that NMIC and NYLPI personnel had informed HRA that there wasn't any merit to do so. I instantly knew then that he was lying to my face again as I promptly told him that I was done talking with him and that I intended to immediately attend the public resource fair nearby to talk with Mr. de Blasio again about and against him to follow-up with Mr. de Blasio about my 3/15/17 conversation with him when I told him that Mr. Banks had repeatedly made false statements to me about why I hadn't been provided pro-bono legal representation. If I had been able to attend the 4/11/17 public resource fair meeting, I would have engaged in protected whistleblowing partly about the fact that Mr. Banks had just lied to my face less than 3 hours after I learned that Jeffrey Mosczyc of HRA and Judge Bannon stole my scheduled 4/12/17 oral arguments hearing in my HRA lawsuit. While doing so, I would have

sought to have sufficient pressure exerted by the public that include journalists on Mr. de Blasio to have Mr. Banks immediately fired partly to improve my chances of being provided pro-bono legal representation for use partly against Urban.

19.    Furthermore, HRA is currently soliciting proposals from legal services organizations to increase the amount of pro-bono legal representation that is available to people with evictions cases in housing courts in New York City. However, HRA is insisting on the inclusion of an indemnification provision in contracts that would be issued between HRA and such legal services providers that would likely and impermissibly dissuade and deter such legal services providers from providing properly zealous pro-bono legal representation to those with such eviction cases in housing courts in New York City who are legally entitled to be provided such representation by them as such providers are unlikely to properly do so in instances in which HRA personnel also committed fraud and negligence against such people that would warrant the issuance of subpoenas against HRA for records. That is illegal and pretextual obstruction of justice by HRA by including that indemnification provision in those contracts. I'm referring to the fact that HRA issued a public notice on 10/19/22 in an official New York City government report known as the City Record that is available at https://a856-cityrecord.nyc.gov/RequestDetail/20221013118 that is about its efforts to increase the amount of pro-bono legal representation in New York City for people with eviction cases in New York City's housing courts. A link to additional information that is available at https://passport.cityofnewyork.us/page.aspx/en/bpm/process_manage_extranet/12442 exists in that public notice. By clicking on that link, that leads to a web site that contains numerous files that correspond to files that legal services providers would need to complete and otherwise review in order to be considered by HRA for its initiative to increase the amount of pro-bono

legal representation in New York City for people with eviction cases in New York City's housing courts by possibly providing funding to those organizations or increasing such funding to them for that purpose. One of the files that is stored on that other web site that is known as Passport is a PDF file named "Appendix_A_-_General_Provisions_Governing_Contracts_for_Consultants__Professional__Technical__Human__and_Client_Services.pdf". Page 37 in that PDF file contains the objectionable indemnification provisions to which I referred earlier in this paragraph. The terms of those provisions are written in a way that would require such legal services providers to help HRA cover-up illegal acts and omissions by HRA that partly include the B&S by requiring those providers to "take all reasonable precautions to protect all persons and the property of the City and of others from injury, damage, or loss resulting from the Contractor's and/or its subcontractors' operations under this Agreement" that includes choosing not to issue subpoenas against HRA to enable HRA to fraudulently avoid liability for illegal acts and omissions by its personnel.

### D.      Ongoing Obstruction of Justice by HRA Pertaining to Urban3 as Well as About Related Matters as Continuing Violations Through Violations of My Rights to Receive Discovery Material

1.      The findings from _Matter of Scirica v. Bane_, 216 A.D.2d 304, 627 N.Y.S.2d 742 (App. Div. 1995) that are shown in this complaint's "Legal Standards" section confirm that HRA has a track record dating back as far as the 1990s of illegally not providing people discovery material that they're legally entitled to receive prior to fair hearings that OTDA conducts between them and HRA.

2.      The criminal practice, policy, and pattern by HRA's personnel in illegally not providing me discovery material that HRA has been legally required to provide to me prior to fair hearings that OTDA conducted between HRA and I certainly isn't new. HRA is legally required to

provide me a complete evidence packet report prior to those fair hearings without me needing to request them. Despite this fact, the following is entirely true, accurate, and relevant:

a.      On 11/13/19, I recorded a video at 9:37 pm at the end of a public town hall meeting in Queens that members of the public conducted with Mr. Banks and other City of New York personnel that is available at https://drive.google.com/file/d/18HKtJTJ4Ih-OsYsERJttojMlR8rHhBF5/view?usp=sharing. That video confirms that after Mr. Banks predictably, insolently, and fraudulently stonewalled me by refusing to talk with me in flagrant violation of my HRA contract's terms, I talked with one of his assistants who is named Kenny Charles at the elapsed time of 1 minute and 9 seconds as I told him that HRA illegally hadn't provided me the evidence packet report that HRA was legally required to have provided me prior to a fair hearing that OTDA conducted on 11/11/19 between HRA and I in my OTDA litigation. I then asked him why that had occurred and told him that I needed to have received that prior to that hearing for the same reason that people need access to study materials prior to a test in order to properly prepare for a test. My Charles' Linkedin profile that reflects his career is available at https://www.linkedin.com/in/kenny-charles-0727335/.

b.      After I commenced K4 primarily about the fact that Mr. Banks and other HRA personnel had been engaging in illegal behavior to block me from receiving discovery material that I was legally entitled to receive from them and HRA as a result of promissory estoppel, my First and Fourteenth Amendment rights, and 18 NYCRR §358-3.7(b)(2), HRA personnel continued to commit continuing violations in regards to criminal obstruction of justice by illegally violating my discovery rights by not providing me discovery material that I ordered them to cause me to be provided partly for use in my OTDA litigation. I certainly would have benefited enormously from having received that discovery material largely because much of it

was applicable to my counterclaims and defenses in Urban3 as a result of overlapping and inextricably intertwined matters between my OTDA litigation and Urban3 largely due to the B&S. HRA continued to engage in such criminal obstruction of justice in the form of witness tampering and illegal withholding of discovery material in furtherance of a cover-up as OTDA scheduled further OTDA fair hearings between HRA and I that were to have been conducted by OTDA by telephone on **a)** 6/7/22 for fair hearing number 8439992H and **b)** 9/14/22 for fair hearing number 8494959H. Maura Noll is the OTDA administrative law judge who presided over my 6/7/22 OTDA fair hearing. I recorded that fair hearing on audio and that recording is available at

https://drive.google.com/file/d/1gYvkqVIv9ITS7JDMaX_MnLcln7pImyvf/view?usp=sharing. That recording confirms that I clearly told Ms. Noll that HRA illegally hadn't provided me discovery material that I ordered HRA's personnel prior to that hearing to provide to me for that hearing. That recording and hindsight also confirms that she then told me in response that she was adjourning that hearing as a result over my objections against that instead of properly granting me an immediate default judgment against HRA for my claims. While doing so, she lied to me by fraudulently claiming that that one of her supervisors would contact me to reschedule that hearing. Contrary to her lie, OTDA's personnel have illegally not contacted in flagrant violation of my First and Fourteenth Amendment rights for that purpose.

   c. HRA's personnel illegally ignored the discovery demands that I e-mailed partly to Ann Marie Scalia and Martha Calhoun on 5/2/22 at 12:46 pm in which I specified the discovery material that I directed them to cause HRA to provide me to by 5/6/22 to which I was legally entitled partly a result of my 6/7/22 OTDA fair hearing. HRA's personnel did that again about the e-mail that I sent to Ms. Scalia and Ms. Calhoun on 9/9/22 at 3:39 pm in which I essentially

resubmitted my 5/2/22 12:46 pm discovery demand to them while preparing for my 9/14/22

OTDA fair hearing. The following shows the e-mail that I sent to Ms. Scalia, Ms. Calhoun, and

others that included Nigel Marks, Craig Crist, and Samuel Spitzberg of OTDA on 9/9/22 at 3:39

pm:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Re: Demand for records due to OTDA fair hearing # 8494959H
> **Date:** September 9, 2022 at 3:39:35 PM EDT
> **To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Cc:** "Calhoun, Martha (HRA)" <calhounm@dss.nyc.gov>, "Marks, Nigel A
> (OTDA)" <Nigel.Marks@otda.ny.gov>, "Spitzberg, Samuel L (OTDA)"
> <samuel.spitzberg@otda.ny.gov>, "Crist, Craig (OTDA)" <craig.crist@otda.ny.gov>
>
> Ms. Scalia,
>
> OTDA mailed me a notice dated 8/31/22 about its intent to conduct a fair hearing
> between HRA and I for fair hearing number 8494959H by telephone.
>
> This e-mail is a non-negotiable and clear directive to you and other HRA personnel
> who receive it to cause HRA to provide me within 4 calendar days the entirety of the
> records specified below. My First and Fourteenth Amendment rights, 18 NYCRR
> §358-3.7(b)(2), the binding and fully-enforceable 8/1/17 agreement that you issued to
> me in which you explicitly that you and others would assist me "in any way possible"
> at the end of it, and findings in _Trump v. Vance_, 591 S. Ct. (U.S. 2020) that start that
> "the public has a right to everyman's evidence" confirms that I am legally entitled to
> have HRA provide me the entirety of the records specified below.
>
> I don't expect cooperation from you nor anyone else at HRA nor OTDA. As a result,
> I'm sending this e-mail mainly as further proof that you, other HRA personnel, and
> OTDA are continuing to engage in criminal obstruction of justice while being co-
> conspirators in relation to that and other matters. I will file this a copy of this e-mail
> in federal court litigation to get immediate injunctive relief.
>
> 18 NYCRR §358-3.7 explicitly confirms that I have rights that include the following:
>
> 1.    To have the New York City Resources Administration ("HRA"), New York City
> Department of Social Services ("DSS"), and New York City Department of Homeless
> Services ("DHS") provide me copies of any additional documents for free at a
> reasonable time prior to fair hearings that the New York State Office of Temporary
> and Disability Assistance ("OTDA") conducts between HRA and I that I order HRA

to provide to me to facilitate my ability to prepare for such fair hearings. 18 NYCRR §358-3.7(b)(2) confirms this.

2.    To have HRA provide me copies of all documents for free at a reasonable time prior to fair hearings that OTDA conducts between HRA and I that HRA will thereafter present in support of its claims during such fair hearings. 18 NYCRR §358-3.7(b)(1) confirms this.

Also, *Cityspec, Inc. v. Smith*, 617 F. Supp. 2d 161 (E.D.N.Y. 2009) includes the following controlling findings of law:

1.    When the government obstructs an individual's effort to seek judicial redress, this First Amendment rights are violated.

2.    Protected First Amendment rights include the right to seek administrative and judicial relief and complain to public officials.

3.    The First Amendment protects the right of access to the courts.

I'm ordering you and HRA to immediately provide me all of the following materials by 9/12/22:

1. A complete copy of HRA's records about me in text-searchable and unredacted form that dates all the way back to January 1, 2016 instead of the evidence packet that HRA recently sent to me that clearly and illegally is incomplete. For example, it doesn't list information in it that HRA provided me in an earlier evidence packet in February of 2017 that shows that Kristin Benjamin-Solis recorded information in HRA's computer systems about a change that she made on 2/18/16 to an apartment number that was associated with me.

2. All other documents that have been in the possession of the personnel of HRA, DSS, and DHS in unedited form and without redactions that are about the following matters:

    a.    The actual apartment lease agreement that I signed with Lisa Lombardi of Urban Pathways, Inc. ("Urban") on 2/16/16 in DHS' offices located at 33 Beaver Street in Manhattan to be issued possession of apartment 4C with no roommate and in its entirety that is located in the building in which I reside. This includes all communications in unedited and unredacted form that all personnel of HRA, DHS, and DSS have had about that lease agreement.

b.      My visit to DHS at 33 Beaver Street in Manhattan on 2/16/16 that is to partly include the identifies of everyone who was in the small conference room with Ms. Lombardi and I when I signed the apartment lease agreement with her for apartment 4C.

c.      My visit to DHS at 33 Beaver Street in Manhattan on 3/10/16 that is to partly include the identifies of members of the Ombudsman office that I then met with as I discussed the fact that I had just learned that I had fallen victim to an illegal bait-and-switch fraud and forgery concerning the apartment lease agreement that I signed on 2/16/16 with Ms. Lombardi.

d.      The entirely invalid and fraudulent lease agreement that I never signed and was issued to me on 3/7/16 by Urban's personnel.

e.      The chain of custody that copies of the apartment lease agreement that I signed with Ms. Lombardi on 2/16/16 have had within HRA, DHS, and DSS from the moment that I signed that lease on 2/16/16 to the present.

f.      Detailed information about the matters listed right after the screenshot that appears next that is from an evidence packet I received that is comprised of some of HRA's records about me:

| 2/18/2016 | Error Correction | Benjamin-Solis,K | Correction to Aprtment number |
|---|---|---|---|

a) Exactly why did someone named Kristin Benjamin-Solis record information about me on 2/18/16 in which she expressed that a correction to an apartment number associated with me was made in records that HRA, DHS, or DSS maintained about me?

b) What information did HRA, DHS, and DSS have about where I resided **a)** immediately prior to 2/16/16 and **b)** immediately prior to Ms. Benjamin-Solis having recorded on 2/18/16 that a correction to an apartment number associated with me was made?

c) Who are all of the people who were involved in having a correction made to an apartment number associated with me that Ms. Benjamin-Solis reported on 2/18/16 and who did all of those people then work for?

d) Who directed the correction to an apartment number associated with

me to be made that Ms. Benjamin-Solis reported on 2/18/16?

e) Exactly how was the correction to an apartment number associated with me made that Ms. Benjamin-Solis reported on 2/18/16?

f) What discussions occurred and what plans were made to have a correction made to an apartment number associated with me that Ms. Benjamin-Solis reported on 2/18/16, who was involved in those discussions and plans, when did they occur, and to what extent was information about them recorded?

g) Which personnel of HRA, DHS, and DSS have known that a correction to an apartment number associated with me was made that Ms. Benjamin-Solis reported on 2/18/16 and when and how were such people first apprised about that?

h) After personnel of HRA, DHS, and DSS were first apprised about a correction to an apartment number associated with me having been made that Ms. Benjamin-Solis reported on 2/18/16, exactly how and when did they respond to that information?

i) Why I wasn't I notified about a correction that was to be made to an apartment number associated with me in accordance with my constitutional due process rights before Ms. Benjamin-Solis reported information on 2/18/16 about that correction having been made?

j) Right before Ms. Benjamin-Solis recorded on 2/18/16 that a correction was made to an apartment number associated with me, what information did HRA, DSS, and DHS have about the specific street address and apartment number associated with me with respect to where I **a)** then resided and **b)** would be residing in the building in which I reside?

l) Exactly how did Ms. Benjamin-Solis know on 2/18/16 that a correction was made to an apartment number associated with me?

m) What sources of information did those who made a correction to an apartment number associated with me that Ms. Ms. Benjamin-Solis recorded on 2/18/16 use to make that correction?

n) How exactly were all of the people who were involved in having a correction made to an apartment number associated with me that Ms. Benjamin-Solis

reported on 2/18/16 involved in that?

       g.     All communications that personnel of HRA, DSS, and DHS have had about me since 11/1/15. This partly includes all communications about me that such personnel have had with Urban and everyone who has worked for the New York City Mayor's Office, NYPD, and Community Affairs Unit of the New York City Mayor's Office since then. This includes an e-mail message that was provided to me with redactions applied to it that was sent on 4/10/17 at 5:24 pm to former HRA Commissioner Steven Banks while Ms. Lucas then worked for HRA as a Special Assistant. That e-mail message includes the following parts of a sentence in which a redaction was applied between those parts while that sentence was about the fair hearing that OTDA conducted on 4/11/17 between HRA and I about storage matters:

               a) "In addition to his claims for legal services, he has also made a claim for reimbursement for three months in 2016"

               b)  "His claim is subject to a fair hearing before the state tomorrow."

This demand for documents from HRA, DSS, and DHS also includes all communications that their personnel had with Jaclyn Rothenberg and Jessica Ramos while both of them worked for the New York City Mayor's Office in 2017. E-mail messages that Ms. Ramos and Ms. Rothenberg sent in June of 2017 that I received with redactions applied to them confirm that they illegally had access to confidential information in June of 2017 that was about litigation that I commenced against HRA that was assigned to OTDA and the New York State Supreme Court in Manhattan in violation of New York State Social Services Law §136(2), 18 NYCRR §357, and a sealing order that was imposed on the lawsuit that I commenced against HRA in January of 2017 that was assigned to the New York State Supreme Court in Manhattan and assigned the index number of 100054/2017. Ms. Ramos illegally apprised a whistleblower news censor in journalism named Erin Durkin about a storage matter dispute that I was engaged in against HRA. Ms. Ramos did so in an e-mail message that she sent to Ms. Durkin on 6/28/17 at 5:42 pm in spite of the fact that Ms. Durkin never inquired about that matter.

       h.     All information that has been in the possession of HRA, DSS, and DHS that concerns the extent to which they have been and continue to be partly responsible for providing proper oversight of how Urban operates as the landlord of the building in which I reside.

i.      All information that has been in the possession of HRA, DSS, and DHS that concerns the complaints that I have reported to them directly and otherwise against Urban and them about my having been illegally subjected to a bait-and-switch fraud and forgery concerning the apartment lease agreement that I signed on 2/16/16 with Urban's Lisa Lombardi.

j.      All information that has been in the possession of HRA, DSS, and DHS that concerns how Jeffrey Mosczyc of HRA illegally submitted an ex-parte adjournment application in the lawsuit that I commenced against HRA that was assigned the index number of 100054/2017 ("my HRA lawsuit") that I referenced earlier to try to have the oral arguments hearing in it to be rescheduled from its date of 4/12/17 that would have otherwise addressed storage matters on that date and would have occurred just 1 day after my 4/11/17 OTDA fair hearing about identical matters.

j.      All information that has been in the possession of HRA, DSS, and DHS that credibly substantiates claims that have made by Jeffrey Mosczyc, Marin Gerber, Steven Banks, and Ann Marie Scalia in which all of them have insisted that the specific apartment in which I reside has been "permanent housing" for me instead of temporary shelter that OTDA illegally never made the personnel of HRA, DHS, and DSS substantiate.

j.      All information that has been in the possession of HRA, DSS, and DHS that clearly confirms that their personnel are legally allowed to define what is meant by "permanent housing" in a manner that conflicts with how it is defined by 24 CFR §578.3. 24 CFR §578.3 requires people to be in possession of a valid apartment lease agreement to be considered to reside in "permanent housing".

j.      All information that has been in the possession of HRA, DSS, and DHS that been related to illegal acts and omissions by those personnel and other personnel of the City and State of New York to impede my ability to receive pro-bono and/or low-cost legal representation and/or assistance that includes such acts that were committed against me that impeded my efforts to attend public meetings that were public forums that I could have attended from within the rooms in which they were conducted by government personnel while I could have then attended them and engaged in networking with people that partly include journalists, voters, and potential voters partly to try to exert sufficient pressure on others to cause me to be provided such legal representation or assistance.

j.      All information that has been in the possession of HRA, DSS, and

DHS that been related to communications that they have had with personnel of Neighborhood Association for Inter-Cultural Affairs, Inc. ("NAICA"), the New York State Office of Temporary and Disability Assistance ("OTDA"), and Urban Pathways, Inc. about me.

From,

Towaki Komatsu

d.      In fact, HRA illegally didn't provide me an evidence packet report for my 9/14/22 that it was also legally required to provide to me for my 9/14/22 fair hearing. The report that it sent to me for that was mailed on 9/12/22 and received after that 9/14/22 fair hearing. Like earlier evidence packet reports that HRA mailed to me, the information in that report was also grossly incomplete. Nigel Marks of OTDA has steadfastly condoned such violations of my discovery rights by HRA for OTDA fair hearings in his capacity as a corrupt cat's paw for HRA. Moreover, what is shown next is an e-mail message that I sent on 9/13/22 to someone who works for HRA after I talked with him and Molly Park in City Hall while at the end of a public hearing that the City Council conducted in which I testified. I clearly sent this e-mail message to him then to have HRA perform its legal duty to **a)** provide me the discovery material that I sought for my 9/14/22 OTDA fair hearing prior to that hearing and b) enable me to visit HRA's offices at 150 Greenwich Street in Manhattan prior to 9/22/22 to enable me to examine a proposed contract between HRA and Urban prior to a public hearing about that. No one responded to that e-mail message.

**From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
**Subject:** Re: Discovery demand for tomorrow's OTDA fair hearing against HRA
**Date:** September 13, 2022 at 6:23:34 PM EDT
**To:** Pazminom@dss.nyc.gov

As discussed, HRA has illegally not both **a)** provided me discovery material for tomorrow's OTDA fair hearing and **b)** responded to a request that I made to HRA to visit the specific location in HRA's offices at 150 Greenwich Street to examine a

proposed contract between HRA and Urban Pathways, Inc. prior to the public hearing on 9/22/22 that corresponds to the following public notice:

https://a856-cityrecord.nyc.gov/RequestDetail/20220906044

From,

Towaki Komatsu

I sent the preceding e-mail message to the person who is shown in the first of the 2 screenshots shown next that are from a video that I recorded of a conversation that I had on 9/13/22 with Molly Park partly about the fact that I illegally wasn't provided discovery for my OTDA fair hearing. That video recording is available at https://drive.google.com/file/d/17ZY72MxbWBK4gEgX1WKFL7-XRwFTm8LZ/view?usp=sharing.



Ms. Park is shown in the following screenshot from that video as I talked with her

while I recorded that video in the hallway outside of the main chamber in City

Hall:



I later met Ms. Park again on City's Hall's grounds after 9/14/22 near a security

screening area after we entered those grounds through the Broadway entrance as

she made remarks to me then during which she condoned the fact that I illegally

wasn't provided the discovery material that I sought. I submitted a FOIL demand

to the NYPD to be provided video recordings from its security cameras that

would show the interactions that I then had with Ms. Park.

e.     Craig Crist works for OTDA as a Deputy Counsel. He mailed me a letter that is

dated 3/9/22 (see A6) in which he informed me that OTDA had directed HRA in February or

March of 2022 to conduct an investigation about whether HRA's personnel were involved in

having created a forgery from my Urban lease that helped to cause the B&S. He informed me

then that OTDA had directed HRA to do so in response to an e-mail that I sent on 2/18/22 to

OTDA personnel. I instead sent that e-mail on 2/16/22 at 4:16 pm partly to Mr. Marks and it was

very detailed as I clearly identified telltale facts about my Urban lease, my BS Urban lease, and

an application that I submitted on 2/16/16 to HRA for a rental subsidy program that was then

known as SEPS that is now known as FPHEPS. I completed that SEPS application on 2/16/16

with Sara Hyler of HRA and submitted it then together with a copy of my Urban lease after I

signed my Urban lease. Information in my Urban lease and 2/16/16 SEPS application to HRA

jointly and clearly confirm that my BS Urban lease has always been a forgery instead of any type

of valid lease agreement. Despite this fact, HRA illegally used my BS Urban lease in both my

OTDA litigation and my HRA lawsuit to commit fraud on the courts and against me while using

my BS Urban lease as a false instrument to defraud me of government benefits to which I was

legally entitled. In particular, HRA did so to defraud me of my legal right pursuant to my HRA

contract, promissory estoppel, 18 NYCRR §352.31(f)(1), 18 NYCRR §352.6(f), 24 C.F.R.

§578.3, OTDA's 9/15/16 fair hearing decision for fair hearing number 7316477K, and my

Fourteenth Amendment equal protection rights to both **a)** be reimbursed by HRA for storage unit

rental expenses that I paid to Cubesmart for the storage unit rental period of May of 2016 thru

July of 2016 and **b)** have HRA to continuously pay for the storage unit rental expenses on my

behalf to Cubesmart on an ongoing basis throughout the entire period that I resided in my Urban

apartment after HRA issued me a notice on 1/27/17 (*see* A11) in which it explicitly stated that it

would continue to do exactly that and that HRA had just paid for storage unit rental expenses on

my behalf to Cubesmart. Although Mr. Crist expressed at the end of his 3/9/22 letter to me that

OTDA would evaluate whether further action is needed upon the conclusion of HRA's

investigation as to whether its personnel were involved in creating a forgery from my Urban

lease, I have no reason to trust HRA and OTDA and have no indication that OTDA did so. Quite

to the contrary, personnel of those agencies have repeatedly lied to me and engaged in collusion

and a conspiracy that has proximately caused me to be deprived of government benefits to which

I'm entitled as well as my First and Fourteenth Amendment rights in relation to how OTDA has

conducted fair hearings between HRA and I.

       f.      On 3/22/22, Nigel Marks of OTDA issued me a letter (*see* A7) in which he

informed me about 18 NYCRR §356.3 that is a New York State regulation that essentially and

preposterously allows HRA to police itself. This is preposterous due to the inherent conflict of

interest that exists with respect to a desire by HRA's personnel to cover-up illegal acts by HRA

personnel. His remarks then were in relation to the fact that OTDA had directed HRA in

February or March of 2022 to conduct an investigation about whether HRA's personnel were

involved in having created a forgery from my Urban lease that helped to cause the B&S.

       g.      On 11/27/20, I received an e-mail message from OTDA at 8:18 am that included

encrypted communications that corresponded to a letter that Nigel Marks of OTDA issued to me

that is dated 11/27/20 (*see* A8). He stated in that letter that he wouldn't cause OTDA to reopen

my OTDA litigation about the fact that HRA didn't fully comply with OTDA's 9/15/16 fair

hearing decision for fair hearing number 7316477K that was about storage unit rental expenses.

That was obstruction of justice against me in violation of my First and Fourteenth Amendment

rights. No immunity exists for that. His refusal to reopen my OTDA litigation was a fraudulent

and biased administrative decision. He also lied in that 11/27/20 letter by fraudulently claiming

that I had ample opportunities to obtain discovery material that I sought from HRA. Contrary to

his lie, HRA and its personnel consistently stonewalled me about that because they were

engaging in an illegal cover-up largely about the B&S. By claiming that I had ample

opportunities that to obtain the discovery material that I sought from HRA and refusing to reopen my OTDA litigation, Mr. Marks committed wire fraud against me then that prolonged economic harm I was experiencing by continuing to be denied reimbursement of storage unit rental expenses by HRA. Mr. Marks stated that he wouldn't reopen my OTDA litigation in response to a demand that I had recently made to him for that to occur. That demand was in response to a material change with applicable matters of fact. That change was about the fact that Nancy Southwell of Urban confirmed earlier that month in a notice that she issued to me that I was residing in my Urban apartment on a month-to-month basis. Such a residency is temporary month-to-month occupancy instead of residing in permanent housing. That fact was sufficient pursuant to CPLR §2221, CPLR §5015, and New York State Judiciary Law §487 to have OTDA reopen my OTDA litigation on that basis. This is because HRA had been claiming in my OTDA litigation that my residency in my Urban apartment was one of residing in permanent housing instead of temporary shelter before Ms. Southwell confirmed that HRA had been committing fraud in my OTDA litigation partly by lying about that.

h.      On 8/27/21, I received an e-mail message from Mr. Marks at 4:14 pm that included a PDF file that corresponds to a letter (*see* A9) that he wrote to me on that date. He made remarks in that letter in which he fraudulently condoned the fact that HRA violated my rights partly pursuant to 18 NYCRR §358-3.7(b)(2), the First and Fourteenth Amendment, and my HRA contract's terms to receive discovery material for my 12/23/20 and 2/9/21 OTDA fair hearings for fair hearing number 8227101K that were about HRA's ongoing illegal failure to fully comply with OTDA's 9/15/16 fair hearing decision about storage unit rental expenses. The sum and substance of that letter confirms that Mr. Marks was a co-conspirator with HRA in illegally causing me to continue to be denied reimbursement for storage unit rental expenses and

discovery material that I directed Mr. Banks on 12/5/20 and 1/31/21 in e-mail messages that I

sent partly to him, Ms. Scalia, and Mr. Marks to provide to me. This is affirmed by the fact that

there was a clear meeting of the minds between Mr. Marks and HRA's personnel about the

decision to block me from receiving discovery material. By condoning that, Mr. Marks flagrantly

violated 18 NYCRR §358-3.7(b)(4) as well as my First and Fourteenth Amendment rights with

no immunity.

       i.       On 8/24/21, I recorded a video at 1:45 pm in Staten Island with my cell phone that

is available at https://drive.google.com/file/d/1H3aREeN1shdEQh0jUoO97FEuCUNGVaQ-

/view?usp=sharing. While doing so, I did so of Mr. Banks while he then wore a light blue dress

shirt, red tie, eyeglasses, gray face-mask, and a watch on his left wrist as we stood outside of and

next to the building that hosted the indoors component of a public resource fair meeting that

members of the public conducted with me, Mr. Banks and others at 230 Broad Street in Staten

Island. I then recorded an audio recording with my cell phone of a conversation that I had with

Mr. Banks at 1:45 pm that is available at https://drive.google.com/file/d/1JeqqeiHprpoCkUL-

RskRuKk9MHjhdBHR/view?usp=sharing as he and I had the following exchange between the

elapsed times of **a)** 2 minutes and 23 seconds and **b)** 2 minutes and 46 seconds that confirm that

he, HRA, and OTDA illegally acted in concert that caused me to be illegally deprived of the

discovery material that I ordered Mr. Banks, Ms. Scalia, and Ms. Calhoun on 12/5/20 and

1/31/21 to cause me to be provided prior to fair hearings that OTDA conducted between HRA

and I on 12/23/20 and 2/9/21 for OTDA fair hearing number 8227101K:

       i.      **Mr. Banks (at the elapsed time of 2 minutes and 23 seconds)**:

             "You send us a lot of e-mails about OTDA fair hearings and you have your
             view, okay? We don't agree with it."

       ii.      **Me (at the elapsed time of 2 minutes and 31 seconds)**:

"So, you're saying that you're not….you're not required to provide me the discovery material that I requested?"

    iii.    **Mr. Banks (at the elapsed time of 2 minutes and 36 seconds)**:

"The State fair hearing issue has been closed and the State has made a conclusion that we don't have to give you the things that you think we have to give you."

    iv.    **Me (at the elapsed time of 2 minutes and 43 seconds)**:

"OTDA didn't comment about that."

    v.    **Mr. Banks (at the elapsed time of 2 minutes and 46 seconds)**:

"We keep going around and around. You sent…I can't tell you how many e-mails you sent."

3.    No immunity exists for illegally withholding discovery material from me to which I'm legally entitled to receive. These facts confirm that I'm legally entitled to benefit from the relevant precedent that was set in *People v. Trump, et. al.*, No. 451685/2020 (Sup. Ct. NY Cty.) in which New York State Supreme Court Judge Arthur Engoron imposed a daily monetary sanction against Donald Trump in the amount of $10,000 per day for violating a discovery order in that case. I have a Fourteenth Amendment equal protection right to be granted identical and retroactive monetary sanctions with accumulated interest against current and former personnel of HRA that partly include Mr. Banks, Ms. Scalia, Ms. Calhoun for violating my rights to receive discovery material from HRA. I certainly was entitled to use any and all discovery material that I received from HRA in other litigation that includes Urban3. The fact that Mr. Banks, Ms. Scalia, and Ms. Calhoun illegally prejudiced my ability to legal papers properly prepared and submitted in Urban3 that partly include my Answer in Urban3 cements the fact that I'm entitled to monetary sanctions against Defendant City, Mr. Banks, Ms. Scalia, and Ms. Calhoun, and other current and former HRA personnel. The findings that appear in *Pantheon Properties, Inc. v.*

*Houston*, No. 20-cv-3241 (ALC)(SN)(S.D.N.Y. March 28, 2022) that is shown in this

complaint's "Legal Standards" section support this point due to comparable behavior partly by

Mr. Banks, Ms. Scalia, and Ms. Calhoun.

4.      Moreover, OTDA has published a report entitled "Temporary Assistance Source Book"

as a PDF file on its web site at https://otda.ny.gov/programs/temporary-assistance/tasb.pdf that

contains the following text on page 119:

> "DEFINITION – Case record means all written and electronic material concerning an
> applicant or recipient, including the application form, the **case history**, budget and
> authorization forms, medical, resource and financial records."

> (boldface formatting added for emphasis)

5.      18 NYCRR §358-3.7 is a New York State regulation that governs the discovery material

that I have been legally entitled to be provided by HRA prior to fair hearings that OTDA has

conducted between HRA and I. The text of that regulation is available at

https://govt.westlaw.com/nycrr/Document/I50c45991cd1711dda432a117e6e0f345?viewType=F

ullText&originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc

.Default). The fact that 18 NYCRR §358-3.7(a)(1) explicitly confirms that I have been legally

entitled to "examine the contents of" my "case record and all documents and records to be used

by the social services agency at" my "fair hearing" at "any reasonable time before the date of"

my "fair hearing and also at the fair hearing" confirms that HRA has always been legally

required to provide me records that partly include the "case history" that HRA's personnel have

maintained about me. Despite this fact, HRA's personnel have consistently engaged in criminal

obstruction of justice against me in the form of witness tampering and illegal withholding of

discovery material partly by illegally not providing me the entire case history that HRA's

personnel have maintained about me. Earlier in this complaint, I discussed and showed a copy of

the e-mail message that Raquel Lucas sent on 4/13/17 at 9:40 am while she then worked for

HRA as an assistant to Mr. Banks. The fact that she was referring to me in that e-mail message

as she stated "His case history is below" confirms that HRA was legally required to provide me a

copy of that e-mail message as discovery material prior to fair hearings that OTDA conducted in

my OTDA litigation. In the same vein, the fact that the end of the following excerpt from an e-

mail message that Ms. Lucas sent on 4/10/17 at 5:24 pm partly to Mr. Banks that was about me

in which she lied about me that appears on page 94 of the 185-page PDF file states "See below

for his case history" confirms that HRA was legally required to provide me that e-mail message

for and prior to fair hearings that OTDA provided to me:

> **From:** Lucas, Raquel
> **Sent:** Monday, April 10, 2017 5:24 PM
> **To:** 'rIauter@cityhall.nyc.gov'; mcarrion@cityhall.nyc.gov; Arslanian, Kayla
> (KArslanian@cityhall.nyc.gov); 'Jaclyn
> Rothenberg (JRothenberg@cityhall.nyc.gov)'
> **Cc:** Banks, Steven; Yeaw, Jennifer
> **Subject:** Staten Island Resource Fair 4/11 Re: Towaki Komatsu
>
> Good Afternoon,
>
> Please be advised that we have been alerted by the Public Engagement Unit that the
> following client, Towaki Komatsu, will be attending both the Staten Island Resource
> Fair tomorrow and the Townhall this week to speak with the Mayor and
> Commissioner Banks. He came to the recent Chelsea Townhall and asked the Mayor
> about why the court system and Commissioner Banks are refusing to assist him. Mr.
> Komatsu currently lives in supportive housing, has been assisted multiple times by
> HRA and has been referred to numerous legal services providers. But he has
> continued to show up at public events claiming that he has not been helped and is a
> disruptive presence. We wanted to make you aware in case he is disruptive at
> tomorrow's fair.
>
> See below for his case history:

6.      The e-mail message that Ms. Lucas sent about me on 4/10/17 at 5:24 pm that I just

discussed also includes the following text as she **a)** discussed complaints that I reported to HRA

while fraudulently suggesting that I first reported them to HRA in March of 2017 instead of

March of 2016; **b)** discussed referrals that HRA issued to me to NMIC and NYLPI partly about those complaints; **c)** lied by claiming that my building has been supportive housing; and **d)** lied by fraudulently claiming that I wasn't legally entitled to be reimbursed by HRA while she was then referring to storage unit rental expenses that I paid to Cubesmart for the storage unit rental period of May of 2016 thru July of 2016 after HRA fraudulently induced me to do so partly by subjecting me to the B&S as she pointed out that she was aware that I was then scheduled to participate in a fair hearing about that matter on 4/11/17 as she referred to the fact that OTDA would conduct that fair hearing for fair hearing number 7406570N:

> Mr. Komatsu resurfaced in March 2017 when he contacted HRA by email with new complaints about his treatment by HRA and allegations of fraud by Urban Pathways in connection with supportive housing he was receiving in the Bronx.
>
> We referred Mr. Komatsu to legal providers Urban Justice Center and New York Lawyers for the Public Interest for legal assistance about his legal concerns, starting with issues he raised regarding his placement at a housing facility maintained by Urban Pathways. We also flagged the issues of possible wage theft from a previous employer.
>
> Mr. Komatsu did get in contact with NYLPI and based on the fact that Mr. Komatsu's current housing is in the Bronx, he was referred through the LEAP consortium to legal provider NMIC. NMIC met with Mr. Komatsu on Friday, April 7.
>
> It was determined by NMIC that Mr. Komatsu has no active legal case. NMIC/LEAP concluded that the assistance he is seeking is beyond the scope of the providers' services.
>
> In addition to his claims for legal services, he has also made a claim for reimbursement for three months in 2016 for which he is not eligible. His claim is subject to a fair hearing before the state tomorrow.

7.      Ms. Lucas illegally disclosed my HRA case history with other City of New York personnel who didn't work for HRA in flagrant violation of 18 NYCRR §357 and New York State Social Services Law §136(2) that govern my privacy rights and my Fourteenth Amendment rights that apply to that. As a result of her actions, NYPD Inspector Howard Redmond

mentioned that "case history" in the following e-mail message that he sent on 4/13/17 at 5:13 pm

that appears on page 8 in the 185-page PDF file as he criminally conspired with Ms. Lucas, Mr.

Banks, Jacqueline Bray, and other City of New York personnel to illegally prevent me from

attending a public town hall meeting on 4/13/17 that was held in Staten Island as he lied about

me in that e-mail message:

> **From:** REDMOND, HOWARD
> **Sent:** Thursday, April 13, 2017 5:13 PM
> **To:** loveno, J
> **Subject:** Jerry see below
>
> **Towaki Komatsu** has been extremely disruptive at events with the Mayor and
> Commissioner Banks. His case history is below. His behavior has been borderline
> harassment to the Commissioner, and he is increasingly belligerent despite our best
> efforts to assist him. Is there any way without making a scene to not allow him in the
> town hall tonight from a safety perspective.
> If this guy shows up alert Cityhall Staff do not let him in. Worst case we will put him
> in overflow.
>
> Sent from my BlackBerry 10 smartphone on the Verizon Wireless 4G LTE network.

**E.    Fraud on the Courts About My Urban Lease by Jeffrey Mosczyc and Marin Gerber
of HRA in My HRA Lawsuit and My OTDA Litigation that the Judges and OTDA
Personnel Tied to that Litigation Condoned**

1.    On 4/7/17, Jeffrey Mosczyc of HRA committed fraud on the courts and against me for

the second time in the span of 2 days in the context of my HRA lawsuit. He first did so on 4/5/17

by engaging in illegal ex-parte communications with Judge Bannon in my HRA lawsuit by

sending a fax to her chambers on 4/5/17 in which he requested an adjournment of my scheduled

4/12/17 oral arguments hearing in that case while he made the unsubstantiated claim that he

sought that adjournment because my 4/12/17 oral arguments hearing would occur on Passover.

While sending that fax, he fraudulently omitted the following material facts before Judge Bannon

illegally countenanced that as she engaged in collusion with Mr. Mosczyc to criminally subject

me to obstruction of justice by stealing both my 4/12/17 oral arguments hearing and my First and

Fourteenth Amendment right to submit opposition to her in response to Mr. Mosczyc's 4/5/17 adjournment application that would be required to be fully and fairly considered by her before she could legally only then issue a decision about whether to deny Mr. Mosczyc's 4/5/17 adjournment application:

      a.      He hadn't bothered to ascertain whether I was Jewish before he sent his fax to her on 4/5/17. If he had done so, then my relatives and I would have been able to confirm that he was barred from being granted an adjournment of my 4/12/17 oral arguments hearing in my HRA lawsuit on religious grounds because I have been Jewish since birth and have been a more observant Jew than Mr. Mosczyc by virtue of the fact that he indisputably violated the prohibition against stealing that is part of the Ten Commandments as he stole my scheduled 4/12/17 oral arguments hearing.

      b.      HRA has other attorneys who likely could have substituted in his place on 4/12/17 in my HRA lawsuit.

      c.      He illegally didn't apprise me about his 4/5/17 request to adjourn the 4/12/17 oral arguments hearing.

      d.      Mr. Banks has claimed that he is Jewish, is also a deceitful attorney, and was recorded on video on 4/13/17 during Passover while he violated Passover's restrictions about work activity by actively participating in the town hall meeting in his capacity as HRA's commissioner that was held in Staten Island.

      e.      He could have contacted Judge Bannon long before 4/5/17 to request that my 4/12/17 oral arguments hearing be conducted prior to 4/12/17 to avoid a scheduling conflict about Passover. Judge Bannon scheduled my 4/12/17 oral arguments hearing in my HRA lawsuit on 1/26/17.

2.      On 4/11/17, I received a voicemail message at 9:56 am from Jerome Noriega in his official capacity as Judge Bannon's court clerk. The audio recording of that voicemail message is available at

https://drive.google.com/file/d/1thzFNjUk0oMsVKLjDFEqzP37bPKueAR8/view?usp=sharing.

Mr. Noriega's remarks in it confirm that he told me the following in it:

a.      The City of New York had requested an adjournment of my 4/12/17 oral arguments hearing in my HRA lawsuit due to Passover on 4/12/17 while he was then referring to Mr. Mosczyc as having made that request.

b.      Judge Bannon granted that request and the new date for my 4/12/17 oral arguments hearing would be on 6/7/17.

3.      It's objectively reasonable to infer from the totality of the circumstances and hindsight that Mr. Mosczyc's actual reason for having sought the adjournment of my 4/12/17 oral arguments hearing in my HRA lawsuit was to engage in illegal gamesmanship to rob me of my right to testify against HRA and Urban just one day after my 4/11/17 OTDA fair hearing largely because **a)** it was a certainty that I would testify partly about matters that were discussed during my 4/11/17 OTDA fair hearing and **b)** he wanted to have longer than the one day period that would have otherwise existed between my 4/11/17 OTDA fair hearing and my 4/12/17 oral arguments hearing in my HRA lawsuit to prepare for that oral arguments hearing than would have been possible without that adjournment. In short, the illegal gamesmanship that Mr. Mosczyc chose to engage in then against me relates to a tactic in football that is known as "freezing the kicker".

4.      When Mr. Mosczyc committed fraud on the courts and against me on 4/7/17, he did so through fraudulent misrepresentations that he made in the 4/7/17 affirmation (*see* A10). That

affirmation is shown in the "Judgment Roll" folder that appears on the left side of the screen on the public computers in the Records Room in the basement of the New York State Supreme Court in Manhattan at 60 Centre Street when searching for my HRA lawsuit. The start of the 4/7/17 affirmation appears on page 453 in the 1,332 page PDF file that corresponds to the "Judgment Roll" entry.

5.     Mr. Mosczyc illegally used my BS Urban lease in the 4/7/17 affirmation **a)** as Exhibit 5 and **b)** in connection with his remarks on page 5 in ¶7 as he lied by claiming that my BS Urban lease was a valid agreement instead of the forgery that it has always strictly been. He also included a copy of my BS Urban lease as the "Exhibit 5" that was annexed to the 4/7/17 affirmation as he illegally used my BS Urban lease as a false instrument while fraudulently claiming that it was a copy of the apartment lease agreement that I signed on 2/16/16 with Lisa Lombardi of Urban. The object of the criminal scheme by Mr. Mosczyc and HRA through Mr. Mosczyc's illegal use of my BS Urban lease in the 4/7/17 affirmation was to continue to enable HRA to get away with defrauding me of my clear right to **a)** be reimbursed by HRA for the storage unit rental expenses that I paid to Cubesmart for the storage unit rental period of May of 2016 thru July of 2016 for the storage unit that I rented from it while I resided in my Urban apartment and **b)** for HRA to continue to pay for all of the storage unit rental expenses that were owed to Cubesmart for that storage unit while I continued to reside in my Urban apartment. I have always and immediately repudiated my BS Urban lease instead of having **a)** signed that and **b)** otherwise agreed to its terms. Mr. Mosczyc's use of my BS Urban lease in my HRA lawsuit as a false instrument while fraudulently claiming that it was a copy of the apartment lease I signed on 2/16/16 with Ms. Lombardi was a deceitful administrative act that wasn't advocacy work and isn't covered by government attorney immunity. On a related note, the decision that was issued

in *In Matter of Truong*, 22 A.D.3d 62, 800 N.Y.S.2d 12 (App. Div. 2005) was about an attorney who illegally used a forgery in the form of a lease agreement as a false instrument in litigation that caused him to be severely sanctioned partly by being disbarred and sanctioned $10,000 in the related earlier case of *Matter of Truong*, 2 A.D.3d 27, 768 N.Y.S.2d 450 (App. Div. 2003) partly for the illegal use of a forged lease in litigation.

6.        Mr. Mosczyc committed further fraud on the courts and against me in the 4/7/17 affirmation in the following ways:

a.        He did so on page 5 and numbered paragraph 7 in 4/7/17 affirmation in the following ways:

i.        He fraudulently omitted the following material facts:

1)        HRA fraudulently claimed that my BS Urban apartment has been permanent housing for me.

2)        HRA fraudulently claimed that according to New York State regulations, I wasn't eligible to have HRA issue payments on my behalf for storage unit rental expenses while I resided in my BS Urban apartment.

3)        HRA recorded patently fraudulent information about where I resided in WMS that corresponds to the Exhibit 4 that he annexed to that 4/7/17 affirmation without bothering to verify and correct the plainly fraudulent and inaccurate information in that exhibit.

4)        Personnel of HRA and Urban jointly and criminally created a forgery that corresponds to my BS Urban lease from my Urban lease before Mr. Mosczyc fraudulently suggested in that paragraph that my BS Urban lease was a rental agreement instead of the forgery and false instrument that corresponds to the Exhibit 5 that he annexed to that

4/7/17 affirmation.

b.      He did so on page 5 and numbered paragraph 8 in the 4/7/17 affirmation by fraudulently claiming that HRA erred by having issued payments for storage unit rental expenses on my behalf while I resided in my Urban apartment.

c.      He did so on page 5 and numbered paragraph 9 in the 4/7/17 affirmation by fraudulently omitting the material fact that though HRA never had any relevant new facts, evidence, nor matters of applicable to cause HRA to have objectively valid grounds to issue a new determination about whether I was eligible to have HRA to issue payments for storage unit rental expenses on my behalf to Cubesmart for the storage unit that I continued to rent from it while I resided in my Urban apartment, HRA pretextually and fraudulently issued such a new determination anyway on 3/28/17 strictly as a ruse to fraudulently evade HRA's legal duty to both **a)** reimburse me for storage expenses that I paid to Cubesmart and **b)** continue to pay for storage unit rental expenses on my behalf that were owed to Cubesmart for the storage unit that I continued to rent from it while I resided in my Urban apartment without a valid apartment lease agreement for it that caused it to be nothing more than temporary month-to-month shelter for me instead of permanent housing. That was before an attorney for Urban named Harold Rosenthal repeatedly told judges in Urban1 and Urbn3 that my building is a "scatter-site" that are widely regarded as shelters instead of "permanent housing".

d.      He did so on page 6 and numbered paragraph 13 in the 4/7/17 affirmation by fraudulently claiming that my BS Urban apartment has been permanent housing in spite of the fact that he and HRA always were prohibited from contending that because 24 C.F.R. §578.3 is a a federal regulation and the U.S. Constitution's Supremacy Clause prohibits HRA from defining "permanent housing" in a way that conflicts with how that is defined by 24 C.F.R. §578.3. This

is about preemption.

7.      Also, though Mr. Mosczc insisted in both the 4/7/17 affirmation and during oral

arguments on 6/7/17 that I wasn't legally eligible and entitled to have HRA **a)** reimburse me for

the storage unit rental expenses that I paid to Cubesmart for the storage unit rental period of May

of 2016 thru July of 2016 while I resided in my Urban apartment and **b)** otherwise pay for

storage unit rental expenses on my behalf while I resided in my Urban apartment, he fraudulently

didn't inform her that HRA was actually paying for the storage unit rental expenses that were

owed to Cubesmart for the storage unit that I rented from it while I resided in my Urban

apartment as HRA paid for that for the entire storage unit rental period from September of 2016

thru September of 2018. This indisputably confirms that Mr. Mosczyc committed mail fraud

against me in the 4/7/17 affirmation as a result of the fact that it was mailed to me.

8.      The next screenshot is from a report that I was issued on 7/26/17 by HRA that confirms

that HRA issued payments between April of 2017 and July of 2017 for storage unit rental

expenses to Cubesmart while I resided in my Urban apartment. I redacted my HRA case number

in that screenshot for privacy reasons. This confirms that HRA committed fraud on the courts

and against me through fraudulent misrepresentations that Jeffrey Mosczyc and Marin Gerber

made in my HRA lawsuit and on 4/11/17 during an OTDA fair hearing that I had then against

HRA.

```
NQCS5E (P)    Benefits Issued With Issuance Codes 21              07/26/17
                  12/01/16 thru 08/10/17                      Page 01 of NM
            Case #▮▮▮▮▮▮     Center 038   Unit/Worker 00213    Reconciliation
S                                                        Adm Dt Out Tall Vouch
e          Issuance                                          --Date--Status
l   Suf --Date-- Cycle              Payment  Payment        Amount    Discr
    T  Cd   Type    RTG   Benefit#   Amount   Period
1   01  07/20/17         SP44158524  339.00  08/01/17
    PA SI 21 STORAGE   PUC  1  EMRG IND  P    08/31/17        /  /       0

2   01  06/20/17         SP44121994  339.00  07/01/17
    PA SI 21 STORAGE   PUC  1  EMRG IND  P    07/31/17        /  /       0

3   01  05/24/17         SP44088076  339.00  06/01/17
    PA SI 21 STORAGE   PUC  1  EMRG IND  P    06/30/17      06/05/17     3
                                                           339.00
4   01  04/19/17         SP44046758  339.00  05/01/17
    PA SI 21 STORAGE   PUC  1  EMRG IND  P    05/31/17      04/28/17     3
                                                           339.00
5   01  03/22/17         SP44006444  339.00  04/01/17
    PA SI 21 STORAGE   PUC  1  EMRG IND  P    04/30/17      03/31/17     3
                                                           339.00

Enter number in Select column to View Grant Details     Next Case:
Issuance Code:              Date Range: 12/01/16 thru 08/10/17       CMD
```

9.      The next screenshot is of a check that HRA issued on 9/11/18 that it gave to me to give to Cubesmart to pay for storage unit rental expenses that were owed for the storage unit that I continued to rent from Cubesmart while I resided in my Urban apartment while nothing had changed with my circumstances nor applicable laws to cause HRA to issue that check then after it previously and fraudulently claimed in both my HRA lawsuit and my OTDA litigation that I wasn't legally eligible and entitled to have it do precisely that while I resided in my Urban apartment.

10.    Any claim that Mr. Mosczyc and Marin Gerber are protected by government attorney immunity for their actions in my HRA lawsuit and my OTDA litigation were blown apart when an attorney named Patricia Miller who works for the Law Department confirmed in the 4/29/22 filing (Dkt. 523) in *Payne v. City of New York*, No. 20-cv-8924 (CM)(GWG)(S.D.N.Y.) that an attorney named Dara Weiss was fired from her job with the Law Department in April of 2022. Ms. Weiss was fired for committing fraud on the court and against her legal adversaries in that case by forging multiple documents and lying to a judge in that case. The illegal acts that Ms. Weiss committed in that case without immunity included creating fake copies of an e-mail message that she claimed she had sent, but hadn't actually done so. Further information about that forgery by Ms. Weiss in that case is discussed in a news article that was written by a journalist named Nick Pinto, published on 5/2/22 by a news organization named "Hell Gate", is entitled "NYPD's Stonewalling Attorney Called Out for Lying and Forging Emails", and is available at https://www.hellgatenyc.com/nypd-lawyer-forgery/. The claims in *Payne* are comparable to what were additional claims of mine in my HRA lawsuit because both of those cases included claims about illegal acts by members of the NYPD in relation to public forums in New York City in retaliation for First Amendment activity.

11.     When Mr. Mosczyc filed the 4/7/17 affirmation in my HRA lawsuit, he illegally didn't redact my social security number, date of birth, and HRA case number in that filing. I instead did so when I included the "Exhibit 8" that he annexed to that affirmation as an exhibit (*see* A8) that is annexed to this complaint. Although the information in that "Exhibit 8" clearly confirms that I was then scheduled to have a fair hearing on 4/11/17 that OTDA would conduct between HRA and I for fair hearing number 7406570N that would be about storage unit rental expenses, Judge Bannon's 8/10/17 and 1/31/18 decisions in my HRA lawsuit confirm that she illegally and prejudicially ignored and lied about the information in that exhibit as a corrupt judge by fraudulently suggesting that I hadn't participated in any OTDA fair hearing about storage matters after 2016. Moreover, that exhibit also confirms that she had access to extremely relevant information before she and Mr. Mosczyc criminally stole my scheduled 4/12/17 oral arguments hearing in my HRA lawsuit that confirm that I was scheduled to participate in parallel litigation with respect to my claims in my HRA lawsuit on 4/11/17 that corresponds to my 4/11/17 OTDA fair hearing.

12.     The audio transcript of my 4/11/17 OTDA fair hearing for fair hearing number 7406570N confirms that Marin Gerber of HRA committed fraud on the courts and against me during that hearing in the following specific ways for the same reasons that Mr. Mosczcy did so in my HRA lawsuit:

        a.      Ms. Gerber lied by stating the following at the elapsed time of 16 minutes and 19 seconds by fraudulently claiming both that **a)** my Urban apartment has been permanent housing for me and **b)** a valid lease agreement existed to substantiate her fraudulent claim:

> "He was residing in permanent housing. I believe the address is on Fairmount in the Bronx and there's a lease to show the same."

        b.      Ms. Gerber stated at the elapsed time of 15 minutes and 47 seconds that a request

had been made to reopen the OTDA fair hearing that was held on 9/7/16 between HRA and I for fair hearing number 7316477K as she fraudulently insinuated that I made that request to reopen that in spite of the fact that I certainly didn't do so and instead had merely directed OTDA to compel HRA to fully and immediately comply with the 9/15/16 OTDA fair hearing decision that was issued in my favor by Joab Okello of OTDA as a result of that 9/7/16 fair hearing decision before he also attended the 4/11/17 OTDA fair hearing for fair hearing number 7406570N between HRA and I about that same matter while he illegally allowed HRA to violate res judicata during that hearing.

c.      Ms. Gerber stated at the elapsed time of 16 minutes and 2 seconds that HRA issued a new determination dated 3/9/17 about whether I was legally eligible and entitled to have HRA issue payments for storage unit rental expenses on my behalf while I resided in my Urban apartment while she fraudulently omitted the material fact that HRA was barred by estoppel from issuing that new determination by virtue of the fact that it had absolutely no objectively valid grounds to do so and had already twice issued determinations in my favor about that on or about both 9/28/16 and 1/27/17 while determining on those earlier dates that I was eligible to have HRA to pay for storage unit rental expenses on my behalf to Cubesmart while I resided in my Urban apartment that prompted HRA to issue such payments on or about those dates to Cubesmart on my behalf.

d.      Ms. Gerber stated at the elapsed time of 16 minutes and 10 seconds that according to HRA's 3/9/17 determination, I wasn't eligible to have HRA to pay for storage unit rental expenses on my behalf while I resided in my Urban apartment because of the fraudulent claim by her and HRA in which they lied by claiming that I didn't reside in a temporary shelter for the time period in question with respect to my Urban apartment. While stating that, she fraudulently

omitted the material fact that that 3/9/17 determination was merely a ruse by HRA to continue to fraudulently evade its legal duties to both **a)** reimburse me for the storage unit rental expenses that I paid to Cubesmart for the storage unit rental period of May of 2016 thru July of 2016 while I resided in my Urban apartment and **b)** pay for the entirety of the storage unit rental expenses that were owed to Cubesmart for the storage unit that I was renting from it on an ongoing basis while I continued to reside in my Urban apartment.

  e.  Although Ms. Gerber stated at the elapsed time of 16 minutes and 53 seconds that there is no authority for HRA "to issue shelter fees while someone is residing in permanent housing", HRA repeatedly and illegally issued shelter fees to Urban on my behalf while I resided in my Urban apartment while HRA fraudulently claiming that the nature of my residency in my Urban apartment was that of permanent housing instead of temporary shelter in spite of the material fact that I have never had a valid lease agreement for my Urban apartment and 24 CFR §578.3 confirms that I absolutely needed to have a valid lease agreement for my Urban apartment in order for me to be able to be validly regarded as residing in permanent housing with respect to my Urban apartment.

  f.  Ms. Gerber lied at the elapsed time of 24 minutes and 33 seconds by fraudulently claiming that I was residing in an apartment with respect to my Urban apartment instead of that being a temporary shelter. Contrary to her lie about that, my Urban apartment has always been a scatter-site temporary shelter while I haven't had a valid apartment lease for it. I immediately rebutted her lie by pointing out yet again that HRA issued me a binding and fully-enforceable agreement dated 1/27/17 in which HRA confirmed that it had just issued a payment to Cubesmart for storage unit rental expenses on my behalf while I resided in my Urban apartment as HRA explained then that it did so because I was residing in a shelter and that it would

continue to issue those payments to Cubesmart on my behalf for as long as I resided in a DHS shelter.

13.     The New York Daily News published a news article on 5/8/14 that was written by Corinne Lestch and is entitled "Exclusive: City HRA Fails to Comply with Own Procedures: Analysis". That article is available at http://www.nydailynews.com/new-york/exclusive-city-hra-fails-comply-procedures- analysis-article-1.1783844 and summarized findings in a report that is entitled "Culture of Deterrence: Voices Of NYC Public Assistance Recipients" that was published by a legal services organization named Urban Justice Center. That report is available at https://snp.urbanjustice.org/sites/default/files/ Culture of Deterrence.pdf and was published in May of 2014. That report and the New York Daily News' article about it confirmed that HRA routinely violated its own procedures and policies in regards to applications that were submitted to it by members of the public for government benefits.

14.     In _Matter of Yarde Ex Rel. AWB v. Roberts_, 2017 N.Y. Slip Op 27455 (NY: Supreme Court, Albany 2017), the judge who issued that decision found that a decision that OTDA made to deny the petitioner's request to it to be provided retroactive government benefits by a social services agency in New York State that is among HRA's counterparts was arbitrary and an abuse of discretion that was affected by error of law. The judge in _Matter of Yarde_ further indicated that he or she would annul decisions that OTDA and a social services agency made that denied the petitioner retroactive government benefits because their "analysis of the governing regulations arbitrarily neglected to account for" a "provision that contemplates correction of underpayments to "those who would be current recipients if the error causing the underpayments had not occurred"", "thereby constituting a determination inconsistent with its own regulations." _Matter of Yarde_ also states that "an agency determination arrived at in a manner inconsistent

with its own regulations is not supported by a rational basis".

15.     _Matter of Puerto v. Doar_, 42 Misc. 3d 563, 975 N.Y.S.2d 527 (Sup. Ct. 2013) was a case

in which Stephanie Feinberg of HRA was the attorney who represented HRA in it. Ms. Feinberg

was also sent a notice dated 4/16/21 by OTDA in which OTDA sought to ascertain whether HRA

objected to a request that I made to OTDA to have OTDA reconsider the fair hearing decision

that OTDA issued on 3/22/21 for OTDA fair hearing number 8227101K that concerned my

efforts to have HRA to be compelled by OTDA to perform HRA's legal duty to reimburse me

for storage unit rental expenses that I paid to Cubesmart. In _Matter of Puerto v. Doar_, the court

determined that HRA repeatedly made errors by having unlawfully relied on an automated

computerized process in defiance of HRA's legal duty pursuant to 18 NYCRR 358-4.1(a) to

have its personnel first review the case record of an applicant for government benefits or

investigating the circumstances of that applicant's case prior to adverse actions being taken by

HRA against that applicant. The judge in _Matter of Puerto v. Doar_ further expressed that **a)**

OTDA disregarded relevant information about the petitioner in that case during OTDA's fair

hearing process and failed to "appreciate the conflict" that existed between relevant matters

during that process and that **b)** the administrative review processes by OTDA and a social

services agency that is a counterpart of HRA afforded the petitioner no remedy.

16.     Despite all of the following relevant facts, Joab Okello of OTDA issued OTDA's 4/19/17

fair hearing decision (_see_ A12) for fair hearing number 7406570N that he and OTDA were

estopped from issuing partly on the grounds that HRA never had any valid legal justification to

have issued its fraudulent and self-serving 3/9/17 determination in which it lied by fraudulently

claiming that I wasn't legally eligible and entitled to have HRA to issue payments for storage

unit rental expenses on my behalf while I resided in my Urban apartment:

a.      The OTDA administrative judge who presided over my 4/11/17 OTDA fair hearing stated at the elapsed time of 22 minutes and 29 seconds in OTDA's audio transcript of that hearing that she was then looking at a copy of my Urban lease as she stated that it was for apartment 4C in my building and that it was signed by me on 2/16/16. That acknowledgment should have caused her and OTDA to swiftly reject and explicitly declare that Ms. Gerber and HRA had been committed fraud against me and OTDA partly by fraudulently claiming that a valid lease agreement existed for my Urban apartment in regards to my residency within that apartment.

b.      18 NYCRR §352.31(f)(1) requires HRA to rectify underpayments that it issues for government benefits within 30 days. This confirms that after HRA issued a payment for storage unit rental expenses to Cubesmart on or about 9/28/16 in response to OTDA's 9/15/16 fair hearing decision for fair hearing number 7316477K, HRA was legally required to reimburse me prior to 11/1/16 for $1,296.70 that corresponds to the storage unit rental expenses that I paid to Cubesmart for the storage unit that I rented from it for the storage unit rental period of May of 2016 thru July of 2016 while I resided in my Urban apartment.

c.      OTDA issued a fair hearing decision on 11/12/02 for fair hearing number 3792259Q (*see* A14) that is available on the Internet at http://www.wnylc.com/kb_wnylc/afile/11/659/. That fair hearing decision confirms that OTDA ordered for the appellant to be reimbursed for storage expenses by a social services agency in New York State that is a counterpart of HRA. I have had a Fourteenth Amendment due process and equal protection right to have benefited from that legal precedent. However, OTDA illegally refused to allow me to do so.

d.      Mr. Okello fraudulently omitted all of the following relevant facts in his 4/19/17

OTDA fair hearing decision for fair hearing number 746570N that confirm that his findings in it are indefensible:

       i.     What I just discussed about the 11/12/02 OTDA fair hearing decision that enabled the appellant to be reimbursed for storage unit rental expenses.

       ii.     The findings from *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009) that appear in this complaint's "Legal Standards" section are controlling law and confirm that OTDA was prohibited from discriminating against me by issuing a determination that contravened the precedent that OTDA set through its 11/12/02 fair hearing decision for fair hearing number 3792259Q when Mr. Okello issued OTDA's 4/19/17 fair hearing decision for fair hearing number 7406570N.

     e.     The fact that the OTDA administrative law judge who presided over my 4/11/17 OTDA fair hearing confirmed during that hearing that my Urban lease was for apartment 4C in my building instead of for my Urban apartment necessarily meant that I never had a valid apartment lease for my Urban apartment due to the B&S. Since 24 C.F.R. §578.3 confirms that that circumstance meant that I couldn't possibly have been validly regarded as residing in permanent housing in regards to my Urban apartment, that meant that the nature of my residency in my Urban apartment has always been that of temporary shelter instead.

     f.     The plain text of 18 NYCRR §352.6(f) confirms that HRA is legally required to pay for storage unit rental expenses on my behalf whenever I reside in temporary shelter and meet the other eligibility criteria to have HRA do that. The fact that the operative text within 18 NYCRR §352.6(f) about this is "must be made" confirms that that HRA didn't have any discretion about whether to pay for storage unit rental expenses on my behalf while I resided in my Urban apartment without a valid apartment lease agreement for it.

17.     On a related note, the next two screenshots are from the video recording that the City

Council arranged to be recorded of the public hearing that its committees on General Welfare

and Veterans jointly conducted on 4/4/22 remotely.





18.     The speaker who was then testifying is Iris Rodriguez. She works for DHS as a program

administrator. Her LinkedIn profile that reflects her career is available at

https://www.linkedin.com/in/iris-rodriguez-6820b149/. The video recording of that public

hearing is available at https://councilnyc.viebit.com/player.php?hash=573MQ04rc8lF. The

preceding screenshots are from what appears in that video between the elapsed times of **a)** 1

hour, 14 minutes, and 25 seconds thru **b)** 1 hour, 14 minutes, and 27 seconds. The remark that

Ms. Rodriguez made then as she stated the following is very important for reasons that I will

clearly explain shortly:

          "they have to have a lease in order for us to use a subsidy"

19.     When Ms. Rodriguez made the preceding remark she did so in the context of explaining

to New York City Councilwoman Diana Ayala what HRA means when its personnel claim that

people reside in "permanent housing" through assistance that HRA provides after Ms. Ayala

asked Ms. Rodriguez to clarify that at the elapsed time of 1 hour, 13 minutes, and 22 seconds in

that video. Ms. Rodriguez clearly explained that insofar as military veterans are concerned at the

elapsed time of 1 hour, 14 minutes, and 14 seconds by making the following remarks:

> "So, our veterans…when we say being placed in permanent housing, it is someone
> that will have an actual lease…whether it be a lease for an apartment or a room, but
> they have to have a lease in order for us to use a subsidy."

20.    Furthermore, I legally recorded an audio recording with my cell phone on 12/18/18 at

12:36 pm of the face-to-face conversation that I had with Mr. Banks while he, others, and I

conducted a public resource fair meeting as a public forum in Manhattan at 14-32 West 118th

Street. That recording is available on the Internet at

https://drive.google.com/open?id=1yBh54VWqQFea5NsK6uDHCGiXKQbS3zQY. That

recording confirms that Mr. Banks made remarks to me at the elapsed time of 14 minutes and 16

seconds as he stated that though I was offered a lease agreement, I declined to sign it. The

following are the specific remarks that Mr. Banks made to me on 12/18/18 about that:

> "You've been offered a lease. You declined to sign it. But, if you're saying to me
> right now, 'I would like to have a lease…I didn't sign it…give it to me again', I
> would be happy to reconnect you. I can't do it myself."

21.    When Mr. Banks made the preceding remarks to me, he was referring to the fact that I

refused to sign my BS Urban lease. By making such remarks then, he implicitly confirmed the

following:

a.    All of the litigation that Urban has commenced against me has been and remains

completely frivolous and barred by equitable estoppel partly because no valid apartment lease

agreement has ever existed between Urban and I for my Urban apartment.

b.    HRA committed fraud against the courts and against me in both my HRA lawsuit

and my OTDA litigation by fraudulently claiming that my BS Urban lease was a copy of the

apartment lease that I signed on 2/16/16 with Urban as HRA did so to fraudulently evade its legal duties to me that concern the payment of storage unit rental expenses to Cubesmart on my behalf as well as the reimbursement of storage unit rental payments to me.

22.     Despite what I discussed above and the fact that I included a copy of the audio recording that I recorded of my 4/11/17 OTDA fair hearing on a USB thumb drive that I submitted in my HRA lawsuit in conjunction with the OSC that I filed in my HRA lawsuit on 5/19/17 as I clearly referred to that hearing and that recording in my supporting affidavit, Judge Bannon subjected me to further criminal obstruction of justice as a corrupt judge through her findings in her 8/10/17 decision (*see* A13) in my HRA lawsuit as she fraudulently suggested it that I **a)** didn't participate in any OTDA fair hearing after 2016 that was about the storage unit rental expenses that were paid to Cubesmart while I resided in my Urban apartment and **b)** hadn't exhausted my administrative remedies with respect to OTDA in regards to my storage unit rental expense claims against HRA. She made such fraudulent claims on pages 5 and 6 in that decision while her remarks about that then cemented the fact that she illegally ignored the entirety of the exhibits that I stored on the USB thumb drive that I submitted in my HRA lawsuit on 5/19/17.

23.     The fact that OTDA illegally changed the agenda for my 4/11/17 fair hearing without providing me prior notice about that in flagrant violation of my First and Fourteenth Amendment rights as it illegally blindsided me during that hearing by doing so is among the facts that confirm that it was futile for me to continue to deal with OTDA on and after 4/11/17 as an administrative appellate forum for claims that I asserted against HRA. As a reminder, OTDA illegally stripped the original agenda for my 4/11/17 OTDA fair hearing of the entirety of the other claims that I asserted against HRA and directed OTDA on or about 2/9/17 to conduct a fair hearing between HRA and I about that Jackie Donovan had added to that hearing's original

agenda. OTDA thereafter illegally never conducted a fair hearing about those other claims.

24.     The fact that Judge Bannon fraudulently upheld her findings in her 8/10/17 decision in her 1/31/18 decision in my HRA lawsuit as she criminally then dismissed my HRA lawsuit in its entirety on 1/31/18 while I continued to have claims that were pending in that hybrid case that were assigned to a different judge doesn't change the material fact that Mr. Mosczyc committed fraud on the courts and against me in that case that demands both sanctions and retroactive voiding of Judge Bannon's 8/10/17 and 1/31/18 decisions in my HRA lawsuit because they were heavily premised on and prejudiced by the fraud on the courts that Mr. Mosczyc committed on his own for HRA's benefit and together with Judge Bannon.

**F.     How the B&S Occurred, What the Repercussions from that Have Been as Snowball Effects, Other Negligence by Urban in My Building, and the Inexcusable Failure by Government Personnel to Intervene on My Behalf Against Urban**

1.     One key way to prove that something is a forgery is through diligent handwriting analysis. Another way to do so is diligently analyzing whether information shown on something that is suspected to be a forgery appears in the exact same location in it as where corresponding information appears in a corresponding authentic document, such as currency. A third way to determine that something is a forgery is by recognizing the material fact that the precise penmanship that people use to sign their name is rarely an identical match between multiple instances in which they sign their name. This leads to the beginning of my discussion about information that appears in the annexed exhibits that may reasonably be relied upon to infer that my BS Urban lease has always been a forgery and the result of the B&S.

2.     The first exhibit within the annexed **Exhibit B** is a copy of the 3-page government rental subsidy application that I completed on 2/16/16 with Ms. Hyler to have HRA to issue me a rental subsidy through the SEPS rental subsidy program for the rental costs of apartment 4C in my building while I would reside in that specific apartment. My completion and submission of that

application for a rental subsidy from HRA was comparable to loan applications that people submit for various purposes that partly include buying an apartment, house, car, etc. and otherwise funding other things that may include law school. Such applications are for the specific thing that they apply to instead of being for something else. For example, such applications can't be used to receive a loan from a bank to buy a house that is located at a different address than what is specified in such loan applications. In other words, when submitting such an application for a loan to buy a house that is located at an address that may be 1 Main Street in the town where someone lives can't legally be unilaterally altered and reassigned by someone who works for the bank that is the counterparty for that application to cause that application to be reassigned to cover some other house that could be nearby or elsewhere, of a different size than the house located at 1 Main Street, and be a shared house that the applicant would need to share with one or more strangers. Instead of such unilateral decisions being made to alter and reassign such a loan application, such decisions certainly require the prior and explicit consent and knowledge of the applicant in order for such alterations and reassignments to occur. This is analogous to how things work in many other contexts, such as employment agreements and law school applications. In other words, when those who signed employment agreements to become a federal judge, they didn't instead do so to work as a cashier in federal courthouses where they work. This means that no one can alter the terms of their employment agreements without their consent and knowledge in a way that would cause them to be valid, enforceable, and for jobs that they never agreed to perform and that would most likely not provide equivalent compensation and benefits as the jobs that correspond to being federal judges. Similarly, parents and kids would explode with rage if someone who works for Harvard University was to be able to get away with changing the terms of a law school application or

college loan application without the consent and knowledge of such parents and kids who seek to attend Harvard Law School to cause the law school application or the college loan application for that to instead apply to a different institution that may include truly trashy ones that my firsthand experience with people who work for Duke University unequivocally confirm Duke University is.

3.      Someone who isn't me and was likely Ms. Hyler instead wrote my name 3 times on the first page of my 2/16/16 application[1] (*see* B1) to HRA to have it issue me a government rental subsidy through its SEPS program.  The second page of that application form includes the following key text in the area where I signed my name on 2/16/16:

> "I declare under penalty of perjury that all statements made on and documents submitted with this application are correct to the best of my knowledge. I certify that by signing this application, I agree to an investigation conducted by the New York City Human Resources Administration (HRA) to verify or confirm the information I have submitted, and determine my eligibility for the SEPS program. I promise to let HRA know if I move from my room and, if I move, I assign to HRA my right, if any, to the return of any SEPS rent/supplement payments to which the landlord is not entitled. **I understand I will not be eligible for SEPS in a new room or apartment without HRA prior approval**."

> (boldface formatting added for emphasis)

4.      The text that I just presented above that has boldface formatting applied to it is important because that information pertains to the fact that after HRA and/or Urban illegally made changes without my prior knowledge nor consent to my Urban lease after I signed it, HRA then secretly reassigned the government rental subsidy for SEPS for the payment of rent by HRA on my behalf to Urban that was to be strictly for apartment 4C in my building to have that subsidy instead be for Room 1 within my Urban apartment. Since I never submitted any application to HRA to have it issue payments to Urban on my behalf that would be for any apartment other

---

[1] I redacted my date of birth and the public assistance case number that HRA assigned to me in this form for privacy reasons.

than apartment 4C in my building, it's abundantly clear that HRA illegally caused Urban to receive public funds from it that may ultimately be partly from federally-funded sources such as HUD as well. HRA did so through payments that it made to Urban for my occupancy in Room 1 within my Urban apartment. Although I can't put my finger on the precise statute, regulation, etc. that applies to the illegal practice of fraudulently causing a person or entity to receive public funds that they certainly aren't eligible to receive that results from fraudulently registering people in a government program to cause such entities and people to receive such public funds without the prior knowledge and consent of people who have been fraudulently registered in such government programs that causes that to occur, what HRA's personnel did to cause that to occur for the benefit of Urban and its personnel certainly is a bait-and-switch fraud and a crime that may possibly pertain to the False Claims Act. That crime was committed partly by wire by HRA personnel by 2/18/16 in conjunction with the B&S. The B&S certainly was the proximate cause for major harm to my **a)** property, liberty, due process, privacy, and equal protection rights as well as my right to enter into contracts and prohibitions against discrimination and selective-enforcement; **b)** security, health, and general well-being; **c)** and ability to be fully and fairly considered for employment opportunities.

5.      The next screenshot corresponds to information that appears on page 40 in a report that is known as an evidence packet that I received on 2/8/17 in the mail from HRA in response to my OTDA litigation.

| 2/18/2016 | Error Correction | Benjamin-Solis,K | Correction to Aprtment number |
|-----------|------------------|------------------|-------------------------------|

6.      It's objectively reasonable to conclude that the person whose last name appears in the preceding screenshot is someone named Kristin Benjamin-Solis who then worked for HRA. The

information in the preceding screenshot was about a change that was made to an apartment

number that was associated with me. That information was fraudulently mischaracterized in that

screenshot by being described as a correction. That fraudulent mischaracterization was in

furtherance of a fraudulent pretext and cover-up by HRA's personnel about the fact that HRA's

personnel were involved with Urban's personnel in criminally perpetrating the B&S against me

in conjunction with the illegal reassignment of my 2/16/16 SEPS government rental subsidy

application to HRA to my Urban apartment from apartment 4C in my building. HRA's personnel

criminally violated the Contracts Clause of the U.S. Constitution by illegally changing the terms

of my Urban lease within 2 days after I signed it to be issued sole possession shortly thereafter

by Urban of apartment 4C that is located in my building with no roommate and in a fully-

furnished state.

7.      If HRA's personnel had meant to express that they had made a change to HRA's records

to indicate that I had moved from one street address to another, then they could have accurately

and clearly have done so in the preceding screenshot instead of having expressed in it that HRA

had made a correction to an "apartment number" that was associated with me. There is a clear

distinction between a change made to an apartment number and a change made to a street

address."

8.      The simple fact that HRA reported on or about 2/18/16 that it made a change in its

records about me that reflected a change to an apartment number that was associated with me

naturally raises key questions about how exactly Urban and its personnel got possession of my

BS Urban lease that its personnel gave me a copy of on 3/7/16. The simple answer to this is that

it's objectively reasonable to infer that either HRA or Urban created a forgery from my Urban

lease that Urban then gave me a copy of on 3/7/16. It's inconsequential whether personnel of

HRA or Urban created that forgery. What matters instead is how that forgery got into Urban's

possession largely because of the distinct possibility that mail or wire fraud occurred to cause

that to happen. Either way, it's perfectly clear that personnel or HRA and Urban acted in concert

as co-conspirators and criminal accomplices in committing, condoning, and/or covering-up the

B&S.

9.        A diligent examination of how my name was written on page 1 of the 2/16/16 SEPS

government rental subsidy application that I submitted to HRA confirms that the handwriting

style that was used to write my name there is a sufficiently similar match with the corresponding

information on page 1 of my Urban lease (*see* B2). That fact causes it to be objectively

reasonable to conclude that the same person wrote my name in both of those documents on those

pages. By comparison, no handwritten information exists on page 1 in my BS Urban lease (*see*

B3) and that fact is a telltale indication that my BS Urban lease has always been nothing more

than a forgery and fake lease agreement that was created from my Urban lease that I instantly

knew upon receiving it on 3/7/16 from Urban's personnel.

10.      The following are further clear facts about my Urban lease and my BS Urban lease that

are telltale indications that confirm that my BS Urban lease has always been nothing more than a

forgery and fake lease agreement:

        a.        I wrote the initials of my name on page 1 in my Urban lease. In contrast and as I

just pointed out, no handwritten information appears on page 1 in my BS Urban lease.

        b.        The area on page 1 in my BS Urban lease that corresponds to where I wrote my

initials on page 1 in my Urban lease is empty.

        c.        The phrase of "represents equal monthly" in the lower-left area of the first

paragraph on page 1 in my Urban lease are the first 3 words that appears on the second to last

line in that paragraph. In contrast, that same phrase is split across two lines in the corresponding

paragraph shown at the top of the first page in my BS Urban lease. This means that that

paragraph was altered after I signed my Urban lease.

        d.      The last page in my Urban lease shows how I signed my name when I signed my

Urban lease on 2/16/16 and how Lisa Lombardi of Urban signed that lease then too. Those

signatures are an exact match with how they appear in the last page of my BS Urban lease. This

means that either a photocopy or scanned image of the last page of my Urban lease was illegally

used as the last page of my BS Urban lease without my knowledge and consent.

11.      When HRA personnel reported on 2/18/16 on page 40 (*see* B4) of the evidence packet

report that I received from HRA that a change was made to an apartment number that was

associated with me, I hadn't resided in any apartment after October of 2015. I redacted entirely

irrelevant and confidential information on that page for privacy reasons. What I didn't redact

from that page was information in which Ms. Benjamin-Solis indicated both that **a)** HRA

personnel processed my 2/16/16 SEPS government rental subsidy application on 2/18/16 and **b)**

HRA intended to issue SEPS rental subsidy checks on my behalf to Urban in spite of the material

fact that the B&S that HRA personnel had committed against me concerning my Urban lease

prohibited HRA from issuing those checks because I submitted my Urban lease in conjunction

with my 2/16/16 SEPS rental assistance application to HRA on 2/16/16 in order to qualify and be

considered for that SEPS rental assistance subsidy program to have those payments to be made

by HRA strictly for apartment 4C in my building instead of some other apartment. The fifth

exhibit within the annexed **<u>Exhibit A</u>** corresponds to a copy of page 41 in the evidence packet

report that I received from HRA on 2/8/17. The information that I redacted on that page was

redacted for the same reasons that I stated earlier about why I redacted information on page 40 in

that report. The information that I didn't redact from page 41 in that report confirms the following:

a.        HRA processed an address change request on 3/16/16 for an address that was associated with me without elaborating about why HRA did so in response to its personnel on or about 2/18/16 having either **a)** illegally changed the apartment number in my Urban lease or **b)** accepted that illegal change in my Urban lease.

b.        I reported complaints to HRA on 3/16/16 about the B&S having occurred and caused me to have a roommate in my Urban apartment.

c.        HRA approved my 2/16/16 SEPS government rental subsidy application on 2/18/16.

d.        HRA personnel lied to my face then by fraudulently claiming that **a)** HRA would be issuing one final payment on my behalf for storage unit rental expenses to Cubesmart for the storage unit that I was continuing to rent from it and **b)** I needed to provide HRA with estimates from a moving company to transport the property from that storage unit somewhere in spite of the material fact that there wasn't anywhere to transfer it to because HRA and Urban jointly perpetrated the B&S that caused me not to have sufficient space, security, and privacy in my Urban apartment for the property that I kept in the storage unit that I rented from Cubesmart. This is largely because I then had a roommate in my Urban apartment.

12.      What is shown next are a pair of screenshots from information that appears on page 29 in the evidence packet report that I received from HRA on 2/8/17. The information in them confirms that HRA illegally issued a payment on or about 3/2/16 to Urban through the SEPS government rental subsidy program only after HRA illegally reassigned my 2/16/16 application

to HRA to receive a rental subsidy through that program as HRA illegally reassigned that to cover rental costs for my Urban apartment instead of apartment 4C in my building.

```
02/23/16 1sps SEPS SHELTER        EXMTM        05/23/16 047 G2230
02/23/16 1spe SEPS ENROLLMENT     EXMTM   1spe 02/23/16 047 G2230
```

```
03/02/16 1sps SEPS SHELTER        WORW5        05/31/16 053 G4346
         checks issued 03/02/2016
03/02/16 1spe SEPS ENROLLMENT     WORW5        03/02/16 053 G4346
03/01/16 005  Single Issuance     WORW5   95BQ 03/01/16 B37 SYSTM
         Updated thru System             - 23:20 160301
```

13.     This preceding information means that the B&S really was twofold in nature in that it illegally blocked my rights both to **a)** be issued sole possession shortly after 2/16/16 of the entirety of apartment 4C in my building by Urban in a fully-furnished condition with no roommate to be blocked and **b)** have my 2/16/16 SEPS rental assistance subsidy application be used strictly to cause rental subsidy payments to be issued by HRA to Urban on my behalf only if Urban complied with its legal duty to fully abide by the terms of my Urban lease. In short, by subjecting me to the B&S that includes the illegal reassignment of my 2/16/16 SEPS rental assistance application, those who did so illegally subjected me to identity-theft and embezzled property with respect to apartment 4C in my building in which I clearly had possessory rights.

14.     In addition, though some personnel of HRA, Urban, Urban's personnel, and Urban's attorneys have claimed that my building is supportive-housing, Mr. Banks stated the following to me on 8/22/18 during a public resource fair meeting that was held in Brooklyn at 177 Myrtle Avenue while I recorded our conversation then on audio that is available at

https://drive.google.com/file/d/1ZGyi8oS0vDlVtWNkPaB6xg8zUT2czwY5/view?usp=sharing:

> "The place you were moved out of from the shelter system is…**is supportive-housing-like**. It doesn't require a mental health evaluation. We don't have any other such locations in Queens, but we do have supportive-housing locations in Queens."

> (boldface-formatting added for emphasis)

15.     Mr. Banks made the preceding remarks at the elapsed time of 14 minutes and 40 seconds in that audio recording. His remarks then contradicted the claim that my building is supportive-housing in much the same way that **a)** counterfeit currency isn't currency; **b)** counterfeit purses that are sold in Chinatown in Manhattan are counterfeit purses and cheap knockoffs instead of authentic designer purses that they have been fabricated to resemble; **c)** men have some of the same body parts as women and yet aren't women; and **d)** a Honda Civic is like a Porsche because it's a car and yet it's very different from a Porsche. Mr. Banks is also heard in that audio recording at the elapsed time of 14 minutes and 7 seconds as he lied to my face by fraudulently claiming that I was incorrect about what an apartment lease agreement is as he stated that I was "into a very technical analysis of a lease" and that my analysis of that was not the correct analysis. What he meant by that preposterous remark was that I didn't need to have signed a valid apartment lease agreement for my Urban apartment or have otherwise agreed to terms in a valid apartment lease agreement for it in order for a valid apartment lease agreement to be in effect between Urban and I for my Urban apartment. He made that utterly absurd remark even after I immediately and continuously raised clear objections about the B&S having been perpetrated against me to HRA personnel and others. Mr. Banks' remarks to me then should be properly regarded and construed as a sufficiently clear implicit admission by him that personnel of HRA and Urban jointly subjected me to the B&S while his view about that then was that the issuance of my Urban apartment to me as a shared apartment in place of the issuance of sole possession of apartment 4C in my building with no roommate was perfectly fine. However, that was clear and criminal tortious interference and fraud instead while that was the but-for cause for enormous, and irreparable harm that I thereafter experienced due to a vicious and largely foreseeable snowball effect.

16.     Neither my Urban lease nor my BS Urban lease contain information that indicate that my building is a scatter-site in spite of the fact that Defendant Harold Rosenthal told judges in both Urban1 and Urban3 that my building is a scatter-site. Quite to the contrary, prior to signing my Urban lease, Lisa Lombardi of Urban and others fraudulently misrepresented my building as a supportive-housing program instead of the no-frills and poorly-run warehouse that was dressed-up as an apartment building for people to reside in that I quickly discovered it was after I began to reside in my Urban apartment. This is in stark contrast to other buildings that Urban operates with public funding partly for military veterans in which wireless Internet service, laundry machines, computers and printers, and elevators are available for use by those who reside in them. Also, a legal filing that was filed on 5/23/22 in _Urban Pathways, Inc. v. Green_, No. LT-301388-22/BX (Civ. Ct., Bronx Cty.) and is available at

https://iapps.courts.state.ny.us/nyscef/ViewDocument?docIndex=fL/52JLQhJ0mHePBlYL2ZA== is a sublease between Urban and someone that explicitly indicates that it's for a scatter-site and shared apartment that isn't specifically listed in that sublease. That sublease also indicates that Urban's scatter-site housing program runs its operations out of an address that is located at 975 Kelly Street in the Bronx. Moreover, much of the remainder of the information in that legal filing that describes how Urban's scatter-site program operates doesn't exist in my Urban lease and my BS Urban lease. It's objectively reasonable to believe that Urban was legally required to include much of the same or very similar terms in my Urban lease to make it crystal clear that my building was a scatter-site before I signed my Urban lease and withheld that information from my Urban lease to fraudulently dupe and induce me to sign my Urban lease.

17.     James Sternheim worked for SUS in 2016 and escorted me to HRA's offices in a building located at 33 Beaver Street on 2/16/16 to sign my Urban lease. Immediately after I signed my

Urban lease, I gave a copy of it to SUS and another organization that is named The Jericho

Project and is also a business partner of HRA. The screenshot shown next is of a cell phone text

message that I received from Mr. Sternheim on 3/4/16 at 3:43 pm that informed me that the date

when I would be able to move into apartment 4C in my building would be on 3/7/16.



18.     The screenshot shown next is of cell phone text messages that I received from and sent to

Mr. Sternheim on 3/10/16 as I pointed out to him in them that though I met with HRA personnel

on 3/10/16 about the B&S (that meeting was also held in HRA's offices at 33 Beaver Street in

Manhattan), the conversation that I had with them about that was unproductive and those

personnel simply gave me excuses about the B&S. I explicitly pointed out in my remarks to Mr.

Sternheim then that my Urban lease was illegally forged after I signed it.



19.    On 3/22/16, I mailed a letter to Urban (see B6) to report an entirely valid complaint to it that was about the fact that its personnel subjected me to the B&S. Page 2 in that letter specifically identifies Andrew Nastachowski as the person who gave me a copy of my BS Urban lease on 3/9/16 while he then worked for Urban. In response to that complaint, Ariana Saunders of Urban issued me a letter dated 5/3/16 (see B8) while she then was Urban's Chief Compliance Officer in which he acknowledged my 3/22/16 letter to Urban. Urban's personnel illegally refused to reverse the B&S during communications that I had with them between March and May of 2016.

20.      On 4/1/16, I sent an e-mail message (*see* B7) at 4:45 pm to a woman named Barbara

Beirne in which I reported a complaint about the B&S after I had a telephone call with her on

that date. She then worked for HRA as it Deputy Agency Chief Contracting Officer and is an

attorney. Her LinkedIn profile that reflects her career is available at

https://www.linkedin.com/in/barbara-beirne-a173b46/. Information that is available in an official

New York City report that is known as "The City Record" and is available at https://a856-

cityrecord.nyc.gov/RequestDetail/20160113025 indicates that she was **a)** involved in the process

that resulted in HRA having issued a contract to Urban that has allowed Urban to be the slumlord

for my building and **b)** someone who worked for HRA to contact about that contract. This

explains why I contacted her then.

21.      After I was viciously assaulted by Mr. Sullivan on 7/2/16 in my Urban apartment that

followed his attempted assault against me in that apartment on 5/12/16, Kishea Paulemont of

Urban lied in a letter dated 8/4/16 (*see* B9) that she sent to me as well as to Mr. Banks and

Frederick Shack, Lisa Lombardi, and Ronald Abad of Urban by fraudulently claiming that I had

brought up some concerns to Urban only in the last several days as opposed to much earlier that

she and other Urban personnel as well as HRA personnel had illegally ignored.

22.      On 8/16/16, someone who then worked for HRA's Bureau of Fraud Investigation sent me

a letter (*see* B10) in response to a complaint that I reported to HRA about the B&S.

23.      On 9/5/16, I sent an e-mail message at 9:33 pm to someone named Richard Kearney

while he then worked for the Bronx DA in response to a voicemail that I had recently received

from him. The e-mail message that I sent to him on 9/5/16 someone was for reporting a

complaint to him about the B&S. However, the Bronx DA never did anything about the B&S.

24.    On a related note, the New York State Court of Claims issued a decision on 3/21/22 in a lawsuit that someone named Jorge Olivieri filed against the State of New York (*see* B12) in which the New York State Court of Claims determined that the State of New York was liable for the injuries that Mr. Olivieri sustained as a result of having been assaulted by someone in a facility that the State of New York operated because that assault was foreseeable and preventable. *Johnson v. NYC Health & Hosps*, 246 A.D.2d 88, 676 N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) includes similar findings about the fact that Defendant City has been previously found liable for violence and other crimes that occur in facilities that it operates that are foreseeable and preventable. This is relevant in this case because the same is true about the fact that Mr. Sullivan's 7/2/16 assault against me in my Urban apartment was foreseeable and preventable after I talked with both Ms. Lombardi and Mr. Abad on 5/19/16 by telephone about that as I directed them then to immediately evict Mr. Sullivan from my building in response to the fact that he tried to assault me in my Urban apartment on 5/12/16.

25.    Scott McDonald, Jr. was the lead prosecutor for the Bronx DA in Sullivan1. That case was the criminal prosecution that was commenced against Ronald Sullivan in response to the vicious and unprovoked assault that he committed against me on 7/2/16 in the living room of my Urban apartment after he had earlier attempted to assault me in that same living room on 5/12/16 before he was physically restrained on 5/12/16 by someone named Thomas Fair in that living room that prevented that assault while Mr. Fair then worked for Urban in my building. On 3/24/21, I legally recorded a telephone call that I had with Mr. McDonald, Jr. during which we discussed engaged in what was tantamount to a post-mortem discussion about major deficiencies about how Sullivan1 was prosecuted, investigated, and adjudicated. That audio recording is available at https://drive.google.com/file/d/1mXz3D46D-33JbFc2pKWQGttC-

XjAnwMQ/view?usp=sharing. That recording confirms that he told me that though he had issued a subpoena to someone who worked for Urban in my building to appear at trial in Sullivan1, that witness defied that subpoena and Bronx Criminal Court Judge Cori Weston refused to issue an order to compel that witness to comply with that subpoena upon being apprised about that. This could possibly mean that Urban and/or its personnel may have engaged in illegal witness tampering to persuade that witness to defy that subpoena. This also warrants having this Court grant me equitable and injunctive relief to enable me to learn both **a)** the identity of that witness and **b)** the information in the Bronx DA's records about why Mr. McDonald chose to issue a subpoena against him in Sullivan1. Just Weston fraudulently didn't find Mr. Sullivan guilty of assaulting me on 7/2/16 in my Urban apartment only after the following additional things prejudicially occurred:

a.       The Bronx DA didn't bother to issue a subpoena to Larry Kayatt to have him appear as a witness in Sullivan1. This is despite the fact that he told me that Mr. Sullivan confessed to him on 7/2/16 in my building about having just assaulted me in my Urban apartment as Mr. Sullivan told him then how he assaulted me then. I recorded an audio recording on 8/29/17 of Mr. Kayatt in my building as he told me about that. That audio recording is available at https://drive.google.com/open?id=1umpKR03FdJyhwoD_lTm5K2fEyxa30vou. I provided Mr. Kayatt's name to the Bronx DA in November of 2016 via e-mail for the purpose of having him used as a prosecutorial witness in Sullivan1.

b.       The Bronx DA didn't bother to use video recordings in Sullivan1 that would have been recorded on 7/2/16 of Mr. Sullivan as he fled from my building after assaulting me in my Urban apartment that would have shown an angry demeanor that he had as he fled.

c.      The Bronx DA didn't bother to use members of the NYPD as witnesses in Sullivan1 in spite of the fact that I met with them in front of my building within 20 minutes after the 7/2/16 assault ended as we met then in response to a 911 call that I made to have Mr. Sullivan arrested. Those members of the NYPD confirmed to me then that they saw that I had sustained visible injuries partly to my head near my left temple as a result of the 7/2/16 assault by Mr. Sullivan.

d.      The Bronx DA didn't bother to pursue an appeal as diligently and as far as it could have of a fraudulent decision that Judge Weston made in Sullivan1 in which he baselessly and prejudicially suppressed admissible and highly relevant security log records that were maintained by personnel who worked for Urban in my building. _Johnson v. NYC Health & Hosps_, 246 A.D.2d 88, 676 N.Y.S.2d 38, 676 N.Y.S. 38 (App. Div. 1998) confirms that those records were admissible evidence in Sullivan1. Also, I saw those records and they confirmed that personnel of Urban who worked in my building on 7/2/16 made remarks in them then in which they reported that Mr. Sullivan and I had gotten into a fight then, police were called about that, and that Mr. Sullivan had an angry demeanor as he ran out of my building afterwards. Guilty people run away after committing crimes.

26.     During Mr. Sullivan's 7/2/16 assault against me, he punched me more than 15 times on my head near my left temple and also struck me on my arms as I used them to try to block his punches to my head. I was in the middle of gathering items to take to a nearby laundromat when he criminally assaulted me in my Urban apartment on 7/2/16. Following that assault, I was diagnosed on 7/2/16 with having suffered a head injury and abrasions on my arms from that assault. After I was instructed by my doctor on 7/2/16 to return to the hospital where I was diagnosed with those injuries on 7/2/16 if I experienced further health problems from that

assault, I returned to that hospital on 7/30/16 and was diagnosed with a concussion from that assault.

27.     The next screenshot is from a brief video that I recorded on 5/12/16 in the living room of my Urban apartment at 10:58 am of Thomas Fair and Ronald Sullivan while Mr. Fair then worked for Urban and Mr. Sullivan was my roommate and sitting in a chair. As I mentioned earlier, Mr. Fair physically restrained Mr. Sullivan during that visit to my Urban apartment in response to Mr. Sullivan having suddenly rushed towards me to try to assault me. Mr. Fair thereafter recorded information in a security logbook on 5/12/16 in which he reported that he reported that incident to a supervisor of his whose first name is Mike.



28.     Long before Nancy Southwell of Urban lied partly by claiming that I pushed Mr. Sullivan on 7/2/16 as her lie about that and other matters is shown in the legal papers that Urban's

attorneys filed to commence Urban3, I sent a cell phone text message on 5/12/16 to Molly

McCracken of SUS that is shown in the screenshot shown next that confirms that I informed her

then that Mr. Sullivan tried to assault me on that date in my Urban apartment and that I sought

for him to be immediately evicted from my building for that reason. I was then using Ms.

McCracken as an intermediary to convey my demands to Urban's personnel.



29.     In response to the demands that I expressed in the preceding cell phone text message, Ms.

McCracken sent me a text message back on 5/12/16 that is shown in the following screenshot

that confirms that Urban refused to evict Mr. Sullivan in response to his attempted physical assault against me on 5/12/16 in my Urban apartment in Mr. Fair's presence:



+1 (646) 866-9302

The management company has offered to meet with you to air our these greavances and offer some solutions to the problem. We eill pass on your requrst to them for a written response as well. Please also consider reaching out to Keisha or Arianna in thr greavances department.  Again, I'd recommend reaching out to the management company to have a meeting, face to face always works better. Lastly, please understand that you are both lea see holders in that bulding and no one is going y be relocated against their will.

30.     The next screenshot is from my AT&T cell phone call records in 2016 that correspond to 2 telephone calls that I had with Lisa Lombardi and Ronald Abad of Urban on 5/19/16 during which I reiterated my demands for Urban to immediately evict Mr. Sullivan from my building because he had proven to a clear and major threat to my safety in it on 5/12/16 by trying to assault me then. Both Ms. Lombardi and Mr. Abad refused my demands to evict him then. Ms. Lombardi told me then that Urban didn't have anywhere else to move Mr. Sullivan to. Also, I

recall asking Mr. Abad then about to what degree hostility between Mr. Sullivan and I needed to

escalate to before Urban would properly intervene by evicting Mr. Sullivan from my building.

## Data, text, & talk logs
## Towaki Komatsu | 201.315.5484

**Device:** TOWAKI KOMATSU  |  201.315.5484

**Billing period:** Apr 29, 2016 - May 28, 2016
Showing details for Talk usage

| Totals for this billing period: | 129 calls | 576 min |
| --- | --- | --- |

| Showing search results for: 212.736.7385 | | Totals: 2 calls | 34 minutes |
| --- | --- | --- | --- |

| Date / Time | Contact ▲ | Location | Call Type | Minutes |
| --- | --- | --- | --- | --- |
| 05/19/2016 11:33AM | 📞 212.736.7385 | Incoming, CL | SDDV | 24 |
| 05/19/2016 11:13AM | 📞 212.736.7385 | New York, NY | SDDV | 10 |

**SDDV** = Shared Minutes **3WC** = Three Way Calling
📞 **Incoming Call**   📞 **Outgoing Call**

31.     On 6/6/16 at 9 am, I sent an e-mail message to Ms. Lombardi partly about the B&S and

the fact that it proximately blocked me from being able to transfer the entirety of the property

that I kept in a storage unit that I was renting to what would have otherwise been apartment 4C

in my building while I would have resided in that specific apartment without any roommate. The

following is a relevant excerpt from that e-mail message:

> **From:** Towaki Komatsu <towaki_komatsu@yahoo.com>
> **To:** "llombardi@urbanpathways.org" <llombardi@urbanpathways.org>
> **Sent:** Monday, June 6, 2016, 09:00:27 AM EDT

**Subject:** Re: Urgent - Having Urban Pathways pay for storage bills

Ms. Lombardi,

Earlier today, an Urban Pathways worker in my apartment building gave me an envelope that contained a rejection notice from HRA that indicated that HRA refused a request on 5/27/16 that I submitted to it on 5/19/16 and 5/26/16 (because it lost my original request) to have it continue paying my storage bills for a storage unit I rent in Queens.

Given that the payment is overdue for for that storage bill (it was due on 5/19/16) and the following are the reasons why I have been unable to have the contents of that storage unit moved into my apartment that your organization provided to me, I need to find out immediately if your organization will pay the overdue storage bill and all ongoing storage bills until it can find me my own private 1 bedroom apartment that I can then have my property moved into:

1. I signed a lease agreement with you in front of witnesses on February 16, 2016 at DHS for apartment 4C in my apartment building and that lease agreement did not suggest in any way that I would be sharing that apartment with anyone.

2. Your organization subsequently illegally altered that lease agreement that is, in fact, a contract and assigned me a tiny room in the shared apartment 4B with an unstable roommate that has anger issues, tossed my property about in the living room of our apartment on 5/12/16, made verbal threats to me in the presence of one of your organization's workers, and had to be held back by that same worker when my roommate charged at me on that date in our apartment's living room.

The attached PDF file contains information about my current and upcoming storage bill, an excerpt from HRA's 5/27/16 letter that shows it rejected my storage payment request, the lease agreement I signed with you on 2/16/16, and photos I took on 5/12/16 when my roommate tossed my property in our living room.

32.     My remarks in the preceding e-mail clear describe the cause-and-effect relationship between **a)** the B&S and attempted 5/12/16 assault against me by Mr. Sullivan in my Urban apartment and **b)** what was my ongoing need to continue to rent a storage unit from Cubesmart as a result. Also, the discussion that follows addresses additional harm that I experienced due to the B&S and otherwise due to negligence by Urban and HRA.

33.     The discussion that follows supports my claims that Urban and HRA jointly and
criminally subjected me to the B&S. On 4/24/18, a woman named Nicole Bramstedt testified
during a public hearing that the City Council's Committee on General Welfare held. She then
worked for Urban as its Director of Policy. Her LinkedIn profile that reflects her career is
available on the Internet at https://www.linkedin.com/in/nicole-bramstedt-15539014a and
indicates that she now works for the City Council after having previously worked for Urban and
HRA. While Ms. Bramstedt testified during that 4/24/18 hearing, that hearing was recorded on
video that is available on the Internet at

https://councilnyc.viebit.com/player.php?hash=iqXbA2gtEFNp as a result of arrangements that
the City Council made.

34.     As Ms. Bramstedt testified during that hearing, she likely came as close as she and other
personnel of Urban ever will to voluntarily admitting that Urban has maintained a fraudulent
bait-and-switch practice of forcing people to whom Urban's personnel have issued a binding and
fully-enforceable apartment lease agreement for a private apartment with no roommates located
in buildings for which Urban is the landlord or managing agent to instead be issued a shared
apartment with a roommate shortly thereafter through the issuance of an invalid lease agreement.
In regards to this point, Ms. Bramstedt made the following pertinent remark at the elapsed time
of 3 hours, 52 minutes, and 29 seconds from the start of the video recording of that public
hearing on 4/24/18:

> "or we double-up as the Speaker referenced and there are issues obviously with
> doubling-up in terms of roommate conflict."

35.     On 5/20/16, I was defrauded the use of a Target gift card that I was issued in May of
2016 as a government benefit by an organization named The Mayor's Fund to Advance New
York City that was loaded with a balance of $1,000. I was defrauded of that as a result of a

telephone scam after HRA personnel told me in May of 2016 that HRA wouldn't pay for storage

unit rental expenses on my behalf to Cubesmart while I resided in my Urban apartment in

response to an application that I submitted to HRA on or about 5/19/16 to have HRA perform its

legal duty to pay for those expenses. HRA's fraudulent refusal to perform its legal duty then to

pay for those expenses as well as the fact that the B&S proximately cost me sufficient space to

transfer the entirety of the property from the storage unit that I rented from Cubesmart into

apartment 4C in my building were causal factors for the circumstances that I was in that caused

me to fall victim to that telephone scam. This is partly because the B&S caused me to have to

continue to rent the storage unit that I rented from Cubesmart past March of 2016. After HRA

fraudulently refused in May of 2016 to pay for the storage expenses that were owed to

Cubesmart to which I just referred, someone somehow managed to illegally transfer the balance

that was stored on the Target gift card that I had been issued and spend almost all of that at a

Target store in California without my knowledge and consent while I was in New York City.

That occurred after that person pretended that he wanted to buy my Target gift card that I was

then offering for sale in order to raise funds to pay for the storage unit rental expense that were

owed to Cubesmart for the storage unit that I rented from it. The following is an e-mail message

that someone named Susanna Lyons sent on 5/27/16 at 7:17 pm while she worked for Target in

California and discussed how that fraudulent use of my Target gift card occurred after I reported

a complaint to Target about that to try to have the full balance of my Target gift card restored for

my use:

> On May 27, 2016, at 7:17:32 PM, Susanna.Lyons (T2238)
> <Susanna.Lyons@Target.com> wrote:
>
> Hi Joann,
>
> Guest Towaki Komatsu received a physical gift card in the amount of $1000 from the

City of New York/Mayors Office on May 19, 2016. He lives in New York and hasn't left New York since. On May 20, 2016 he logged onto Targets gift card website to check the balance of his new card, and discovered that the card had been used at "San Jose East" that day. There were two transactions, one in the amount of $117.05 and one in the amount of $873.08.

Mr. Komatsu called the number on the back of the Target gift card, as well as the Mayors Office to try to find out what happened, and how his new card could have been used in San Jose, CA, and was told the card's balance was downloaded and accessed by phone (digitally).

The card number is: 041-301-001-589-723

Is there any way we can look up the transactions and any related video footage available to provide to the authorities as he seeks to recover his lost balance? His contact number is: 201-315-5484

.Susanna Lyons
. Target-2238 | ETL- Salesfloor | 408-238-7800
3155 Silver Creek Rd | San Jose, CA 95121

36.     One of the claims that I asserted against HRA in February of 2017 while I directed

OTDA then to conduct fair hearings between HRA and I about that claim was about my having

been defrauded the use of my Target gift card in May of 2016 that was triggered by HRA's

fraudulent refusal to pay for storage unit rental expenses on my behalf. However, OTDA

illegally never conducted a fair hearing about that claim. On a related note, a news organization

named The City published a news article on 8/9/19 that was written by Savannah Jacobson that is

entitled, "City Pays Storage Fees for Homeless, but One Bronx Family Still Lost Items". That

article is available at https://www.thecity.nyc/housing/2019/8/9/21210915/city-pays-storage-

fees-for-homeless-but-one-bronx-family-still-lost-items and includes a discussion about property

that people lost while renting a storage unit from Cubesmart. The following quote from that

article confirms that government benefits about storage unit rental expenses that I have sought to

receive from HRA are ultimately and partly funded by the federal government that confirms that

this Court has jurisdiction over my claims in this case that are about storage unit rental expenses

because that involves a federal matter:

> "The current system allows the city to claim partial reimbursement from the federal
> government and state for the fees, HRA said."

37.     On 4/10/19, the property that I kept in the storage unit that rented from Cubesmart was

auctioned as a result of arrangements that Cubesmart made in response to unpaid storage bills for

the storage unit that I rented from it while I resided in my Urban apartment. That auction was the

direct result of both **a)** HRA having refused to continue to perform its legal duty after September

of 2018 to continue to pay for the storage unit rental expenses that were owed to Cubesmart for

my rental of that storage unit while I resided in my Urban apartment and **b)** the B&S. That

auction caused me to lose property that includes confidential legal regards that can be used to

commit identity-theft, clothing that included a suit that I need for job interviews, a musical

keyboard that I could to compose music and for musical performances possibly for commercial

purposes, priceless and extremely sentimental family photographs and correspondence, furniture,

other household items, and other property. Before that auction occurred, I had a $5,000 insurance

policy in effect for the property that I kept in that storage unit.

38.     The concussion that I suffered from being assaulted by Mr. Sullivan on 7/2/16 in my

Urban apartment sabotaged my ability to be fully and fairly considered for a job that I

interviewed for on 8/18/16 that was for a job with an investment bank named BNP Paribas. This

is largely because the concussion that I was suffering from then didn't let me think and

communicate nearly as clearly during that interview as I otherwise would have been able to do.

The following e-mail message that I received on 8/16/16 from Russell Robertson in his capacity

as the recruiter who arranged for my 8/18/16 job interview that I just discussed confirms that that

job would have provided me $450 per day in compensation if it had been offered to me:

**From:** "Robertson, Russell" <R.Robertson@huxley.com>
**Subject:** RE: *Urgent-Job Opportunity-Support Specialist-Investment Bank-NYC*
**Date:** August 16, 2016 at 10:56:16 AM EDT
**To:** 'Towaki_Komatsu' <towaki_komatsu@yahoo.com>

BNP is looking to pay $450 a day W2.

39.     Additionally, after Mr. Sullivan viciously assaulted me in my Urban apartment on 7/2/16,

Urban unconscionably allowed him to resume being my roommate in my Urban apartment. It did

so after he was both arrested and stupidly released by the NYPD on 7/11/16 for assaulting me on

7/2/16. That circumstance traumatized me enormously and continuously because he assaulted me

in that apartment and it was entirely possible that he would try to do so again in it that would

likely cause me to instantly and viciously kill him. It wasn't until the Bronx DA finally caused

me to be issued an Order of Protection against Mr. Sullivan in October of 2016 in response to his

assault against me on 7/2/16 that Mr. Sullivan ceased being my roommate as a result of the fact

that that Order of Protection required him to not be near me and caused him to move out of my

Urban apartment. This means that for roughly 3 months after he viciously assaulted me in my

Urban apartment, I had to continue to live in fear in my Urban apartment of the prospect that he

would assault me again and possible criminal consequences that I would face if I killed him in

response. I had to contend with that at the same time that I was struggling mightily to try to

recover from the concussion that his 7/2/16 assault against me caused me to suffer. Moreover,

before he ceased being my roommate, Mr. Sullivan periodically and illegally smoked in my

Urban apartment and used the oven in the kitchen to heat our apartment due to nonexistent or

inadequate heat that Urban made available for our apartment. When he used the oven for that

purpose, he illegally left its door open while he enabled the gas for it. That illegally caused

noxious fumes to spread throughout our apartment and certainly was a major fire hazard.

40.     Also, a sudden lack of water service in my building on 8/6/16 due to Urban's negligence and HRA's failure to provide proper oversight of Urban caused me to have to pay to stay at a hotel for 1 night then in order to be able to bathe and maintain proper hygiene. That lack of water service lasted an extended amount of time and I wasn't provided any prior notice about that nor an approximation about when water service would be restored before I decided to stay a hotel. As a result, I paid $227.32 for that hotel stay. That was another claim that I asserted against HRA in February of 2017 in my OTDA litigation that OTDA illegally never conducted fair hearing about.

41.     In addition, Urban's personnel illegally violated my privacy rights on numerous dates in my building by both **a)** engaging in trespassing in my Urban apartment while I resided in it and **b)** intercepting mail that was addressed to me that was delivered to my building. Concerning this point, I recorded a video on 3/1/22 at 5:16 pm that confirms that someone who then worked for Urban in my building told me then that Gary Cohen of Urban had recently authorized people to illegally engage in trespassing in my Urban apartment that they had engaged in as a result of that person and contractors that Urban hired having entered my Urban apartment while I wasn't present and without prior notice to me. That video is available at

https://drive.google.com/file/d/1_TqX1OHybrpWIDOuuiSSbUSjNOJciPYn/view?usp=sharing.

In addition, I legally recorded an audio recording in my building o 10/3/16 at 7:24 pm of a conversation that I had with someone named Demetrius Nathaniel while he then worked for Urban in my building. He is heard in that recording as he admitted that he intercepted certified mail on 10/2/16 that was addressed to me and delivered to my building. That piece of mail concerned the 7/2/16 assault that Mr. Sullivan committed against me in my Urban apartment. It's indisputable that I have been legally to receive mail in my building without that ever being in

the possession of Urban's personnel while that hasn't been sent by them. I repeatedly apprised Defendant Ann Marie Scalia and other personnel of HRA to no avail about Urban's personnel illegally **a)** intercepting mail that was sent to me and delivered to my building and **b)** otherwise preventing me from being able to visit a post office to collect mail that was sent to me by certified mail to my building. That circumstance and the B&S caused me to have to continue to rent a private mailbox after March of 2016 to enforce my privacy rights. I believe that I also asserted a claim against HRA in February of 2017 in my OTDA litigation that was about being reimbursed for the costs to rent a private mailbox after February of 2016 before OTDA illegally never conducted a fair hearing about that claim.

42.     Moreover, Urban has consistently not made necessary repairs in public areas in my building. For example, Urban hasn't properly made repairs to a leak in the roof of my building that has caused water to leak through the ceiling of the hallway located on the fourth floor of my building. That defect has been in existence prior to 5/23/17 and been repeatedly reported partly by me to Mr. Banks, other HRA personnel, and HPD to no avail. As a result, leaks from that defect have caused tripping hazard in the hallway located outside of my Urban apartment. Urban has also stupidly kept dumpsters in a stairwell in my building that attracts insects and rats while causing odious smells to spread in that stairwell. Trash has often overflowed from those dumpsters and likely contributed to colds, Covid-19, and other illnesses that others and I have experienced in my building. Although HPD has periodically issued violations against Urban due to its negligence in my building by not making repairs and otherwise not keeping conditions in a sanitary manner, that often hasn't caused Urban to correct those deficiencies in a timely manner. Such necessary repairs have also included repairs to the door handle to the front door of my building and the an interior door that leads to my building's lobby before I recorded a video on

3/8/22 that shows the door handle for the front door to my building coming off after I normally pulled on it to open that door. Instead of City of New York government agencies and personnel having caused Urban to properly perform its duties as the slumlord of my building, HRA and other City of New York government agencies have stupidly and illegally continued to issue new contracts to Urban and otherwise extend existing contracts with Urban in violation of New York State's Open Meetings Law and my constitutional rights as they have illegally prevented me from **a)** testifying in public hearings about those contracts and **b)** visiting HRA's offices at 150 Greenwich Street to exercise my First and Fourteenth Amendment right to examine draft versions of those contracts prior to testifying in public hearings about those contracts and otherwise using that information. Personnel of HRA did so most recently as a continuing violation that dates back to April of 2018 as they most recently did so in regards to a proposed contract between HRA and Urban about which a public hearing was held on 9/22/22. Information about that public hearing and contract is available at https://a856-cityrecord.nyc.gov/RequestDetail/20220906044. When that practice of illegally barring me from HRA's offices at 150 Greenwich Street in Manhattan began in April of 2018 with respect to my efforts to examine proposed contracts prior to public hearings, that pertained to my efforts to go there to examine a proposed contract between HRA and Urban.

**G.** **Why Offsetting Penalties and My Fourteenth Amendment Rights Confirm that the City of New York and People Who Have Worked for it Have No Enforceable Privacy Rights Insofar as that Relates to Me**

1.      The information presented in this section is largely applicable to the fact that I'm legally entitled to comprehensive and detailed discovery material from HRA, those who have worked for it since 2016, Defendant City, and others who have worked for Defendant City since 2016 partly to prove a claim of mine about the fact that sufficient entwinement has existed between **a)** how Urban has operated since 2016 in regards to its status as the slumlord of my building and **b)**

HRA, its personnel, Defendant City, and other City of New York personnel that has caused illegal acts and omissions that have been committed against me by Urban, its personnel, and its agents that include its attorneys to be attributable to HRA, its personnel, Defendant City, and other City of New York personnel as Urban, its personnel, and its agents have been private state actors in that that regard

2.      On 1/17/17, Judge Ostrager issued an order in my HRA lawsuit at my request that sealed my HRA lawsuit and authorized me to proceed anonymously in it. That order prohibited people who didn't for HRA from having access to information about my HRA lawsuit while it was sealed. It also restricted access to information about my HRA lawsuit to a limited number of HRA personnel on a need-to-know basis. Judge Tisch ended the sealing of my HRA lawsuit through the order that he issued on 10/4/18 in my HRA lawsuit. Despite these facts, New York State Senator Jessica Ramos and Jaclyn Rothenberg were among people who illegally had access to information about my HRA lawsuit in June of 2017 while they also illegally communicated information about my HRA lawsuit to other City of New York personnel.

3.      The e-mail message shown next appears on pages 368 and 369 in the 374-page PDF file and was sent by Ms. Ramos on 6/27/17 at 5:42 pm to a whistleblower news censor in journalism named Erin Durkin as Ms. Ramos lied in her remarks in that e-mail message about **a)** me, **b)** my HRA lawsuit, **c)** her claim that I was ineligible to have HRA to issue a storage unit rental expense benefit to me, and **d)** her claim that every legal services provider to which I was referred refused to provide me assistance about a claim that I asserted against HRA that concerned storage unit rental expenses on account of the fact that some of them refused to assist me about other matters instead:

> On Wed, Jun 28, 2017 at 5:42 PM, Ramos, Jessica
> <JRamos@cityhall.nyc.gov> wrote:

> Mr. Komatsu wanted a storage allowance, for which he was ineligible because he had an apartment. We also referred him to multiple legal services providers about this specifically and all of them denied him.
>
> Mr. Komatsu has been served an Order to Show Cause due to his appearance at HRA in June, when he showed disruptive behavior. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.
>
> Sent from my BlackBerry 10 smartphone

4.      Ms. Ramos worked for the Mayor's Office when she sent the preceding e-mail message. Her remarks in it confirm that she illegally both had access to and communicated information about my HRA lawsuit while it was sealed. Contrary to her lies in that e-mail message, I never was disruptive at any HRA office and the OSC that she referred to was actually one that I prepared and filed in my HRA lawsuit. Ms. Ramos also flagrantly violated my privacy rights pursuant to New York State Social Services Law §136(2), 18 NYCRR §357, and my Fourteenth Amendment rights in an additional way in her remarks in that e-mail message by illegally disclosing information to Ms. Durkin about a storage unit rental expense government benefit that I sought from HRA. In order for City of New York personnel to disclose information to journalists about government benefits that I receive from HRA and otherwise apply for from HRA, such journalists first need to contact HRA directly and inquire about that. Ms. Durkin hadn't made such an inquiry about me before Ms. Ramos illegally disclosed information to her in that e-mail message about a storage unit rental expense government benefit that I sought from HRA.

5.      On 6/28/17, Ms. Rothenberg also worked for the Mayor's Office when she sent the following e-mail message about me and my HRA lawsuit to other City of New York personnel while she illegally had access to and communicated information about my HRA lawsuit then:

**From:** Rothenberg, Jaclyn
**Sent:** Wednesday, June 28, 2017 17:18
**To:** Ramos, Jessica
**Cc:** Phillips, Eric; Redmond, Howard DI.; Hagelgans, Andrea; Casca, Michael; Arslanian, Kayla; Carrion, Marco A.; Wolfe, Emma
**Subject:** RE: town halls

Confirmed that he appeared at 4WTC on June 6 and served an Order to Show Cause. That OSC and another pending matter were submitted to the court for a decision on June 7. HRA is still waiting for the written decision.

6.     The reference that Ms. Rothenberg made to "4WTC" in the preceding e-mail message refers to Four World Trade Center in Manhattan that is located at 150 Greenwich Street. That is where HRA's headquarters are located. As I mentioned earlier in this complaint, Mr. Mosczyc illegally didn't redact my social security number, date of birth, nor my HRA case number in the 4/7/17 affirmation that he filed in my HRA lawsuit on 4/7/17. That fact and circumstance caused me to be at much greater risk of falling victim to identity-theft than I would have otherwise been until I arranged in 2022 to have that information no longer be publicly available from the New York State Supreme Court in Manhattan.

7.     I have long reported entirely valid complaints to federal judges in New York City about the fact that a copy of an image of my face and name has been shown on tablet computer screens inside of federal courthouses in New York City after 1/23/20 while that image was from the entirely frivolous and malicious prosecution that was commenced against me that corresponds to *People v. Komatsu*, No. 2017BX048917 (Bronx Crim. Ct. Jan. 23, 2020) in which I prevailed on 1/23/20 by virtue of the fact that Bronx Criminal Court Judge Tara Collins both dismissed and sealed that total sham then. Defendant City, NYPD, and Bronx DA were the custodians for the evidence that was from that case and Bronx Criminal Court Judge Jeffrey Zimmerman issued a retroactive protective order in that case before that case was dismissed to further safeguard the confidentiality of the evidence and discovery material in that case. Despite these facts, those

custodians illegally allowed USMS personnel and CSOs to continue to illegally have possession of and publicly display an image of my face that was from the evidence and discovery material in *People v. Komatsu* on tablet computer screens inside of public areas in federal courthouses in New York City after 1/23/20 in flagrant violation of Judge Collins' 1/23/20 sealing order and my Fourteenth Amendment rights.

8.       In addition, the fact that **a)** the 4/10/19 auction of the storage unit that I rented from Cubesmart clearly cost me my privacy rights with respect to the property that I kept in that storage unit and **b)** fraud by HRA is to blame for that auction having occurred further cements the fact that Defendant City and those who have worked for it since 2016 have no enforceable privacy rights insofar as that relates to me due to offsetting penalties, my Fourteenth Amendment rights, and estoppel.

**H.       Indications of sufficient entwinement between HRA and Urban that have caused Urban to be an alter-ego, proxy, and agent of HRA while being a private entity whose acts are attributable to HRA**

1.       New York City Councilman Rafael Salamanca, Jr. told me on 5/15/18 that HRA is responsible for running Urban as I recorded that face-to-face conversation on audio while he and I talked in front of the main steps in front of City Hall. What he meant by that remark was that HRA was responsible for providing proper oversight of how Urban operates. Although I submitted a timely FOIL demand to the NYPD in which I directed the NYPD to provide me video recordings that were recorded on 5/15/18 by video security cameras that the NYPD controls that would have included those that recorded the specific area where Mr. Salamanca, Jr. and I stood as we talked on 5/15/18, the NYPD illegally didn't comply with that part of that FOIL demand.

2.       The following is a link to the audio recording that I legally recorded at 1:25 pm on 5/15/18 that recorded much of the face-to-face conversation that I had with Mr. Salamanca, Jr.

that I just discussed. My conversation with him then began at about 1:32 pm:

https://drive.google.com/file/d/1f1G32Nf4jSpgrsuGMKFApQ3VRO_Quksz/view?us
p=sharing

3.      At the elapsed time of 1 minute and 14 seconds in that recording, Mr. Salamanca, Jr. is

clearly heard telling me that he gave information that I previously handed him to Mr. Banks and

that HRA is responsible for running Urban. The following shows a relevant excerpt from an e-

mail message that I received from the NYPD on 5/18/18 at 3:29 pm in response to a FOIL

demand that I submitted to it earlier on that date to be provided all of the video recordings that

were recorded on 5/15/18 by video security cameras that it controls that are installed near City

Hall and recorded Mr. Salamanca, Jr. and I as we had the face-to-face conversation on that date

that I just discussed while we stood directly in front of the steps that lead to the main entrance of

City Hall:

> **From:** <openrecords@records.nyc.gov>
> **Subject:** [OpenRecords] Request FOIL-2018-056-01070 Submitted to New York
> City Police Department (NYPD)
> **Date:** May 15, 2018 at 3:29:45 PM EDT
> **To:** <Towaki_Komatsu@yahoo.com>
>
>
> Your request FOIL-2018-056-01070 has been successfully submitted to the New
> York City Police Department (NYPD). The details of your request are shown below.
>
> Request Title: Video of conversation on 5/15/18 between 1:18 pm & 1:40 pm in front
> of City Hall's steps
>
> Request Description: Immediately provide me with the following: 1. All video
> recordings from security cameras controlled by the NYPD that show me standing
> next to New York City Councilman Rafael Salamanca, Jr. on 5/15/18 between 1:18
> pm and 1:40 pm in front of the steps that lead into New York City Hall while he was
> wearing a pink colored shirt and I was wearing a blue colored long-sleeve dress shirt.
> While I stood next to him during that period, I did so at a point that was roughly 10
> feet away from the bottom of the steps to the front doors of City Hall.

4.      I thereafter received video recordings from the NYPD in response to that a FOIL demand

that I submitted to it in March of 2019 that shows video recordings that were recorded on

3/18/19 in the exact same area where Mr. Salamanca, Jr. and I stood on 5/15/18 in front of City

Hall's main entrance. What follows is a screenshot from one of those video recordings that was

recorded on 3/18/19 in which I'm shown standing next a flagpole in front of the main entrance to

City Hall while wearing a white sweater as I recorded a video recording of NYPD Sergeant

Jemaal Gungor while he then was a member of the NYPD security detail for Bill de Blasio while

Mr. de Blasio was then New York City's Mayor:



5.      In a similar vein, I legally recorded a video recording of a telephone conversation that I

had with Defendant Ann Marie Scalia on 4/9/18 that confirms that she flagrantly violated the

terms of my HRA contract then by refusing to assist me in a manner that was possible as she

intentionally opted to be evasive then. The following is a link to a copy of the video recording on

the Internet that I just discussed that I legally recorded with my cell phone on 4/9/18 at 11:20 am

while I called Ms. Scalia at 929-221-5408:

https://drive.google.com/open?id=1yoQvpg51rvMhP3Q6zIr652NwR6LkA_n2

6.      At the elapsed time of 6 minutes and 43 seconds in that recording, I'm heard asking Ms. Scalia to tell me who was responsible for providing oversight of Urban with respect to how it operates as the landlord of the building. I quickly followed-up that question by asking her if it was HRA, HPD, or someone else. She is heard in that recording at the elapsed time of 6 minutes and 54 seconds as she told me in response that she wouldn't answer that question because the answer to that was the basis for all of my legal arguments in my legal disputes against HRA about the B&S and the repercussions from that. It's objectively reasonable to infer from her refusal to answer that question and the totality of the circumstances that HRA was and remains primarily responsible for providing proper oversight over Urban with respect to how Urban operates as the slumlord of my building and had negligently not performed its duty to provide proper oversight of Urban.

7.      By making remarks within 2 days after I signed my Urban lease on 2/16/16 as Kristin Benjamin-Solis of HRA did so on or about 2/18/16 that I discussed earlier in this complaint in which she indicated that a change was made to an apartment number that was associated with me, her words then sufficiently demonstrated that HRA had substantial control over how Urban operates in regards to its status as the slumlord of my building. HRA did so by criminally reassigning my right of possession of the entirety of apartment 4C in my building that stemmed from my Urban lease to Room 1 within what would then be the shared apartment 4B in my building. Also, Nancy Southwell of Urban made the following remarks while lying by claiming that I owe Urban rent that demonstrate control by HRA over Urban's operations in regards to its status as the slumlord of my building in a Notice of Termination dated 2/16/21 that was included

in the petition that was filed in Urban3 on 2/25/22 and shown in it on page 6 in that PDF file:

    a.     "On a continuing monthly basis since March 2016 through January 2021, Mr. Komatsu has deliberately failed to pay his rent."

    b.     "The lack of rent payments seriously affects the Landlord's ability to provide supportive services to its clients. This shortfall in the collections of funds is reported to the Governmental oversight authorities. Their funding of this program is predicated on the collection of the minimal rental amount and full occupancy of the available rooms."

    c.     "Your actions have endangered the other occupants of this supportive services building. By placing in jeopardy the program's ability to function and remain a viable entity. The Landlord has received notice that the Governmental Authorities are reviewing its status as a result of the empty bedroom and collections shortfall."

8.    Ronald Abad's signature appears on page 22 in Urban's contract with HRA for my building. That contract is 95 pages in length and contains information that explicitly and implicitly indicates that HRA has sufficient control over how Urban operates as the slumlord of my building that has caused Urban and those who have worked for it to be sufficiently entwined with HRA's operations while they have largely been proxies, agents, and private state actors of HRA and Defendant City whose illegal acts and omissions have been and continue to be attributable to HRA and Defendant City.  For example, pages 92 and 93 in that contract contain detailed information about the scope of work that HRA required Urban to perform under that contract as the slumlord of my building and indicates that HRA set the pricing for apartments in my building instead of Urban. Pages 93 in that contract states that Urban was required to provide "security for the entire property and all the residents, including adequate around-the-clock security staffing and maintenance of the existing security services" that Urban certainly, frequently, and prejudicially didn't do to my detriment that enabled me to be viciously assaulted on 7/2/16 by Mr. Sullivan following his attempted 5/12/16 assault against me. Information on page 93 in that contract about how quickly Urban was required to have necessary repairs made in

my building and how Urban has operated confirms that Urban consistently violated the timetable for such repairs that are specified on that page.

9.      Page 65 in Urban's contract with HRA includes a discussion in section 10.03 about situations in which Defendant City would be entitled to declare Urban in default of its contract with HRA for my building. Information at the bottom of that page confirms that Urban could be declared in default of that contract in the event that Urban, its personnel, and others who were closely affiliated with Urban (this includes HRA's personnel) were to be indicted or convicted after execution of that contract under any state or federal law of things that include "fraud, embezzlement, theft, bribery, forgery, falsification, or destruction of records, or receiving stolen property". This confirms that in the event that Urban and/or those to whom I just referred were to be indicted or convicted of subjecting me to the B&S, falsifying records, destroying records, forgery, fraud, and/or embezzlement, then Defendant City would be able to declare Urban in default of that contract. Page 66 in that contract contains information about further grounds that would entitle Defendant City to declare Urban in default of that contract and includes information about RICO violations and other violations by Urban, its personnel, and others affiliated with it. Information on that page specifically states the following as behavior that would entitle Defendant City to declare Urban in default of that contract:

> "an offense indicating a lack of business integrity that seriously and directly affects responsibility as a City vendor."

10.      One of the things that is meant by the preceding text is that in the event that **a)** HRA personnel directed Urban and its personnel to assign me to my Urban apartment instead of issuing me sole possession of apartment 4C in my building in accordance with the terms of my Urban lease and **b)** Urban and its personnel cooperated with such directives, then that would be "an offense indicating a lack of business integrity that seriously and directly" affected Urban's

responsibilities "as a City vendor" by virtue of the fact that Urban would illegally allow itself to be controlled by HRA's personnel in such a scenario while functioning as an alter-ego of HRA.

11.     In addition, I'm about to discuss acts of clear negligence by Urban and its personnel that have occurred in my building that upon information and belief occurred partly due to negligence by HRA personnel as such personnel of HRA authorized or condoned that in a way that also demonstrates control by HRA of how Urban and its personnel have operated as the slumlord of my building through official and unofficial polices, practices, and customs about permissible behavior by Urban and its personnel pertaining to the operations of my building. Robert Vargas and Gilda Giscombe were 2 military veterans who resided in my building and died in it on or about 8/11/20 and 12/15/19 due to criminal negligence by Urban, HRA, and their personnel. I have long gone out of my way to staunchly advocate for those who have resided in my building partly by **a)** testifying on their behalf during public hearings that the City Council has held, **b)** otherwise attending or attempting to attend public town hall and resource fair meetings across New York City, and **c)** commencing litigation against HRA, Defendant City, and Urban. I twice testified on Mr. Vargas' behalf during City Council public hearings on 9/20/18 and 2/4/19 before I later about him again as well as Ms. Giscombe during a City Council public hearings after they were murdered in my view by criminal negligence in my building by Urban, HRA, and their personnel. Mr. Banks was present on 2/4/19 while I testified about Mr. Vargas and deliberately turned the screen of my laptop to face Mr. Banks as I played a relevant video in conjunction with and support of my testimony.

12.     The following shows the e-mail message that I sent on 8/3/20 at 1:27 pm on Mr. Vargas' behalf that hindsight confirms was to no avail to Ann Marie Scalia, Mr. Banks, and Martha Calhoun to try to cause Mr. Vargas to be immediately provided an air conditioner in his

apartment that he sorely needed during what was then a sweltering Summer in New York City

while conditions in his apartment were very humid:

> **From:** Towaki_Komatsu <towaki_komatsu@yahoo.com>
> **Subject:** Question about helping a disabled military veteran in my building
> **Date:** August 3, 2020 at 1:27:32 PM EDT
> **To:** "Scalia, Ann Marie" <scaliaa@dss.nyc.gov>
> **Cc:** "banksst@dss.nyc.gov" <banksst@dss.nyc.gov>, "Calhoun, Martha" <calhounm@dss.nyc.gov>
>
> Ms. Scalia,
>
> I'm sending you this to find out what you, Mr. Banks, and HRA is willing to do to help the disabled military veteran who lives in apartment 1D in the building in which I reside who needs an air conditioner to be installed in his living room.
>
> He told me yesterday that Urban Pathways, Inc.'s personnel told him that though it has an air conditioner to install that is located in the basement of that building, it will take 2 weeks from when he was told last week for bars to be cut outside of his living room window to install that air conditioner.
>
> I previously talked with you and Mr. Banks on his behalf and i also testified on his behalf during a City Council public hearing.
>
> The person I'm talking about has had several strokes and can barely move.
>
> It is unconscionable for HRA to allow him to have to sweat in his apartment only because Urban's personnel, its contractors, and HRA won't get off of their fat ass to abide by applicable health and safety laws in the middle of Summer.
>
> I'm not anticipating a response to this e-mail and will likely use it in my federal lawsuit to further establish that HRA is blatantly disregarding its legal duties with its business partners.
>
> From,
>
> Towaki Komatsu

13.     Before I sent that e-mail, Mr. Vargas had asked Urban's personnel to cause him to be

provided an air conditioner for his apartment. However, he told me that they made excuses for

why Urban hadn't provided him one that he could use in his apartment. He certainly could have

been provided a portable air conditioner to use in it while waiting for someone to cut metal bars

outside of one of his windows in his apartment to use a different type of air conditioner. It's objectively reasonable to conclude that the apartment lease agreement that Mr. Vargas was issued for his apartment was sufficiently similar to my Urban lease and required Urban to have issued him his apartment in a fully-furnished condition that meant that Urban was required to have had an air conditioner installed and fully available for Mr. Vargas to use in his apartment whenever he wanted to. Moreover, one of HRA's core legal duties pursuant to New York State's Constitution is to provide "care for the needy". That includes HRA's legal duty to provide safe and sanitary shelter for those who sought it. Depriving an elderly person who has suffered numerous strokes the use of an air conditioner in his apartment during a Summer certainly and flagrantly violates HRA's legal duty to care for the needy and provide safe and sanitary shelter. On a related note, 18 NYCRR §352.23(a) states the following about a similar legal duty that HRA has:

> "Resources must be so used as to eliminate or reduce the need for public assistance, rehabilitate the client"

14.     Depriving elderly stroke victims of air conditioners during Summer is criminal negligence, inhumane, cruel, and unusual punishment instead of behavior that is in compliance with HRA's legal duty to rehabilitate those who receive public assistance from HRA. Mr. Vargas was also someone who I had been intending to use as a witness in litigation of mine largely to have him vouch for the fact that Urban, HRA, HPD, and their personnel had been engaging in negligence by not making necessary repairs in my building and otherwise failing to provide proper services in it that include oversight, security, and cleaning services. Before the FDNY broke open the door to Mr. Vargas' apartment on 8/11/20 and discovered that he had passed away on 8/10/20 or 8/11/20 in it while he didn't have an air conditioner available for use in it, I recorded an audio recording on 8/2/20 at 9:11 pm of a face-to-face conversation that I had with

Mr. Vargas that is available at https://drive.google.com/file/d/1kgqME-aLSNUjKknYGY9lX03pfYBCQmM6/view?usp=sharing. That recording confirms that he told me then that he was very concerned about the possibility that he might die in his apartment from continuing to be deprived of an air conditioner as he rhetorically asked me if that was what others wanted to happen to him while he was referring to Urban and HRA. He also told me then that he was having a hard time sleeping because of how humid it was in his apartment. I also recorded a video recording on 8/11/20 at 3:39 pm that is available on the Internet at https://drive.google.com/file/d/1BGbVCcAlTCTy_WpODblxPbh7H-q1zYnk/view?usp=sharing that shows members of the FDNY in the lobby of my building as they worked to break open the front door to Mr. Vargas' apartment in response to him being unable to unlock that door from the inside while it was locked that way because he had died in his apartment. On 8/11/20 and following Mr. Vargas' death, I talked in front of my building with Gary Cohen of Urban as I asked him why Urban hadn't arranged for Mr. Vargas to be provided an air conditioner for his apartment. He told me then that according to the City of New York's standards, that as long as air circulated in my building, that was sufficient for those who resided in it instead of having an air conditioner in Mr. Vargas' apartment that he could use to cool the air temperature in it. His remarks then confirmed that Urban and its personnel had intentionally deprived Mr. Vargas of a fully-furnished apartment that would have otherwise included an air conditioner that Mr. Vargas could have used in it. Stores that are located near my building have portable air conditioners for sale that Urban certainly could have purchased and provided to Mr. Vargas to use in his apartment as a stopgap measure.

15.      I also recorded a conversation that I had with Mr. Vargas on 12/19/19 on audio. I recorded that at 2:25 pm on 12/19/19 while I stood in the lobby of my building and that

recording is available on the Internet at

https://drive.google.com/file/d/1KRAiloeCKFB_aWofL7cMIV14C6R0Gx1s/view?usp=sharing.

During my conversation with him Mr. Vargas on 8/2/20, he described the circumstances in

which Ms. Giscombe died on or about 12/15/19. He told me then and on 12/19/19 that she had

collapsed in the lobby of my building roughly one week prior to my 12/19/19 conversation with

him and that she died in her apartment a few days after she collapsed in that lobby. He also told

me that after she collapsed, she asked one of Urban's personnel who worked as a security guard

in my building to help her to get up to her apartment on the third floor before that security guard

refused to help her. He also told me that no one checked on Ms. Giscombe's health between the

time when she collapsed and the time that he discovered dead in her apartment.

16.     The fact that page 19 of Urban's contract with HRA for my building includes the

following text confirms that Urban was legally required to inform HRA in a timely manner about

**a)** Urban's failure to provide Mr. Vargas an air conditioner in his apartment that he could use in

it, **b)** Urban's refusal to evict Mr. Sullivan from my Urban apartment both after his 5/12/16

attempted assault against me and his 7/2/16 assault against me, **c)** the refusal by a security guard

in my building to assist Ms. Giscombe on or about 12/15/19 to get back to her apartment after

she collapsed in my building's lobby, **d)** arson that occurred in my building on its third floor on

4/11/19 before Urban allowed that arsonist to continue to reside in my building after he was

arrested and stupidly released by the NYPD for that, **e)** a flood in the basement in my building

that occurred on 8/25/20 over electrical outlets while they were plugged in that meant that

anyone who may have then walked in that area risked being electrocuted, **f)** a lack of water

service in my building, **g)** a power outage in my building, **h)** illegal trespassing in my Urban

apartment as well as interception of my mail by Urban's personnel, and **i)** the commission of the

B&S and Urban's frivolous litigation against me partly by Urban's personnel:

> **Section 9.03 Allegations of abuse or maltreatment.** Contractor will notify the Department within twenty-four (24) hours of promptly determining that reasonable cause exists to suspect that any of Contractor's administrators or staff, including both paid and volunteer, has abused, maltreated, neglected, assaulted or endangered the welfare of any program participant. In addition, if such reasonable cause is found, the Contractor shall take appropriate action to remove the person from the proximity of program participants while the matter is being investigated by the Contractor. The term abuse shall mean the infliction of physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ. The term maltreatment shall mean (i) treatment that results in serious physical injury other than by accidental means, or (ii) neglect or failure to exercise a minimum degree of care that impairs, or places in imminent danger of being impaired, the physical, mental or emotional condition of a program participant. Contractor shall provide telephone notice to the Department within 24 hours of determining that reasonable cause exists, followed by a written report, to be delivered to the Department within three (3) business days. Compliance with this reporting requirement does not satisfy any other legally mandated reporting of abuse, such as to the New York State Central Registry (SCR).

17.     Page 50 of Urban's contract with HRA for my building contains the following text that confirms that Urban is required to retain all records that are relevant to that contract for the latter of **a)** 6 years after Urban receives the final payment for it or that contract otherwise ends or **b)** the completion of litigation, claims, or audits that are commenced and otherwise conducted about that that contract prior to the expiration of that 6-year period:

> "The Contractor agrees to retain all books, records, and other documents relevant to this Agreement, including those required pursuant to Section 5.01, for six years after the final payment or expiration or termination of this Agreement, or for a period otherwise prescribed by Law, whichever is later. In addition, if any litigation, claim, or audit concerning this Agreement has commenced before the expiration of the six-year period, the records must be retained until the completion of such litigation, claim, or audit. Any books, records and other documents that are created in an electronic format in the regular course of business may be retained in an electronic format."

18.     Page 62 of Urban's contract with HRA for my building contain indemnification provisions that require Urban to "defend, indemnify and hold" the City of New York," "its

officers and employees harmless from any and all claims" "or judgments for damages on account of any injuries or death to any person or damage to any property and from costs and expenses to which the City, its officers and employees may be subjected or which it may suffer or incur allegedly arising out of or in connection with any operations of" Urban "and/or its subcontractors to the extent resulting from any negligent act of commission or omission, any intentional tortious act, or failure to comply with the provisions of" that contract or of various laws. Those indemnification provisions further state that insofar "as the facts or Law relating to any claim would preclude the City from being completely indemnified by" Urban, "the City shall be partially indemnified by" Urban "to the fullest extent permitted by Law."

**I.** **Miscellaneous**

1.      Although it's generally true that people aren't legally-entitled to high quality shelter nor employment, the terms of my HRA contract cause that not to apply to me because the end of my HRA contract explicitly states that Defendant Ann Marie Scalia and others to whom she referred would assist me "in any way possible" while the other people whose names appear in my HRA contract were Mr. Banks and Martha Calhoun. Mr. Banks explicitly told me on 12/14/17 that he had personally arranged for Ms. Scalia to contact me following earlier conversations that I had with him as I recorded my conversation with him on 12/14/17 during a public town hall meeting in Brooklyn while he told me that. In fact, my HRA contract explicitly refers to earlier conversations that I had with Mr. Banks while explaining that it was due to those conversations that Ms. Scalia issued me my HRA contract. Two questions about which the simple and straightforward answer certainly is "yes" are about whether Mr. Banks, Ms. Calhoun, Ms. Scalia, and others to whom my HRA contract was and remains legally bound have had the ability after my HRA contract was issued to me to cause me to **a)** reside in much better accommodations than what my Urban apartment and my building have been and remain and **b)** be employed by HRA.

Another question about which the answer certainly is "yes" is about whether HRA personnel were able to also participate in meetings and other communications while I've had them with legal services providers that HRA funds to determine whether those providers would provide me pro-bono legal representation. Despite the fact that HRA personnel certainly could participate in those meetings and other communications with me while they have occurred to prevent HRA personnel from continuing to lie about why I haven't been provided pro-bono legal representation from those providers when I have sought that from them partly for use against Urban, HRA personnel have never agreed to participate in such discussions at the same time that I would be involved in them.

2.       The fact that Mr. Banks certainly could have complied with clear and repeated requests that I made to him in 2017 and thereafter to terminate Urban's contract with HRA for my building and replace Urban with some other vendor to be the landlord of my building to cause services to be properly provided to those who reside in my building necessarily means that my HRA contract required him to do precisely that. If he had done so, then it's far less likely that Urban would have commenced any of the litigation that it commenced against me because Urban wouldn't have continued to be the slumlord of my building.

3.       I presented some of the information that I discussed above in this section because of how it's tied to what I will soon discuss and relief that I seek to be promptly granted in accordance with my HRA contract's terms. I included relevant findings in this complaint's "Legal Standards" section that are from **a)** _Dayton Bd. of Ed. v. Brinkman_, 433 U.S. 406, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977)_, **b)** _Toy Manufacturers v. Helmsley-Spear_, 960 F. Supp. 673, 42 U.S.P.Q.2d 1203 (S.D.N.Y. 1997)_, and **c)** _Capitol Records, Inc. v. Thomas-Rasset_, 692 F.3d 899 (8th Cir. 2012)_ that confirm that this Court is authorized to "restructure the operation of local and

state governmental entities" "on the basis of a constitutional violation" and grant me injunctive

relief that enjoins "certain otherwise lawful conduct" that "when performed in the context of a

totality of acts" constitutes "unfair competition".

4.      I have long urged Mr. Banks to cause me to be provided relocation assistance by HRA to

enable me to relocate from my Urban apartment to an area in Queens near where I last resided

there. However, he consistently stonewalled me in response and merely instead offered to make a

supportive housing facility available to me on the condition that I first agree to undergo a mental

health evaluation in spite of the fact that in stark contrast to him, other HRA personnel, members

of the NYPD, and others, I don't have any mental health issue. This is not to say that I don't

have extraordinarily bad luck because I'm cursed and am incredibly disadvantaged by that.

Concerning what I just discussed, I have an audio recording of a conversation that I had with him

on 8/22/18 during a public resource fair meeting in Brooklyn while he made excuses to me about

why he had been able to cause someone named Sherman Jackson to be able to be issued a private

apartment in Brooklyn at the same time that he hadn't done anything on my behalf to help me to

be able to similarly relocate from my Urban apartment to a private apartment elsewhere. This is

despite the fact that he knew from the very first time that I met him on 3/1/16 that I urgently

sought assistance from him to enable me to relocate back to Queens near where I last resided.

The New York Daily News published a news article on 8/1/18 on the Internet at

https://www.nydailynews.com/new-york/ny-metro-homeless-press-secretary-20180801-

story.html that is entitled "After a Year in Homeless Shelters Former Press Secretary to Top

NYC Officials is Homeward Bound" that was written by Greg Smith. That news article reported

that Mr. Banks intervened on behalf of Sherman Jackson that enabled Mr. Jackson to be issued a

private apartment in Brooklyn.

5.      While Mr. Banks was HRA's commissioner, he made appearances at various apartment buildings for their grand opening events while such facilities appear to have been funded partly by the City of New York and were partly for military veterans that is a group that I'm among as a Navy veteran. The fact that some of those facilities were funded partly by HRA means that he had the ability to have arrangements made on my behalf to enable me to be relocated from my Urban apartment to those buildings. Upon information and belief, some of those buildings include free laundry machines, wireless Internet service, printing, computers, and elevators for use to those who reside in them. None of that is available in my building for me. This means that I prejudicially have to pay for laundry, Internet service, and printing in contrast to those who reside in those buildings and otherwise have far less frequent Internet access as a result. It also means that I have to contend with poor weather and high crime outside of my building in the immediate vicinity of it whenever I have to visit a nearby laundromat.

6.      On a related note, the City of New York is continuing to illegally discriminate against me and violate my HRA contract partly by providing migrants and others in shelters in New York City that include hotels being used as shelters free access to wireless Internet access, Xboxes, televisions, clothing, cooked meals, laundry services, printing, computers, housekeeping services, and functional thermostats partly in rooms in which they reside. This means that I'm clearly at a competitive disadvantage compared to those other similarly-circumstanced people partly because their ability to have free and regular access to the Internet allows them to pursue employment opportunities faster and more frequently than I can. I certainly want to be entirely self-sufficient as quickly as possible. However, the personnel of HRA, Urban, and other City and State of New York personnel have sabotaged my efforts to cause that to occur and that sabotage is ongoing.

7.     On 7/31/18, a press release was published that is available at

https://www.csh.org/2018/07/jericho-project-and-bb-urban-open-walton-house/ that is entitled

"Jericho Project and B&B Urban Open Walton House". That press release indicates that Mr.

Banks attended the grand opening event for a supportive housing facility located in the Bronx

that is operated by an organization named Jericho Project. Information in that press release also

indicates that that facility is partly for military veterans and includes wireless Internet access,

laundry facilities. Also, the fact that that facility has ten floors means that it also has an elevator.

That press release further indicates that that grand opening event was attended by representatives

of Wells Fargo, Citi, and the Home Depot. This means that Mr. Banks had the option of inviting

me to that event and enabling me to be among those who would reside in that facility while my

attendance at that event could have allowed me to talk with the representatives of Wells Fargo,

Citi, and Home Depot to try to immediately be granted job interviews with them.

8.     Instead of receiving proper assistance from HRA's personnel to which I'm legally

entitled, I keep learning that the City of New York's personnel are devising new ways to

discriminate against me and make it even harder for me to secure employment. For example,

New York City Mayor Eric Adams announced an initiative in which his administration partnered

with private organizations to establish apprenticeships with such organizations for younger

people. That is age discrimination against me and otherwise violates my Fourteenth Amendment

equal protection rights. Information about that initiative is available in a news article that the

New York Daily News published on 9/12/22 that was written by Chris Sommerfeldt and is

entitled "Mayor Adams Pours $33M into Private-Sector Apprenticeships for NYC Students

Amid City Government Staff Shortage". That article is available at

https://www.nydailynews.com/news/politics/new-york-elections-government/ny-mayor-adams-

private-sector-apprenticeships-nyc-students-20220912-huhrlwcj4naahekmmn2od4rdli-
story.html.

9.      On 10/14/22, HRA published a public record in an official City of New York government
report named the City Record that is available at https://a856-
cityrecord.nyc.gov/RequestDetail/20221005022. That public notice is about a public hearing that
HRA will conduct on 10/27/22 partly about a proposed contract between HRA and IOS
Acquisitions LLC that would cause HRA to be provided temporary workers. Information in that
public notice also states the following about that proposed contract:

> "A draft copy of the proposed contract is available for public inspection at the Human
> Resources Administration of the City of New York, Office of Contracts, 150 Greenwich
> Street, 37th Floor, New York, NY 10007, on business days, from October 14, 2022 to
> October 27, 2022, between the hours of 10:00 AM and 5:00 PM, excluding Saturdays,
> Sundays and Holidays. If you need to schedule an inspection appointment and/or need
> additional information, please call (929) 221-6353 or 7305."

10.     On 10/18/22, though I called the telephone number of 929-221-6353 at 4:16 pm that is
listed in the preceding excerpt to schedule a time prior to 10/27/22 to exercise my First and
Fourteenth Amendment right to visit HRA's offices at 150 Greenwich Street on the 37th floor to
examine the proposed contract between HRA and IOS Acquisitions LLC, I was connected to
voicemail when I made that phone call and no one has called me back in response to the
voicemail message that I recorded to be granted an opportunity to visit that specific location
prior to 10/27/22 for the purpose that I just stated. When I made that telephone call, I also
recorded an audio recording of that because I can expected that outcome and intended to use that
recording to provide to a judge partly to be granted overdue and immediate injunctive relief
partly to uphold my First and Fourteenth Amendment rights. That audio recording is available at
https://drive.google.com/file/d/1E8Ko6GuMV6Ofzk81dBCUgMM2takUyRHx/view?usp=sharin
g. One of the reasons why I'm interested in that contract is because it's possible that I could be

among the temporary workers that would be provided to HRA through that contract if I were to be able to learn about the nature of the jobs that are available under that contract and how to submit an application for them.

11.    On a related note, information appears on page 9 in a PDF file that is named "General_Information_and_Regulatory_Requirements.pdf" that HRA has made available at https://passport.cityofnewyork.us/bare.aspx/en/fil/download_public/36BDD554-CD93-419F-A897-474CE98E8405 that indicates that those to whom HRA may issue a contract will be required to hire at least one person who receives public assistance government benefits for each $250,000 in annual value of that contract. That proposed contract is about HRA's initiative to increase the amount of pro-bono legal representation that is available for those with eviction cases in New York City's housing courts that I discussed earlier in this complaint. Among the relief that I seek in response to this complaint is an order by this Court that will require HRA to modify its contracts by requiring HRA to include a provision that requires its counterparties to prioritize their recruiting efforts by recruiting people who reside in my building for jobs that pay at least $80,000 annually to compel HRA to comply with its mandate to try to enable those who reside in my building to be self-sufficient.

12.    On 6/27/22, New York City Mayor Eric Adams conducted a public hearing with me at 4 pm in the Blue Room in City Hall. The Mayor's Office arranged for that hearing to be recorded on video. That video is available at https://www.youtube.com/watch?v=rAye14zJr_Q. That video confirms that I testified to him then about the B&S while I pointed out that the B&S had been committed by HRA and Urban. I also pointed out then that Frederick Shack was both Urban's CEO and an ally of Mr. Adams. Mr. Adams stated during that hearing in response to my testimony that no one should be committed fraud with lease agreements. Mr. Adams then met

with me shortly thereafter in a small conference room in City Hall while I recorded an audio

recording of that meeting at 4:17 pm. That recording is available at

https://drive.google.com/file/d/1cC5ABgu1g3tLKGtBngdeI9U0JbE9yqCW/view?usp=sharing.

That recording confirms that Mr. Adams illegally condoned the fact that Rachel Atcheson and

members of the NYPD illegally prevented me from attending public meetings that were public

forums on 5/23/17 and thereafter in 2017 after I told him both that Ms. Atcheson worked for him

while we were having that meeting and that she and members of the NYPD previously and

illegally prevented me from attending public meetings in 2017 that were public forums while I

conducted myself in a lawful manner in stark contrast to them. That recording also confirms that

he made remarks to me during that meeting in which he suggested that I may be blacklisted from

employment opportunities with the City of New York due to litigation of mine. He told me that

after I told him that though I had repeatedly applied for jobs with City of New York government

agencies, I had never been granted a job interview with them. I have been fully qualified for all

of those jobs and have supposed to have been accorded preferential hiring for them due to my

status as a Navy veteran and also due to my HRA contract. I immediately Mr. Adams in response

to his remark about the possibility that I may be blacklisted from such employment opportunities

with the City of New York that that litigation activity isn't valid grounds to deprive someone of

employment opportunities. He also told me during that meeting that he would look into housing

matters that I apprised him about. That meeting in that small conference room was also attended

by Fred Kreizman. Mr. Kreizman is the CAU's Commissioner. Frederick Shack was a member

of a group that worked to facilitate Mr. Adams transition from his job as the Brooklyn Borough

President to being New York City's Mayor.

13.     On a related note, the New York Daily News published a news article on 10/20/22 that

was written by Chris Sommerfeldt and is entitled "Mayor Adams Shrugs Off Fired Staffer's

Comments About Him, but Calls Anti-NYPD Rant 'Unacceptable'". That article is available at

https://www.nydailynews.com/news/politics/new-york-elections-government/ny-nyc-mayor-

adams-city-hall-staffer-fired-nypd-comments-20221020-c3ampuheircr7oevrdmxljpucu-

story.html. The following excerpts from that news article confirm that New York City Mayor

Eric Adams subjected someone named Christopher Baugh to illegal viewpoint discrimination

and First Amendment retaliation in response to criticism of the NYPD that Mr. Baugh expressed

while he then worked for the Mayor's Office and expressed his criticism in his personal capacity

and during his time off from work that cement the fact that his remarks were protected First

Amendment expression:

    a.    "Mayor Adams revealed Thursday he didn't initially plan to fire a City Hall aide caught on camera making disparaging remarks about him — but had a change of heart after additional footage emerged of the staffer unloading on NYPD officers.

        The now-former staffer, Christopher Baugh, was terminated Wednesday, as first reported by the Daily News, after the right-wing Project Veritas group disseminated secretly recorded video clips of him calling Adams "corrupt" and questioning his ability to lead the city through the migrant crisis."

    b.    "Adams said his mind changed once he saw another clip of Baugh belittling NYPD officers, though.

        "When you have disparaging remarks about first responders, that's unacceptable," said the mayor, himself a retired NYPD captain. "I know what first responders went through, I cannot allow that to happen and my team cannot be a part of that... You got to have thick skin in this business. My first responders do not need to have thick skin, and I'm going to stand up for them.""

14.    On 10/21/22, a news organization named CBS6 Albany published a news article that was

written by Kalani Aaron that is entitled "Whitehall judge suspended by NYS Court of Appeals".

That article is available at https://cbs6albany.com/news/local/whitehall-judge-suspended-by-nys-

court-of-appeals and reports that Acting Chief Judge Anthony Cannataro ordered the immediate

suspension of a state-court judge in New York State who is named Robert Purtorti. This is

relevant because it supports having this Court issue an order pursuant to the All Writs Act and ex

Parte Young to cause the immediate suspension and removal of Judge Bannon and Judge Frank

as judges of the UCS to occur for cause.

## **Causes of Action**

I incorporate by reference the entirety of the allegations that I made earlier in this complaint as

though fully set forth herein within this section.

A.    **First Claim:**    Deprivation of Rights under the United States Constitution through 42
       U.S.C. §1983

   - **Against the following:**      Urban, the City of New York, Ronald Abad, Steven
     Banks, Nancy Bannon, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates,
     Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Shorab Ibrahim, Gary
     Jenkins, Joni Kletter, Lisa Lombardi, Nigel Marks, Jeffrey Mosczyc, Maura Noll,
     Andrew Nastachowski, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana
     Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg

1.      The individual defendants to whom this claim applies correspond to it for the reasons that

I have discussed in this complaint.

2.      To clarify matters even further about this in the event that there may be some uncertainty

about why some of the defendants that I have listed above for this claim have been included here,

the following applies:

        a.      Through their acts and omissions, Steven Banks, Ann Marie Scalia, Kristen

Benjamin-Solis, Urban, Ronald Abad, Sharon Coates, Lisa Lombardi, Andrew Nastachowski,

Kishea Paulemont, Ariana Saunders, Frederick Shack, and Nancy Southwell deprived me of my

right Fifth and Fourteenth Amendment rights that apply to property, due process, liberty, and

equal protection rights that include the right to contract and establish a home as a result of the

B&S.  The findings in this complaint's "Legal Standards" section that are from *Mizrahi v. City of*

*New York* and *US v. Basey* confirm this.

b.      By fraudulently concealing information in my HRA lawsuit and my OTDA

litigation that was in HRA's possession that confirmed that HRA personnel were involved by

2/18/16 in subjecting me to the B&S, Jeffrey Mosczyc, Marin Gerber, and Ann Marie Scalia also

triggered liability for themselves for claims of mine under 42 U.S.C. §1983. By condoning and

covering-up such violations, Mr. Banks and Martha Calhoun are also liable.

c.      Both Judge Bannon and Judge Frank issued orders in my HRA lawsuit after it was

technically dismissed and disposed of because of errors by them on 1/31/18 and 4/9/19 after they

appear to have illegally discriminated against me in that case in violation of my First and

Fourteenth Amendment rights in response to my 9/13/21 and 8/26/22 OSC filings in that case as

it appears that they ruled against me in their 9/14/21 (*see* A1) and 8/29/22 (*see* A2) orders in

response to those OSC filings on the grounds that my HRA lawsuit was in a disposed of state

when I submitted those OSC filings in it that seems to have caused them to contend that I

couldn't be granted the relief that I sought in those OSC filings in spite of the fact that the

precedent that the set by issuing orders in that case while it was technically disposed of cemented

the fact that I could following in their footsteps by submitting OSC applications in it while it was

disposed of and be granted relief in response. Moreover, by fraudulently **a)** ignoring relevant

information in my HRA lawsuit that included the Exhibit 8 in the 4/7/17 affirmation and the

exhibits that I stored on the USB thumb drive that I filed in my HRA lawsuit on 5/19/17, **b)**

dismissing my HRA lawsuit on 1/31/18 while I still had claims that were pending to be

addressed in it, and **c)** lying in her 9/14/21 order in my HRA lawsuit by fraudulently claiming

that I couldn't be granted relief that I sought in response to my 9/13/21 OSC, Judge Bannon

triggered liability for herself for claims of mine under 42 U.S.C. §1983 while committing

continuing violations.

     d.     By fraudulently claiming in the order that he issued on 8/29/22 in my HRA

lawsuit in response to my 8/26/29 OSC that I couldn't be granted relief that I sought without

providing an objectively plausible reason to support that contention, Judge Frank committed a

continuing violation against me in that case that triggered liability for him for claims of mine

under 42 U.S.C. §1983.

     e.     By illegally barring me from OTDA's offices and allowing HRA to get away with

fraud in my OTDA litigation partly by not complying with my discovery demands instead of

causing fair hearing decisions to be reinstated and reversed due to fraud by HRA, Nigel Marks,

Samuel Spitzberg, and Maura Noll committed continuing violations against me in my OTDA

litigation that triggered liability for themselves for claims of mine under 42 U.S.C. §1983.

     f.     By subjecting me to obstruction of justice in Urban3 largely by refusing to issuing

a subpoena that would cause me to be provided video recording evidence by Urban that would

prove that I illegally wasn't served the legal papers by a process server that were filed in Urban3

to commence it prior to the first court hearing in Urban3, Judge Ibrahim triggered liability for

himself for claims of mine under 42 U.S.C. §1983.

     g.     The City of New York, Steven Banks, Martha Calhoun, Allison Gill-Lambert,

Gary Jenkins, Molly Park, and Ann Marie Scalia triggered liability for themselves for claims of

mine under 42 U.S.C. §1983 partly by virtue of the fact that **a)** I continued to illegally not be

provided discovery material prior to fair hearings that OTDA conducted between HRA and I and

**b)** HRA illegally hasn't provided me the report that it was required to provide to me within 20

days after it was directed on or after 2/16/22 by OTDA to investigate whether HRA personnel

were involved in subjecting me to the B&S after I talked with Mr. Jenkins on 10/28/21 partly

about the fact that HRA didn't have proper safeguards in place to stop violating my rights that put him on notice of the need to devise and implement them.

**B.**   <u>**Second Claim**</u>:  Violation of the FDCPA (15 U.S.C. §1692)

- **Against the following**:     Urban, DNCT, Ronald Abad, Sharon Coates, Allison Heilbraun, Lisa Lombardi, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Frederick Shack, Nancy Southwell, Eric Tavel

1. The individual defendants' acts and omissions that apply to this claim amounted to violations of 15 U.S.C. §1692 for the reasons that I have discussed in this complaint that correspond to their fraudulent claims directly and indirectly that I have owed Urban rent payments.

**C.**   <u>**Third Claim**</u>:   Violation of Civil RICO (18 U.S.C. §1964)

- **Against the following**:     Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Marin Gerber, Allison Heilbraun, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Maura Noll, Andrew Nastachowski, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Eric Tavel

1. The individual defendants' acts that apply to this claim amounted to violations of 18 U.S.C. §1964 for the reasons that I have discussed in this complaint. Acts of mail and wire fraud that were committed by others against me while defendants among this group were accomplices of those who actually committed the mail and wire fraud against me cause those additional defendants to be equally liable for this as they illegally ratified and covered-up such fraud. This is particularly true about Mr. Banks and Ms. Calhoun.

**D.**   <u>**Fourth Claim**</u>:  Violation of New York General Business Law§349

- **Against the following**:     Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Anthony M. Gonzalez, Allison Heilbraun, Shorab Ibrahim, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie

Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel

1.      The individual defendants' acts and omissions that apply to this claim amounted to

violations of New York General Business Law §349 for the reasons that I have discussed in this

complaint.

E.      **Fifth Claim:**      Violations of the Fourth Amendment

- **Against the following:**      Urban, the City of New York, Ronald Abad, Steven
  Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Marin Gerber,
  Shorab Ibrahim, Lisa Lombardi, Jeffrey Mosczyc, Nigel Marks, Andrew
  Nastachowski, Kishea Paulemont, Ariana Saunders, Ann Marie Scalia, Frederick
  Shack, Nancy Southwell, Samuel Spitzberg

1.      The individual defendants' acts and omissions that apply to this claim violated my rights

pursuant to the Fourth Amendment by **a)** unlawfully detaining me partly by requiring me to have

to contend with unnecessary court hearings and other legal proceedings in Urban1, Urban2,

Urban3, my OTDA litigation and **b)** unlawfully causing property of mine to be seized as this

relates to my right of possession of apartment 4C in my building, the property that I kept in the

storage that I rented from Cubesmart by virtue of its auction in April of 2019 as a result of the

B&S and HRA's refusal to continue to pay for storage unit rental expenses on my behalf to

Cubesmart.

F.      **Sixth Claim:**      Violations of the Fifth Amendment

- **Against the following:**      Urban, the City of New York, Ronald Abad, Steven
  Banks, Nancy Bannon, Martha Calhoun, Sharon Coates, Lyle Frank, Marin Gerber,
  Shorab Ibrahim, Lisa Lombardi, Nigel Marks, Jeffrey Mosczyc, Andrew
  Nastachowski, Kishea Paulemont, Ariana Saunders, Ann Marie Scalia, Frederick
  Shack, Nancy Southwell, Samuel Spitzberg

1.      The individual defendants' acts and omissions that apply to this claim violated my

substantive due process rights and the Takings Clause that pertain to the Fifth Amendment in the

ways that I discussed earlier in this complaint.

G.      **Seventh Claim:** Violations of the Contracts Clause of the U.S. Constitution

- **Against the following:**     Urban, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Lyle Frank, Marin Gerber, Joni Kletter, Lisa Lombardi, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg

1. The individual defendants' acts and omissions that apply to this claim violated my rights pursuant to the Contracts Clause of the U.S. Constitution in the ways that I have discussed in this complaint.

**H.     Eighth Claim:**     Violations of procedural due process and equal protection rights in violation of the Fourteenth Amendment

- **Against the following:**     Urban, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Shorab Ibrahim, Marin Gerber, Gary Jenkins, Allison Gill-Lambert, Joni Kletter, Lisa Lombardi, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Daniel Tietz

1. The individual defendants who this claim applies to are liable for it due to the information that I discussed earlier in this complaint.  Mr. Tietz is listed here primarily because the violations by OTDA that this claim concerns are ultimately due to his failure to devise, implement, and enforce appropriate policies within OTDA that have proximately allowed ongoing violations of my due process and equal protection rights as well as my First Amendment rights by OTDA personnel while he has been OTDA's commissioner. Relief that I seek against him in this case is strictly declaratory and prospective injunctive relief.

**I.     Ninth Claim:**     Violations of Fourteenth Amendment liberty rights

- **Against the following:**     Urban, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Daniel Tietz

1.      The individual defendants who this claim applies to are liable for it due to the information that I discussed earlier in this complaint. Judge Cannataro is listed here primarily because the violations of my First and Fourteenth Amendment rights in Urban3 and my HRA lawsuit by judges are ultimately attributable to his failure to devise, implement, and enforce appropriate policies within the UCS that have proximately allowed ongoing violations of my First and Fourteenth Amendment rights in that litigation partly while he has been the Acting Chief Judge of the State of New York. Relief that I seek against him in this case is strictly declaratory and prospective injunctive relief.

**J.**     **Tenth Claim:**   Abuse of Process

- **Against the following:**     Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel, Daniel Tietz

1.      The defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint.

**K.**     **Eleventh Claim:**      Discrimination and selective-enforcement in violation of the Fourteenth Amendment

- **Against the following:**     Urban, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Daniel Tietz

1.      The individual defendants who this claim applies to are liable for it due to the information that I discussed earlier in this complaint.

**L.**     **Twelfth Claim:** Tortious Interference

- **Against the following:**      Urban, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Lisa Lombardi, Jeffrey Mosczyc, Andrew Nastachowski, Kishea Paulemont, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell

1.      The individual defendants' acts and omissions that apply to this claim amounted to tortious interference against me in the ways that I have discussed in this complaint. I have been sufficiently clear in this complaint about tortious interference with both my Urban lease and the storage unit that I rented from Cubesmart while I resided in my Urban apartment.

**M.      Thirteenth Claim:**      Breach of Contract and Violations of Promissory Estoppel

- **Against the following:**      Urban, NAICA, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell

1.      The individual defendants' acts and omissions that apply to this claim amounted to breach of contract against me for the reasons that I have discussed in this complaint.

**N.      Fourteenth Claim:**      Violation of RPAPL §853

- **Against the following:**      Urban, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Lisa Lombardi, Andrew Nastachowski, Kishea Paulemont, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell

1.      As I have discussed in this complaint, the individual defendants' acts and omissions that apply to this claim violated RPAPL §853 by illegally preventing me to be issued possession of apartment 4C located in the building in which I reside after I signed a binding and fully-enforceable apartment lease for that apartment on 2/16/16.

**O.      Fifteenth Claim:**      Fraud

- **Against the following:**      Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Lyle Frank, Marin Gerber, Anthony M. Gonzalez, Allison Heilbraun, Shorab Ibrahim, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey

Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel

1.      The individual defendants' acts and omissions that apply to this claim amounted to fraud

against me for the reasons that I have discussed in this complaint.

**P.      Sixteenth Claim:**      Fraud on the Courts

- **Against the following:**      Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Marin Gerber, Anthony M. Gonzalez, Allison Heilbraun, Lisa Lombardi, Julio Manjarrez, Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Eric Tavel

1.      The individual defendants' acts and omissions that apply to this claim amounted to fraud

against me for the reasons that I have discussed in this complaint.

**Q.      Seventeenth Claim:**      Violation of New York State Judiciary Law §487 & Legal Malpractice

- **Against the following:**      Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Kristen Benjamin-Solis, Martha Calhoun, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Allison Heilbraun, Shorab Ibrahim, Joni Kletter, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Maura Noll, Molly Park, Harold Rosenthal, Ann Marie Scalia, Samuel Spitzberg, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint.

**R.      Eighteenth Claim:**      Stigma-Plus Defamation

- **Against the following:**      Urban, DNCT, the City of New York, Ronald Abad, Steven Banks, Sharon Coates, Allison Heilbraun, Lisa Lombardi, Andrew Nastachowski, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Frederick Shack, Nancy Southwell, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint.

**S.      Nineteenth Claim:**      Conspiracy to Violate Civil Rights

- **Against the following:** Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint.

**T.    Twentieth Claim:**          Identity-Theft

- **Against the following:** Urban, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Lisa Lombardi, Jeffrey Mosczyc, Andrew Nastachowski, Kishea Paulemont, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell

1.      The defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint. By subjecting to the B&S and using a copy of my BS Urban lease in my HRA lawsuit, my OTDA litigation, and Urban's litigation against me while fraudulently claiming that my BS Urban lease was the lease that I signed on 2/16/16 with Lisa Lombardi of Urban, those who did so and were part of that scheme committed identity-theft against me.

**U.    Twenty-First Claim:**          Violations of 22 NYCRR §130-1.1 and RPAPL §741

- **Against the following:** Urban, DNCT, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Martha Calhoun, Sharon Coates, Lyle Frank, Anthony M. Gonzalez, Allison Heilbraun, Lisa Lombardi, Jeffrey Mosczyc, Andrew Nastachowski, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Frederick Shack, Nancy Southwell, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint. The defendants that this claim applies made false statements in Urban's litigation against me, my HRA lawsuit, and were otherwise accomplices of those who did so.

**V.**   **Twenty-Second Claim:**     Violations of the Supremacy Clause of the U.S. Constitution

- **Against the following:**     the City of New York, Steven Banks, Martha Calhoun, Marin Gerber, Jeffrey Mosczyc, Ann Marie Scalia

1.   The individual defendants' acts and omissions that apply to this claim violated my rights pursuant to the Supremacy Clause of the U.S. Constitution in the ways that I have discussed in this complaint. These defendants illegally contravened the federal regulation that defines what "permanent housing" is.

**W.**   **Twenty-Third Claim:**     Negligence

- **Against the following:**     Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel, Daniel Tietz

1.   The individual defendants' acts and omissions that apply to this claim amounted to negligence against me for the reasons that I have discussed in this complaint.

**X.**   **Twenty-Fourth Claim:**     Intentional and Negligent Infliction of Emotional Distress

- **Against the following:**     Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Shorab Ibrahim, Joni Kletter, Gary Jenkins, Lisa Lombardi, Julio Manjarrez, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel, Daniel Tietz

1.   The individual defendants' acts and omissions that apply to this claim amounted to intentional and negligent infliction of emotional distress against me for the reasons that I have discussed in this complaint.

**Y.**   <u>**Twenty-Fifth Claim**</u>:        Deliberate Indifference

- <u>**Against the following**</u>:        Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Jeffrey Mosczyc, Andrew Nastachowski, Lawrence Marks, Nigel Marks, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Samuel Spitzberg, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Eric Tavel, Daniel Tietz

1.      The individual defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint.

**Z.**   <u>**Twenty-Sixth Claim**</u>:        Failure to Train and Supervise

- <u>**Against the following**</u>:        Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Allison Gill-Lambert, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Lawrence Marks, Nigel Marks, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel, Daniel Tietz

1.      The individual defendants' acts and omissions that apply to this claim amounted to failures train and supervise subordinates that caused me harm as I have discussed in this complaint.

**AA.**   <u>**Twenty-Seventh Claim**</u>:        Violations of the First Amendment

- <u>**Against the following**</u>:        Urban, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Allison Gill-Lambert, Anthony M. Gonzalez, Shorab Ibrahim, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Daniel Tietz

1.      The individual defendants who this claim applies to are liable for it due to the information that I discussed earlier in this complaint.  Similar to what I stated earlier, Judge Cannatoro, Judge Marks, and Mr. Tietz are listed here because my claims about this are due to

their policies and lack of proper oversight.

**BB.** <u>**Twenty-Eighth Claim**</u>:        First Amendment Retaliation and Viewpoint Discrimination

- <u>**Against the following:**</u>        Urban, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Martha Calhoun, Sharon Coates, Lyle Frank, Marin Gerber, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel.

1.        The individual defendants who this claim applies to are liable for it due to the

information that I discussed earlier in this complaint.

**CC.** <u>**Twenty-Ninth Claim:**</u>        Obstruction of Justice by Impeding Access to the Courts (both backward and forward-looking claims)

- <u>**Against the following:**</u>        Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Martha Calhoun, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Maura Noll, Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg

1.        The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint.

**DD.** <u>**Thirtieth Claim:**</u>        Violation of New York State Civil Rights Law §50

- <u>**Against the following:**</u>        Urban, DNCT, the City of New York, Ronald Abad, Steven Banks, Martha Calhoun, Sharon Coates, Allison Heilbraun, Lisa Lombardi, Jeffrey Mosczyc, Andrew Nastachowski, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Eric Tavel

1.        The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint. By commencing frivolous litigation against me for trade

purposes and subjecting me to the B&S, those who did so and condoned that violated New York

State Civil Rights Law §50.

**EE.** <u>**Thirty-First Claim:**</u>  Private Nuisance

- **Against the following:**      Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Lawrence Marks, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel, Daniel Tietz

1.      The defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint.

**FF.   Thirty-Second Claim:**      Violations of the False Claims Act (Qui Tam)

- **Against the following:**      Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Lisa Lombardi, Julio Manjarrez, Jeffrey Mosczyc, Andrew Nastachowski, Molly Park, Kishea Paulemont, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I discussed earlier in this complaint. Urban's personnel fraudulently claimed to HRA that Urban would comply with applicable laws in how it operated as the slumlord of my building in violation of the False Claims Act. Urban has also violated the False Claims Act by fraudulently claiming in the litigation it commenced against me that I have owed it rent. Also, HRA's personnel violated the False Claims Act partly by fraudulently claiming in my OTDA litigation and my HRA lawsuit that **a)** HRA had complied with the 9/15/16 fair hearing decision for OTDA fair hearing number 7316477K about storage unit rental expenses, **b)** I wasn't eligible and entitled to have HRA to pay for storage unit rental expenses on my behalf while I resided in my Urban apartment, and **c)** I resided in permanent housing with respect to my Urban apartment. The object of that scheme by HRA's personnel was to avoid having HRA incur losses by having to perform its legal duty to pay for storage unit rental expenses on my behalf to Cubesmart while I resided in my Urban apartment and to otherwise reimburse for storage unit rental expenses that

I paid for the storage unit rental period of May of 2016 thru July of 2016.

**GG.**   **Thirty-Third Claim:**     Violations of NYC Charter §1116, New York State Public Officer Law 195.00, New York City Mayoral Executive Order 16, and the Constitutional Oaths of Office of City and State of New York Personnel

- **Against the following:**     the City of New York, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Gary Jenkins, Joni Kletter, Nigel Marks, Jeffrey Mosczyc, Maura Noll, Molly Park, Pinny Ringel, Ann Marie Scalia, Samuel Spitzberg,

1.      The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint.

**HH.**   **Thirty-Fourth Claim:**     Unjust Enrichment

- **Against the following:**     Urban, DNCT, NAICA, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Gary Cohen, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Anthony M. Gonzalez, Allison Heilbraun, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint.

**II.**   **Thirty-Fifth Claim:**     Sabotage to My Right to Pursue and Be Considered for Employment Opportunities

- **Against the following:**     Urban, DNCT, NAICA, the City of New York, Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Anthony Cannataro, Sharon Coates, Lyle Frank, Marin Gerber, Allison Gill-Lambert, Allison Heilbraun, Shorab Ibrahim, Gary Jenkins, Joni Kletter, Lisa Lombardi, Julio Manjarrez, Lawrence Marks, Jeffrey Mosczyc, Nigel Marks, Andrew Nastachowski, Maura Noll, Molly Park, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel

1.      The defendants that this claim applies to are liable for it due to the information that I

discussed earlier in this complaint.

**JJ.**   **Thirty-Sixth Claim:**  Municipal Liability

- **Against the following:**     The City of New York

1.     Defendant City is liable for this claim due to the information that I discussed earlier in this complaint.

### Demand For A Jury Trial

I demand a trial by jury in this action.

### Prayer For Relief

WHEREFORE, I request the following relief:

1.     Having this Court possibly compartmentalize my claims in this case by bifurcating this case into several smaller and related ones with separate trials for each that will correspond to my claims in this case that are mostly about the following:

      a.     The commission of the B&S and its cover-up partly by HRA's illegal and ongoing failure to provide me discovery material for OTDA fair hearings.

      b.     Fraud on the courts and against me partly through the use of my BS Urban lease as a false instrument in my HRA lawsuit and my OTDA litigation.

      c.     Fraud on the courts and against me partly through the use of my BS Urban lease as a false instrument in the litigation that Urban commenced against me.

      d.     My claims that pertain to the snowball effects of harm that I experienced from the B&S.

2.     Ordering the USMS to no longer cause me to be stalked inside of federal courthouses nor otherwise treated any differently than any other visitor to federal courthouses while I conduct myself in a lawful manner in them partly by displaying my face and name on tablet computer screens in public areas in them while that is viewable by the general public in order to uphold my rights pursuant to **a)** *Sheppard v. Maxwell*, 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) serenity and calm throughout the entire time that I'm inside of courthouses while I conduct

myself in a lawful manner and **b)** *Ingraham v. Wright*, 430 U.S. 651, 97 S. Ct. 1401, 51 L. Ed. 2d

711 (1977) "to be free from, and to obtain judicial relief for, unjustified intrusions on personal

security" inside of federal courthouses. Granting me this relief will serve to end ongoing,

longstanding, illegal, and pretextual stigmatization, demonization, and provocation of me inside

of federal courthouses by USMS personnel and CSOs that federal judges have long illegally,

biasedly, and prejudicially countenanced in flagrant violation of my rights in spite of the material

fact that longstanding and illegal practice materially and substantially sabotages my right to fair

trials partly by contaminating the pool of potential jurors that I may choose from for litigation of

mine as a result of first impressions that are often lasting impressions that potential jurors can't

be relied on to reveal during jury selection nor thereafter. Moreover, granting me this relief is

supported by the material fact that **a)** *Monsky v. Moraghan*, 127 F.3d 243 (2d Cir. 1997) states

that "hostile action toward a litigant could be so offensive as to effectively drive the litigant out

of a courthouse and thereby become the functional equivalent of a denial of access" and **b)** *Sevy*

*v. Barach*, No. 17-13789 (E.D. Mich. Aug. 5, 2019) cites *Cohen v. California*, 403 U.S. 15, 26

(1971) in support of its finding that states that "Sevy has a clearly established right to protest

public policies in the courthouse". *Sevy v. Barach* was about court officers who criminally

assaulted the plaintiff in a courthouse as First Amendment retaliation that was recorded on video

that I have watched. *Sheppard v. Maxwell* confirms that all federal judges are required to

diligently, continuously, and neutrally exercise proper control of court partly to hold the USMS

and CSOs in proper check by not letting them pretextually commit illegal and otherwise abusive

acts and omissions that cause disruptions and mayhem inside of federal courthouses. This point

is affirmed by findings in *US v. Smith*, 426 F.3d 567 (2d Cir. 2005) and is otherwise buttressed

by findings in *Chambers v. Nasco, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991),

28 U.S.C. §566(a), 28 U.S.C. §1651, 5 U.S.C. §552a(e)(7), 18 U.S.C. §401, 18 U.S.C. §1507, 18 U.S.C. §1509, 18 U.S.C. §1512, 18 U.S.C. §1513(e), 18 U.S.C. §245(b)(5), and 41 CFR §102-74.390.

3.      Having this Court immediately make arrangements with this Court's Pro Se Intake office to try to cause me to be assigned an attorney for pro-bono legal representation for this case.

4.      Declaring all of the following:

a.      My BS Urban lease has always been a forgery that has been illegally used as a false instrument **a)** by Jeffrey Mosczyc in my HRA lawsuit; **b)** Marin Gerber in my OTDA litigation; and **c)** Urban, its personnel, and DNCT's attorneys in Urban1, Urban2, and Urban3.

b.      **a)** Urban3 has been conducted in violation of my First and Fourteenth Amendment rights, my right to competent pro-bono legal representation in it, and in bad-faith and **b)** those facts and circumstances have caused substantial and irreparable harm to my First and Fourteenth Amendment rights partly to effectively, timely, and efficiently pursue the entirety of my counterclaims and defenses in it that demands the immediate intervention by this Court in that matter by immediately staying Urban3, removing it to this case, and consolidating that with this case.

c.      Urban has engaged in major fraud concerning my Urban lease and the City of New York is ordered to terminate all of its contracts with Urban as soon as possible and to permanently bar Urban from being considered for further business opportunities with the City of New York.

d.      My HRA contract and the 1/27/17 agreement that HRA issued to me that concerned the fact that it agreed to continuously pay for storage unit rental expenses on my behalf to Cubesmart for as long as I continued to reside in my Urban apartment were and remain

binding and fully-enforceable agreements that HRA and its current and former personnel willfully, substantially, and prejudicially violated that caused me and is continuing to cause me substantial and irreparable harm.

e.    My HRA contract imposed special duties upon Ms. Scalia, Mr. Banks, and Martha Calhoun as well as the rest of those who then worked for HRA that required them and still requires them to immediately and continuously assist me in any way possible instead of in ways that are discretionary, practical, convenient, and temporary.

f.    No immunity exists for the illegal acts and omissions that attorneys committed against me in my HRA lawsuit, my OTDA litigation, Urban1, Urban2, and Urban3 and otherwise in relation to that litigation partly by Mr. Banks, Ms. Scalia, and Martha Calhoun partly by illegally condoning and covering-up matters pertaining to that largely because those were administrative acts about which immunity doesn't exist.

g.    This Court will cause the following people to be immediately and permanently disbarred as attorneys and otherwise banned for life from being employed in the legal and real estate industries, by government agencies, and by organizations that are similar to Urban pursuant to the All Writs Act, New York State Public Officer Law §30, and NYC Charter §1116 in response to fraud and negligence that they perpetrated that is analogous to the reasons why U.S. District Judge Denise Cote imposed a lifetime ban in *In Federal Trade Commission v. Shkreli*, No. 20-cv-706 (DLC)(S.D.N.Y. Jan. 14, 2022) against Martin Shkreli from being employed in the pharmaceutical industry:

> Ronald Abad, Steven Banks, Nancy Bannon, Barbara Beirne, Kristen Benjamin-Solis, Martha Calhoun, Sharon Coates, Lyle Frank, Marin Gerber, Anthony M. Gonzalez, Allison Heilbraun, Joni Kletter, Lisa Lombardi, Nigel Marks, Jeffrey Mosczyc, Andrew Nastachowski, Kishea Paulemont, Pinny Ringel, Harold Rosenthal, Ariana Saunders, Ann Marie Scalia, Frederick Shack, Nancy Southwell, Samuel Spitzberg, Eric Tavel

h.      The confidentiality and protective orders that were issued Judge Gorenstein in K6

on 1/15/21 about the 185-page PDF file have always been void and unenforceable due to

offsetting penalties and estoppel in regards to the fact that the City of New York, its agencies,

and its personnel violated my privacy rights as I discussed earlier in this complaint partly about

my HRA lawsuit and *People v. Komatsu*.

i.      The confidentiality and protective orders that were issued by U.S. District Judge

Valerie Caproni *USA v. Komatsu*, No. 18-cr-671 (VEC)(S.D.N.Y.) has also always been void

and unenforceable due to offsetting penalties and estoppel in regards to the fact that the USMS

personnel and CSOs violated my privacy rights by illegally having possession of and publicly

displaying an image of my face and my name on tablet computer screens inside of public areas

of federal courthouses in New York City while that image was from *People v. Komatsu* and

continued to be illegally possessed and displayed by them after 1/23/20 that was the date when

Bronx Criminal Court Judge Tara Collins both dismissed *People v. Komatsu* and sealed that

frivolous case in which I prevailed.

j.      This Court certainly will not prejudge nor be shortsighted about matters in this

case and will instead diligently follow the facts and evidence that is presented in this case

wherever that leads while fully abiding by all applicable legal standards and being entirely

neutral.

k.      This Court will not rely on stereotypes and assumptions about matters in this case

and will instead follow the facts, evidence, witness accounts, and matters of law largely because

stereotypes and assumptions often are inapplicable and prejudicial.

l.      This Court will timely apprise me if there is some matter in the information that I

present in this case that this Court is unclear about or needs clarification about to enable me to

promptly and fully address such scenarios instead of risking the possibility that this Court may reach erroneous determinations about matters that it may possibly and prejudicially misapprehend.

      m.    This Court will not reject lengthy filings that I submit in this case that are lengthy solely because of my need to present sufficient relevant details largely to try to avoid prejudicial misconceptions by those who read them about the information in them.

      n.    This Court will grant me declaratory and injunctive against Judge Ibrahim by **a)** declaring that he violated my rights in Urban3 in the ways that I described in the "Cause of Action" section in this complaint and elsewhere in it and **b)** immediately staying Urban3, removing it to this case, and consolidating Urban3 with this case.

      o.    The restrictions that exist in state courthouses in New York State that restrict the ability of those who visit them to freely record audio recordings, video recordings, and take photographs is an unlawful prior restraint that is unduly prejudicial in violation of First and Fourteenth Amendment rights instead of being narrowly-tailored to serve a legitimate governmental interest and is therefore void and unenforceable.

      p.    New York City's housing courts are restrained from allowing cases to proceed against tenants who are legally entitled to be represented by pro-bono attorneys in those cases while they're not represented by attorneys in those cases.

      q.    Every single court hearing that is conducted by courthouse personnel in state courthouses in New York State that the public may attend or otherwise access must be accurately recorded electronically or in written form by courthouse personnel for possible appellate review and to fully comply with the public's First Amendment rights to immediate and continuous access to information about all public legal proceedings.

r.      Every litigant in litigation assigned to state courthouses in New York State must be given the opportunity to participate in legal proceedings in such litigation in the same way by requiring the parties to participate in the legal proceedings in each case in the same way that means that if some of the parties do so remotely, then all of the parties must have the ability to do so remotely.

s.      All judges assigned to state courthouses in New York State are prohibited from granting adjournment requests that they receive as a result of *ex-parte* communications.

t.      All judges assigned to state courthouses in New York State are required to diligently review the entirety of the submissions that are filed in cases assigned to them that includes all exhibits that are included in such submissions prior to issuing determinations about matters in those cases that those submissions are about.

u.      The First and Fourteenth Amendment as well as estoppel confirm that judges assigned to state courthouses in New York State have been and continue to be prohibited from preventing litigants in cases to which they have been assigned from seeking relief in them after they have been dismissed or disposed of in instances in which judges assigned to those same cases previously and illegally dismissed or disposed of them while claims continued to be pending in them for adjudication before they or other judges of coordinate jurisdiction then issued orders that reversed the wrongful dismissals and/or disposals of those cases. This point is based on the fact that judges are barred from throwing the rulebook out the window in the first instance by dismissing and/or disposing of such cases under such circumstances prior to then issuing post-disposition orders about those cases while they're technically dismissed or disposed before such judges thereafter may try to block litigants in them from following in their footsteps by submitting post-disposition filings in them in which they seek relief.

v.

w.      OTDA is prohibited from cancelling fair hearings that it has scheduled to be

conducted between HRA and an appellant without the appellant's consent in instances in which

HRA remedies an error that it made that proximately caused the appellant to request a fair

hearing from OTDA largely because that doesn't change the fact that the appellant is still entitled

to be provided discovery material from HRA for such a fair hearing partly to probe whether the

error that HRA made that is the subject of that fair hearing was intentional, retaliatory, and

pretextual instead of inadvertent. Nigel Marks of OTDA issued me a notice on 10/27/21 in which

he informed me that he cancelled such a fair hearing for fair hearing number 8363917Z that had

been scheduled to be held between HRA and I in my OTDA litigation about a claim that I

asserted against HRA after its personnel arbitrarily and capriciously cancelled the issuance of a

government benefit to me earlier that month. He informed me in that notice that he cancelled that

fair hearing because the issues that fair hearing was to address had been resolved in my favor

prior to it. However, he biasedly and prejudicially ignored the material fact that I still had a First

and Fourteenth Amendment right to engage in discovery in connection with that fair hearing by

being provided discovery material for it by HRA to enable me to ascertain whether HRA

personnel had intentionally and illegally discriminated against me by cancelled the issuance of

the government benefit that it concerned. In fact, I thereafter had a face-to-face conversation with

Gary Jenkins of HRA on 10/28/21 at 4 pm at John Joy College in Manhattan during a public

resource fair meeting that I recorded on video as one of the things that we talked about was the

fact that someone who worked for HRA had illegally cancelled the issuance of a government

benefit to me recently while I asked Mr. Jenkins then about what safeguards HRA had in place to

prevent that from happening. That video recording is available at

https://drive.google.com/file/d/1eD7xjGs9VzFx8-LFLEZGTEQs8u32Zdka/view?usp=sharing.

     x.     This Court will not uphold the filing restrictions that Judge Stanton imposed on me in K2 primarily for the following reasons:

     i.     The excerpt from _Kennedy v. Bremerton School Dist._ that I listed at the start of this complaint's "Legal Standards" section forbids that because that would **a)** be support of a post hoc and pretextual excuse that was invented by Judge Stanton to interfere with my First Amendment rights to pursue my claims in this case and **b)** violate the findings from _Alabama Association of Realtors v. Department of Health and Human Services_ that are also shown in this complaint's "Legal Standards" section that state that "our system does not permit agencies to act unlawfully even in pursuit of desirable ends".

     ii.     The findings from _Gulf Oil Co. v. Bernard_ that are shown in this complaint's "Legal Standards" section confirm that Judge Stanton's filing restrictions on me in K2 were and remain an abuse of discretion and illegal prior restraint.

     iii.     The filing restrictions that Judge Stanton imposed on me in K2 violated his duty to fully comply with and uphold decisions that were issued by SCOTUS and the Second Circuit until and unless they're reversed or modified as _Maness v. Meyers_, 419 U.S. 449, 95 S. Ct. 584, 42 L. Ed. 2d 574 (1975) confirms that he shared that duty with all other federal judges in this judicial circuit.

     iv.     Judge Stanton's filing restrictions on me in K2 were preempted by Judge Schofield's 5/13/20 and 7/13/20 orders in K6 that I discussed earlier in this complaint.

     v.     Hindsight confirms that Judge Stanton was impermissibly assigned to K2 in the first place as he impermissibly monopolized assignments to federal court litigation that was filed in 2020 against Urban. Although newly commenced federal court litigation in New

York City is required to be randomly assigned to judges, besides having been assigned to K2 that was filed in 2020, Judge Stanton was also assigned to the federal court lawsuits that correspond to **a)** *Jones v. City of New York*, No. 20-cv-6788 (LLS)(S.D.N.Y. Jan. 5, 2021), **b)** *Williams v. Urban Pathways, Inc.*, No. 20-cv-2007 (LLS)(S.D.N.Y. April 21, 2020), and **c)** *Jallow v. City of New York*, No. 20-cv-8871 (LLS)(S.D.N.Y. Dec. 28, 2020) that were filed against Urban in 2020 in New York City that essentially cause his findings in K2 to be null and void on the grounds that it's objectively reasonable to infer from this information that my right to have had K2 to be randomly assigned to a judge was violated that caused an procedural infirmity to have impermissibly occurred in violation of my First and Fourteenth Amendment rights. Also, in contrast to how he dealt with matters in K2, Judge Stanton let the plaintiffs in those other cases against Urban to learn about his objections to the information in their complaints prior to giving them opportunities to file further amended complaints in response to that in contrast to how he illegally discriminated against me in K2 by not according me that same courtesy in violation of **c)** *In re Snyder*, 472 U.S. 634, 105 S. Ct. 2874, 86 L. Ed. 2d 504 (1985) that confirms that he owed me a duty of courtesy in K2 and **d)** *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006) that confirms that he was required to construe and interpret my submissions in K2 to raise the strongest arguments that they suggested and to accord me special solicitude.

vi.     Neither Judge Stanton nor the Second Circuit accorded me my First and Fourteenth Amendment right to a full and fair hearing for my claims in K2 and K3 that causes res judicata not to apply.

vii.     Hindsight confirms that Judge Stanton prejudicially dismissed K2 without letting me know beforehand what his objections were to the information that I presented in my amended complaint in K2 as he prejudicially didn't let me file a further amended complaint in

response to those objections in defiance of FRCP Rule 15.

        viii.    Hindsight also confirms that after I apprised Judge Stanton of the fact following 10/22/20 that I had additional relevant evidence that directly contradicted his findings in his 10/22/20 dismissal order in K2, he prejudicially refused to grant me reconsideration about his 10/22/20 dismissal order.

        ix.    The filing restrictions that Judge Stanton imposed on me in K2 violate the legal duties that he and other federal judges have in regards to me partly pursuant to canon 3(A)(4) within the Code of Conduct for U.S. Judges that is available at https://www.uscourts.gov/judges-judgeships/code-conduct-united-states-judges. That canon confirms that he and all other federal judges are required to accord me "the full right to be heard according to law".

        x.    The Second Circuit confirmed in its 12/20/21 decision in K3 that Judge Stanton misapprehended and mischaracterized information that I presented in my amended complaint in K2 as it sugarcoated that after hindsight confirms that it violated my rights pursuant to FRAP Rule 34 to oral arguments in that appeal while it largely and prejudicially rubber-stamped Judge Stanton's findings in his 10/22/20 dismissal order in K2 instead.

5.    Ordering Urban2 to be dismissed with prejudice and imposing a filing restriction against Urban, its personnel, and Urban's attorneys that will restrain them from commencing further litigation against me that may be filed with state courts in New York State.

6.    Authorizing me to immediately move for and be granted partial summary judgment for my claims partly by ordering the following:

        a.    The City of New York, Jeffrey Mosczyc, Marin Gerber, Steven Banks, and Ann Marie Scalia are ordered to make full payments to me within 24 hours to both **a)** reimburse me a

trebled amount pursuant to New York State Judiciary Law §487 and 18 U.S.C. §1964 for all expenses that I paid to commence, proceed, and participate in my HRA lawsuit and my OTDA litigation and **b)** pay me pre-judgment and post-judgment interest that corresponds to that while that amount will also be equitably increased to fully account for the rise in inflation that has occurred since then. Those payments will need to include a trebled amount of compensatory damages to account for lost time that I experienced as a result of having to contend with my HRA lawsuit and my OTDA litigation partly by having to attend court hearings for that and engage in legal research and prepare legal filings in that litigation while the hourly rate for such compensatory damages will be set at $400 that is a standard rate that attorneys charge per hour in litigation.

   b. The City of New York, Urban, Jeffrey Mosczyc, Marin Gerber, Steven Banks, and Ann Marie Scalia are ordered to make full payments to me within 24 hours to both **a)** reimburse me a trebled amount pursuant to New York State Judiciary Law §487, 18 U.S.C. §1964, and RPAPL §853 in regards to the fact that I was illegally cost my right of possession of the entirety of apartment 4C in my building for the costs of $1,296.70 that I paid to Cubesmart for the storage unit rental expenses that were owed to it for the storage unit rental period of May of 2016 thru July of 2016 for the storage unit that I rented from it while I resided in my Urban apartment and **b)** pay me pre-judgment and post-judgment interest that corresponds to that while that amount will also be equitably increased to fully account for the rise in inflation that has occurred since then.

   c. The City of New York, Urban, Jeffrey Mosczyc, Marin Gerber, Steven Banks, and Ann Marie Scalia are ordered to make full payments to me within 24 hours to both **a)** reimburse me a trebled amount pursuant to New York State Judiciary Law §487, 18 U.S.C.

§1964, and RPAPL §853 in regards to the fact that I was illegally cost my right of possession of the entirety of apartment 4C in my building for the $5,000 value of the insurance policy that I had in effect for the property that I kept in the storage unit that I rented from Cubesmart before Cubesmart arranged for the contents of that storage unit to be auctioned in April of 2019 and **b)** pay me pre-judgment and post-judgment interest that corresponds to that while that amount will also be equitably increased to fully account for the rise in inflation that has occurred since then.

      d.      The City of New York, Urban, Jeffrey Mosczyc, Marin Gerber, Steven Banks, and Ann Marie Scalia are ordered to pay me the following within 24 hours pursuant to New York State Judiciary Law §487, 18 U.S.C. §1964, and RPAPL §853:

            i.      $3,000 that is the trebled amount of the $1,000 value that was credited to the Target gift card that I was defrauded the use of in May of 2016 due to the B&S and HRA's fraudulent refusal to pay for storage unit rental expenses on my behalf while I resided in my Urban apartment to remedy the fact that but-for causation by them caused me to be defrauded of that.

            ii.      Pre-judgment and post-judgment interest that corresponds to that $3,000 amount as well as an increased amount to fully account for the rise in inflation that has occurred since May of 2016.

      e.      The City of New York, Steven Banks, and Ann Marie Scalia are ordered to immediately cause a written transcript to be prepared as quickly as possible from the 6/7/17 oral arguments hearing that was conducted in my HRA lawsuit and to provide me a free copy of that transcript in text-searchable and electronic form as PDF files within 24 hours after it has been prepared.

      f.      The City of New York is ordered to immediately cause HRA to provide me the

following within 24 hours in electronic, text-searchable, and unredacted form:

        i.     A copy of the report that HRA was required by 18 NYCRR §356.3 to

provide to me within 20 days after it was directed by OTDA between 2/16/22 and 3/9/22 to

conduct an investigation about whether personnel of HRA were involved in subjecting me to the

B&S. That report needed to apprise me about the status and outcome of that investigation. As a

reminder, Craig Crist of OTDA sent me a letter on 3/9/22 that confirmed that OTDA had issued

that directive to HRA.

        ii.    A copy of the entirety of the discovery material that I directed current and

former personnel of HRA that include Ann Marie Scalia, Martha Calhoun, and Steven Banks to

cause HRA to provide to me prior to fair hearings that OTDA conducted between HRA and I in

my OTDA litigation.

        g.     The City of New York, Steven Banks, Ann Marie Scalia, and Martha Calhoun are

ordered to pay me sanctions within 24 hours in the amount of $10,000 per day retroactively

together with pre-judgment and post-judgment interest while that total amount will be increased

to fully account for the rise in inflation while those sanctions are in response to the fact that HRA

illegally didn't provide me discovery material that it was legally required partly by 18 NYCRR

§358-3.7(b)(2), promissory estoppel in regards to my HRA contract, and my First and Fourteenth

Amendment rights to provide to me **a)** prior to fair hearings that OTDA conducted and otherwise

scheduled to be conducted between HRA and I in my OTDA litigation and **b)** in response to the

directive that OTDA issued to HRA between 2/16/22 and 3/9/22 to conduct an investigation

about whether HRA personnel were involved in subjecting me to the B&S. Donald Trump was

similarly ordered by New York State Supreme Court Judge Arthur Engoron in *People v. Trump,*

*et. al.*, No. 451685/2020 (Sup. Ct. NY Cty.) to pay $10,000 for failing to provide records in

litigation that he was required to provide.

h.        The City of New York is ordered to reinstate and fully comply with my First and Fourteenth Amendment right to within 24 hours to lawfully visit HRA's offices at 150 Greenwich Street in Manhattan partly to serve legal papers upon HRA on the 37th floor at that address and to examine draft versions of proposed contracts between HRA and various vendors prior to public hearings about those contracts in the same exact locations in HRA's offices at 150 Greenwich Street in Manhattan where HRA makes those contracts available to other members of the public to examine.

i.        This Court retroactively declares that all contracts are void pursuant to New York State's Open Meetings Law with respect to those that were issued between HRA and others about which **a)** HRA conducted public hearings since April of 2018 and **b)** I was prevented from visiting HRA's offices at 150 Greenwich Street in Manhattan to examine draft versions of those contracts prior to public hearings that were held about them.

j.        This Court will promptly devise and implement a remedy to uphold my First and Fourteenth Amendment rights by enabling me to pursue claims in this case or a separate civil action that it may arrange that correspond to claims that I asserted against HRA in my OTDA litigation about which OTDA illegally and prejudicially never conducted fair hearings between HRA and I that would be in accordance with my First and Fourteenth Amendment right to participate in such hearings face-to-face partly to enable me to diligently observe possible signs of illegal collusion and fraud between personnel of OTDA and HRA after OTDA imposed a pretextual ban against me following 7/5/16 that has since discriminatorily and pretextually blocked me from being able to participate in such hearings in-person in OTDA's offices that are located at 14 Boerum Place in Brooklyn. That occurred after the OTDA administrative law judge

who presided over my 7/5/16 fair hearing against HRA illegally and abruptly terminated that

hearing while I was in the middle of trying to answer a question that I was asked during it just 3

days after I was viciously assaulted on 7/2/16. That prompted Samuel Spitzberg of OTDA to

send me a letter dated 7/21/16 (*see* B13) in which he confirmed this point as he informed me that

OTDA would conduct a new fair hearing about that 7/5/16 fair hearing before that new fair

hearing was my 9/7/16 fair hearing for fair hearing number 7316477K about which Joab Okello

of OTDA issued the 9/15/16 fair hearing decision in my favor about storage unit rental expenses

that HRA illegally never fully complied with and OTDA illegally didn't enforce.

  k.  This Court will promptly devise and implement an effective remedy to deter

further illegal acts and omissions by HRA and OTDA personnel by requiring the City of New

York to respond to all instances in which HRA illegally doesn't provide complete discovery

material to appellants involved in litigation against HRA that is assigned to OTDA prior to fair

hearings that OTDA conducts or otherwise schedules to be conducted in such litigation that **a)**

such appellants request from HRA and **b)** HRA is otherwise automatically required to provide to

those appellants by:

  i.  Suspending the employment of the personnel of the City of New York for

90 days without any compensation with respect to those personnel who are responsible for that

having occurred.

  ii.  Terminating the employment of the personnel of the City of New York

who are responsible for that having occurred if they cause that to occur repeatedly and barring

them from further employment with the City of New York in any capacity.

  iii.  Granting the appellants in such litigation immediate summary judgment

for their claims by accepting the fact that HRA defaulted on its legal duty to provide discovery

material for such fair hearings that warrants a default judgment on that basis.

iv.    Paying the appellants in such litigation monetary penalties in the amount of $10,000 per day for each day that they're not provided the discovery material from HRA that they have requested for those fair hearings.

l.    This Court will further devise and implement an effective remedy to deter further illegal acts and omissions by HRA and OTDA personnel whenever HRA illegally doesn't provide complete discovery material to appellants involved in litigation against HRA that is assigned to OTDA by ordering the USMS to have its personnel conduct decisive and comprehensive raids of HRA's offices and the homes of its personnel in order to retrieve discovery material for such appellants and arrest personnel of HRA for prosecution by federal prosecutors or private prosecutors that federal judges may designate for that.

m.    This Court will further promptly devise and implement an effective remedy to deter illegal acts and omissions by HRA personnel by requiring the City of New York to respond to all instances in which HRA illegally doesn't fully comply with fair hearing decisions that OTDA issues by:

i.    Suspending the employment of the personnel of the City of New York for 90 days without any compensation with respect to those personnel who are responsible for that having occurred.

ii.    Terminating the employment of the personnel of the City of New York who are responsible for that having occurred if they cause that to occur repeatedly and barring them from further employment with the City of New York in any capacity.

iii.    Paying the appellants in such litigation monetary penalties in the amount of $10,000 per day for each day that HRA doesn't fully comply with those fair hearing decisions

after HRA has been legally required to fully comply with them.

n.      OTDA personnel are prohibited from changing the scheduled agenda for fair hearings that OTDA conducts without first **a)** apprising all of the parties in such litigation of plans to change their agenda to comply with the First and Fourteenth Amendment rights of such parties to prepare and submit opposition in response to such plans and **b)** according the parties in such litigation a full and fair hearing about opposition that they submit to OTDA about such proposed changes to not allow such parties to be blindsided and subjected to prohibited gamesmanship during fair hearings by only then learning that the scheduled agenda for such hearings was changed without their knowledge and consent while prejudicing their preparations for such hearings.

o.      This Court will respond to instances in which **a)** state court judges in New York State illegally engage in prohibited *ex-parte* communications that grant illegal *ex-parte* adjournment requests and **b)** OTDA personnel violate this Court's directives in this case partly by illegally changing the agenda for scheduled fair hearings without first apprising all of the parties about that before such hearings in the manner and for the purposes discussed above by promptly ordering the immediate termination of the employment of such state court judges and OTDA personnel while barring them from further employment as such.

p.      The City of New York, its agencies and its personnel as well as OTDA and its personnel are prohibited from causing people to be prospectively barred from lawfully visiting government buildings that they control and otherwise maintain offices in whenever those facilities are otherwise open to members of the general public to visit them partly to **a)** participate in fair hearings that OTDA conducts in them, **b)** attend public meetings that are public forums, **c)** examine public records, **d)** testify in public hearings, unless the City of New

York, its agencies and its personnel as well as OTDA and its personnel first commence litigation

for that purpose and has a judge and jury approve of that in order to fully comply with

fundamental First and Fourteenth Amendment rights partly about proper due process that is

clearly discussed in _Freedman v. Maryland_, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649

(1965) in regards to procedural safeguards.

      q.      This Court declares that apartment lease agreements and all other business

agreements have been and continue to be signed and agreed upon have been and continue to be

prohibited from being modified during the period that they cover after they have been signed,

except for when such modifications are with the prior knowledge and consent of all who have

signed them.

      r.      This Court similarly declares that applications that are submitted to HRA to

receive government benefits are prohibited from being modified in ways that will cause them to

be applied to things that the applicant didn't apply for and didn't' intend to apply for at the time

that he or she submitted such applications while this means among other things that HRA has

been and continues to be prohibited from reassigning applications that are submitted to it for

rental subsidies for a specific apartment to have such subsidies to be issued by HRA for some

other apartment instead.

      s.      Urban; its current and former personnel who are partly responsible for causing the

litigation that Urban has commenced against me in Urban1, Urban2, and Urban3; and DNCT and

its personnel who have been involved in that litigation are ordered to immediately make all

payments to me within 24 hours to cause me to be reimbursed for a trebled amount pursuant to

New York State Judiciary Law §487 and 18 U.S.C. §1964 for all expenses that I paid to contend

with that litigation together with pre-judgment and post-judgment interest about that while that

amount will need to be increased to fully account for the rise in inflation.

t.      Urban; its current and former personnel who are partly responsible for causing the litigation that Urban has commenced against me in Urban1, Urban2, and Urban3; and DNCT and its personnel who have been involved in that litigation are ordered to immediately pay me compensatory damages to account for lost time that I experienced as a result of having to contend with that litigation partly by having to attend court hearings for that and engage in legal research and prepare legal filings in that litigation while the hourly rate for such compensatory damages will be set at $400 that is a standard rate that attorneys charge per hour in litigation.

u.      Steven Banks, Ann Marie Scalia, and Martha Calhoun are ordered to pay me sanctions within 24 hours in the amount of $10,000 per day retroactively together with pre-judgment and post-judgment interest while that total amount will be increased to fully account for the rise in inflation while those sanctions are in response to the fact that HRA illegally didn't provide me discovery material that it was legally required partly by 18 NYCRR §358-3.7(b)(2), promissory estoppel in regards to my HRA contract, and my First and Fourteenth Amendment rights to provide to me **a)** prior to fair hearings that OTDA conducted and otherwise scheduled to be conducted between HRA and I in my OTDA litigation and **b)** in response to the directive that OTDA issued to HRA between 2/16/22 and 3/9/22 to conduct an investigation about whether HRA personnel were involved in subjecting me to the B&S. Donald Trump was similarly ordered by New York State Supreme Court Judge Arthur Engoron in *People v. Trump, et. al.*, No. 451685/2020 (Sup. Ct. NY Cty.) to pay $10,000 for failing to provide records in litigation that he was required to provide.

v.      This Court orders NAICA to:

i.      Cause written transcripts to be prepared in electronic and text-searchable

form as PDF files from all of the court hearings that were conducted in Urban3 prior to 7/30/22 and to provide me free copies of them as quickly as that may be arranged.

        ii.    Reimburse me within 24 hours for all expenses that I paid and otherwise incurred to contend with Urban3 prior to 7/30/22 that partly consists of costs for transportation, printing, and notary services.

        iii.    Provide me a copy of all communications within 48 hours in electronic, unredacted, and unedited form that its personnel engaged in about me between 3/21/22 and 7/29/22 inclusively about Urban3 that may include communications that its personnel had with attorneys for Urban and personnel of HRA.

      w.    This Court orders the City of New York to cause HRA to provide me records within 72 hours for everyone who has resided in my building while redacting their personal identifying information to uphold their privacy rights as the remainder of the very limited information about them that I seek will strictly indicate whether HRA personnel similarly recorded information about them that indicates that a change that may include what HRA characterized as an "error correction" was made to an apartment number that was associated with them within 1 month before they began to reside in my building in order to further enable an objectively reasonable inference to be made that personnel of HRA and Urban illegally subjected me to the B&S as they illegally discriminated against me by doing so.

7.    Declaring that the totality of the facts, circumstances, matters of law, and evidence strongly suggests that all of the following have been and are continuing to engage in an illegal cover-up and condonation for the benefit of HRA, Urban, and their personnel about the B&S largely by pretextually obstructing my ability and First and Fourteenth Amendment right to pursue my claims about the B&S in litigation that includes obstructing my right to be provided

relevant discovery material about that and otherwise fraudulently condoning violations of my

discovery rights in that regard by HRA personnel:

     a.     DNCT, NAICA, HRA, OTDA, and their current and former personnel.

     b.     New York State Supreme Court Judges Nancy Bannon and Lyle Frank.

     c.     Bronx Housing Court Judge Shorab Ibrahim

     d.     Judge Stanton

8.     Further declaring the following:

     a.     It's anomalous and could likely be the cause of inconsistent results about proper

compliance with discovery rights in the context of my OTDA litigation that OTDA accepts

applications from Urban for funding on one hand while OTDA's personnel have condoned the

fact that HRA personnel have consistently violated my rights to be provided discovery material

in my OTDA litigation that could further confirm that personnel of Urban and HRA subjected

me to the B&S that likely would prohibit Urban from receiving funding from OTDA. Page 41 in

a 2021 annual report that OTDA prepared that is entitled "Homeless Housing and Assistance

Program (HHAP)" and available as a PDF file on OTDA's web site at

https://otda.ny.gov/programs/housing/documents/HHAP-Annual-Report-2021.pdf contains

information about a request by Urban to OTDA for more than $33 million in funds for a real

estate project in the Bronx. In other words, a major and inherent conflict of interests exists about

this that sufficiently demonstrates that it has always been futile for me to pursue claims against

HRA that implicated Urban through my OTDA litigation. This point is buttressed by the fact that

though **a)** my building is a publicly-funded scatter-site shelter as was confirmed by information

in the 1/27/17 notice that HRA issued to me that I discussed earlier in this complaint about the

fact that it had recently paid for storage unit rental expenses on my behalf while it described my

building in that notice as a "DHS shelter" and information on OTDA's web site at

https://otda.ny.gov/programs/shelter/ claims that OTDA provides oversight of publicly-funded

shelters in New York State, OTDA certainly hasn't been providing proper oversight of how

Urban and its personnel have operated in regards to Urban's status as the slumlord of my

building in spite of the fact that I have been extremely clear about Urban's deficiencies as such

during fair hearings that OTDA has conducted between HRA and I and in other communications

that I've had with OTDA personnel.

      b.      OTDA's personnel have been estopped from contending that I abandoned my

efforts to pursue claims that I asserted against HRA in my OTDA litigation by refusing to

participate in fair hearings that OTDA personnel opted to conduct at times that were other than

the specific times that were shown in the scheduling notices that OTDA issued for those fair

hearings for the following reasons:

          i.      OTDA personnel first violated my First and Fourteenth Amendment right

to participate in those fair hearings in-person in OTDA's offices in Brooklyn at 14 Boerum Place

partly as a result of the fact that OTDA personnel didn't commence any legal proceeding to have

a judge who wasn't part of OTDA to independently ratify the decision by OTDA's personnel to

cause me to be barred from OTDA's offices in Brooklyn.

          ii.      OTDA arbitrarily, capriciously, discriminatorily, and prejudicially

violated my First and Fourteenth Amendment rights on 4/11/17 by refusing to conduct the fair

hearing that I participated in then for OTDA fair hearing number 7406570N in a manner that

would address the entirety of the matters that Jackie Donovan had added to its agenda before

OTDA thereafter illegally changed that agenda by stripping it of the vast majority of the matters

that had been a part of it while not apprising me about that prior to that 4/11/17 hearing that

proximately caused me to be blindsided upon learning at the start of that hearing on 4/11/17 that that change had been made in defiance of my due process rights.

        iii.     OTDA arbitrarily, capriciously, discriminatorily, and prejudicially violated my First and Fourteenth Amendment rights by abruptly cancelling the fair hearing that I was scheduled to have then about the same matter that my 4/11/17 fair hearing addressed.

        iv.     Nigel Marks arbitrarily, capriciously, discriminatorily, and prejudicially violated my First and Fourteenth Amendment rights by abruptly cancelling the fair hearing that I was scheduled to have for fair hearing number 8363917Z as he apprised me about that cancellation in a notice dated 10/27/21.

    c.     This Court authorizes me to freely submit applications for permission to intervene in other litigation.

9.     The City of New York is ordered to cause HRA to provide me copies of all records in electronic, unredacted, and text-searchable form within 7 calendar days that identifies **a)** who Urban's competition has been for contracts with the City of New York since 2015 and **b)** the representations that Urban's personnel have made in relation to bids that that Urban has submitted to the City of New York, its agencies, and its personnel for consideration for such contracts about whether and the degree to which Urban and its personnel would comply with all applicable laws and perform Urban's duties pursuant to those contracts in order to facilitate my efforts to pursue claims against Urban pertaining to fraud, unfair competition, and violations of the False Claims Act.

10.    The City of New York is ordered to cause HRA to provide me copies of all records in electronic, unredacted, and text-searchable form within 7 calendar days of all communications that people who have been HRA personnel had since 1/16 with personnel of OTDA, Urban, the

CAU, Mayor's Office, NYPD, judges, and all others about me.

11.     The City of New York is ordered to cause HRA to stop deducting amounts from cash assistance benefits that it issues to me as a government benefit and instead provide me the total amount within 24 hours with pre-judgment and post-judgment interest added together with an increased amount for that to account for the rise in inflation that HRA has deducted to date from cash assistance benefits that it has issued to me.

12.     The City of New York is ordered to exclude and otherwise void all indemnification provisions within 24 hours that exist and would otherwise exist in contracts and related business correspondence that it and its agencies issue that would possibly interfere with efforts to hold the City of New York, its agencies, and its personnel liable for illegal and otherwise abusive acts and omissions by City of New York personnel.

13.     The City of New York is ordered to cause HRA to fully comply with its legal duties pursuant to **a)** New York State's Constitution that requires it to "provide care for the needy", **b)** 18 NYCRR §352.23(a) that requires HRA to use resources "to eliminate or reduce the need for public assistance" and "rehabilitate the client", and my HRA contract that requires HRA to assist me "in any way possible" on an ongoing and permanent basis due to the lack of an expiration date and disclaimer in my HRA contract by causing me to be employed within 24 hours in a full-time job with full employee benefits while that job will provide me compensation greater than the $450 per day partly to reflect the rise in inflation since then that I stood to earn from the job with BNP Paribas for which I interviewed on 8/18/16 while I was suffering from a concussion due to the 7/2/16 assault that I suffered as a result of the B&S that personnel of HRA and Urban criminally perpetrated against me. That job must authorize me to work remotely whenever I choose to do so, grant me full autonomy for that job, provided me all resources that I will need to

perform that job, and must not be terminated nor suspended unless I conduct myself in a manner while performing that job that would ordinarily warrant termination or suspension while such behavior corresponds to things that include sexual harassment, unlawful threats, etc.

14.     The City of New York is ordered to pay me back-pay dating back to 3/7/16 and front-pay lasting to my normal retirement age within 48 hours in accordance with the findings in _Padilla v. Metro-North Commuter RR_, 92 F.3d 117 (2d Cir. 1996), **b)** _Petty v. City of New York_, No. 10-cv-8581 (KPF) (S.D.N.Y. Nov. 25, 2014), and **c)** _Aristotle Psychological and BioFeedback Services, PLLC v. Tenenbaum_, 2019 N.Y. Slip Op 32159 (Sup. Ct. 2019) that are shown in this complaint's "Legal Standards" section to provide me make-whole equitable relief in response to the fact that the B&S sabotaged my ability to be fully and fairly considered for the job with BNP Paribas for which I interviewed on 8/18/16 that would have paid me $450 per day by causing me to have Mr. Sullivan as a roommate before he then viciously assaulted me in my Urban apartment on 7/2/16 following his attempted 5/12/16 assault against me in my Urban apartment that caused the 7/2/16 assault to be both foreseeable and preventable. The back-pay and front-pay for this is to be both **a)** based upon the $450 per day that I would have earned from the job with BNP Paribas that I interviewed for on 8/18/16 and **b)** trebled pursuant to RPAPL §853, 18 U.S.C. §1964, and New York State Judiciary Law §487. Also, pre-judgment and post-judgment interest is to be added to this amount together with an increased amount to fully account for the rise in inflation since 2016.

15.     The City of New York is furthered ordered to cause HRA and its personnel to fully comply with my HRA contract by causing me to be able to reside in a fully-furnished apartment within 48 hours that will be located in Rego Park in Queens that will be fully paid for by HRA, Ann Marie Scalia, Martha Calhoun, and Steven Banks for the next 5 years and about which the

following will also apply:

a.      All costs for utilities for that apartment that include gas, water, electricity, unlimited data and high-speed Internet access, cable television, telephone service, and security service will be fully paid for by HRA, Ann Marie Scalia, Martha Calhoun, and Steven Banks for the next 5 years.

b.      All property insurance for that apartment will be fully paid for by HRA, Ann Marie Scalia, Martha Calhoun, and Steven Banks for the next 5 years.

c.      That apartment will need to be a 2-bedroom apartment and wheelchair accessible.

d.      The apartment building that that apartment will be located in must be wheelchair-accessible, have an elevator, and be well-maintained.

e.      Laundry machines will need to be in that apartment for use.

16.     Granting me equitable tolling for my claims in this case largely due to the applicability of the continuing violation doctrine, duress tolling, and an ongoing illegal cover-up by HRA and personnel in regards to my claims.

17.     The City of New York is ordered to cause HRA to enable me to use all HRA offices for all of my printing, photocopying, and mailing needs within 24 hours and on a ongoing basis.

18.     The City of New York is ordered to cause HRA to have free high-speed and reliable wireless Internet service available within 48 hours and on an ongoing basis for all who visit them while they visit them to apply for and otherwise follow-up with HRA about government benefits.

19.     Ordering the City of New York and Jeffrey Mosczyc to provide me all discovery material within 48 hours that serves to determine whether Mr. Mosczyc conducted work for HRA on 4/12/17, was present in an HRA office on that date, and accessed any HRA resource on that date that includes e-mail.

20.     Ordering Jeffrey Mosczyc to immediately provide me a credible explanation within 24 hours about why he didn't apprise me about the adjournment application that he caused to be faxed to Judge Bannon's chambers on 4/5/17 in regards to my HRA lawsuit before she illegally granted that illegal *ex-parte* application.

21.     Ordering the City of New York to cause HRA to pay for the entire costs necessary to have me provided talented legal representation immediately for all of my legal needs in accordance with my HRA contract and otherwise ordering Ann Marie Scalia, Steven Banks, and Martha Calhoun to do the same by using their total household assets.

22.     This Court declares that it will grant me equitable relief by adopting the practice in *USA v. Donziger*, No. 11-cv-0691(LAK)(RWL)(S.D.N.Y.) to similarly appoint private prosecutors to commence criminal prosecutions against the defendants that this complaint concerns as well as their accomplices in response to criminal acts and omissions that they committed and/or condoned against me to remedy the fact that prosecutors have negligently refused to do so.

23.     Awarding me compensatory damages for violations of my constitutional rights, pain, suffering, mental anguish, and humiliation that I have suffered.

24.     Awarding me compensatory damages for violations of my privacy rights that I have suffered.

25.     Awarding me punitive damages for my claims to serve as an effective deterrent against further abuse against me and others by the defendants and those who they work with and have otherwise previously worked with.

26.     Granting me fast-tracking for this case.

27.     Ordering Ann Marie Scalia, Steven Banks, Martha Calhoun, and HRA to immediately pay for all costs that are necessary to enable me to travel to Japan to be where my father is to

enable me to properly grieve about his passing there in September of last year and to thank everyone who looked after him there. Such necessary expenses will include the following:

a.  Round-trip airfare.

b.  Costs for local transportation for taxis, trains, and buses following my arrival there.

c.  Suitable lodging for a stay of at least 2-months while I'm there.

d.  Costs for meals while I'm there.

e.  Costs for roaming cell phone service with unlimited data Internet service while I'm there.

f.  Costs for medical and dental insurance while I'm  there.

g.  Costs for interpreters.

28.  Voiding all contracts within 24 hours that have been issued by HRA and other agencies of Defendant City about which public hearings were conducted since April of 2018 about which I illegally was prevented from **a)** visiting HRA's offices at 150 Greenwich Street in Manhattan to examine the proposed contracts that were on the agenda for discussion during those public hearings prior to those hearings or **b)** not accorded my First and Fourteenth Amendment right to testify in those public hearings while they were conducted.

29.  Ordering the City of New York to standardize how all publicly-funded homeless shelters and supportive housing facilities are furnished and operated in New York City within 48 hours by requiring all of them to:

a.  Have high speed and unlimited data Internet service continuously available within 48 hours for use for free by those who reside in them and otherwise visit them.

b.  Have a sufficient number of laundry machines, printers, and computers available

within 48 hours for continuous use for free by those who reside in them and otherwise visit them.

      c.      Have fully-furnished kitchens in them for the residents as well as fully-furnished restrooms where the residents reside in those facilities.

      d.      Have a sufficient number of air conditioners as well as functional thermostats where the residents reside in those facilities.

      e.      Have air-conditioning to be as available in public areas of those facilities as that is available in other such facilities.

      f.      Have necessary repairs and other cleaning and maintenance tasks performed with equal frequency and diligence with respect to other such facilities by housekeeping, janitorial, and others who perform repairs partly to not allow one set of recipients of government benefits from HRA to be discriminated against by having to incur expenses for that as other such recipients don't have to pay for that.

      g.      Implement programs to enable those who reside in them to be provided replacement clothing that includes shoes and sneakers as well as backpacks for free within 24 hours to replace such damaged and badly-worn clothing, footwear, and backpacks.

30.      Ordering the City of New York to cause HRA to cancel all of its contracts with NTT Data, Inc. within 72 hours in accordance with my HRA contract's terms in response to the fact that NTT Data, Inc. is still subjecting me to wage-theft that dates back to 2012 about which I have repeatedly had discussions with Steven Banks and Ann Marie Scalia.

31.      Such other further and different relief as to the Court may seem just and proper.

Dated:      New York, New York
            October 22, 2022

                              Respectfully submitted,


                              _____
                              Towaki Komatsu
                              *Plaintiff, Pro Se*
                              802 Fairmount Pl., Apt. 4B
                              Bronx, NY 10460
                              (347) 316-6180
                              Towaki_Komatsu@yahoo.com

## **PLAINTIFF'S CERTIFICATION AND WARNINGS:**

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a non-frivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.


Dated:      New York, New York
            October 22, 2022


                                    Towaki Komatsu
                                    *Plaintiff, Pro Se*
                                    802 Fairmount Pl., Apt. 4B
                                    Bronx, NY 10460
                                    (347) 316-6180
                                    Towaki_Komatsu@yahoo.com

# Exhibit A

At I.A.S. Part 42 of the Supreme
Court of New York, held in and for
the County of New York. at the
Courthouse thereof, 60 Centre
Street, New York, N.Y., on the 14
day of September_____,
2021

EX PART ____ ____ _CE

APPROVED
FOR THE PAYMENT
OF MOTION FEE
ONLY
PRESENT: HON. NANCY M. BANNON_____ JSC

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

MS # 12: RENEW /
REARGUE /...

---------------------------------------------------------------- X

In the Matter of Towaki Komatsu,

Index No. 100054/2017

Petitioner,

**EMERGENCY ORDER TO
SHOW CAUSE TO RENEW**

-v-

FILED
AND FEE PAID
SEP 13 2021
COUNTY CLERK'S OFFICE
NEW YORK

New York City Human Resources Administration,

Respondent.

---------------------------------------------------------------- X

Upon reading **a)** the attached affidavit of Petitioner, sworn to on September 10, 2021, **b)**

the exhibits attached to that affidavit, and **c)** all papers previously submitted by him in this

proceeding that are incorporated by reference pursuant to CPLR §2214(c) as though fully set

forth herein,

Let the Respondent or counsel appear and show cause at I.A.S. Part _____42_____,

Room _____, of this Court, to be held at the Courthouse, 60 Centre Street, New York, N.Y., on

the ___day of September, 2021, at _____ o'clock in the _____noon or as soon as the

parties to this proceeding may be heard why an Order should not be made and entered herein that

will grant Petitioner relief by:

1.    Immediately assigning this application to a judge other than New York State Supreme

Court judges Nancy Bannon, Alexander Tisch, and Lyle Frank.

A1

Sufficient cause appearing therefore, let personal service of a copy of this order by Petitioner, the affidavit in support and all other papers upon which this order is granted, upon all parties to this action or their attorneys, who have appeared in this action, or before the ___ day of _____, 2021 be deemed good and sufficient. An affidavit or other proof of service shall be presented to this Court on the return date directed in the second paragraph of this order.

ENTER :

_____
J.S.C.

Decline to sign —
Relief requested
can not be granted.

MMB 9-14-21

**HON. NANCY M. BANNON**

A1

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT: Hon. Lyle E. Frank
_____
                          **Justice**

PART 11

Komatsu, Towaki

INDEX NO. 100054-17

-v-

MOTION DATE _____

NYC Human Resources Admin.

MOTION SEQ. NO. 13

The following papers, numbered 1 to __1__ , were read on this motion to/for ____ Misc. _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____  No(s). __1__

Answering Affidavits — Exhibits _____  No(s). _____

Replying Affidavits _____  No(s). _____

Upon the foregoing papers, it is ordered that this ~~motion is~~ order to show cause will not be Signed as there is no claim upon which relief can be granted.

**MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE**
**FOR THE FOLLOWING REASON(S):**

# FILED
### SEP. 14 2022
### COUNTY CLERK'S OFFICE
### NEW YORK

Dated: 8/29/22                                          _____, J.S.

**HON. LYLE E. FRANK**
                                                              **J.S.C.**

1. CHECK ONE: ................................................ ☒ CASE DISPOSED          ☐ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ...................MOTION IS: ☐ GRANTED ☒ DENIED   ☐ GRANTED IN PART   ☐ OTHER

3. CHECK IF APPROPRIATE: ................................. ☐ SETTLE ORDER           ☐ SUBMIT ORDER

                                                ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

## Your concerns

From:   Scalia, Ann Marie (scaliaa@hra.nyc.gov)

To:     towaki_komatsu@yahoo.com

Date:   Tuesday, August 1, 2017 at 05:58 PM EDT

Dear Mr. Komatsu,

Attached you will find a letter that addresses concerns you raised with Commissioner Banks at a town hall meeting in Queens.  Thank you.

Ann Marie Scalia
Senior Deputy General Counsel/ Fair Hearings


image2017-08-01-174611.pdf
27.8kB



**Human Resources
Administration**
Department of
Social Services

**Office of the
Legal Affairs**

·Steven Banks
Commissioner

Martha A. Calhoun
General Counsel

Ann Marie Scalia
Senior Deputy General
Counsel/Fair Hearings

150 Greenwich Street
New York, NY 10007

929 221 5408

W-2-110N
Rev. 12/15

August 1, 2017

Mr. Towaki Komatsu

Re:  Addressing your concerns

Dear Mr. Komatsu:

I am the Senior Deputy General Counsel for the Fair Hearing Administration of the Department of Social Services.  I am responding to the concerns you recently raised with Commissioner Banks at a town hall meeting in Queens.

1. Storage Fees: HRA has contacted Cube Smart in order to address your outstanding storage fees. The account is paid in full and there is currently a credit of $108. They confirmed that there is no longer an auction date on your storage account.
2. Urban Pathways building:  An initial attempt was made on or about July 21, 2017, by staff from New York City Housing Preservation Development (HPD) to inspect your premises, however they were unable to gain access to your unit.  Another attempt was made over the weekend of July 22nd and they were again unable to gain access.
3. Job opportunities: The NYC Department of Veterans Services reached out to you by phone and email on July 24, 2017.  They are, as they have been in ·the past, willing to assist you with employment related services. Please respond to their outreach in order to avail yourself of their services.
4. Request for a legal services provider: We have identified a legal services provider that is able to conduct an intake appointment with you regarding your legal matters. The organization is Mobilization for Justice and you should contact:   John Bart, Esq. at (212) 417-3766, in order to make an intake appointment. Their address is 100 William Street, 6th Floor, New York, NY 10038.

We will continue to try to address your concerns and assist you in any way possible.

Sincerely,

Ann Marie Scalia

A3

L & T Index No. 5572 /19

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF BRONX HOUSING PART

URBAN PATHWAYS INC.

*Petitioner(s)-Landlord(s)*

-against-

TOWAKI KOMATSU

*Respondent -Tenant*

-address-
798-802 FAIRMOUNT PLACE
APT.# 4B, ROOM 1
BRONX, NY 10460

**Amount Claimed: $24,465.00**

URBAN -802 -4B, ROOM 1      **FILE NO: 1062268**

**NOTICE OF PETITION-NON PAYMENT
DWELLING**

*Attorney for Petitioner*

**DANIELS NORELLI CECERE & TAVEL, PC.**
**Attorneys at Law**
**272 Duffy Avenue**
**Hicksville, NY 11801**
**Phone: (718) 459-6000**

---

COUNTY OF BRONX HOUSING PART                          Index No. L/T

URBAN PATHWAYS INC.

-against-                    *Petitioner(s)-Landlord(s)*

TOWAKI KOMATSU              *Respondent -Tenant*

-address-
798-802 FAIRMOUNT PLACE
APT.# 4B, ROOM 1
BRONX, NY 10460

*First Name of Tenant and/or Undertenant being fictitious and unknown to petitioner.*
*Person intended being in possession of the premises herein described.*

**IMPORTANT TO TENANT**
If you are dependent upon a person in the military service of the United States or the State of New York, advise the Clerk immediately, in order to protect your rights.

| NOTICE OF PETITION |
| Non-Payment DWELLING |

To the respondent(s) above named and described, in possession of the premises hereinafter described or claiming possession thereof:

PLEASE TAKE NOTICE that the annexed petition of URBAN PATHWAYS INC. verified January 28, 2019 prays for final judgment of eviction, awarding to the petitioner possession of the premises described as follows:All Rooms, Apartment 4B, ROOM 1 located at 798-802 Fairmount Place Bronx, NY 10460, County of Bronx, in the City of New York as demanded in the petition.

TAKE FURTHER NOTICE also that demand is made in the petition for judgment against you for the sum of $24,465.00 plus the cost and disbursements of the proceeding.

TAKE NOTICE also that WITHIN FIVE DAYS after service of this Notice of Petition upon you, you must answer, either orally before the Clerk of this Court at 1118 Grand Concourse, Bronx, NY 10456, County of Bronx, City and State of New York, or in writing by serving a copy thereof upon the attorneys for the petitioner, and by filing the original of such answer, with proof of service thereof, in the Office of the Clerk. Your answer may set forth any defense or counterclaim you may have against the petitioner unless such defense or counterclaim is precluded by law or prior agreement of the parties. On receipt of your answer, the Clerk will fix and give notice of the date for trial or hearing which will be held not less than 3 nor more than 8 days thereafter, at which you must appear. If, after the trial or hearing, judgment is rendered against you, the issuance of a warrant dispossessing you may, in the discretion of the Court, be stayed for FIVE days from the

TAKE NOTICE that under Section 745 of the Real Property Actions and Proceedings Law, you may be required by the Court to make a rent deposit, or a rent payment to the petitioner, upon your second request for an adjournment or if the proceeding is not settled or a final determination has not been made by the court within 30 days of the first court appearance. Failure to comply with an initial rent deposit or payment order may result in the entry of a final judgment against you without a trial. Failure to make subsequent required deposits or payments may result in an immediate trial on issues raised in your answer.

the date of such judgment.

TAKE NOTICE also that if you fail to interpose and establish any defense that you may have to the allegations of the petition, you may be precluded from asserting such defense or the claim on which it is based in any other proceeding or action.

In the event you fail to answer and appear, final judgment by default will be entered against you but a warrant dispossessing you will not be issued until the tenth day following the date of the service of this Notice of Petition upon you.

ALIA RAZZAQ

Dated: January 28, 2019          Chief Clerk of the Civil Court of the City of New York

A4

Case 1:22-cv-09586-PKC   Document 2   Filed 10/02/22   Page 256 of 338

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF BRONX  HOUSING PART

URBAN PATHWAYS INC.
                    *Petitioner(s)-Landlord(s)*
        -against-
TOWAKI KOMATSU



                    *Respondent -Tenant*



        -address-
798-802 FAIRMOUNT PLACE
 APT. 4B, ROOM 1
BRONX, NY 10460

**Amount Claimed: $24,465.00**
URBAN -802 -4B,        FILE NO:1062268

---
**PETITION NON-PAYMENT DWELLING**

Notice of Petition served on _____

Notice of Petition returned on _____

Notice of Petition issued on _____

Tenant appears on _____
                    but fails to answer.
Tenant answers on _____
Answer is _____
_____
Set for Trial on _____
Landlord notified on _____
Sufficiency of answer referred
   to court _____
   Raises _____ issue

---
        *Attorney for Petitioner*        Judge
**DANIELS NORELLI CECERE & TAVEL, PC.**
**Attorneys at Law**
**272 Duffy Avenue**
**Hicksville, NY 11801**
**Phone: (718) 459-6000**

---

**THE PETITION OF URBAN PATHWAYS INC.** respectfully shows upon information and Belief:
1. Petitioner(s) is(are) the landlord and owner of the premises.
2. Upon information and belief, Respondent-tenant(s) TOWAKI KOMATSU is(are) in possession of said premises pursuant to a written lease agreement wherein respondents promised to pay to landlord or landlord(s) predecessor as rent $800.00 each month in advance on the 1ST day of each month.
3. Respondent(s) are now in possession or claiming possession of said premises.
4. Said premises are the residence of the tenant(s) and the undertenant(s) herein.
5. The Premises for which removal is sought was rented for Dwelling purposes and are described as follows: All Rooms, Apartment # 4B, ROOM 1 in the building known as 798-802 Fairmount Place, Bronx, NY 10460, situated within the territorial jurisdiction of this Court.
6. Pursuant to said agreement there was due to the petitioner-landlord from respondent-tenant(s), the sum of $24,465.00 rent and additional rent as follows:

    ** * SEE RIDER ATTACHED * **

    TOTAL RENT:          $24,465.00

7. **The premises are not subject to the City Rent Law (Rent Control) nor are they subject to the Rent Stabilization Law of 1969 as amended by Chapter 576 of the Laws of 1974 and the Omnibus Housing Act of 1983, by reason that it is rented by a not for profit corporation and the occupancy of said apartment is pursuant to compliance with program rules and regulations and has beeen duly registered with the Division of Housing and Community Renewal (DHCR).**
8. Rent has been duly demanded from the respondent(s) tenant(s) by a statutory ten day written-notice since the same became due. A copy of same with proof of due service is annexed hereto and marked Exhibit "A"
9. Respondent(s) have defaulted in the payment thereof and continue in possession of premises without permission after said default.
10. The premises are not a multiple dwelling.



WHEREFORE Petitioner requests a final judgment against respondents(s) for the rent demanded therein, awarding possession of the premises to the petitioner landlord, and directing the issuance of a warrant to remove respondent(s) from possession of the premises together with the costs and disbursements of this proceeding.
**URBAN PATHWAYS INC.,**                                    **Dated January 28, 2019**
STATE OF NEW YORK, COUNTY OF QUEENS. The undersigned affirms under penalty of perjury that: he is one of the attorneys for the petitioner, that he has read the foregoing petition and knows the contents thereof: that the same are true to his own knowledge except as to matters stated to be upon information and belief: and as to those matters he believes them to be true. The grounds of his belief as to matters not stated upon his knowledge are statements and/or records provided by the petitioner, its agents and/or employees and contained in the file in the Attorney's office Petitioner is not in the County in which Attorney's office is located. This verification is made pursuant to the provisions of RPAPL 741.



                    January 28, 2019            _____
                                                ALLISON M. HEILBRAUN

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF BRONX : HOUSING PART

                                                              X

File #: 089407

L&T Index #: 8402

URBAN PATHWAYS INC.

                                 against                Petitioner

TOWAKI KOMATSU
798-802 FAIRMOUNT PLACE
BRONX, NY 10460
Apt. 4B, BEDROOM #1

Respondent
Tenant

**NOTICE OF PETITION**
**Non-Payment**
**Residential Premises**

JOHN DOE - UnderTenant
JANE DOE - UnderTenant
ALTERNATIVE ADDRESS:
Apartment 4B, First bedroom on the right
798-802 Fairmount Place
Bronx, NY 10460

                                                              X

**Your landlord is suing you for nonpayment of rent.**

1. Your landlord has started an eviction nonpayment case against you for rent the landlord claims you owe. The landlord's reasons are given in the attached Petition.

2. Your landlord is asking this Court for:
   - a money judgment for $34,065.00, plus interest from July 1, 2016, and
   - permission to evict you from your home if you do not pay the money judgment.

3. You have a right to a trial. But first you must Answer the Petition by going to the landlord-tenant Clerk's Office at: 1118 Grand Concourse Ground Floor Bronx, NY 10456. You must do this **within 10 days** after the date these papers were given to you or a person who lives or works in your home, or were posted at your home at:
   all rooms, Apt. 4B, BEDROOM #1 at 798-802 FAIRMOUNT PLACE, BRONX, NY 10460

*Warning!* If you don't Answer the Petition within 10 days, a judgment may be entered against you.
If that happens, the landlord will have the right to evict you.

4. Your Answer should say the legal reasons that you don't owe all or part of the rent. The legal reasons are called defenses. You can also say any claims you have against the landlord. You will have to prove your defenses and claims in court. To Answer the Petition you must either:
   - Go to the landlord-tenant Clerk's Office and tell the Clerk your Answer, or
   - Give the landlord-tenant Clerk your Answer in writing (Form No. Civ-LT-91a).
   Information to help you Answer the Petition is attached (Form No. Civ-LT-92) is available at the landlord-tenant's Clerk's Office or online at nycourts.gov/housingnyc.
   *Important!* If you don't tell the Clerk about a defense in your Answer you might not be able to talk about it later in this case or any other case.

5. When you Answer the Petition, you will get a date to come back to Court 3 to 8 days later. You have a right to postpone that date for 14 days but you have to come to the courthouse to ask for a postponement. If you pay all the rent due before your court date, the case will be dismissed.

6. If your name is not on this Notice but you live in the home listed above, you have a right to come to Court and Answer the Petition.

7. Available Resources:
   - **Legal Help:** Under New York City law, you may be able to get a free lawyer to represent you in this case. Call 718 557-1379 or go to nycourts.gov/nyc-freelawyer for information about getting free legal help. If you have money to hire a lawyer, you can contact the New York City Bar Legal Referral Service at 212 626-7373.
   - **Language Help:** If you don't speak English well or are deaf or hard of hearing, you have a right to a free court interpreter. Tell the Court Clerk you need an interpreter, or call 646 386-5670. To read a translation of this Notice in another language visit: nycourts.gov/housingnyc. For information on evictions:

A5

**646 386-5750: Informations concernant les expulsions • বেদখলের তথ্য • 迫迁相关信息**
**迫遷相關資訊 • Информация о выселении • معلومات بشأن حالات الطرد**
**بے دخلیوں کی معلومات • Enfòmasyon Konsènan Degèpisman • Información sobre desalojos**

- **ADA Help:** If you need special accommodations to use the court because of a disability, call 646 386-5300 or 711 (TTY) or tell a Court Clerk.
- **Financial Help:** If you owe the rent and don't have the money, contact HRA's Infoline at (718) 557-1399 for more information about getting help to pay the rent.
- **Help at the Courthouse:** There is a Help Center in the courthouse where you can speak to a Court Attorney or a Volunteer Lawyer.
- **Online Help:** Visit the Housing Court's website at: nycourts.gov/housingnyc (also available in Spanish and Chinese) or visit LawHelpNY at lawhelpny.org

**Postponements and Rent Deposits.** In court, you can ask to postpone your case. You have a right to postpone the case for at least 14 days. If your case is not finished in 60 days or you ask to postpone the case again, the court can order you to deposit money in court or make a rent payment to the landlord. If you don't do this, your case may go to trial right away. RPAPL Sec. 745.

**After Judgment.** If the court orders a judgment against you after a trial, the court may give you time to pay the judgment and not be evicted. After that time is up, you will get a Notice of Eviction from a Marshal giving you at least 14 days to pay all the rent due or move. If you don't pay or move, you will be evicted by the Marshal. RPAPL Sec. 749(2).

DATED: February  4, 2020

Alia  Razzaq
_____

Daniels Norelli Cecere & Tavel P.C.
Attorneys for the Petitioner
272 Duffy Ave, Hicksville, NY 11801
(718) 459-6000 | fax: (516) 338-1063

Chief Clerk of the New York City Civil Court

Form #: D0004203

**IMPORTANT TO TENANT - If you are dependant upon a person in the military service of the United States or of the State of New York, advise the Clerk immediately, in order to protect your rights.**

CIVIL COURT OF THE CITY OF NEW YORK
COUNTY OF BRONX : HOUSING PART

File #: 089407

L&T Index #:

---------------------------------------------------------------------- X

URBAN PATHWAYS INC.                                          Petitioner

                              against

                                                            Respondent
TOWAKI KOMATSU                                              Tenant
798-802 FAIRMOUNT PLACE
BRONX, NY 10460
Apt. 4B, BEDROOM #1

JOHN DOE - UnderTenant
JANE DOE - UnderTenant
ALTERNATIVE ADDRESS:
Apartment 4B, First bedroom on the right
798-802 Fairmount Place
Bronx, NY 10460

**NON-PAYMENT PETITION**
*Residential Premises*

---------------------------------------------------------------------- X

THE PETITION OF URBAN PATHWAYS INC., the landlord of the premises, shows that:

1. The Petitioner is the landlord of the within described premises.

2. The Respondent(s) TOWAKI KOMATSU, is/are the tenant(s) of the Premises described below, and entered into possession under a lease between Respondent as tenant and Petitioner as landlord, wherein Respondent promised to pay to landlord as rent $800.00 per month, payable on the first of each month. Respondent(s) JOHN DOE - UnderTenant, JANE DOE - UnderTenant is/are the person or persons in possession of the premises, the exact name or names being unknown to petitioner. Respondent(s) is/are now in possession of said Premises.

3. The Premises from which removal is sought are described as follows:  all rooms, Apt. 4B, BEDROOM #1 at 798-802 FAIRMOUNT PLACE, BRONX, NY 10460. The Premises are situated within the territorial jurisdiction of this Court.

4. Pursuant to said lease there was due to landlord from Respondent tenant as follows and Respondent tenant has defaulted in the payment thereof. The total rent in arrears as of the date hereof is as follows:
Arrears:

| | |
|---|---|
| Jul 2016 | $465.00 |
| Aug 2016 | $800.00 |
| Sep 2016 | $800.00 |
| Oct 2016 | $800.00 |
| Nov 2016 | $800.00 |
| Dec 2016 | $800.00 |
| Jan 2017 | $800.00 |
| Feb 2017 | $800.00 |
| Mar 2017 | $800.00 |
| Apr 2017 | $800.00 |
| May 2017 | $800.00 |
| Jun 2017 | $800.00 |
| Jul 2017 | $800.00 |
| Aug 2017 | $800.00 |
| Sep 2017 | $800.00 |
| Oct 2017 | $800.00 |
| Nov 2017 | $800.00 |
| Dec 2017 | $800.00 |
| Jan 2018 | $800.00 |
| Feb 2018 | $800.00 |
| Mar 2018 | $800.00 |
| Apr 2018 | $800.00 |
| May 2018 | $800.00 |
| Jun 2018 | $800.00 |
| Jul 2018 | $800.00 |
| Aug 2018 | $800.00 |
| Sep 2018 | $800.00 |
| Oct 2018 | $800.00 |

A5

| | |
|---|---|
| Dec 2018 | $800.00 |
| Jan 2019 | $800.00 |
| Feb 2019 | $800.00 |
| Mar 2019 | $800.00 |
| Apr 2019 | $800.00 |
| May 2019 | $800.00 |
| Jun 2019 | $800.00 |
| Jul 2019 | $800.00 |
| Aug 2019 | $800.00 |
| Sep 2019 | $800.00 |
| Oct 2019 | $800.00 |
| Nov 2019 | $800.00 |
| Dec 2019 | $800.00 |
| Jan 2020 | $800.00 |

Total Balance Due: $34,065.00

5. Said rent has been demanded ☐ personally ☒ by written 14 day demand from the tenants since same became due.

6. Respondent continues in possession of the Premises without the permission of landlord after said default.

7. The apartment is not subject to New York Emergency Housing Rent Law or the Rent Stabilization Law of 1969, as amended, because the premises are rented by a not for profit entity and the occupancy is pursuant to compliance with program rules and regulations. Further, the premises are subject to a regulatory agreement with the New York City Department of Social Services / Human Resources Administration to provide supportive housing to homeless veterans.

The premises are a multiple dwelling. Registration Number: 227429
Registered Managing Agent: Marilyn Andzeski 575 EIGHTH AVENUE 16th Floor, NEW YORK, NY 10018

8. The property herein sought to be recovered was rented for residential purposes by the tenants and undertenants herein.

9. Petitioner lacks written information or notice of any address where Respondent-tenant - resides / is employed / has a place of business - in New York State, other than the address of the property sought to be recovered and Apartment 4B, First bedroom on the right  798-802 Fairmount Place Bronx, NY 10460

**WHEREFORE**, Petitioner requests final judgment awarding possession of the Premises to the Petitioner landlord; the issuance of a warrant to remove Respondent from possession of the Premises; a judgment for rent in arrears against Respondent tenant for $34,065.00, and the costs and disbursements of this proceeding.

DATED: February  4, 2020              PETITIONER: URBAN PATHWAYS INC.

STATE OF NEW YORK, COUNTY OF BRONX. The undersigned affirms under penalty of perjury that he is one of the attorneys for the petitioner, that he has read the foregoing petition and knows the contents thereof; that the same are true to his own knowledge except as to matters stated to be on information and belief; and as to those matters he believes them to be true. The grounds of his belief as to matters not stated upon his knowledge are statements and/or records provided by the petitioner, its agents and/or employees. This affirmation is made pursuant to RPAPL 741 and CPLR§3020(d)(3).

DATED: February  4, 2020

_____
Eric T. Tavel, Esq.

Daniels Norelli Cecere & Tavel P.C.
Attorneys for the Petitioner
272 Duffy Ave, Hicksville, NY 11801
(718) 459-6000 | fax: (516) 338-1063

A5

**URBAN PATHWAYS INC. LANDLORD, CASERO**
**NOTICE TO TENANT - AVISO AL INQUILO**

File # 089407  -  Form # T0007254                                                    January 12, 2020

TO:   TOWAKI KOMATSU
      798-802 FAIRMOUNT PLACE
      BRONX, NY 10460
      Apt. 4B, BEDROOM #1


**Tenant of the above named premises:**
      TAKE NOTICE, that you are justly indebted to the Landlord of the above described premises in the sum of $34,065.00 for rent from July 1, 2016 to January 31, 2020, which you are required to pay to on or before the expiration of fourteen (14) days from the date of service of this Notice, or surrender up the possession of said premises to  the landlord, in default of which the Landlord will commence summary proceedings under the Statute to recover the possession thereof.

**Inquilino del local arriba mencionado:**
      AVISO: Que usted debe al casero de la propiedad arriba mencionada segun olo arriba expuesto que usted debe pagar en  antes del termino de catorce dias a partir del dia que usted reciba este aviso o entregar posesion de dicho local al casero. En caso de incumplimiento, el casero comenzara un juicio sumario de acuerdo a la ley para recobrar su propriedad.

      More specifically, this notice is based upon your failure to make timely rental payments to your landlord as follows:


Arrears history:

| Month | Amount |
|-------|--------|
| Jul 2016 | $465.00 |
| Aug 2016 | $800.00 |
| Sep 2016 | $800.00 |
| Oct 2016 | $800.00 |
| Nov 2016 | $800.00 |
| Dec 2016 | $800.00 |
| Jan 2017 | $800.00 |
| Feb 2017 | $800.00 |
| Mar 2017 | $800.00 |
| Apr 2017 | $800.00 |
| May 2017 | $800.00 |
| Jun 2017 | $800.00 |
| Jul 2017 | $800.00 |
| Aug 2017 | $800.00 |
| Sep 2017 | $800.00 |
| Oct 2017 | $800.00 |
| Nov 2017 | $800.00 |
| Dec 2017 | $800.00 |
| Jan 2018 | $800.00 |
| Feb 2018 | $800.00 |
| Mar 2018 | $800.00 |
| Apr 2018 | $800.00 |
| May 2018 | $800.00 |
| Jun 2018 | $800.00 |
| Jul 2018 | $800.00 |
| Aug 2018 | $800.00 |
| Sep 2018 | $800.00 |
| Oct 2018 | $800.00 |
| Nov 2018 | $800.00 |
| Dec 2018 | $800.00 |
| Jan 2019 | $800.00 |
| Feb 2019 | $800.00 |
| Mar 2019 | $800.00 |
| Apr 2019 | $800.00 |
| May 2019 | $800.00 |

A5

| | |
|---|---|
| Jun 2019 | $800.00 |
| Jul 2019 | $800.00 |
| Aug 2019 | $800.00 |
| Sep 2019 | $800.00 |
| Oct 2019 | $800.00 |
| Nov 2019 | $800.00 |
| Dec 2019 | $800.00 |
| Jan 2020 | $800.00 |

Total balance due: $34,065.00

URBAN PATHWAYS INC., Landlord, Casero

By: _N Southwell_ 1/17/2020

Nancy Southwell, Deputy Executive Director

Immediately, if you are currently receiving public assistance, bring this fourteen-day notice for rent to the worker who handles your case. Your worker will consider this notice on an emergency basis and may be able to provide funds to avoid the possible loss of the apartment. If you are not currently receiving public assistance and require financial help, you should apply immediately at your local Income Maintenance Center. If you show this notice to the receptionist, you may also be entitled to assistance on an emergency basis.

Immediatamente, si esta recibiendo asistencia publica al presente, traiga este aviso para pagar renta dentro de catorce dias al trabajador que menaga su caso. Su trabajador considera este aviso con caracter de emergencia y possiblemente podra proveerle fondos para evitar que usted pierda su apartamento. Si no recibe asistencia publica al presente y necesita ayuda financiera, usted debe solicitarla immediatmente en su centre local de maintenimiento de ingreso. Si muestra este aviso a la receptionista, usted posiblemente podra tener derecho a recibir ayuda con caracter de emergencia.

**ALTERNATE MAILING ADDRESS:**
Apartment 4B, First bedroom on the right
798-802 Fairmount Place
Bronx, NY 10460

A5

## AFFIDAVIT OF CONSPICUOUS SERVICE

STATE OF NEW YORK      }
COUNTY OF QUEENS       }

CASE #  DNCT
L&T  #

EMMANUEL LANZOT, BEING DULY SWORN, DEPOSES AND SAYS: THAT DEPONENT IS NOT A PARTY TO THIS PROCEEDING, IS A LICENSED PROCESS SERVER OVER 18 YEARS OF AGE AND RESIDES AT BRONX, NEW YORK.

DEPONENT WAS UNABLE TO SERVE: TOWAKI KOMATSU, RESPONDENT(S) BY PERSONAL DELIVERY.

AT 798-802 FAIRMOUNT PLACE, APT. 4B, BEDROOM #1, BRONX, NY 10460

THIS IS THE ONLY APARTMENT IN THE BUILDING WITH THE ABOVE APARTMENT #

AT THE PROPERTY SOUGHT TO BE RECOVERED.

ON  1/16/2020  AT  10:46 AM  DEPONENT SERVED THE ATTACHED
                        RENT DEMAND

[X] BY AFFIXING A TRUE COPY FOR EACH RESPONDENT UPON A CONSPICUOUS
    PART, TO WIT-THE ENTRANCE DOOR OF THE APARTMENT, OR
[ ] BY PLACING A COPY FOR EACH RESPONDENT UNDER THE ENTRANCE DOOR
    OF SAID PROPERTY.
DEPONENT WAS UNABLE TO FIND A PERSON OF SUITABLE AGE AND DISCRETION WILLING TO RECEIVE THE SAME AT THIS TIME OR DURING A PRIOR ATTEMPT MADE ON 1/15/2020  AT  7:06 PM.


AND ON 1/16/2020 DEPONENT SERVED COPIES OF THE RENT DEMAND BY MAILING A COPY TO EACH RESPONDENT BY DEPOSITING TRUE COPIES OF THE SAME ENCLOSED IN A POST PAID PROPERLY ADDRESSED WRAPPER TO EACH RESPONDENT AT 798-802 FAIRMOUNT PLACE, APT. 4B, BEDROOM #1, BRONX, NY 10460, IN THE POST OFFICE BY CERTIFIED MAIL AND BY REGULAR FIRST CLASS MAIL MAILED WITHIN THE STATE OF NEW YORK.

ALSO MAILED TO TOWAKI KOMATSU AT798-802 FAIRMOUNT PLACE, APT. 4B, FIRST BEDROOM ON THE RIGHT, BRONX, NY 10460 BY REGULAR AND CERTIFIED MAIL.

SWORN TO BEFORE ME ON 1/17/2020


THOMAS A. DUNDAS
NOTARY PUBLIC, State of New York
NO. 01DU6016919
Qualified in Queens County
Commision Expires 11/30/2022

EMMANUEL LANZOT
LIC.# 1258345

Caseld        550961
MG


PROCESS SERVER PLUS INC. LIC# 1077004, 96-11 101ST AVENUE, 2ND FL, OZONE PARK, NY 11416

A5

 **Office of Temporary and Disability Assistance**

NEW YORK STATE OF OPPORTUNITY.

**KATHY HOCHUL**
Governor

**DANIEL W. TIETZ**
Acting Commissioner

**BARBARA C. GUINN**
Executive Deputy Commissioner

March 9, 2022

Towaki Komatsu
802 Fairmount Place. Apt. 4B
Bronx, NY 10460

Dear Towaki Komatsu:

   The Office of Temporary and Disability Assistance (OTDA) is in receipt of your February 18, 2022 e-mail in which you have lodged a complaint against NYC HRA.  Specifically, you assert therein that "The attached PDF file confirm [sic] that HRA committed fraud all along in the OTDA fair hearing process," and thereafter detailing several instances of purported forgeries on the document entitled "Rental Agreement."

   After receiving your email, by letter dated February 24, 2022, Mr. Nigel Marks, Downstate Director, addressed your request that the subject Decision be revisited.  Pursuant to OTDA regulations, local social services districts are responsible for reviewing their own activity.  Therefore, OTDA has forwarded your complaints to NYC HRA and we have asked that it respond to this office with a report summarizing its investigation findings and any actions taken.  Once that report has been received, we will evaluate whether further action is needed.

Sincerely,

Craig M. Crist
Deputy Counsel

A6



**NEW YORK**
STATE OF
OPPORTUNITY.

# Office of Temporary and Disability Assistance

**KATHY HOCHUL**
Governor

**DANIEL W. TIETZ**
Commissioner

**BARBARA C. GUINN**
Executive Deputy Commissioner

March 22, 2022

Towaki Komatsu
802 Fairmount Place
Apt. 4B
Bronx, NY 10460

Re: FH: 8227101K

Dear Towaki Komatsu:

This is in response to your February 16, 2022, email to me, and your March 13, 22, 2022, email to Deputy Counsel Craig Crist in which you claim that "HRA illegally created a forgery from the apartment lease agreement [you] signed on 2/16/16." The Office of Administrative Hearings (OAH) investigated your complaint as it relates to your fair hearing and sent you a response on February 24, 2022.

This letter is to inform you that in keeping with OAH's responsibility under Regulations at 18 NYCRR 356.3, your complaint has been referred to New York City's Human Resources Administration's General Counsel for further investigation.

Yours truly,

Nigel A. Marks, Downstate Director
Office of Administrative Hearings



**NEW YORK STATE OF OPPORTUNITY.**

**Office of Temporary and Disability Assistance**

**ANDREW M. CUOMO**
Governor

**MICHAEL P. HEIN**
Commissioner

**BARBARA C. GUINN**
Executive Deputy Commissioner

(800) 342-3334

November 27, 2020

Towaki Komatsu
802 Fairmount Place
Apt. 4B
Bronx, NY 10460

Dear Mr. Komatsu:

This is in response to your November 23, 2020, email in which you asked that the Office of Administrative Hearings (OAH) "immediately reinstate my claims against HRA that were assigned to OTDA concerning storage benefit matters."

Your request has been thoroughly reviewed and OAH has found no valid basis for reopening any of your hearings.  You were given ample opportunities to present documentary evidence and testimony in support of your case.  Title 18 of the New York Codes Rules and Regulations section 358-6.6(b) states that on "notice to all parties, OAH may reopen a previously closed fair hearing record for the purposes of completing such record."  The review has determined that all parties were given an opportunity to present evidence in support of their positions and that the record in each hearing was complete before a decision was issued.

OAH will recognize your November 23, 2020, email as request for a hearing regarding the adequacy of your storage allowance.  During that scheduled hearing you will once again be offered an opportunity to introduce documentary evidence and testimony in support of your claim. If you disagree you may withdraw the request or contact OAH's intake staff and amend the issue as you deem appropriate.

I hope this addresses the issues you raised in your email.  I would once again remind you, as I have in prior responses, to kindly include the fair hearing number of the hearing you are referring to in all your correspondence with OTDA.  Doing so will expedite our responses to your queries.

Yours truly,

Nigel A. Marks
Assistant Director
Office of Administrative Hearings

NAM: nnm



**NEW YORK STATE OF OPPORTUNITY.**

# Office of Temporary and Disability Assistance

| **KATHY HOCHUL** | **MICHAEL P. HEIN** | **BARBARA C. GUINN** |
|---|---|---|
| Governor | Commissioner | Executive Deputy Commissioner |

August 27, 2021

**Via Email**

Towaki Komatsu
802 Fairmount Place
Apt. 4B
Bronx, NY 10460

Dear Towaki Komatsu:

This is in response to your August 24, 2021, email in which you asked that we "confirm whether OTDA authorized HRA not to comply with [your] discovery demands" dated December 5, 2020 and January 30, 2021.

I have thoroughly investigated this matter. During my investigation I have reviewed your emails, listened to the fair hearing recording of fair hearing 8227101K, and read the Decision After Fair Hearing. My review has found no evidence that OTDA has ever instructed HRA not to comply with your "discovery demands."

Fair hearing 8227101K was requested to address an alleged failure by HRA to pay your storage expense. During the hearing, which was held on February 9, 2021, the presiding Administrative Law Judge (ALJ) asked you if you received the evidence packet and you stated that you received it. You subsequently testified that you did not receive "documents" from HRA. The ALJ asked you if you were referring to your case record. You stated that you were not referring to your case record. You informed the ALJ that you were speaking about documents stated in your emails to me and Director Samuel Spitzberg. The ALJ informed you that she does not have access to those emails. You then read portions of one of your emails listing the documents you requested.

Your December 5, 2020, and January 31, 2021, emails cite 18 NYCRR Section 358-3.7 as the basis for your demand for certain documents from HRA. The regulation you reference specifically refers to: "**Examination of case record before the hearing**." Since you testified that you were not asking for documents in the evidence packet or your case record, your document request is beyond the scope of the fair hearing process. OTDA has no jurisdiction over your demands for documents that are beyond the scope of the fair hearing process.

I hope this addresses the issues you raised in your emails.

Yours truly,

Nigel A. Marks
Assistant Director
Office of Administrative Hearings

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

---------------------------------------------------------------X

In the Matter of the Application of       :

ANONYMOUS       :

                       Petitioner,       :

For a Judgment Pursuant to Article 78 of the Civil       :
Practice Law and Rules

     - against -       :

NEW YORK CITY HUMAN RESOURCES       :
ADMINISTRATION,
                      Respondent.       :

      :

      :

---------------------------------------------------------------X

Index No.:
100054/2017

(Hon. Nancy Bannon,
J.S.C.)

**AFFIRMATION IN
SUPPORT OF
RESPONDENT'S
CROSS-MOTION TO
DISMISS**

      I, JEFFREY MOSCZYC, an attorney duly admitted to practice before the Courts

of the State of New York, affirm the following statements to be true under the penalties

of perjury:

      1.     I am of Counsel to ZACHARY W. CARTER, Corporation Counsel of the

City of New York, and MARTHA A. CALHOUN, Special Assistant Corporation

Counsel of the City of New York, and attorney of record for STEVEN BANKS, as

Commissioner of the City of New York Human Resources Administration ("City

Respondent" or "HRA").

      2.     I am familiar with the facts stated herein based on my review of records

kept in the regular course of business by Respondent and my discussions with employees

of Respondent. I submit this Affirmation in support of Respondent's Cross-Motion to Dismiss this proceeding.

3.      Petitioner is a former public assistance recipient who commenced this proceeding by Order to Show Cause, and Verified Petition, on or about January 17, 2017 against the New York City Human Resources Administration ("HRA" or "Respondent").

4.      Petitioner challenges Respondent's compliance with the Decision After Fair Hearing ("DAFH") number 7316477K, issued by the New York State Office of Temporary and Disability Assistance ("OTDA") on September 15, 2016 which directed Respondent to make a determination as to Petitioner's eligibility for storage fees from the period of May 2016 to the date of the decision. The Administrative Law Judge based this decision in part on Petitioner's testimony, that during the relevant time period (May 2016 through September 2016) he was residing in a temporary shelter. *See* DAFH number 7316477K dated September 15, 2016 as Exhibit "1" at page 4.

5.      Subsequent to the DAFH, on September 28, 2016, Respondent issued storage fees in the amount of $984.00 for the months of August and September 2016 which was the outstanding balance for the period in question. *See* Notice of Special Grant Form W-636 dated September 28, 2016 attached as Exhibit "2." *See also* Fair Hearing Compliance Statement dated October 6, 2016 attached as Exhibit "3."

6.      On January 17, 2017, Petitioner brought the instant proceeding claiming that HRA had not fully complied with the DAFH because he was still owed reimbursement for the months of May through July 2016 which he had paid directly to the storage facility.

7. Respondent has reviewed Petitioner's case record and determined that, as Petitioner was residing in permanent housing at 798-802 Fairmont Place #4B, Bronx, NY 10460 during the period in question, he was not eligible for storage fees from May to September 2016 under state regulation. *See* New York State Welfare Management System ("WMS") address history screen and Rental Agreement dated February 16, 2016 attached as Exhibits "4" and "5."

8. Under 18 NYCRR §§ 352.6(f) and 397.5(k), storage fees are available when essential for circumstances such relocation, eviction or temporary shelter. There is no authority to issue storage fees while someone is in permanent housing based on their apartment being too small to store their belongings. Therefore, while HRA did issue storage fees for the months of August 2016 through September 2016, those fees were issued as a result of agency error.

9. Accordingly, on March 9, 2017 Respondent issued a new Fair Hearing Compliance Statement, and on March 28, 2017, a new notice of determination stating that, as Petitioner lived in permanent housing during the period in question, he was not entitled to storage fees. *See* Fair Hearing Compliance Statement dated March 9, 2017, and Action Taken on Your Request for Emergency Assistance, Additional Allowances or Adding to the Case, dated March 28, 2016, and attached as Exhibits "6" and "7."

10. Since, as directed in the DAFH, Respondent has issued a new determination on Petitioner's eligibility for storage fees, Respondent has fully complied with the September 15, 2016 DAFH.

11. Additionally, it should be noted, on October 20, 2016 Petitioner requested that OTDA re-open the September 7, 2016 fair hearing -- the DAFH of which being the

5

subject of Petitioner's order to Show Cause and Verified Petition. OTDA granted Petitioner's request, and the matter is scheduled to be heard April 11, 2016. *See* OTDA's Schedule of Fair Hearing screen attached as Exhibit "8."

12.    Respondent hereby cross-moves to dismiss this proceeding pursuant to CPLR 3211(a)(2),(7) and CPLR 7801(1) because: (1) Petitioner has failed to state a cause of action because his compliance claim is moot, as Respondent has fully complied with the DAFH by making a new determination which found Petitioner was ineligible for storage fees while residing in permanent housing; (2) as the fair hearing that is the subject of this proceeding has been reopened, the court lacks subject matter jurisdiction to hear this claim as Petitioner improperly seeks judicial review over a non-final administrative action; and (3) to the extent Petitioner seeks relief for claims that are outside the scope of an Article 78 proceeding, this court lacks subject matter jurisdiction; and for any and such further relief as this Court may deem just and proper.

13.    Contrary to Petitioner's representations, when Petitioner submitted his request for storage fees, and when Respondent denied that application, Petitioner was residing in permanent housing. *See* Action Taken on Your Emergency Assistance, Additional Allowances, or Adding a person to the Case, form W-137B dated May 27, 2016, attached as Exhibit "9." *See also* Exhibits "4" and "5." This proceeding must, therefore be dismissed pursuant to CPLR 3211(a)(7), because Petitioner has failed to state a cause of action because his compliance claim is moot, as Respondent has fully complied with the DAFH, by making a new determination which found Petitioner was ineligible for storage fees while residing in permanent housing. *See* Respondent's Memorandum of Law in Support of its Cross-Motion to Dismiss, Argument, Point I.

14.     Additionally, as the fair hearing that is the subject of this proceeding has been reopened, the court lacks subject matter jurisdiction to hear this claim as Petitioner improperly seeks judicial review over a non-final administrative action. Accordingly, this proceeding must therefore be dismissed as Petitioner's claims are precluded by CPLR 3211(a)(2) and 7801(1). *See* Respondent's Memorandum of Law in Support of its Cross-Motion to Dismiss, Argument, Point II.

15.     Lastly, to the extent Petitioner seeks relief for claims that are outside the scope of an Article 78 proceeding, this court lacks subject matter jurisdiction *See* Respondent's Memorandum of Law in Support of its Cross-Motion to Dismiss, Argument, Point III.

Respectfully submitted,

Dated: New York, New York
     April 7, 2017

JEFFREY MOSCZYC, of Counsel

7

A10

# EXHIBIT 1

**STATE OF NEW YORK**
**OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE**

**REQUEST:** June 6, 2016
**CASE #:** ████████
**CENTER #:** 46
**FH #:** 7316477K

---

In the Matter of the Appeal of

Towaki Komatsu

from a determination by the New York City
Department of Social Services

:
:
:   **DECISION**
:   **AFTER**
:   **FAIR**
:   **HEARING**
:
:

---

## JURISDICTION

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on September 7, 2016, in New York City, before Joab Okello, Administrative Law Judge. The following persons appeared at the hearing:

For the Appellant

Towaki Komatsu, Appellant (by telephone)

For the Social Services Agency

James Calttrell, Fair Hearing Representative

## ISSUE

Was the Agency's determination to deny the Appellant's application for Storage of Possession expenses correct?

## FINDINGS OF FACT

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1.     The Appellant is in receipt of Public Assistance benefits.

2.     The Appellant's household consists of one person.

3.     On May 26, 2016, the Appellant requested that the Agency provide for Storage of Possession expenses.

FH# 7316477K

    4.     On May 27, 2016, the Agency denied the Appellant's application for Storage of Possession expenses.

    5.     On June 6, 2016, the Appellant requested this fair hearing.

## APPLICABLE LAW

Section 352.6 of 18 NYCRR provides that an allowance for storage of furniture and personal belongings shall be made when it is essential, for circumstances such as relocation, eviction or temporary shelter, so long as eligibility for public assistance continues and so long as the circumstances necessitating the storage continue to exist.

Section 370.3 of 18 NYCRR provides that Agencies must authorize emergency and short term assistance to provide for the effective and prompt relief of identified needs which cannot be met under Emergency Assistance to Needy Families with Children (EAF), Family Assistance, the Home Energy Assistance Program (HEAP) or Safety Net Assistance. In cases where the need is determined to be temporary, the grant may be limited to those items for which there is immediate need. Emergency Safety Net Assistance can only be provided where there is an identified emergency need and where the applicant is without income or resources immediately available to meet the emergency need. The household's gross income at the time of application cannot exceed 125 percent of the federal income official poverty line unless the emergency is the result of a fire, flood or other like catastrophe or the emergency assistance is granted in accordance with Section 352.5(c), (d) and (e) of 18 NYCRR. An emergency is defined as a serious occurrence or situation needing prompt attention. Emergency Safety Net Assistance is not available if the emergency arose because the applicant failed to comply with the requirements of Part 385 of the regulations relating to employment and training and was therefore disqualified from receiving assistance.

## DISCUSSION

During a telephone hearing, the Appellant stated that he applied to the Agency for assistance to pay Storage of Possession expenses on May 26, 2016, because he was residing in a temporary residence which was a very small room in an apartment that he shared with a roommate. The Appellant testified further that he was residing in a very hostile environment, his roommate having assaulted him on one occasion and also threw away his personal belongings. The Appellant testified that his personal belongings, already in storage, will be auctioned if the Agency does not pay for the storage fee from May 2016 to the present time.

The Agency presented a notice of denial dated May 27, 2016, indicating that the Agency determined to deny the Appellant's application for storage fee because the Appellant "did not get three moving estimates to move items from storage". The Agency did not offer any explanation as to why the Agency's denial was addressing "moving expenses" instead of the Appellant's

FH# 7316477K

request for Storage fee". The Agency did not present any other documents to sustain its determination.

Section 352.6 of 18 NYCRR provides that an allowance for storage of furniture and personal belongings shall be made when it is essential, for circumstances such as relocation, eviction or temporary shelter, so long as eligibility for public assistance continues and so long as the circumstances necessitating the storage continue to exist.

The Appellant's testimony is found to be credible to sustain his claim that he met *prima facia* eligibility for Storage fee Expenses on the grounds that he was residing in a temporary shelter which was too small to accommodate all his personal belongings and that he was a recipient of Public Assistance. Accordingly, the Agency's determination to deny the Appellant's request for Storage of Possession expenses cannot be sustained.

## DECISION AND ORDER

The Agency's determination to deny the Appellant's application for Storage of Possession expenses is not correct and is reversed.

1.     The Agency is directed to make a determination as to the Appellant's eligibility for Storage  of  Possession expenses from May 2016 to present time.

2.     The Agency is directed to advise the Appellant of any additional documents which are required to make this determination.

3.     The Agency is further directed to advise the Appellant in writing of its determination to provide any allowances to which the Appellant may be entitled.

4.     In the event that the Appellant is found to be eligible for Storage of Possession expenses, the Agency is directed to make payments retroactive to the date of request.

Should the Agency need additional information from the Appellant in order to comply with the above directives, it is directed to notify the Appellant promptly in writing as to what documentation is needed. If such information is requested, the Appellant must provide it to the Agency promptly to facilitate such compliance.

As required by 18 NYCRR 358-6.4, the Agency must comply immediately with the directives set forth above.

4

FH# 7316477K

DATED:   Albany, New York
          09/15/2016

NEW YORK STATE OFFICE OF
TEMPORARY AND DISABILITY ASSISTANCE

By

Commissioner's Designee

**A10**

# EXHIBIT 5

This Rental Agreement ("Lease" or "Agreement") is dated 2/16 , and is between        Urban Pathways        Inc.        (the        "LESSOR"),        and Towaki Komatsu (the "TENANT(S)").

WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished **1BR/2BR** Apartment 4b rm 1 on the 4ᵗʰ floor of the Building  known as **798-802 Fairmount Place, Bronx, New York 10460,** in the Borough of **Bronx**  and State of **New York** (the "Premises"), for the term of **12 Months**, unless sooner  terminated as hereinafter provided, to be used and occupied as a strictly private residential dwelling  by TENANT at the **12-month** rental rate of **$9,600**, which represents equal monthly  payments of **$800** each, in advance, to be paid as specified in this Agreement.

NOW THEREFORE, the Parties agree as follows:

**1.    TERM**: The term of this Agreement will be for a term of 12 months, from to_____ . LESSOR reserves the right and option to renew this lease for an additional 12 month term. If LESSOR elects to renew this lease, LESSOR will provide TENANT with a renewal lease no later than 90 days before the end of the initial term.

**2.    PAYMENTS**: Rent and/or other charges are to be paid at such place or method designated by the LESSOR as follows directly to LESSOR a monthly amount of $. TENANT shall pay, representing 30% of TENANT'S monthly income.  The remaining balance of the rent due pursuant to the terms of this lease shall be  paid to the Landlord directly on behalf of the TENANT through various rental assistance programs  for which the TENANT may be eligible. All TENANT payments are to be made by check or money  order.  All payments are to be made payable to LESSOR. TENANT shall promptly assign all  government rental assistance received to LESSOR.

**3.    UTILITIES**:  LESSOR will supply (a) heat as required by law, (b) hot and cold water for bathroom and kitchen sink, and (c) cooling if central air-conditioning is installed. TENANT may enforce its rights under the warranty of habitability. TENANT must pay for the costs of all electric, gas, telephone and other utility services used in the Apartment to the extent these costs exceed any governmental utility allowances for which TENANT may be eligible.

**4.    FURNISHINGS**:  TENANT accepts all furniture and other furnishings within the Apartment as is. At the end of the Term, TENANT shall return the furniture and other furnishings clean and in good order and repair, reasonable wear excepted.

**5.    REPAIRS**:  TENANT must take good care of the Apartment and all equipment and fixtures in it. LESSOR will repair the plumbing, heating and electrical systems. TENANT must, at TENANT'S cost, make all repairs and replacements whenever the need results from TENANT'S act or neglect.

**6.    OCCUPANTS**: Guest(s) staying over 15 days without the written consent of LESSOR shall be considered a breach of this Agreement. ONLY the following individuals  AND NO OTHERS shall occupy the subject residence for more than 15 days unless the expressed written consent of LESSOR obtained in advance_____ .

**7.    PETS**: TENANT shall not keep any pets within the premises.

**8.    NOISE**: TENANT agrees not to cause or allow any noise or activity on the premises which might disturb the peace and quiet of another TENANT and/or neighbor. Said noise and/or activity shall be a breach of this Agreement.

**9.    DESTRUCTION OF PREMISES**: If the premises become totally or partially destroyed during the term of this Agreement so that TENANT'S use is seriously impaired, LESSOR or

**A10**

# EXHIBIT 8

```
** SCHEDULE OF FAIR HEARING **        ** SCHEDULE OF FAIR HEARING **        ** SCHEDULE OF FAIR HEARING **
OAH – 457              NEW YORK STATE OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE        DATE CREATED 03/22/17
NOTICE OF                              OFFICE OF ADMINISTRATIVE HEARINGS                              PAGE 207
CASE #    :           CIN  :          FAIR HEARING # : 7406570N  DISPOSITION:
OFFICE    : 046       UNIT :          WORKER    : 00213    REPRESENTATIVE :
CASE NAME : KOMATSU    TOWAKI        REQUEST DATE : 10/20/16
STREET    : 1 PENN PLAZA , STE 6321  REQUEST SOURCE : FAX
CITY      : NY        ST NY ZIP 10119 POST/FAX DATE :
PHONE     : 201-315-5484  SEX M DOB    SOC SEC NUMBER :
DAI       :
HEARING DATE: 04/11/17  TIME: 01:30PM  HO ASSIGNED: 326   OLD HEARING DATE/TIME: 03/10/17  01:30PM  OLD HO ASSIGNED: 326
LOCATION  : TELEPHONE   HEARING TYPE: TELEPHONE HEARG   SCHEDULE STATUS: X              SCHEDULING RESTRICTIONS
                                                                                          M T W T F
AGENCY    : N046       INTERPRETER : SECURITY       ISSUE DATE:                      AM X X X X X
CATEGORY  : SNA        SUB-CATEGORY : PERS          COMPLIANCE COMPLAINT:            PM         X
                                                    COMPLIANCE OBTAINED :
CAT  ACTION ISSUES                                             AIDSTATUS  NOTICE #   NOTICE DATE  EFFECTIVE DATE
SNA  INAD  044 – STORAGE OF POSSESSIONS                            NA
SNA  INAD  998 – TELEPHONE HEARING FOR NON-HOMEBOUND APPELLANTS    NA
SNA  REDU  004 – SHELTER ALLOWANCE                                 NA

COMMENTS:  PA:INAD STORAGE FEES
           ...
           STORAGE FEE INAD: APP CONTESTING INADEQUACY OF AG PAYMENT OF $984 ON 9/29/16
           TO CUBESMART FOR PERIOD 5/1/16 – 9/30/16 AS PER COMPLIANCE WITH DECISION
           OF FH#7316477K HELD 9/7/16. PER WMS PAYMENT OF $984 REDEEMED ON 10/7/16.
           ******APP CLAIMS SHE STILL HAVE A BALANCE OF $426 TO BE PAID.
           **PER REPORT FROM C/C ON PRIOR FH#7316477K,CLT WOULD NEED TO BRING IN
           MONTHLY BILL TO STORAGE CO.FOR PAYMENT, AS STORAGE FEES ARE NOT A RECURRING
           GRANT"
           ***** PER C/UNIT (LK, ALBANY):
            "I CALLED THE STORAGE COMPANY AND THE AUTOMATED SYSTEM SAID CLIENT
           STILL HAS A BALANCE OF $426.00 BUT IT DOESN'T SAY WHY OR FOR WHAT PERIOD".
           AS THE DECISION ONLY ADDRESSED A DENIAL OF STORAGE AND STORAGE HAS BEEN PAID
           THROUGH THE MONTH OF THE DECISION DATE, COMPLIANCE IS SATISFIED"
           PER FH7316477K "SECU ADDED PER INCIDENT REPORT AND SS"
                                                              REVD W/ EGR
                                                              10/26/16 LMN
           *ADVISED PA & LIAISON UNITS OF SECU CODING ON THIS FH.  10/26/16 LMN
           (AF) DUP REQ REC'D 10/27/16                          10/27/16 CMB
           *FROM CC-31:  PLEASE NOTE THAT AGENCY PAID $984 AS RESULT OF FH 7316477K.
           CLT APPEARS TO SAY HIS MONTHLY STORAGE IS IN EXCESS OF $400.  APPEARS CLT
           HAS PAID SOME OF HIS STORAGE AND THAT IS WHY THE AGENCY ONLY PAID $984
           COVERING MAY THROUGH SEPTEMBER 2016.  THERE MAY BE A REIMBURSEMENT ISSUE
           TO ADDRESS UNDER THIS FH ALONG W/ THE ADEQUACY ISSUE.  11/1/16-LJK
           HADG 30 OF  11/29/16 02:30 HEARING                   11/29/16 LPS
           ......
           APPELLANT REQUESTED STATED HE DID NOT REQUEST HEARING HE ONLY WANTED
           COMPLIANCE. STATED HE WAS @ HRA & REQUESTED AN ADJOURNMENT AND HUNG UP THE
           PHONE.
           AS PER EMAIL RECEIVED FROM ALJ. 326 SHE IS REQUESTING THAT THIS CASE BE
           SCHEDULED AS AN AFTERNOON TELEPHONE HEARING AND THAT HIS CASE BE THE ONLY
           CASE SCHEDULED. PERSONALIZE TO ALJ. 326 AND EMAIL SENT TO SCHEDULING UNIT
           AS REQUESTED BY ALJ. GAMBLE AND PHO DALTON REQUESTING THAT THIS CASE BE THE
           ONLY ONE ON HER CALENDAR FOR THE AFTERNOON THE DAY HEARING IS SCHEDULED.
           ......                                               11/29/16 LPS
           HADG    OF  01/24/17 01:30 HEARING                   01/24/17 LD
           REASON CHANGE                                        01/25/17 AIM
           APP DID NOT REC THE EVIDENCE PACKET
           //APPELLANT IS NOW CLAIMING REIMBURSEMENT FOR LATE FEES ON HIS CREDIT CARD
           AS A RESULT OF HRA NOT COMPLYING WITH THE PRIOR FAIR HEARING DECISION.  HE
           IS ALSO SEEKING REIMBURSEMENT FOR STORAGE FEES FOR A PRIOR PERIOD IN TIME
                                                              FAIR HEARING # : 7406570N   PAGE 208
           NOT COVERED BY 7316477K.
           *62 PAGE FAX REC'D FROM CLIENT ADDRESSED TO J.D. ON 2/10/17 WITH VARIOUS
           DOCUMENTS INCLUDING STORAGE BILLS/NOTICES/ETC... FORWARDED FAX TO J.D.
           ON 2/14/17.   2/16/17-LJK
           PACKET SENT TO FILE REGARDING ADDITIONAL ISSUES APPELLANT WANTS TO ADDRESS.
           JMD 3-3-17
           .....
           (NYC) ADDITIONAL DOCUMENTS RECEIVED FROM ALBANY ONE SET 19 PAGES AND 2ND SET
           ARE INVOICES TO SHOW HE PAID APR. TO AUG.TO CUBESMART 3 PAGES.
           ALL DOCUMENTS RECEIVED AND PLACED INSIDE FILE FOLDER.    3-8-9/LPS.
           ......
           OADG 12 OF  03/10/17 01:30 HEARING                   03/09/17 CRN
           LEFT APP. V/M ADVISING FH WAS ADJOURNED DUE TO SCHEDULING ERROR, LEFT DIRECT
           NUMBER TO CALL BACK  3/9/17 CRN
           //APPELLANT HAD RENT ON THE BUDGET IN OCTOBER 2016 WHEN THE AGENCY CLOSED
           HIS CASE ON 10-14-16.  WHEN THE CASE REOPENED 11-1716, NO RENT WAS PUT ON
           THE BUDGET. JMD 3-17-17
COPY SENT TO:
```

FIA-1127 (E) 09/23/14
LLF

**NYC** Human Resources | Family Independence
Administration | Administration
Department of
Social Services

CROTONA JOB CENTER (046)
1910 MONTEREY AVENUE,1ST FLOOR

BRONX, NY 10457

Date: 01/27/2017

Case Number: ████████

*0101250000000026*

KOMATSU    TOWAKI

Case Name: KOMATSU TOWAKI

Center: 046

798-802 FAIRMONT  PL      4B
BRONX, NY  10460-

## Notice to Household of Storage Fee Payment to Vendor

Dear  KOMATSU TOWAKI                              :

We are notifying you that the agency has agreed to pay your storage fee of $ 339.00

beginning   01   / 27   / 2017  . This payment is being made to:

Vendor's Name  CUBESMART STORAGE FR K #6006

Vendor's Address:  33-24 WOODSIDE AVE.

City:  QUEENS                State: NY        Zip Code:  11101

The account number assigned to you by the  CUBESMART STORAGE FR K #6006

facility is  #6006                                                   .

This payment will continue to be made as long as you reside in a Department of Homeless Services (DHS)
shelter.

A11

**STATE OF NEW YORK**
**OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE**

**REQUEST:** October 20, 2016
**CASE #:** ▉
**CENTER #:** 46
**FH #:** 7406570N

In the Matter of the Appeal of

Towaki Komatsu

from a determination by the New York City
Department of Social Services

:
: **DECISION**
: **AFTER**
: **FAIR**
**HEARING**
:
:

## JURISDICTION

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on April 11, 2017, in New York City, before C. Gamble, Administrative Law Judge. The following persons appeared at the hearing:

For the Appellant

Towaki Komatsu, Appellant (by telephone)

For the Social Services Agency

Marin Gerber, Esq., Fair Hearing Representative
S. Jatto, Fair Hearing Representative

J. Okello, Supervising Hearing Officer (Observer)

## ISSUE

Was the determination of the Agency not to provide the Appellant with reimbursement for storage fees for May 2016, June 2016 and July 2016 correct?

## FINDINGS OF FACT

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1.     The Appellant is in receipt of Public Assistance Benefits for a household of one.

A12

FH# 7406570N

2.      The Appellant seeks review of the Agency's determination not to reimburse the Appellant for storage fees he paid covering the period for May 2016, June 2016 and July 2016.

3.      On October 20, 2016, the Appellant requested this fair hearing.

## APPLICABLE LAW

At a fair hearing concerning the denial of an application for or the adequacy of Public Assistance, Medical Assistance, HEAP, SNAP benefits or services, the appellant must establish that the agency's denial of assistance or benefits was not correct or that the appellant is eligible for a greater amount of assistance or benefits. Except where otherwise established by law or regulation, in fair hearings concerning the discontinuance, reduction or suspension of Public Assistance, Medical Assistance, SNAP benefits or services, the social services agency must establish that its actions were correct. 18 NYCRR 358-5.9(a).

Resources shall be so utilized as to eliminate or reduce the need for assistance, rehabilitate the client and conserve public funds through assignment and recovery. 18 NYCRR 352.23(a).

Pursuant to Section 352.6(f) of the Regulations, an allowance for storage of furniture and personal belongings shall be made when it is essential, for circumstances such as relocation, eviction or temporary shelter, so long as eligibility for Public Assistance continues and so long as the circumstances necessitating the storage continue to exist.

## DISCUSSION

The record in this case establishes that the Appellant seeks review of the Agency's determination not to reimburse the Appellant for storage fees paid for May 2016, June 2016 and July 2016. The Appellant testified that he applied to the Agency for payment of storage fees for May 2016, June 2016 and July 2016, August 2016 and September 2016. He testified that the Agency failed to pay the storage fees. On September 7, 2016, the Appellant had a Fair Hearing (FH 7316477K)) on the Agency's determination to deny the Appellant's application for storage fees. A decision on Fair Hearing (FH 7316477K) was issued on September 15, 2016. That decision directed the Agency to make a determination as to the Appellant's eligibility for Storage of Possession expenses from May 2016 to present time; advise the Appellant of any additional documents which are required to make this determination and; advise the Appellant in writing of its determination and provide any allowances to which the Appellant may be entitled. The decision also, stated that if the Appellant was eligible for Storage of Possession expenses, the Agency was directed to make payments retroactive to the date of request.

At the hearing, the Agency presented a Notice of Special Grant dated September 28, 2016 which states that "a check was issued to you at the Job Center on :9/28/2016. $984.00 from 5/1/2016 to 9/30/2016 for storage fees." A monthly invoice from CubeSmart for rent for unit 6006 in the amount of $984.00 covering the period August 20, 2016 thru October 19, 2016 was submitted at the hearing. The notice date on the invoice is September 28, 2016. A monthly invoice from CubeSmart for rent for unit 6006 in the amount of $447.00 covering the period

FH# 7406570N

October 20, 2016 thru November 19, 2016 was submitted at the hearing.  The notice date on the invoice is November 9, 2016.  This invoice does not show rent for unit 6006 for the period August 20, 2016 thru October 19, 2016.  Based on this evidence, the Agency provided storage fees for August 20, 2016 thru October 19, 2016 in the amount of $984.00.

The Appellant contends that the storage fees were not paid by the Agency.  He testified that he paid the storage fees for May 2016, June 2016 and July 2016.  In support of his testimony, the Appellant submitted an invoice from CubeSmart showing a VISA transaction on June 7, 2016 in the amount of $430.75.  According to the invoice, unit 6006 rent: (May 20, 2016 thru June 19, 2016) $379.80. He submitted an invoice from CubeSmart showing a VISA transaction on June 19, 2016 in the amount of $427.95.  According to the invoice unit 6006 rent: (June 20, 2016 thru Jul 19, 2016) $399.00.  He submitted an invoice from CubeSmart showing a VISA transaction on July 31, 2016 in the amount of $438.00.  According to the invoice unit 6006 rent: (Jul 20, 2016 to Aug 19, 2016) $399.00.  The Appellant testified that he is seeking reimbursement for the above invoices which total $1296.70.

Based on the Appellant's documentation, he obtained funds to pay for the storage fees he incurred during the following periods: May 20, 2016 thru June 19, 2016, June 20, 2016 thru July 19, 2016 and July 20, 2016 to August 19, 2016.  Resources shall be so utilized as to eliminate or reduce the need for assistance, rehabilitate the client and conserve public funds through assignment and recovery.  18 NYCRR 352.23(a).  There is no provision in the Social Services Law or in Department Regulations that authorizes reimbursement for storage fees paid by an applicant or recipient of Public Assistance benefits.  In fact, the above regulation states that a recipient shall utilize resources to eliminate or reduce the need for assistance and to conserve public funds.  The Appellant's obtaining of resources to pay for his storage fees is in keeping with that regulation.  Therefore, the Agency's determination in this case is proper.

## **DECISION**

The determination of the Agency not to provide the Appellant with reimbursement for storage fees for May 2016, June 2016 and July 2016 is correct.

DATED:   Albany, New York
              04/19/2017

NEW YORK STATE OFFICE OF
TEMPORARY AND DISABILITY ASSISTANCE

By

Commissioner's Designee

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 42
----------------------------------------X
In the Matter of
ANONYMOUS

                        Petitioner/Plaintiff

                                            Index No. 100054/2017

                    v
                                            DECISION, ORDER &
                                                  JUDGMENT

NEW YORK CITY HUMAN RESOURCES
ADMINISTRATION

                        Respondent/Defendant.   MOT SEQ 001, 002, 003
----------------------------------------X


NANCY M. BANNON, J.:


## I. INTRODUCTION

     The petitioner/plaintiff, Towaki Komatsu (the petitioner),

applied to the respondent/defendant, New York City Human

Resources Administration (HRA), for a storage allowance in the

total sum of $3,066.69.  The HRA approved the payment of only

$984, but denied the remainder of the application.  Under

sequence 001, the petitioner seeks review that determination

pursuant to CPLR article 78, and the HRA cross-moves pursuant to

CPLR 7804(f) and 3211(a) to dismiss the petition on the ground,

inter alia, that he failed to exhaust his administrative

remedies.  Under sequence 002, the petitioner moves to compel

this court to recuse itself, for leave to amend the caption to

replace his designation as "Anonymous" with his name, and for

1

A13

relief in the nature of mandamus to compel the HRA to reimburse him for all of his requested storage expenses.  Under sequence 003, the petitioner again moves for relief in the nature of mandamus to compel the HRA to reimburse him for all of his requested storage expenses.

The petition/complaint also seeks money damages and/or injunctive relief against the HRA and several other municipal agencies and their employees, asserting that his personal property was stolen due to the HRA's alleged negligence in providing security in the homeless shelter in which he resided, his wages were stolen or converted by the HRA, and he was unlawfully precluded from public meetings of municipal agencies in violation of his constitutional rights.

The cross motion under sequence 001 to dismiss the petition is granted, and the petition and the proceeding are dismissed. That branch of motion sequence 002 which is for leave to amend the caption is granted, and that motion is otherwise denied.  The motion under sequence 003 is denied.  The court severs the causes of action seeking money damages and/or injunctive relief, and transfers them to a City part of this court.


## II. BACKGROUND

The petitioner is a recipient of public assistance from the HRA.  See 18 NYCRR part 397.  On May 26, 2016, he requested the

2

A13

HRA to award him a storage allowance pursuant to 18 NYCRR
352.6(f), and thereupon reimburse him for storage expenses that
he incurred to maintain his belongings while he was allegedly
residing in a temporary shelter.  On May 27, 2016, the HRA denied
the petitioner's request, determining that he was required to
obtain three estimates for moving expenses.  The petitioner
thereafter sought a fair hearing before the Office of Temporary
and Disability Assistance (OTDA) of the New York State Department
of Social Services in connection with the HRA's denial.  After
the OTDA conducted a fair hearing, it rendered a decision dated
September 15, 2016, reversing the HRA's denial dated May 27,
2016, upon concluding that the HRA impermissibly determined that
it needed estimates for moving services, when the petitioner had
made only a simple request for storage expenses.

Crucially, however, the OTDA did not direct the HRA to
approve the petitioner's request for storage expenses or
immediately pay all of the storage fees that he sought.  Rather,
it remitted the matter to the HRA to properly apply the
provisions of 18 NYCRR 352.6, and thereafter "make a
determination as to the [petitioner]'s eligibility for Storage of
Possession expenses from May 2016 to present time."  The OTDA
ordered that "[i]n the event that the [petitioner] is found to be
eligible for Storage of Possession expenses, the [HRA] is
directed to make payments retroactive to the date of request."

3

(emphasis added).  It further directed the HRA to "advise the [petitioner] of any additional documents which are required to make this determination."

On September 27, 2016, the HRA, in accordance with the OTDA's directive, requested in writing that the petitioner provide it with a "storage letter" from the petitioner's storage facility covering the period from May through October 2016, as well as the petitioner's lease from his current landlord, which he had entered into on February 16, 2016.  The petitioner did not respond to that request.

On September 28, 2016, the HRA issued a check in the sum of $984 to the facility in which the petitioner had stored his belongings, ostensibly covering the period from May through September 2016.  In a fair-hearing compliance report and determination dated October 6, 2016, the HRA, in accordance with the OTDA's directive, denied the petitioner's request to be reimbursed the sum of $3,066.69 for storage expenses from October 22, 2015, through August 19, 2016.  In that determination, the HRA indicated that, inasmuch as the petitioner did not provide the documentation requested in the letter dated September 27, 2016, it was "unable to determine" if the petitioner was "eligible for the benefits that were the subject of [the] Fair Hearing."  On October 19, 2016, the OTDA sent the petitioner a letter confirming its receipt of a report from the HRA, and

4

concluded that the HRA "has taken appropriate action to comply with the [fair hearing] decision's directives."

The petitioner did not seek a fair hearing before the OTDA in connection with the HRA's determination dated October 6, 2016.

On January 17, 2017, the petitioner commenced this hybrid proceeding and action, naming only the HRA as a respondent/defendant.  To the extent that it seeks relief pursuant to CPLR article 78, the petition/complaint seeks review only of the HRA's determination dated October 6, 2016.

While this hybrid proceeding and action was pending before this court, the HRA reopened its administrative review of the petitioner's case file, and determined that, as of February 2016, he was no longer residing in a temporary shelter, but resided in permanent housing.  It thus issued a new notice of determination on March 28, 2017, concluding that the petitioner was not entitled to any storage allowance after February 2016, but did not seek reimbursement of the $984 it had already awarded.  There is nothing in the parties' submissions indicating that the petitioner sought a fair hearing before the OTDA in connection with the new HRA determination dated March 28, 2017.


### III. <u>DISCUSSION</u>

A.   <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u> (SEQ 001).

Where, as here, a statute, ordinance, or regulation permits

an administrative appeal, and a party has an opportunity to pursue it, he or she must exhaust all administrative remedies (see Matter of Carter v State of New York, 95 NY2d 267 [2000]), and judicial review of the initial administrative determination is foreclosed.  See Matter of Harrell v New York City Housing Auth., 300 AD2d 54 (1st Dept. 2002).  18 NYCRR 358-3.1(a) affords the petitioner the right to challenge HRA's determinations dated October 6, 2016, and March 28, 2017, by requesting a fair hearing before the ODTA in accordance with 18 NYCRR 358-3.5(a).  Since the submissions do not reflect that the petitioner requested a fair hearing in connection with either of those determinations, so much of the petition as seeks to review those determinations must be dismissed, without prejudice, for failure to exhaust administrative remedies.

Contrary to the petitioner's contention, the HRA, when acting in its governmental capacity, is not estopped from reconsidering an administrative determination.  See Matter of Gonzalez v New York City Hous. Auth., 148 AD3d 505 (1st Dept. 2017).  Hence, its partial payment of a storage award is not a binding determination that the petitioner was eligible therefor, and the HRA was permitted to reopen its own proceedings in order to further review the petitioner's eligibility.  See Matter of Adams v Joy, 48 AD3d 914 (3rd Dept. 2008).  The court also rejects the petitioner's contention that the HRA and the OTDA are

6

barred by the doctrine of res judicata from reconsidering a prior determination.  See <u>Matter of Ireland v Zoning Bd. of Appeals of Town of Queensbury</u>, 195 AD2d 155 (3rd Dept. 1994).

B. <u>RECUSAL</u> (SEQ 002)

The court discerns no basis upon which to recuse itself in this matter.  See <u>Mehulic v New York Downtown Hosp.</u>, 140 AD3d 417 (1st Dept. 2016); Judiciary Law § 14.

C. <u>AMENDMENT OF CAPTION</u> (SEQ 002)

A party will be generally permitted to proceed anonymously upon alleging that the matter implicates "a privacy right so substantial as to outweigh the customary and constitutionally embedded presumption of openness in judicial proceedings." "J. Doe No. 1" v CBS Broadcasting Inc., 24 AD3d 215, 215 (1st Dept. 2005).  The circumstances presented here are not so "drastic" as to warrant maintaining the secrecy of the petitioner's identity (<u>id.</u>), and the petitioner himself requests the court to permit him to reveal his identity in the caption.  Moreover, leave to amend a caption to reflect the correct name of a party should be freely granted. See <u>Clarke v Laidlaw Tr., Inc.</u>, 125 AD3d 920 (2nd Dept. 2015).  The court thus grants that branch of the motion under sequence 002 which is for leave to amend the caption.

7

D.  <u>MANDAMUS TO COMPEL</u> (SEQ 002 and 003)

 In motion sequences 002 and 003, the petitioner moves for relief in the nature of mandamus to compel the HRA to reimburse him for the entirety of the $3,066.69 in storage expenses that he seeks.  <u>See</u> CPLR 7803(1).  This request for relief articulates a cause of action distinct from the request for relief set forth in the petition, which seeks to review the HRA's determination on the ground that it is arbitrary and capricious.  <u>See</u> CPLR 7803(3).  Thus, in the absence of a proper motion pursuant to CPLR 3025(b) for leave to amend the petition/complaint to add a claim under CPLR 7803(1), the allegations are not properly before the court.  <u>See</u> <u>State Farm Mut. Auto. Ins. Co. v Clouden</u>, 50 AD3d 1552 (4th Dept. 2008).

 Nonetheless, "[a] CPLR article 78 proceeding seeking mandamus to compel the performance of a specific duty applies only to acts that are ministerial in nature and not those that involve the exercise of discretion."  <u>Matter of Maron v Silver</u>, 14 NY3d 230, 249 (2010).  "Mandamus is available . . . only to enforce a clear legal right where the public official has failed to perform a duty enjoined by law."  <u>New York Civil Liberties Union v State of New York</u>, 4 NY3d 175, 185 (2005); see CPLR 7803(1).  Since the determination of eligibility for a storage allowance is discretionary (<u>see</u> <u>Matter of Marquart v Perales</u>, 142 AD2d 678 [2nd Dept. 1988]), any such request for relief must be

8

denied here regardless of the form in which the claim is made.

## IV. CONCLUSION

In light of the foregoing, it is

ORDERED and ADJUDGED that the respondent's cross motion under sequence 001 to dismiss the petition is granted, and the proceeding is dismissed, without prejudice; and it is further,

ORDERED that the motion under sequence 002 is granted to the extent that leave to amend the caption is granted, and the motion is otherwise denied; and the caption is amended to read as follows:

---

In the Matter of
TOWAKI KOMATSU
        v
NEW YORK CITY HUMAN
RESOURCES ADMINISTRATION

---

and it is further,

ORDERED that the Clerk of the court and the Trial Support Office shall update their records accordingly; and it is further,

ORDERED that the petitioner's motion under sequence 003 is denied as academic in light of the court's determination of the motion under sequence number 002; and it is further,

ORDERED that the remaining causes of action in the petition/complaint, which allege that the respondent/defendant was negligent in the provision of security at a homeless shelter,

9

converted the petitioner/plaintiff's property to its own use, and
unlawfully precluded the petitioner/plaintiff from attending
certain public meetings, and seek both damages and injunctive
relief, are severed, and the matter is referred to the Trial
Support Office for reassignment to a City Part of this court.

This constitutes the Decision, Order, and Judgment of the
Court.


Dated: August 10, 2017          ENTER: 
                                        J.S.C.
                                **HON. NANCY M. BANNON**

                                        Clerk



**FILED**

**AUG 21 2017**

COUNTY CLERKS OFFICE
NEW YORK


10

A13

```
                                        REQUEST  August 20, 2002
STATE OF NEW YORK                       CASE #   0000XXXXXXXX
OFFICE OF TEMPORARY AND DISABILITY ASSISTANCE   CENTER # 23
                                        FH #     3792259Q
```

---

```
            In the Matter of the Appeal of            :

            C.M.                                            DECISION
                                                      : AFTER
                                                        FAIR
                                                        HEARING
from a determination by the New York City
Department of Social Services                         :
```

---

## JURISDICTION

Pursuant to Section 22 of the New York State Social Services Law (hereinafter Social Services Law) and Part 358 of Title 18 NYCRR, (hereinafter Regulations), a fair hearing was held on October 21, 2002, in New York City, before Oluseye Soetan, Administrative Law Judge.  The following persons appeared at the hearing:

### For the Appellant

C.M., Appellant

Jonathan Hafetz, Attorney

### For the Social Services Agency

A. Paneque, Fair Hearing Representative

## ISSUES

Was the Agency's determination to deny the Appellant's application for assistance to pay storage fees correct?

## FACT FINDING

An opportunity to be heard having been afforded to all interested parties and evidence having been taken and due deliberation having been had, it is hereby found that:

1.   The Appellant is in receipt of benefits from Supplemental Security Income (SSI).

2.   The Appellant's belongings have been in storage.

3.   On June 14, 2002, the Appellant requested a hearing to review the Agency's failure to provide him with a storage allowance.

4.   On June 18, 2002 the Appellant paid $919.00 in storage fees.

5.   On June 25, 2002 a fair hearing was held on the Agency's failure to provide the Appellant with a storage allowance.

6. By Decision After Fair Hearing at FH #3734970P dated June 27, 2002, the Commissioner directed the Agency to determine whether the Appellant applied for assistance to pay storage fees, and if the Appellant applied for storage fees, to process the Appellant's application, and advise the Appellant as to what additional documentation is necessary, and to provide the Appellant with an opportunity to provide any required documentation and to advise the Agency in writing of its determinations.

7. By notice dated July 25, 2002, the Agency advised the Appellant to report to the Agency on August 1, 2002 with a completed application and his current storage bill.

8. On July 31, 2002 the Appellant submitted a request for a storage reimbursement

9. By notice dated August 2, 2002, the Agency denied the Appellant's request on the grounds that the Appellant had paid his storage bill on June 18, 2002.

10. On August 20, 2002, this fair hearing was requested.

APPLICABLE LAW

At a fair hearing concerning the denial of an application for assistance, the Appellant must establish that the Agency's denial of assistance was not correct. 18 NYCRR 358-5.9(a).

Sections 351.1 and 351.2 of Department Regulations require each applicant for assistance to provide complete, accurate, and current information as to his/her needs and resources and to submit verification of income, and other factors in order to enable the Agency to determine eligibility.

Emergency Assistance for Adults (EAA) means grants of assistance to aged, blind or disabled individuals and couples who have been determined eligible for or are receiving Federal Supplemental Security Income (SSI) benefits or additional State payments and applied for such assistance to meet emergency needs, in the circumstances specified in Part 397 of Department Regulations, that cannot be met by the regular monthly benefits of SSI and additional State payments. Social Services Law, Section 300(2); Social Services Law, Section 300(3); Social Services Law, Section 302; 18 NYCRR 397.1(a); 18 NYCRR 397.4.

EAA may be available for certain needs only. Under EAA, storage of furniture and personal belongings shall be paid when the storage is essential during relocation, eviction or residence in temporary shelter, as long as the circumstances necessitating the storage and eligibility for EAA continues to exist. Social Services Law, Section 303(k); 18 NYCRR 397.5(k).

Sections 605-610 of the General Business Law set forth the requirements for a person engaged in the business of storing goods for hire.

DISCUSSION

The record established that on June 14, 2002, the Appellant requested a hearing to review the Agency's failure to provide him with a storage allowance. The Appellant's belongings have been in storage. The record also

FH# 3792259Q

established that the Appellant paid $919.00 in storage fees on June 18, 2002.
The record further established that on June 25, 2002 a fair hearing was held
on the Agency's failure to provide the Appellant with a storage allowance.
The record disclosed that by decision at FH #3734970P dated June 27, 2002,
the Commissioner remanded the Appellant's case back to the Agency for an
investigation of the Appellant's application with directives that the
Appellant be notified in writing of the Agency's determinations.  The record
also disclosed that by notice dated July 25, 2002, the Agency advised the
Appellant to report to the Agency on August 1, 2002 with a completed
application and with his current storage bill.  The record further disclosed
that on July 31, 2002 the Appellant submitted an application and requested a
storage reimbursement of $919.00.  By notice dated August 2, 2002, the Agency
denied the Appellant's request on the grounds that the Appellant had already
paid his storage bill on June 18, 2002.

At the hearing, the Appellant's attorney contended that the Appellant's
request for a storage allowance which was made to the Agency on June 5, 2002
was not processed because the Agency informed the Appellant that he was
ineligible for a storage allowance because he is not in receipt of Public
Assistance benefits.  The Appellant's attorney also contended that the
Agency's action was erroneous in that the Regulation cited above provides
that a recipient of Supplemental Security Income (SSI) may be entitled to a
storage allowance.  The record established that the Appellant is in receipt
of SSI benefits.  The Appellant's attorney further contended that due to the
Agency's error the Appellant resorted to a loan from his friend to pay his
storage bill on June 18, 2002, to forestall the auction of his belongings by
June 24, 2002.  At the hearing, the Appellant verified the loan of $919.00
with a statement from his friend.  The Appellant also provided receipts to
verify the payment of his storage expense in said amount.

The Agency did not present any information with respect to the
Appellant's contention and thereby failed to rebut the contention as to her
June 5, 2002 request for a storage allowance and the Agency's action with
respect to said request.  It is noted that the Appellant's June 14, 2002
request for a review of the Agency's failure to provide her with a storage
allowance reinforced the Appellant's contention that he made a request on
June 5, 2002.  Based on the hearing record, the Agency's determination cannot
be supported.

<u>DECISION AND ORDER</u>

The Agency's determination to deny the Appellant's application for
*assistance to pay storage fees is not correct and is reversed.*

1.   The Agency is directed to provide a grant for storage fees to the
Appellant in the amount of $919.00.

As required by 18 NYCRR 358-6.4, the Agency must comply immediately with
the directives set forth above.

DATED:  Albany, New York
        November 12, 2002

                         NEW YORK STATE OFFICE OF
                         TEMPORARY AND DISABILITY ASSISTANCE

**By**

**Commissioner's Designee**

# Exhibit B



**NYC** | Human Resources Administration / Department of Social Services | Homelessness Prevention Administration

SEPS APPROVAL REQUEST – ROOM HRA-129d (E)

## Request for Approval for the SEPS Program (Room)

Submit this application for any individual or adult family who is potentially eligible for the SEPS rent supplement program to preserve their apartment or move to a new room.

### 1. Referral Source

- ☑ SEPS Provider
- ☒ HRA Rapid Rehousing
- ☐ Homebase
- ☐ HRA NOVA

### 2. Eligibility Category

**Shelter Referral**

- ☐ Eviction, Foreclosure, Vacate Order, City Health/Safety Determination and residing in a DHS shelter
- ☒ Previous or Current United States Military Service and residing in a DHS shelter
- ☐ Certified as a survivor of domestic violence by HRA, residing in DHS or HRA shelter
- ☐ Discharged into DHS shelter from a residential substance abuse treatment program, residential treatment program/facility licensed by the NYS OMH or NYS OASAS
- ☐ Discharged into DHS shelter system from foster care placement
- ☐ Discharged into DHS shelter system from a correctional institution

**Community Referral**

- ☐ At risk of entry into a DHS Shelter for Single Adults or Adult Families and, 1.) has previous or current United States military service; **or** 2.) within the last 12 months has been evicted or has lived in a residence in NYC that was or is the subject of an eviction proceeding, a vacate order issued by a City agency or a foreclosure action, or was or is required to leave such a residence for health or safety reasons as determined by a City agency

### 3. Household Information

Head of Household Name: Towaki Komatsu      PA Case Number: ▮▮▮▮▮

Address: 802 Fairmount Place, Bronx, NY 10460

| Name | DOB | Relationship to Applicant | PA Status | Income/Frequency | Type of Income |
|------|-----|---------------------------|-----------|------------------|----------------|
| Towaki Komatsu | ▮▮▮ | Self | FG | — | — |

| | | |
|--|--|--|
| 1. Room Rent: | | 800 |
| 2. Household Size (no more than 2 allowed): | | 1 |
| 3. Monthly Contribution for Household (30% of household income): | | — |
| 4. Proposed SEPS Monthly Rent Supplement: (#1 - #3): | | 800 |

### 4. Room Information

**Landlord Room Rentals**

Landlord's Name: Urban Pathways

Landlord's Address: 575 58th Avenue, New York, NY 10004

Address of Premises to be rented:
802 Fairmount Place
Bronx, NY 10460

**Primary Tenant Room Rentals**

Primary Tenant's Name: Towaki Komatsu

Primary Tenant's Address: 802 Fairmount Place
Bronx, NY 10460

B1



**NYC** Human Resources | Homelessness Prevention
Administration | Administration
Department of
Social Services

SEPS APPROVAL REQUEST – ROOM HRA-129d (E)

---

### 5. Clearances Completed

**Landlord Room Rentals Inspection Checklist**
☒ Inspection Completed, Residence approved          Date: _____
☐ Room is NOT in a unit subject to Rent Stabilization          Date: _____
☐ Apartment does NOT have more than 3 bedrooms          Date: _____
☐ Apartment does NOT currently have more than 2 unrelated adults          Date: _____

**Primary Tenant Room Rentals**
☑ Inspection Checklist completed:  Residence approved          Date: _____
☐ Is the Room in a Unit subject to Rent Stabilization: ☐ Yes ☐ No          Date: _____
☐ Apartment does NOT have more than 3 bedrooms:          Date: _____
☐ Apartment does NOT currently have more than 2 unrelated adults:          Date: _____
☐ Primary Tenant Resides in the apartment:          Date: _____
☐ Is the apartment subsidized housing (e.g. NYCHA, Section 8, FEPS)  If yes, subsidy type: _____
Is the Primary Tenant on PA? ☐ Yes ☐ No

---

### 6. Payment and Voucher Request

☐ Payment in the amount of $ _____, representing the first full month's rent made payable to:

_____
(Landlord, managing agent, or Primary Tenant)

☐ Payment in the amount of $ _____, representing broker's fee, made payable to:

_____
(broker name or company name)

☒ Security Deposit Voucher, HRA Form W-147N (landlord's or primary tenant name and address)
☑ Furniture Allowance Request (W-137A)
☐ Broker's Check Request (HRA-121E)
☐ Check box if pro-rated rent for current month is requested*
   * Pro-rated rent is available if the household can move in immediately beginning one day after RAU approval (except for approvals on or before the 3rd day of the month or on or after the 3rd day before the end of the month). In the case of RAU approvals on or before the 3rd day of the month, that month will count as the first full month.

Signed: SARA Hyloryos _____          _____
(Case Manager/HRA Worker - Print Name)          (Case Manager/HRA Worker - Signature)

_____          _____
Phone          Email

_____          _____
(Supervisor - Print Name)          (Supervisor - Signature)

**Certification**

I declare under penalty of perjury that all statements made on and documents submitted with this application are correct and complete to the best of my knowledge. I certify that by signing this application, I agree to an investigation conducted by the New York City Human Resources Administration (HRA) to verify or confirm the information I have submitted, and determine my eligibility for the SEPS Program. I promise to let HRA know if I move from my room and, if I move, I assign to HRA my right, if any, to the return of any SEPS rent/supplement payments to which the landlord is not entitled. I understand I will not be eligible for SEPS in a new room or apartment without HRA prior approval.

_____          2/6/16          201-315-5484
Signature of Applicant          Date          Phone Number

B1



Human Resources | Homelessness Prevention
Administration | Administration
Department of
Social Services

**SEPS APPROVAL REQUEST – ROOM HRA-129d (E)**

## <u>Documents Attached</u>

### 1. <u>Proof of Eligibility</u>

- Pay stubs or other income documents for household members not on public assistance
- <u>Single Adults in shelter</u>:  Shelter Residency Letter which verifies current stay in shelter that includes or is in addition to at least one stay between 5/1/15-7/31/15
- <u>Adult Families in shelter</u>:  Shelter Residency Letter which verifies current stay in shelter
- SEPS Referral Letter
  - o  Applicants pre-identified by DHS and HRA will have an eligibility certification number
  - o  Applicants who do not have an eligibility certification number must submit documentation for one of the following categories:
    - *Eviction, Foreclosure, Vacate, Health and Safety*:  Legal or City Agency notices
    - *Military Service:*  Documents establishing US Military Service
    - *Discharge (DHS Shelter Only):*  Foster Care discharge letter, Correctional Institution Discharge Letter, NYSOMH or NYS OASAS documents
    - *Domestic Violence Certification:*  HRA NOVA eligibility letter
    - *At-Risk of Shelter Entry:* SEPS Verification of Risk of Shelter Entry form

### 2. <u>Rental Documents</u>

<u>Landlord Room Rentals</u>

- Lease or Rental Agreement for one year (heat and hot water included)
- Landlord Proof of Ownership
- W9 (from Landlord)
- Security Voucher (W-147N)
- Printout from DHCR website

<u>Primary Tenant Room Rentals</u>

- Primary Tenant Statement of Occupancy
- Primary Tenant Cash Assistance Release
- Primary Tenant Lease from Landlord
- W9 (from Primary Tenant )
- Security Voucher (W-147N)
- Primary Tenant Room Rental Maximum Rent Calculation Spreadsheet
- Printout from DHCR website

**Optional for all rentals**
  - o  Furniture Allowance Request (W-137A)
  - o  Broker's Check Request (HRA-121E)
  - o  Broker's License
  - o  Moving Fee Request (including inventory and 3 estimates)

This Rental Agreement ("Lease" or "Agreement"), ated ⊕/1 ⓾, and is between   Urban
Pathways   Inc.   (the   "LESSOR"),   and Towaki   (the "TENANT(S)").
Komatsu

WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished **1BR/2BR** Apartment
4 C on the 4 floor of the Building known as **798-802 Fairmount Place, Bronx, New York**
**10460,** in the Borough of **Bronx** and State of **New York** (the "Premises"), for the term of **12
Months,** unless sooner terminated as hereinafter provided, to be used and occupied as a strictly
private residential dwelling by TENANT at the **12-month** rental rate of **$14,400/$19,200,** which
represents equal monthly payments of **$1,200/$1,600** each, in advance, to be paid as specified in
this Agreement.

NOW THEREFORE, the Parties agree as follows:

**1.      TERM:** The term of this Agreement will be for a term of 12 months, from
to_____. LESSOR reserves the right and option to renew this lease for an additional 12
month term. If LESSOR elects to renew this lease, LESSOR will provide TENANT with a renewal
lease no later than 90 days before the end of the initial term.

**2.      PAYMENTS:** Rent and/or other charges are to be paid at such place or method designated
by the LESSOR as follows directly to LESSOR a monthly amount of $. TENANT shall pay,
representing 30% of TENANT'S monthly income. The remaining balance of the rent due pursuant to
the terms of this lease shall be paid to the Landlord directly on behalf of the TENANT through various
rental assistance programs for which the TENANT may be eligible. All TENANT payments are to be
made by check or money order. All payments are to be made payable to LESSOR. TENANT shall
promptly assign all government rental assistance received to LESSOR.

**3.      UTILITIES:** LESSOR will supply (a) heat as required by law, (b) hot and cold water for
bathroom and kitchen sink, and (c) cooling if central air-conditioning is installed. TENANT may
enforce its rights under the warranty of habitability. TENANT must pay for the costs of all electric,
gas, telephone and other utility services used in the Apartment to the extent these costs exceed any
governmental utility allowances for which TENANT may be eligible.

**4.      FURNISHINGS:** TENANT accepts all furniture and other furnishings within the Apartment
as is. At the end of the Term, TENANT shall return the furniture and other furnishings clean and in
good order and repair, reasonable wear excepted.

**5.      REPAIRS:** TENANT must take good care of the Apartment and all equipment and fixtures
in it. LESSOR will repair the plumbing, heating and electrical systems. TENANT must, at
TENANT'S cost, make all repairs and replacements whenever the need results from TENANT'S act
or neglect.

**6.      OCCUPANTS:** Guest(s) staying over 15 days without the written consent of LESSOR shall
be considered a breach of this Agreement. ONLY the following individuals AND NO OTHERS
shall occupy the subject residence for more than 15 days unless the expressed written consent of
LESSOR obtained in advance_____.

**7.      PETS:** TENANT shall not keep any pets within the premises.

**8.      NOISE:** TENANT agrees not to cause or allow any noise or activity on the premises which
might disturb the peace and quiet of another TENANT and/or neighbor. Said noise and/or activity
shall be a breach of this Agreement.

**9.      DESTRUCTION OF PREMISES:** If the premises become totally or partially destroyed

Page 1 of 5

B2

comply with all such House Rules, and noncompliance may constitute a default as defined herein. In the event of a conflict between the House Rules and the terms of this Agreement, the terms of this Agreement shall prevail.

**16.    TENANT DEFAULTS:**  LESSOR must give TENANT written notice of default stating the type of default. The following are defaults and must be cured by TENANT within the time stated:

A.    Failure to pay TENANT'S portion of the rent on time, 3 days

B.    Failure to move into the Apartment within 15 days after the beginning date of the Term, 10 days

C.    Issuance of a court order under which the Apartment may be taken by another party, 10 days

D.    Improper conduct by TENANT annoying other tenants, including, but not limited to nuisance and harassment, 10 days

E.    Failure to comply with any term or Rule in the Lease, 10 days.

If TENANT fails to cure the default in the time stated, LESSOR may cancel this Agreement by giving TENANT a cancellation notice. The cancellation notice will state the date the Term will end, which may be no less than 10 days after the date of the notice. On the cancellation date in the notice, the Term of this Agreement shall end. TENANT must leave the Apartment and give LESSOR the keys on or before the cancellation date. TENANT continues to be responsible as stated in this Agreement. If the default cannot be cured in the time stated, TENANT must begin cure within that time and continue diligently until cured.

**17.    CHANGE OF TERMS:** The terms and conditions of this Agreement are subject to future change by LESSOR after the expiration of the agreed lease period upon 30-days written notice setting forth such change and delivered to TENANT. Any changes are subject to laws in existence at the time of the Notice of Change of Terms.

**18.    POSSESSION:** If LESSOR is unable to deliver possession of the residence to TENANTS on the agreed date, because of the loss or destruction of the residence or because of the failure of the prior residents to vacate or for any other reason, the TENANT and/or LESSOR may immediately cancel and terminate this Agreement upon written notice to the other party at their last known address, whereupon neither party shall have liability to the other, and any sums paid under this Agreement shall be refunded in full. If neither party cancels, this Agreement shall be prorated and begin on the date of actual possession.

**19.    INSURANCE:** TENANT acknowledges that LESSOR'S insurance does not cover personal property damage caused by fire, theft, rain, war, acts of God, acts of others, and/or any other causes, nor shall LESSOR be held liable for such losses. TENANT is hereby advised to obtain TENANT'S own  insurance policy to cover any personal losses.

**20.    FIRE, ACCIDENT, DEFECTS, DAMAGE:**  TENANT must give LESSOR prompt notice of fire, accident, damage or dangerous or defective conditions. If the Apartment cannot be used because of fire or other casualty, TENANT is not required to pay rent for the time the Apartment is unusable. If the Apartment cannot be used, LESSOR has 30 days to decide whether to repair. LESSOR'S decision to repair must be given TENANT within 30 days of the fire or casualty. LESSOR shall have a reasonable time to repair. If LESSOR fails to give TENANT notice of its decision within 30 days, TENANT may cancel the lease as of the date of the fire or casualty.

**31.**    **KEYS AND ADDENDUMS:** TENANT acknowledges receipt of the following which shall be deemed part of this Agreement: (Please check)/   X Keys #of keys and purposes
X House Rules____Other

**32.**    **LESSOR'S WARRANTY OF HABITABILITY:**  LESSOR states that the Apartment and Building are fit for human living and there is no condition to health, life or safety.

**33.**    **ENTIRE AGREEMENT:** This Agreement constitutes the entire Agreement between LESSOR and TENANT. No oral agreements have been entered into, and all modifications or notices shall be in writing to be valid.

**34.**    **RECEIPT OF AGREEMENT:** The undersigned TENANT(S) has/have read and understand this Agreement and hereby acknowledge receipt of a copy of this Rental Agreement.

**35.**    **SUBORDINATION TO MASTER LEASE:** Urban Pathways, Inc. is the tenant of the Building known as 798-802 Fairmount Place, Bronx, New York 10460 under a Prime Lease with Fairmount Place LLC. This Rental Agreement is subject and subordinate to the terms and conditions of the Prime Lease. The undersigned Tenant has had the opportunity to review the Prime Lease.

TENANT'S Signature

Date 2/16/16

TENANT'S Signature

Date 2/16/16

LESSOR'S or Agent's Signature

Date

B2

This Rental Agreement ("Lease" or "Agreement") is dated 2/16 , and is between        Urban Pathways      Inc.      (the       "LESSOR"),      and Towaki Komatsu (the "TENANT(S)").

WHEREAS, Urban Pathways hereby leases to TENANT, a fully-furnished **1BR/2BR** Apartment 4b rm 1 on the 4th floor of the Building  known as **798-802 Fairmount Place, Bronx, New York 10460**, in the Borough of **Bronx** and State of **New York** (the "Premises"), for the term of **12 Months**, unless sooner  terminated as hereinafter provided, to be used and occupied as a strictly private residential dwelling  by TENANT at the **12-month** rental rate of **$9,600**, which represents equal monthly  payments of **$800** each, in advance, to be paid as specified in this Agreement.

NOW THEREFORE, the Parties agree as follows:

**1.**    **TERM**: The term of this Agreement will be for a term of 12 months, from to_____ . LESSOR reserves the right and option to renew this lease for an additional 12 month term. If LESSOR elects to renew this lease, LESSOR will provide TENANT with a renewal lease no later than 90 days before the end of the initial term.

**2.**    **PAYMENTS**: Rent and/or other charges are to be paid at such place or method designated by the LESSOR as follows directly to LESSOR a monthly amount of $. TENANT shall pay, representing 30% of TENANT'S monthly income.  The remaining balance of the rent due pursuant to the terms of this lease shall be  paid to the Landlord directly on behalf of the TENANT through various rental assistance programs  for which the TENANT may be eligible. All TENANT payments are to be made by check or money  order.  All payments are to be made payable to LESSOR. TENANT shall promptly assign all  government rental assistance received to LESSOR.

**3.**    **UTILITIES**:  LESSOR will supply (a) heat as required by law, (b) hot and cold water for bathroom and kitchen sink, and (c) cooling if central air-conditioning is installed. TENANT may enforce its rights under the warranty of habitability. TENANT must pay for the costs of all electric, gas, telephone and other utility services used in the Apartment to the extent these costs exceed any governmental utility allowances for which TENANT may be eligible.

**4.**    **FURNISHINGS**:  TENANT accepts all furniture and other furnishings within the Apartment as is. At the end of the Term, TENANT shall return the furniture and other furnishings clean and in good order and repair, reasonable wear excepted.

**5.**    **REPAIRS**:  TENANT must take good care of the Apartment and all equipment and fixtures in it. LESSOR will repair the plumbing, heating and electrical systems. TENANT must, at TENANT'S cost, make all repairs and replacements whenever the need results from TENANT'S act or neglect.

**6.**    **OCCUPANTS**: Guest(s) staying over 15 days without the written consent of LESSOR shall be considered a breach of this Agreement. ONLY the following individuals  AND NO OTHERS shall occupy the subject residence for more than 15 days unless the expressed written consent of LESSOR obtained in advance_____ .

**7.**    **PETS**: TENANT shall not keep any pets within the premises.

**8.**    **NOISE**: TENANT agrees not to cause or allow any noise or activity on the premises which might disturb the peace and quiet of another TENANT and/or neighbor. Said noise and/or activity shall be a breach of this Agreement.

**9.**    **DESTRUCTION OF PREMISES**: If the premises become totally or partially destroyed during the term of this Agreement so that TENANT'S use is seriously impaired, LESSOR or

TENANT may terminate this Agreement immediately upon three day written notice to the other.

**10.     CONDITION OF PREMISES/END OF TERM**: TENANT acknowledges that TENANT has examined the Premises and that Premises, all furnishings, fixtures, furniture, plumbing, heating, electrical facilities, all items listed on the attached property condition checklist, if any, and/or all other items provided by LESSOR are all clean, and in good satisfactory condition except as may be indicated elsewhere in this Agreement. At the termination of this Agreement, all of above items in this provision shall be returned to LESSOR in clean and good condition except for reasonable wear and tear and the premises shall be free of all personal property and trash not belonging to LESSOR. It is agreed that all dirt, holes, tears, burns, and stains of any size or amount in the carpets, drapes, walls, fixtures, and/or any other part of the premises, do not constitute reasonable wear and tear.

**11.     ALTERATIONS**: TENANT shall not paint, wallpaper, alter or redecorate, change or install locks, install antenna or other equipment, screws, fastening devices, large nails, or adhesive materials, place signs, displays, or other exhibits, on or in any portion of the premises without the written consent of the LESSOR except as may be provided by law.

**12.     PROPERTY MAINTENANCE**: TENANT shall deposit all garbage and waste in a clean and sanitary manner into the proper receptacles and shall cooperate in keeping the garbage area neat and clean. TENANT shall be responsible for disposing of items of such size and nature as are not normally acceptable by the garbage hauler.

**13.     TENANT'S DUTY TO OBEY LAWS AND REGULATIONS**:  TENANT must comply with all laws, orders, rules, requests and directions of all governmental authorities, LESSOR'S insurers, Board of Fire Underwriters, or similar groups. Notices received by TENANT from any authority or group must be promptly delivered to LESSOR. TENANT must not do anything which may increase LESSOR'S insurance premiums.

**14.     APARTMENT RULES**:  TENANT must comply with the following rules:

A.     TENANT must not interfere with the comfort or rights of neighbors or other tenants.

B.     No one is allowed on the roof. Nothing may be placed on or attached to fire escapes, sills, windows, or exterior walls of the Apartment or in the hallways or public areas.

C.     TENANT must give LESSOR keys to all locks. Doors must be locked at all times, and windows must be locked down when TENANT is out.

D.     Apartment floors must be covered by carpets or rugs.

E.     Garbage disposal rules must be followed.

F.     Laundry machines, if any, are used at TENANT'S own risk and cost.

G.     Moving furniture, fixtures, or equipment must be scheduled with LESSOR.

H.     TENANT shall conserve energy.

**15.     HOUSE RULES**:  LESSOR may, from time to time, establish, modify or revoke House Rules. Such House Rules are a supplement to the Lease and are incorporated herein. TENANT must

B3

comply with all such House Rules, and noncompliance may constitute a default as defined herein. In the event of a conflict between the House Rules and the terms of this Agreement, the terms of this Agreement shall prevail.

**16.     TENANT DEFAULTS**:  LESSOR must give TENANT written notice of default stating the type of default. The following are defaults and must be cured by TENANT within the time stated:

     A.      Failure to pay TENANT'S portion of the rent on time, 3 days

     B.      Failure to move into the Apartment within 15 days after the beginning date of the Term, 10 days

     C.      Issuance of a court order under which the Apartment may be taken by another party, 10 days

     D.      Improper conduct by TENANT annoying other tenants, including, but not limited to nuisance and harassment, 10 days

     E.      Failure to comply with any term or Rule in the Lease, 10 days.

If TENANT fails to cure the default in the time stated, LESSOR may cancel this Agreement by giving TENANT a cancellation notice. The cancellation notice will state the date the Term will end, which may be no less than 10 days after the date of the notice. On the cancellation date in the notice, the Term of this Agreement shall end. TENANT must leave the Apartment and give LESSOR the keys on or before the cancellation date. TENANT continues to be responsible as stated in this Agreement. If the default cannot be cured in the time stated, TENANT must begin cure within that time and continue diligently until cured.

**17.     CHANGE OF TERMS**: The terms and conditions of this Agreement are subject to future change by LESSOR after the expiration of the agreed lease period upon 30-days written notice setting forth such change and delivered to TENANT. Any changes are subject to laws in existence at the time of the Notice of Change of Terms.

**18.     POSSESSION**: If LESSOR is unable to deliver possession of the residence to TENANTS on the agreed date, because of the loss or destruction of the residence or because of the failure of the prior residents to vacate or for any other reason, the TENANT and/or LESSOR may immediately cancel and terminate this Agreement upon written notice to the other party at their last known address, whereupon neither party shall have liability to the other, and any sums paid under this Agreement shall be refunded in full. If neither party cancels, this Agreement shall be prorated and begin on the date of actual possession.

**19.     INSURANCE**: TENANT acknowledges that LESSOR'S insurance does not cover personal property damage caused by fire, theft, rain, war, acts of God, acts of others, and/or any other causes, nor shall LESSOR be held liable for such losses. TENANT is hereby advised to obtain TENANT'S own  insurance policy to cover any personal losses.

**20.     FIRE, ACCIDENT, DEFECTS, DAMAGE**:  TENANT must give LESSOR prompt notice of fire, accident, damage or dangerous or defective conditions. If the Apartment cannot be used because of fire or other casualty, TENANT is not required to pay rent for the time the Apartment is unusable. If the Apartment cannot be used, LESSOR has 30 days to decide whether to repair. LESSOR'S decision to repair must be given TENANT within 30 days of the fire or casualty. LESSOR shall have a reasonable time to repair. If LESSOR fails to give TENANT notice of its decision within 30 days, TENANT may cancel the lease as of the date of the fire or casualty.

**21.     RIGHT OF ENTRY AND INSPECTION**: LESSOR may enter, inspect, and/or repair the premises at any time in case of emergency or suspected abandonment. LESSOR shall give 24 hours advance notice and may enter for the purpose of showing the premises during normal business hours to prospective renters, buyers, lenders, for smoke alarm inspections, and/or for normal inspections and repairs. LESSOR is permitted to make all alterations, repairs and maintenance that in LESSOR'S judgment is necessary to perform.

**22.     ASSIGNMENT**: TENANT agrees not to transfer, assign or sublet the premises or any part thereof. LESSOR may assign or transfer its interest in the Premises to a new operator without prior notice to TENANT. TENANT acknowledges that any assignment or transfer by LESSOR shall not change TENANT'S obligations under this Agreement. TENANT agrees that upon notice of an assignment or transfer by LESSOR, TENANT will assign all government rental assistance over to the new operator.

**23.     PARTIAL INVALIDITY**: Nothing contained in this Agreement shall be construed as waiving any of the LESSOR'S or TENANT'S rights under the law. If any part of this Agreement shall be in conflict with the law, that part shall be void to the extent that it is in conflict, but shall not invalidate this Agreement nor shall it affect the validity or enforceability of any other provision of this Agreement.

**24.     STATUTORY OR HOLDOVER TENANT.** If, subsequent to the expiration of the term of this Lease, TENANT remains in possession, as a holdover tenant, TENANT shall pay the maximum legal rent which is obtainable there under without prior notice or demand.

**25.     NO WAIVER**: LESSOR'S acceptance of rent with knowledge of any default by TENANT or waiver by LESSOR of any breach of any term of this Agreement shall not constitute a waiver of subsequent breaches. Failure to require compliance or to exercise any right shall not be constituted as a waiver by LESSOR of said term, condition, and/or right, and shall not affect the validity or enforceability of any provision of this Agreement.

**26.     JOINTLY AND SEVERALLY**: The undersigned TENANTS are jointly and severally responsible and liable for all obligations under this Agreement.

**27.     REPORT TO CREDIT/TENANT AGENCIES**: You are hereby notified that a nonpayment, late payment or breach of any of the terms of this rental Agreement may be submitted/reported to a credit and/or tenant reporting agency, and may create a negative credit record on your credit report.

**28.     LEAD NOTIFICATION REQUIREMENT**: For rental dwellings built before 1978, TENANT acknowledges receipt of the following: (Please check)____Lead Based Paint Disclosure Form____EPA Pamphlet

**29.     NOTICES**: All notices to TENANT shall be served at TENANT'S premises and all notices to LESSOR shall be served at
Urban Pathways Inc. 575 8th Avenue New York, N.Y. 10018                    .

**30.     INVENTORY**: The premises contain the following items that the TENANT may use.
_____.

B3

31.     **KEYS AND ADDENDUMS:** TENANT acknowledges receipt of the following which shall be deemed part of this Agreement: (Please check)___ Keys #of keys and purposes ___House Rules____Other

32.     **LESSOR'S WARRANTY OF HABITABILITY:** LESSOR states that the Apartment and Building are fit for human living and there is no condition to health, life or safety.

33.     **ENTIRE AGREEMENT**: This Agreement constitutes the entire Agreement between LESSOR and TENANT. No oral agreements have been entered into, and all modifications or notices shall be in writing to be valid.

34.     **RECEIPT OF AGREEMENT**: The undersigned TENANT(S) has/have read and understand this Agreement and hereby acknowledge receipt of a copy of this Rental Agreement.

35.     **SUBORDINATION TO MASTER LEASE:** Urban Pathways, Inc. is the tenant of the Building known as 798-802 Fairmount Place, Bronx, New York 10460 under a Prime Lease with Fairmount Place LLC. This Rental Agreement is subject and subordinate to the terms and conditions of the Prime Lease. The undersigned Tenant has had the opportunity to review the Prime Lease.

TENANT'S Signature

Date 2/16/16

TENANT'S Signature

Date 2/16/16

LESSOR'S or Agent's Signature X

Date

B3

| CASE Number | | CASE Name | KOMATSU, TOWAKI | CIN | |
| Suffix | 01 | Case Head: | KOMATSU, TOWAKI | SSN: | |
| From: | 10/27/2015 | To: | 01/18/2017 | Search | Clear | Save |

| | Date | Activity | Staff Member | COMMENT |
|---|---|---|---|---|
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | 2/18/2016 | Error Correction | Benjamin-Solis,K | As per regional Directive placing case in SI status code Y19 for CA due to SEPS approval package. Caseload changed to SP000 and address was updated. Furniture allowance was already issued. SEPS subsidy checks will be issued in PAM once case is in SI ststaus for CA. |
| ☐ | 2/18/2016 | Error Correction | Benjamin-Solis,K | Correction to Aprtment number |
| ☐ | | | | |
| ☐ | | | | |
| ☐ | | | | |

17619 00027 00055 029 031  000779

B4

| | | | |
|---|---|---|---|
| ☐ | 3/16/2016 | Approve CA Eligibility Decision | Idion,C | : : : Current Lease in the viewer. Address change request approved. |
| ☐ | 3/16/2016 | CA Application Interview | Mensah,R | .00 that was surpose to be issued by SSU progam state he will receive for moving into apartment. He also provided a lease stating in apartment by himself but when he moved he found out there was someone else sharing the apartment with him. and the first lease he signed was change by landlord. He also stated heAs per management change address and mailing address only. Please, review and approve case action. Thanks. |
| ☐ | 3/16/2016 | Make Case Comment | Harris,V | Case Comment: : : Applicant in service inquiring about $1028.00 that was surpose to be issued by SSU progam state he will receive for moving into apartment. He also provided a lease stating this is where he moved to but stated he was surpose to be moving in apartment by himself but when he moved he found out there was someone else sharing the apartment with him. and the first lease he signed was change by landlord. Applicant complained agency and SSU give out wrong information about apartment and furniture allowanceand he was going to make a complaint to Mr. Steven Banks. He ask if he could speak to my supervisor who came over and explained to him how the agency work. I reviewed case and found that on 02/17/16 the agency issued security, rent, and gave applicant funiture allowance totalling $1028.00 I explained to applicant this benefits was in EBT. ON 02/18/16 was approved. Case was approved for SEPS on 02/18/16. Storage w |
| ☐ | 3/24/2016 | Make Case Comment | Pellot,B | : : : applicant has also been informed this will be last storage pymt sent by agency. client is residing in an apartment. Explained to client he must provide 3 estimates from 3 licensed movers along with lease, inventory and residency letter. |

B5

Urban Pathways, Inc.
575 Eighth Ave., 16th Fl.
New York, NY 10018


Re:     Forgery and fraud by your organization

March 22, 2015

Dear Urban Pathways representative,

      My name is Towaki Komatsu. I am sending you this letter to make you aware of the fact that your organization committed fraud and forgery in the second degree at my expense by having committed the following acts and find out if and how your organization proposes to resolve this to my satisfaction:

1.  Illegally modified an apartment lease agreement without my prior knowledge and consent, after I signed an apartment lease agreement with Lisa Lombardi of your organization on February 16, 2016 at the offices of DHS located at 33 Beaver Street in Manhattan while several other people were in the room with me as I signed that agreement.

    a.  According to the handwritten terms shown on the first page of the lease agreement that I signed with her on that date, I would be renting all of apartment 4C within the apartment building located at the following address from your organization, that apartment was to be "fully-furnished" at the time I moved into it, and your organization would supply heat to that apartment as required by law:

        798-802 Fairmount Place
        Bronx, New York  10460

b.  After being informed by your organization's staff on March 7, 2016 that my
apartment was ready for me to move-in and that your organization had
assigned me apartment Room 1 within 4B for some reason, I took residence
on that date in that apartment and in that room. After doing so, however, I
immediately realized that it was an apartment that had not been "fully-
furnished" by your organization and that your organization was not providing
heat to that apartment as required by law. Since your organization fraudulently
claimed in the lease agreement that the apartment was fully-furnished, I have
had to incur unnecessary out-of-pocket expenses and waste large amounts of
time and energy in order to provide a mirror for that apartment's bathroom, 3
sets of curtains, a tension rod from which to hang curtains, kitchen supplies, a
shower curtain, wastebaskets, etc. In addition, it was only after I filed a valid
complaint with New York City's Department of Housing, Preservation, and
Development about a lack of heat in my apartment and one of its inspectors
apparently visited the building where I presently reside that heat became
available in my apartment there.

c.  On March 9, 2016, Andrew Nastachowski of your organization gave me an
illegally modified version of the lease that I signed with your organization on
February 16, 2016. The modified version of that lease that I received from his
constitutes forgery in the second degree for the following irrefutable reasons:

   i.  Your organization changed the terms of the lease agreement that I
   signed on February 16, 2016 by indicating in the illegally modified
   version of that agreement that I would be renting Room 1 of

Apartment 4B from your organization. Room 1 within Apartment 4B is a very small room.

    ii.   When Ms. Lombardi had me sign the lease agreement on February 16, 2016, she had me enter the initials of my name next to paragraph 6 on the first page of that agreement. The illegally modified version of that lease agreement that your organization produced does not show my initials next to paragraph 6 on its first page.

    iii.   Your organization illegally attached a photocopy of the signed page from the lease agreement that I signed on February 16, 2016 with Ms. Lombardi to the illegally modified lease agreement.

Since there is a very big difference between renting an entire apartment for myself and residing in a small room within an apartment I share with someone else, it is entirely clear that by not abiding by the terms of the actual lease agreement that I signed with Ms. Lombardi on February 16, 2016, your organization committed fraud at my expense that cost me the opportunity of having my own apartment.

Enclosed are copies of the lease agreement that I signed on February 16, 2016 and the illegally modified lease that your organization gave to me in which it also committed forgery. Unless a satisfactory proposal is presented to me within one week, I may have no choice than to pursue valid litigation against your organization.

From,

Towaki Komatsu

Tel: 201-315-5484

Mailing address:

Towaki Komatsu
One Penn Plaza, Ste. 6321
New York, NY  10119

B6

Case 1:22-cv-09080-LTS    Document 2    Filed 10/22/22    Page 318 of 338

## Fraud by HRA's business partner, Urban Pathways, Inc.

From:  Towaki Komatsu (towaki_komatsu@yahoo.com)

To:    beirneb@hra.nyc.gov

Cc:    bankss@hra.nyc.gov

Date:  Friday, April 1, 2016, 04:45 PM EDT

Dear Ms. Beirne,

Good afternoon and thank you for the time you shared with me during our phone call today.

As discussed, the following is a copy of the lease agreement that I signed with Lisa Lombardi of Urban Pathways on February 16, 2016 at the offices of DHS located at 33 Beaver Street in Manhattan in a small conference room where there were roughly 5 people who witnessed that signing by Ms. Lombardi and I:

The following file attachment is a copy of the illegally modified lease agreement I received from Urban Pathways on or about March 7, 2016:

The following is a list of how those 2 lease are different:

a) I signed the lease that was presented to me by Ms. Lombardi on February 16, 2016. I never signed the subsequently modified lease that illegally contains a photocopy of my signature from where I signed the original lease agreement.  By having included that photocopy of my signature in the illegally modified lease, Urban Pathways committed the crime of forgery in the second degree pursuant to New York law.

b) The terms of the lease I signed clearly indicated that I would be residing in apartment 4C and that information was handwritten. The terms of the subsequent lease indicates that I would reside in Room 1 of Apartment 4B in that same building, which is  a very small room. The information in the subsequent lease was typed.

d) The pricing shown in the 2 leases differs.

d) When signing the original lease, I entered my initials on its first page roughly halfway down the first page. The subsequent lease's first page does not show that I entered my initials on its first page.

e) The lease I signed on February 16th consisted of just 3 pages. The subsequent lease is 5 pages in length.

Moreover, both of the lease clearly indicate that the apartments would be "fully-furnished" and heat would be provided by the landlord when required by law. Urban Pathways committed fraud by having the apartments minimally furnished and failing to have heat provided to my apartment until I finally filed a complaint with HPD about the lack of heat.

Also, as I stated during the phone call with you, the following attachment confirms that HPD's web site presently indicates that the building where I'm residing is not validly registered with HPD:

Lastly and to recap, the following are the other problems with that building and Urban Pathways that I discovered yesterday:

- Apartment 3A has no heat
- Apartment 2A has a toilet that overflows
- Apartment 4C has a broken entrance door to that apartment
- There is no bathroom in my apartment building for employees of Urban Pathways that work there to use.
- Someone who works for Urban Pathways told me yesterday that he and at least one of his coworkers are not being paid completely and on time by Urban Pathways.

B7

Regards,

Towaki Komatsu

 Urban Pathways - Original Lease.pdf
1.2MB

 Urban Pathways - Illegally Revised Lease.pdf
2.1MB

 HPD Building Info.pdf
102.4kB



BBB ACCREDITED CHARITY
ny.give.org

## urban pathways

**FREDERICK SHACK, LMSW**
Chief Executive Officer

**BOARD OF DIRECTORS**

OFFICERS

**KEITH A. BERGER, Esq.**
PRESIDENT
Bank of America Merrill Lynch

**STEVEN SHEPPARD DICESARE, Esq.**
VICE PRESIDENT
Hughes Hubbard & Reed, LLP

**TRISHA LAWSON**
SECRETARY
Bank of America Merrill Lynch

**BRAD HANDLER**
TREASURER
Jefferies, LLC

PRESIDENTS EMERITUS

**GARY BELSKY**
Consultant

**BEN BRAUN**
LionTree

**SONYA COVINGTON**
Forest City Ratner Companies

MEMBERS

**ERIN H. ABRAMS, Esq.**
Via Transportation Inc.

**MICHAEL BARNETT**
Och-Ziff Capital Management Group

**PETER BREST**
Consultant

**LISA CHOI**
Ernst & Young LLP

**KELLEY GOTT**
Adaptiv

**ADAM HEFT, Esq.**
Goldman, Sachs & Co.

**ERIK IPSEN**
Crain's New York Business

**DANIEL KATCHER**
Newmark Grubb Knight Frank

**ETHAN KAUFMAN, Esq.**
Fragomen, Del Rey, Bersen and Loewy, LLP

**MICHAEL KAYE**
Douglaston Development

**JAMES LINDSAY**
Bank of America Merrill Lynch

**DR. BRUCE PINKER,**
DPM, AACFAS, AAPWCA

**ED POTEAT**
Carthage Advisors

575 8TH AVENUE 16TH FLOOR
NEW YORK, NY 10018
P: 212.736.7385
F: 212.736.1388
URBANPATHWAYS.ORG

May 3, 2016

Mr. Komatsu
802 Fairmount Place
Bronx, N.Y.  10460

Dear Mr. Komatsu,

My name is Ariana Saunders, I am the Chief Compliance Officer for Urban Pathways. I understand you filed a formal compliant on March 22, 2016 regarding the terms of your lease and noted some other concerns. The Program Director, Kishea Paulemont has attempted to reach out to you on the following days:

- ❖ 4/5/16- by phone call. There was no answer. A message was left.
- ❖ 4/6/16- again by phone call. There was no answer. A message was left.
- ❖ 4/14/16- again by again by phone call. There was no answer. A message was left. In addition, the Program Director Kishea Paulemont and Case Manager, Andrew Nastachowski conducted a home visit in the attempt to speak with you. You were not home. Both the Program Director and Case Manager left a letter underneath your door and also mailed you a letter.

As the Chief Compliance Officer, I would like to set up a meeting with you to formally discuss your concerns. At your earliest convenience please give me a call at 212-736-7385 ext. 245 to arrange a face to face meeting.

Ariana Saunders
Chief Compliance Officer

B8



Kishea Paulemont
1947 Hughes Ave
Bronx, New York 10457

Augusts 4, 2016

Towaki Komatsu
802 Fairmount Ave # 4B Rm1
Bronx New York 10460

Hello Mr. Komatsu

Within the last several days you have brought up some concerns in which we would like to meet, further discuss and come up with a plan to resolve. We have received and heard your concerns. You informed management of an injury you sustained through an altercation with your roommate. Your safety is key and we are very much concern. The only way we can assist with a resolution is to meet. Although we have made several other attempts in the past, we are hopeful due to the severity of the situation you will be willing to meet to ensure the situation is resolved.

Can please give me a call at 718-960-4393x836 to schedule an appointment. In addition to meeting with us, would you provide us with any medical documentation that validates your injuries? This will help expedite any needed services. We look forward to meeting with you.

Thanks

Kishea Paulemont

Cc: Fred Shack
Ron Abad
Lisa Lombardi
Banks (HRA)
(DHS)

B9



**NYC**
**Human Resources Administration**
Department of Social Services

W-2-539
Rev. 04/14

**Investigation, Revenue, and Enforcement Administration**

8/16/2016

**Steven Banks**
Commissioner

Towaki Komatsu
802 Fairmount Place  4B
Bronx, NY 10460

**Saratu Grace Ghartey**
Chief Program
Accountability Officer

Dear   Mr. Komatsu:

**Bedros L. Boodanian**
Deputy Commissioner

**250 Church Street**
New York, NY 10013

22 252 3020

We are writing to you from the City of New York Human Resources Administration, Bureau of Fraud Investigation. We have received your complaint regarding fraud.

Please be advised that your complaint will be duly investigated. The appropriate action will be taken based on the investigation. Due to the laws of confidentiality, we cannot disclose the result of any investigation.

Thank you for your efforts in combating social service fraud in New York City. Please send any additional correspondence to the Bureau of Fraud Investigation, 250 Church Street, 3rd floor, New York, NY 10013 or call (718) 722-8001.

Sincerely,

Bureau of Fraud Investigation

IRIS Ctrl#: 201608160143

B10

From: **Towaki Komatsu** towaki_komatsu@yahoo.com 
Subject: Re: Fraud by Urban Pathways, Inc.
Date: September 5, 2016 at 9:33:21 PM
To: kearneyr@bronxda.nyc.gov

Dear Assistant District Attorney Kearney,

I'm sending you this e-mail in response to the voicemail I received from you on Friday in regards to allegations I have made that Urban Pathways, Inc. has committed fraud to my detriment, taxpayers that fund it, and a commercial lender it seems to have been issued mortgages from that total more than $3,000,000 for the apartment building in the Bronx where I reside.

Due to the following specific set of facts, I, and other tenants of the apartment building where I reside are firmly convinced that Urban Pathways has committed fraud:

1. On February 16, 2016, I signed an apartment lease agreement for apartment 4B in the apartment building located at 802 Fairmount Place in the Bronx. When I signed that lease agreement, I did so at 33 Beaver Street in Manhattan, in the offices of DHS, in front of roughly 5 witnesses in a small conference room, and with Lisa Lombardi of Urban Pathways, Inc. According to the terms of that lease agreement, it did not indicate in any way whatsoever that I would be sharing that apartment with anyone. That lease agreement also made it clear that my apartment would be fully-furnished and my landlord was required to notify me 24 hours in advance of any attempt it made to enter my apartment. In addition, paragraph number 6 that appears on the first page of the lease agreement contained an area for me to enter my initials. The following is a copy of that lease agreement.



Urban Pathways -
Original Lease.pdf

2. On or about March 6, 2016, Andrew Nastachowski of Urban Pathways, Inc. gave me a substantially different lease agreement when I visited my present apartment building to collect the keys for my apartment from him. As shown in the attached file that is a copy of the substantially different lease agreement that I received from him and that I never signed, the following facts apply to that illegally altered lease agreement:

   a) The illegally altered lease agreement is for Room 1 within apartment 4B that is in the same apartment building as the apartment building discussed in the lease agreement that I signed on February 16, 2016.

   b) The illegally altered lease contains a photocopy of my signature from the lease I signed on February 16, 2016. This fact establishes that Urban Pathways, Inc. committed forgery in the second degree.

   c) Unlike the first page of the lease I signed on February 16, 2016, there is no area on the first page of the lease agreement that I received on or about March 6, 2016 for me to enter my initials.

   d) Although both the lease I signed on February 16, 2016 and the one I received on or about March 6, 2016 indicated that my apartment would be fully furnished and that my landlord had to provide me with 24 hours of advance notice before it would enter my apartment, my apartment has not been fully-furnished at any time since March 6, 2016 and my landlord's workers have repeatedly entered my apartment without giving me any notice in violation of criminal trespass and harassment laws.



Urban Pathways -
Illegally Re…d Lease.pdf

3. On May 12, 2016, my roommate, Ronald Sullivan harassed me and expressed verbal threats of violence against me in the presence of one of my landlord's workers in our apartment's living room before Mr. Sullivan abruptly rushed toward me to try to assault me and was physically held back by that same worker for my landlord in our apartment's living room. Mr. Sullivan also threw my property about in the living room of our apartment on that same date. As a result of Mr. Sullivan's behavior and threats against me on that date, I contacted the NYPD shortly thereafter to try to file a complaint against him on the basis of harassment. However, the NYPD told me that its staff would need to be present at the time of harassment in order for a complaint to be made. I also contacted my landlord to order it to evict my roommate immediately because of his threats. However, my landlord refused to evict or otherwise have him moved somewhere else.

On July 2, 2012, Mr. Sullivan abruptly assaulted me without any provocation as I was preparing to leave our apartment to do laundry. He committed that assault in our apartment's living room by punching me more than 15 times by the left temple area of my head, on my left arm, and on the left side of my chest. After he ceased his assault, I immediately retreated into my bedroom, locked its door, and called 911 to have the police come to arrest him. While overhearing my call to 911, Mr. Sullivan fled the apartment building and told at least 2 people in our apartment building that he hit me as he was fleeing.

The following PDF file contains information about the altercation I had with Mr. Sullivan on 5/12/16 and 7/2/16. It also contains information

The following PDF file contains information about the altercation I had with Mr. Sullivan on 3/2/16 and 4/2/16. It also contains information about attempts I made to have my landlord evict him and to have HRA investigate my landlord for fraud. However, HRA apparently ignored the e-mails I sent to it on April 1, 2016 about Urban Pathways.



Information about
disputes wi…Sullivan.pdf

The following are medical reports from 7/2/16 & 7/30/16 that describe the effects I have had to contend with because of Mr. Sullivan's assault and my landlord's blatant acts of fraud that enabled that assault to occur. If it had not been for my landlord's acts of fraud, Mr. Sullivan and I would never have been roommates.



July 2nd & July 30th ER
diagnosis r…om D.A.pdf

Moreover, due to the fraud I have been subjected to because of Urban Pathways, Inc., I have been unable to move property of mine from storage that costs me roughly $430 per month into my apartment due to inadequate space in my apartment that would not be the case if Urban Pathways, Inc. had honored the actual lease agreement I signed on 2/16/16. Also, though landlords are required to register their apartment buildings with HPD before they can legally collect rent, my apartment building is not validly registered with HPD. Also, though employers are required to provide workers with a bathroom, my landlord has not provided its workers in my apartment building with one that they can use in my building. My landlord has previously told me that it has workers in my apartment building on a 24 hour and 7-day basis. Furthermore, my landlord has consistently not been making repairs in my apartment building and has repeatedly had the water turned off in my apartment building without any advance notice having been given to me in violation of the law.

In addition, though there are more than 10 tenants living in my apartment building, it appears that my landlord fraudulently claimed to a commercial lender that there is only one tenant in my apartment building. The following is a mortgage agreement for my apartment building that reflects this point and shows how the borrower of that mortgage is in violation of its terms that is tantamount to mortgage fraud.



Urban's Mortgage
Agreement.pdf

From what I have been informed by other tenants in my apartment building, my landlord similarly and illegally altered their lease agreements without their authorization that caused them to have been issued to materially different lease agreements by Urban Pathways, Inc.

From,

Towaki Komatsu

Tel: 201-315-5484

B11

STATE OF NEW YORK          COURT OF CLAIMS

 JORGE OLIVIERI,

                                    Claimant,          **DECISION**

              -v-

THE STATE OF NEW YORK,                          Claim No.      124849

                                    Defendant.

BEFORE:                 **HON. WALTER RIVERA**
                        **Judge of the Court of Claims**

APPEARANCES:            **For Claimant:**
                        **CONSTANTINIDIS & ASSOCIATES, P.C.**
                        **By: Steven T. Lane, Esq.**

                        **For Defendant:**
                        **LETITIA JAMES**
                        **Attorney General of the State of New York**
                        **By: Heather R. Rubinstein, Assistant Attorney General**

<u>Decision</u>

The trial of this claim on liability only was heard on October 5, 2021 via video-conferencing technology.[1] The instant claim alleges negligence and improper supervision due to an unprovoked assault on claimant by another patient at Mid-Hudson Forensic Psychiatric Center on November 16, 2013. Claimant testified on his own behalf and presented the testimony of Martin Vazquez. Claimant's Exhibit 2 and defendant's Exhibits C through F were received into evidence

---

[1] Due to the retirement of Judge Stephen J. Mignano, the claim was transferred to Judge Walter Rivera by Order dated May 28, 2021.

on stipulation. Defendant presented the testimony of James Parker. The executed virtual trial

stipulation was received into evidence as Court's Exhibit 1.

Claimant's Case

Testimony

      Claimant testified to the following facts.

      On November 16, 2013, he was a patient at Mid-Hudson Forensic Psychiatric Center

(Mid-Hudson). The hospital was a custodial setting and patients were required to be in the dayroom

at various times of the day (T: 12-13).[2] To get to the dayroom, patients had to walk in a hallway

about six to eight feet wide. At about 4:00 p.m. or 5:00 p.m. on the day in question, claimant was

walking to the dayroom and had to pass between two staff members seated on the left side of the

hallway. Across the hall on the right, there was an open door to a room in which there was a patient

(identified herein as "J.D."). Claimant had been back and forth to the dayroom that day (T: 14-16).

As claimant walked by the open door on the right, there was nothing between claimant and J.D., who

suddenly emerged from the room and struck claimant. The staff pulled claimant away to the

dayroom, then to the nurse's station (T: 16-19).

      Claimant was not previously acquainted with the patient who hit him. Claimant had

not been told by staff that J.D. had threatened to kill somebody or was dangerous (T: 20-21). On

cross-examination, claimant testified that he had not seen J.D. before being hit by him (T: 21).

      Martin Vazquez testified to the following facts.

---

[2] References to the trial transcript are preceded by the letter "T."

Vazquez works as a Security Hospital Treatment Assistant (SHTA) at Mid-Hudson. He held the same position at Mid-Hudson in November of 2013 (T: 24-25). The patients' dorm is separate from the dayroom, and in between them there is a quiet room and a single-man room (T: 29). On November 16, 2013, Vazquez was assigned to a two-to-one observation of J.D. due to the latter's prior assault against somebody at the facility.[3] Two-to-one observation means there are two SHTAs with one patient (T: 26-28).  Vazquez remembered the name Jorge Olivieri (claimant herein) "because [Vazquez] was traumatized about how much blood [Olivieri] spewed on the day he was assaulted" (T: 26). Vazquez recalled standing behind J.D. when he saw the latter assault claimant. Referring to J.D., Vazquez testified, "I wouldn't want him walking behind me" (T: 31).

At the time, Vazquez was not aware that J.D. had threatened to punch anyone who walked by his door (T: 31-33). On reviewing the narrative in the incident report (Ex. 2), Vazquez acknowledged writing that J.D. told him, "my right cross is dangerous and I'm going to body one of these [expletive deleted] unless you send me back to Riker's" (T: 35). The words "kill body bag" are noted above the word "body." Vazquez claimed that J.D. made the statement after and not before the incident, in order "to clarify why he did it" (id.). Vazquez was questioned about another statement referred to in the investigative findings section of the report prepared by Senior SHTA McPherson[4] that "[p]atient [J.D.] had made threats to hit anybody passing the doorway" (Ex. 2, ¶ 16). Vazquez reiterated that the statement he referred to in the report was made by J.D. after the

---

[3] Vazquez did not recall whether the person J.D. previously assaulted was a patient or a staff member.

[4] Vazquez referred to Karen McPherson as a Senior SHTA (T: 25).

incident, but he did not know what, if anything, J.D. had said previously to McPherson or other staff members (T: 37-39).

Vazquez was questioned about a video of the incident admitted as Exhibit C. He acknowledged the video shows that just prior to the incident, J.D. was in his room and Vazquez was seated on a chair across the hallway. Other patients and staff walking down the hallway passed between the door to J.D.'s room and where Vazquez was seated along with another SHTA. Vazquez judged the distance between him and the door to J.D.'s room as being an arm's length plus twelve inches, which is the custom (T: 40-45). He explained that he could not have a door between himself and the patient as "[t]hat would be seclusion" (T: 46), and he was not sitting across the hallway nearer to J.D. because "we don't have patients behind our backs" (T: 47). Notably, Vazquez admitted that from where he was seated, he "could not prevent any assault" (T: 48).

Vazquez was asked about the terminology "the least restrictive confinement." He understood it to mean giving a patient "enough room so he doesn't feel secluded" (T: 51), which is what he was trying to accomplish with J.D. on November 16, 2013. Only a doctor can place a patient in seclusion (T: 55-56). Vazquez explained that seclusion means there is a locked door and, during his 20 years of experience, seclusion was not used (T: 56-57). Vazquez believed that J.D. was placed in the room where he was the day of the incident because it was a single-man room and the least restrictive way to restrict a patient without a locked door. There were no other single-man rooms (T: 59-61).

Exhibits

The Incident Report (Ex. 2) contains a narrative description by SHTA Vazquez and

initial investigative findings by Senior SHTA McPherson. The narrative description written by

Vazquez on the day of the incident provides, in pertinent part:

> "Patient [J.D.] who was on a 2:1 observation was at
> the doorway of his room [and] suddenly [and] without
> provication [sic] violently assaulted his peer []Olivieri
> who was walking past his doorway to get to the
> dayroom. 2:1 staff immediately intervened [and] a
> manual restraint as this patient was continuing to
> pummel his peer with great force. Patient stated "my
> right cross is dangerous and I'm going to <u>body</u> (kill
> body bag)[5] one of these [expletive deleted] unless you
> send me back to jail (Rikers Island). Patient [J.D.]
> suffered no injuries @ this time. Patient OLIVIERI
> suffered a huge laceration to the right side of his face"
> (Ex. 2, ¶ 15).

In a "witness statement" attached to the Incident Report, Vazquez states that the

second staff member monitoring J.D. with him on November 16, 2013 was SHTA McManus.

Vazquez also wrote in his statement that J.D. was in the doorway to his room and that "both staff

and patients have to pass his doorway," and "patient Olivieri [claimant herein] had to move pass

between both 2:1 staff and patient [J.D.] to get to the dayroom."

The initial investigative findings made by McPherson on the day of the incident (<u>id.</u>

at 16) provide, in pertinent part: "Pt [J.D.] had made threats to hit 'anybody that passes my door. I

want to go back to jail.'  Pt [J.D.] punched pt Olivieri in the jaw." These findings appear in the

section captioned "Probable Cause and Contributing Factors" (<u>id.</u>). The observation level ordered

for J.D. was noted on the report as being "2:1 - two staff in proximity to patient" (<u>id.</u> at 31).

Claimant rested his case.

---

[5] The words in parentheses "kill body bag" appear above the word "body" in the handwritten summary.

The State moved to dismiss the claim for failure to prove a prima facie case. Claimant opposed the motion. The Court reserved decision on the motion.

Defendant's Case

Witnesses

James Parker testified that he has been employed by the New York State Department of Mental Health for thirty-five years and he has held the job title of Supervising Security Hospital Treatment Systems for nine years. He is head of security at Mid-Hudson. In November 2013 he was a Supervising SHTA. Claimant objected to the State's offer of Parker as an expert in the field of security at Mid-Hudson, citing Parker's lack of a college and advanced degrees in the fields of security or forensic psychology, his sole experience being on-the-job training by the State, and his current position as supervisor of Mid-Hudson. The Court sustained the objection. Parker was permitted to explain the protocols at the hospital as a fact witness (T: 63-72).

Parker testified to the following facts.

"A forensic psychiatric center is a facility that houses patients who are going through the court system, pending or deemed not fit to stand trial" (T: 77). Mid-Hudson is not a correctional facility, but it is a custodial setting. Determinations as to the level of restriction necessary for a patient are clinical determinations made by a psychiatrist (T: 80-81, 96). If a patient has been in a prior altercation, they put him on levels of supervision, such as two-to-one supervision. In a two-to-one supervision situation, their policy is to have staff be in "close proximity" to the patient (T: 89), and to have visual contact with the patient (T: 89-93). Manual restraint is used only for imminent danger, such as being assaultive with another patient (T: 94-95). Parker also testified that patients who are an imminent danger to themselves or others are given two-to-one supervision (T: 112).

A threat like the one made by J.D. that was referred to by Senior SHTA McPherson in the Incident Report would have been reported to a doctor (T: 108-109). If the staff is aware that a patient had made threats, they "would keep the patient separated" (T: 88). Close proximity to a patient making a threat means close enough to prevent the patient from carrying out the threat (T: 105). After viewing the video of the incident, Parker explained that the staff were in the typical location for staff in a two-to-one observation in the facility. If they had been sitting in front of the patient's door that would have been considered seclusion, which requires a doctor's order (T: 102-103). Significantly, Parker acknowledged that patients walking down the hallway passed within six inches of J.D.'s doorway, and the staff observing J.D. could not have stopped him from punching claimant from where they were seated (T: 101, 105-106).

Exhibits

The section of the Mid-Hudson Policy & Procedure Manual (the "manual") dealing with supervision was admitted as Exhibit D. Under the heading "Policy Statement," the manual provides, in relevant part, that "at times particular patients demonstrate behaviors that pose a high risk threat of harm to themselves or others" (Ex. D, p 1). Under the heading "Enhanced Levels of Supervision," the manual provides that a "[p]atient should be separated from potential targets (staff and patient)" (id. at 5). With respect to two-to-one supervision, which is the highest level of enhanced supervision, the manual provides that:

> "[S]taff must ensure there are **no physical barriers between them and the patient being monitored** that would prevent immediate intervention with the patient [. . .]. Unless 2:1 Supervision is ordered for Assault, staff is to maintain a distance of arm's length plus 12 inches from the patient and is to maintain continuous visual contact at all times. **Patients placed on a 2:1**

> **for Assault are to be maintained in visual contact at all times as well as in close proximity** so both staff members are able **to respond quickly to mitigate the risk of injury**" (<u>id.</u> at 8) (emphasis added).

The section of the manual dealing with restraint and seclusion (Ex. E) defines seclusion as: "The placement of an individual alone in a room or area from which he or she cannot leave at will [. . .]. This includes restricting the patient's egress through the presence of staff, by coercion, or by imposing implicit or explicit consequences for non-compliance [. . .]" (<u>id.</u> at 6).

The State rested its case.

At the conclusion of the State's case, the State again moved to dismiss the claim for failure to prove a prima facie case. Claimant opposed the motion. The Court reserved decision on the motion. The parties put forth closing arguments in post-trial written memoranda that have been received and reviewed by the Court.

<u>Analysis</u>

The elements of negligence are "(1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom" (<u>Solomon v City of New York</u>, 66 NY2d 1026, 1027 [1985]). It is not disputed that the State owed claimant a duty of care. The State had a legal duty to exercise reasonable care to protect claimant because he was being held in State custody (<u>see</u> <u>Sanchez v State of New York</u>, 99 NY2d 247, 256 [2002] [duty owed to incarcerated individuals]), and he was a patient in a State psychiatric facility (<u>see</u> <u>Dawn VV. v State of New York</u>, 47 AD3d 1048, 1050 [3d Dept 2008] [duty owed to patient in State facility]; <u>Kalem v State of New York</u>, 213 AD2d 515, 515 [2d Dept 1995], <u>lv</u> <u>denied</u> 86 NY2d 701 [1995]).

"Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or omissions" (Gordon v City of New York, 70 NY2d 839, 841 [1987]). Claimant argues that the State had actual knowledge of J.D.'s threats to assault other patients and, as such, it was reasonably foreseeable to the State that J.D. would do so if given the opportunity. Claimant also argues that the following unreasonable acts and omissions on the part of the State violated Mid-Hudson's policies and gave J.D. the opportunity to harm claimant: failing to classify J.D. for seclusion; failing to place J.D. in a room away from those he threatened to hit; placing the two SHTAs across the hall from J.D.'s room; and forcing patients to walk within six inches of J.D.'s open doorway, thereby becoming barriers between J.D. and the SHTAs. The State argues that the evidence shows the State acted reasonably by placing staff in close proximity to J.D. and there was no foreseeable risk of potential harm.

After observing the witnesses at trial and reviewing the exhibits and post-trial memoranda, the Court finds that the material facts are mostly undisputed and support a finding of liability for negligence. The evidence establishes the following facts. Patients being held in custody at the psychiatric facility Mid-Hudson have pending charges or are deemed not fit to stand trial. On November 16, 2013, Mid- Hudson patient J.D. was placed in a single-man room on a hallway near the dayroom pursuant to a two-to-one supervision clinical order. J.D. had previously assaulted a patient or a staff member. There were other rooms on the floor, but only one single-man room. The two SHTAs implementing that order were seated across the hall from J.D.'s open doorway. Patients at Mid-Hudson are required to be in the dayroom at certain times during the day. The only access to the dayroom was through the hallway and patients had to walk within six inches of J.D.'s open doorway, between J.D. and the two SHTAs. When claimant walked by the doorway, the SHTAs

remained seated as J.D. jumped out and punched claimant in the jaw. Stated simply, at the time of

the assault, the SHTAs were not within close proximity to prevent the assault and placed themselves

in a position where they could not do so.

        Contrary to the State's argument, the evidence does not establish that the threats by

J.D. recorded in the Incident Report were both made after the incident. Even accepting Vazquez's

testimony that J.D. said he would "body  one of these [expletive deleted]" after the incident, Senior

SHTA McPherson stated in the Incident Report that J.D. "had made threats to hit 'anybody that

passes my door' " (Ex. 2).  McPherson also recorded J.D.'s past statement in the section of the report

captioned "Probable Cause and Contributing Factors" (id.). The State does not address McPherson's

use of the past tense, to wit, "had made threats," or the inclusion of the threat in the report as a

reason for J.D.'s assault on claimant. Parker testified that close proximity to a patient making a threat

means close enough to prevent the patient from carrying out the threat, and that Vazquez and the

other SHTA assigned to supervise J.D. could not have prevented J.D. from assaulting claimant from

where they were seated (T: 105-106).

        The evidence also demonstrates that patients put under two-to-one supervision pose

a "high risk threat," Mid-Hudson requires that such patients are  to be "separated from potential

targets" and to be maintained in "continuous visual contact" by the staff. Furthermore,  the staff are

to "ensure there [are] no physical barriers between them and the patient" (Ex. D, pp 5, 8). Because

of the SHTAs' location across the hallway, other patients passing between them and J.D.'s doorway

constituted a physical barrier and interrupted their visual contact with the patient.

        The Mid-Hudson policy, that two-to-one supervision requires staff "to maintain a

distance of arm's length plus 12 inches from the patient," is also qualified where a patient has

committed a prior assault. Under such circumstances, Mid-Hudson requires staff to be "in close proximity" to the patient in order "to mitigate the risk of injury" (id. at 8). The Court credits Vazquez's testimony that J.D. had committed a prior assault. Although Vazquez's testimony that he was standing behind  J.D. at the time of the assault was contradicted by the Incident Report and the video, his testimony that J.D. had committed a prior assault was not contradicted by other evidence. It is also supported by the fact that J.D. was assigned the highest level of observation.

The patients were not separated from J.D., but rather they were obliged to pass only six inches from his doorway. Even if the SHTAs were, as Vazquez testified, an arm's length and twelve inches from J.D., they were instead required to be in "close proximity" to J.D. so as to mitigate the risk of injury to other patients, including claimant. Rather, as Parker testified, the SHTAs could not have stopped J.D. from assaulting claimant from the place where they were seated. This constitutes a violation of Mid-Hudson's own policies and manual and amounts to a violation of the State's duty to use reasonable care to protect claimant from a foreseeable assault by J.D.

The Court will not go so far as to find that clinicians at Mid-Hudson should have ordered seclusion for J.D. instead of two-to-one supervision. The parties did not address this issue in any depth or cite to relevant case law. Moreover, claimant did not produce expert testimony on this issue. Suffice it to say, the State's actions and omissions fell short of the hospital's own policies and manual and did not provide claimant with the protection to which he was entitled. Additionally, the State's arguments based on the tight dimensions of the hallway, the lack of other single-man rooms, and J.D.'s mental-health needs do not excuse the State's failure to protect claimant.

Finally, the evidence establishes that the State's violation of its duty was the proximate cause of his injuries. " 'To carry the burden of proving a prima facie case, [a] plaintiff

Claim No.  124849                                                                                      **Page 12**

must generally show that the defendant's negligence was a substantial cause of the events which produced the injury' " (<u>Santaiti v Town of Ramapo</u>, 162 AD3d 921, 926 [2d Dept 2018], quoting <u>Derdiarian v Felix Contr. Corp.</u>, 51 NY2d 308, 315 [1980]). Here, the State failed to separate J.D. from claimant and other patients and violated its own policies and manual by failing to properly implement the ordered two-to-one supervision. The Court finds that this failure was the proximate cause of claimant's injuries stemming from the assault at the hands of J.D.

Upon consideration of all the evidence presented at trial, including listening to the witnesses testify and observing their demeanor as they did so, the Court finds that claimant established by a preponderance of the credible evidence that the State is 100% liable.

Accordingly, the State's motions to dismiss made at the close of claimant's case and made at the conclusion of trial are now DENIED. All other motions and objections not ruled upon are DENIED. A trial on the issue of damages will be scheduled as soon as is practicable.

LET INTERLOCUTORY JUDGMENT BE ENTERED.

Consistent with the new policy of the Unified Court System, the parties are encouraged to consider alternative dispute resolution for the ascertainment of damages.

**White Plains, New York**
**March 21, 2022**

_____

**WALTER RIVERA**
**Judge of the Court of Claims**



**NEW YORK**
STATE OF
OPPORTUNITY.

# Office of Temporary
# and Disability Assistance

ANDREW M. CUOMO
Governor

SAMUEL D. ROBERTS
Commissioner

MICHAEL PERRIN
Executive Deputy Commissioner

July 21, 2016

Mr. Towaki Komatsu
1 Penn Plaza, Ste. 621
New York, New York 10119

Subject: Komatsu, Towaki FH#7316477K

Dear Mr. Komatsu:

Please accept this response to your letter, dated July 6, 2016, concerning a fair hearing you attended at 14 Boerum Place on July 5, 2016. In your letter, you contend that Administrative Law Judge Roberts and Ms. Fernandez, the representative from HRA, failed to give you an opportunity to provide complete answers to questions regarding payment of your storage fees at the hearing. You further contend that Administrative Law Judge Roberts asked you the same question multiple times, indicating that she was not paying proper attention to the answers you provided to her questions. Administrative Law Judge Roberts ended your hearing and entered a default. You argue that you were denied an opportunity to be heard in violation of your due process rights at a fair hearing.

A review of the recording of the hearing shows that Administrative Law Judge Roberts asked you multiple questions to elicit necessary factual information from you about your request for storage fees in order for her to properly review the issue for the hearing. The recording does show at one point a contentious exchange between you and Administrative Law Judge Roberts regarding the conduct of the hearing. However following this exchange, you made an effort to answer the question she asked concerning when you applied for storage fees but then the hearing concluded.

Based on a review of the entire record of the hearing, together with your letter, your hearing should be re-opened, pursuant to 18 NYCRR 358-6.6(b). You will be afforded another opportunity to provide testimony and documentary evidence regarding the issue of payment and/or reimbursement for storage fees.

The reopened fair hearing (FH#7316477K) will be scheduled on the next appropriate fair hearing calendar prepared for New York City. Confirming notification of the date and location will be forwarded to all parties under separate cover.

Thank you.

Sincerely,

Samuel L. Spitzberg
Director Office of Administrative Hearings

cc:  Ann Marie Scalia, Esq. NYC-HRA Office of Legal Affairs
     Nicola Aaronson, Esq. NYC-HRA Office of Legal Affairs
     Nigel Marks, Assistant Director
     James Dalton, Principal Hearing Officer
     Akinwale Akinrefon, Supervising Hearing Officer
     Diane Roberts, Hearing Officer
     James W. Ryan, III, Supervising Hearing Officer